FELDMAN'S MEDICAL CENTER
PHARMACY, INC. and PHARMACY
MANAGEMENT ASSOCIATES, LLC,

          Plaintiffs,

v.

CAREFIRST, INC.,
1501 South Clinton Street
Baltimore, Maryland  21224

INDEPENDENCE BLUE CROSS,
1901 Market Street
Philadelphia, Pennsylvania  19103

QCC INSURANCE COMPANY,
1333 Chestnut Street
Philadelphia, Pennsylvania 19107

THE BLUE CROSS BLUE SHIELD
ASSOCIATION,
7004 Security Boulevard
Baltimore, Maryland  21207

and JOHN DOES 1-10,

          Defendants,

IN THE

CIRCUIT COURT FOR

BALTIMORE CITY

Civil Action No. 24-C-11-008977

JURY TRIAL DEMANDED

---

## FIRST AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, as and for their First Amended Complaint,

allege:

        Plaintiffs Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and

Pharmacy Management Associates, LLC ("PMA" and, together with Feldman's,

"Plaintiffs") bring this action to seek redress for the deliberate, concerted and

abusive actions of Defendants CareFirst, Inc. ("CareFirst"), Independence Blue Cross ("Independence"), QCC Insurance Company ("QCC"), John Does 1-10, and the Blue Cross and Blue Shield Association (the "BCBSA"), which have resulted in the destruction of Feldman's once-thriving retail pharmacy and business of providing life-saving medicine to individuals suffering from hemophilia, and caused PMA to sell Feldman's operating assets at a fire-sale price.  Defendants put profits and executive compensation above their responsibility to their insureds and vendors and participated in a scheme to: (a) drive Feldman's out of business, (b) direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, (c) purge hemophiliacs from the rosters of their insureds and push Feldman's hemophilia patients to government programs such as Medicare and Medicaid, and/or (d) steer Feldman's hemophilia patients to large pharmacies and pharmacy benefit managers from whom Defendants receive a financial benefit or in whom Defendants have a financial interest.  Under the guise of a completely bogus and never-ending "investigation," Defendants worked hard and steadily to defame Feldman's, to violate applicable laws pertinent to their dealings with Feldman's, to defraud Feldman's, and to interfere in Feldman's business with the ultimate purpose of destroying Feldman's ability to supply "high value" and very expensive medicines to Feldman's patients.  Because it was focused on "loss savings," i.e. not paying claims, CareFirst wrecked Feldman's business and PMA's investment therein.

2

As a result of Defendants' purposeful and unjustified actions, Feldman's accounts receivable grew to nearly $4 million, forcing Feldman's to default on its bank loans. On information and belief, CareFirst, Independence, QCC and the BCBSA knew or should have known that Feldman's accounts receivable were growing and were untenable for a company of Feldman's size. CareFirst had audited Feldman's in the past and knew that mounting accounts receivable would lead to the destruction of Feldman's. Feldman's serious financial hardship and ultimate default caused by Defendants' actions set in motion a chain of events that forced Feldman's out of the business of providing life-saving medicine to chronically-ill hemophiliacs and forced PMA to sell its interest in Feldman's.

## PARTIES

1.     Feldman's is a Maryland corporation, with its principal place of business located at 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201. Until the events complained of herein, Feldman's had a highly profitable and thriving business that included the dispensing of Factor drugs to hemophiliacs.

2.     Pharmacy Management Associates, LLC is a Maryland limited liability company, with its principal place of business located at 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201. Until the events complained of herein, PMA owned and profitably operated all aspects of Feldman's and had no intention whatsoever of diminishing or liquidating its investment in Feldman's. PMA is a wholly-owned subsidiary of Factor Health Management, LLC.

3

3.    Defendant CareFirst, Inc. is a Maryland corporation with its principal office located at 1501 South Clinton Street, Baltimore, Maryland 21224.

4.    Defendant BCBSA is a national federation of 39 independent, community-based and locally operated Blue Cross and Blue Shield companies and an Illinois corporation that has its national headquarters at 225 North Michigan Avenue, Chicago, Illinois 60601. BCBSA also maintains an office in Maryland at 7004 Security Boulevard, Baltimore, Maryland 21207 and in Washington D.C. at 1310 G Street, N.W., Washington, D.C. 20005. BCBSA does business in the State of Maryland directly, and indirectly through its licensees.

5.    Defendant Independence Blue Cross is a Pennsylvania non-profit corporation and health insurer in southeastern Pennsylvania with its principal place of business located at 1901 Market Street, Philadelphia, Pennsylvania 19103. On information and belief, Independence operates under a license from the BCBSA.

6.    On information and belief, defendant QCC Insurance Company is a Pennsylvania corporation with its principal place of business located at 1333 Chestnut Street, Philadelphia, Pennsylvania 19107. On information and belief, QCC is a wholly-owned subsidiary of AmeriHealth, Inc. which in turn is a wholly-owned subsidiary of Independence. According to information obtained from the Independence website (www.ibx.com), insurance benefits offered through Independence are underwritten or administered by QCC, and both QCC and Independence operate under licenses from the BCBSA. QCC knew that if it did not promptly pay good and valid claims for reimbursements submitted by Feldman's for

4

Factor — given the enormous cost of the Factor — that Feldman's business would be severely impaired or destroyed.

7.     On information and belief, John Does 1 – 10 are individuals or entities who conspired with CareFirst, Independence, and the BCBSA to drive Feldman's out of business, to purge hemophiliacs from the rosters of their insureds and to push the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees.  In the event they were unable to achieve the primary objectives of the conspiracy, on information and belief, John Does 1 – 10 conspired with CareFirst, Independence, and BCBSA to drive the very profitable business of providing medication to hemophilia patients from Feldman's to pharmacy benefit managers or large chain pharmacies in exchange for some form of compensation paid to John Does 1 – 10, to CareFirst, to Independence, or to each of CareFirst, Independence, and John Does 1 - 10.

8.     The true names and identities of John Does 1 - 10 are currently unknown to Plaintiffs. If necessary, Plaintiffs will seek leave of the Court to amend the First Amended Complaint to state the true names and identities of John Does 1 – 10 when this information is ascertained through discovery in this action.

## JURISDICTION

9.     Jurisdiction is appropriate in this Court pursuant to §§ 6-102, 6-103, and 6-201 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, because (i) CareFirst resides in, and maintains its principal place

of business in, Baltimore City, (ii) BCBSA transacts business in Maryland, performs services in Maryland, and caused tortious injury in Maryland based on acts both inside and outside the State, and (iii) Independence and QCC transact business in Maryland, perform services in Maryland, and caused tortious injury in Maryland based on acts both inside and outside the State, and (iv) John Does 1 – 10 caused tortious injury in Maryland based on acts both inside and outside the State.

## BACKGROUND INFORMATION

A.    Background on Hemophilia

10.    Hemophilia is an hereditary genetic disorder that impairs the body's natural ability to control blood clotting.  Blood clotting is the mechanism used by the body to stop bleeding.  Hemophiliac patients therefore experience prolonged bleeding from the slightest wound, as well as painful internal bleeding without apparent cause.  As a result, hemophiliacs are literally in mortal danger any time they suffer a cut or a bruise.  There is no cure for hemophilia but it can be treated acutely and prophylactically.

11.    Internal bleeding – often spontaneous – is common in hemophiliacs, especially in their joints and their head, and in addition to the risk of death such internal bleeding often results in severe and permanent joint damage and disfigurement.

12.    Clotting Factors are proteins in the blood that help strengthen blood platelet plugs that form at the site of injury to a blood vessel.  Blood clotting is impaired in hemophiliacs because their bodies do not produce sufficient blood

6

clotting Factor to clot their blood.  In a "normal" person's body, the blood's normal clotting Factor would stop the bleeding in short order.  However, for a hemophiliac, the deficiency of natural blood clotting Factor means that a scab will form at the site of the wound, but the clot cannot be maintained.  The result is bleeds that can last for days and weeks, and can ultimately be fatal.  For these individuals, an injection of the deficient clotting Factor is necessary so that the patient does not "bleed out" and die.

13.    Prior to 1993, the typical treatment for hemophilia was an infusion of replacement clotting Factor that was derived from human blood plasma that had been donated to a blood bank.  In the 1980s and 1990s, much of the blood supply in the United States became tainted with blood infected with hepatitis and/or the HIV virus.  Out of approximately 22,000 hemophiliacs in the United States at the time, approximately 6,000 to 10,000 became infected with HIV as a result of this contamination of the blood bank supply.  The most famous instance of HIV infection of a hemophilia patient was Ryan White, a 12 year old boy who became infected through blood products used to clot his bleeds, who died of AIDS in 1990.  Many hemophiliacs also became infected with hepatitis.  As a result of the mass infection of hemophiliacs with HIV and hepatitis, the hemophilia community became extremely mistrustful of "outsiders," or those without a personal experience with hemophilia, and sought out pharmacies and other service providers with experience with the hemophilia community.

14.     In response to the tragic circumstances of a vulnerable population of hemophiliacs contracting incurable viral illnesses, pharmaceutical companies developed recombinant, or synthetic, products that replace the missing clotting Factor in a hemophiliac patient without subjecting that patient to the risks and diseases inherent in the human blood supply.    For example, ADVATE, Antihemophilic Factor (Recombinant) (Plasma/Albumin Free), is administered directly into the bloodstream by simple injection and works by temporarily raising the level of Factor VIII in the blood, thus allowing the body's blood clotting process to function properly.   Such synthetic drugs are very expensive – costing in the tens of thousands of dollars a month – due to the length of time it takes to manufacture the drugs, the small number of hemophilia patients in the United States, and the frequency of the required injection treatments.

15.     The Factor medicine is administered by self-injection.   After a minimal amount of training, the patient or the patient's family member(s) can administer the injection without the presence of a nurse or other medical professional.

16.     With proper care and access to medication, hemophiliacs can and do live productive lives.   But without such care or medication, hemophilia is debilitating and ultimately fatal.

17.     For example, prior to the development of effective treatments in the 1960s, the average life expectancy for a hemophiliac was only 11 years.   By the 1980s, the average life expectancy for a hemophiliac receiving Factor

8

replacement treatment derived from human blood was 50–60 years.  Today, with proper treatment with synthetic Factor drugs, hemophiliacs have life expectancies equal to the average life expectancies of non-hemophiliacs.

18.     Since the 1980s, the primary cause of death among hemophiliacs is no longer bleeds, but rather complications from HIV/AIDS acquired through treatment with contaminated blood products.  The second leading cause of death for hemophiliacs is intracranial hemorrhage, or bleeding in the skull, which today accounts for one-third of all deaths of patients suffering from hemophilia.

19.     Many hemophiliacs can inject themselves with the Factor medicine after they suffer a bleed and they will recover in due course.  But for many others, they must treat themselves prophylactically pursuant with regular infusions of the Factor medicine in order to keep clotting levels sufficiently high to prevent spontaneous bleeding episodes.

20.     Although prophylactic treatment with Factor medicine can cost tens of thousands of dollars each month and more than acute treatment with Factor medicine, in 2007 the New England Journal of Medicine published a study that showed the overwhelming effectiveness of prophylactic treatment compared to on-demand treatment.

21.     As a result of the study, the United States Food and Drug Administration ("FDA") approved Factor medicine for prophylactic use.

22.     The FDA has approved for prophylactic use clotting Factor replacement drugs that replace Factor VIII.  Factor VIII refers to the particular

protein that is deficient in some hemophiliacs.    Other hemophiliacs suffer

deficiencies in other proteins, but 80 percent of hemophilia cases involve Factor

VIII deficiencies.

23.    Prophylactic use of Factor drugs also reduces the frequency and

length of hospital visits and stays for hemophilia patients.

24.    Each person who suffers from hemophilia is different and there

is no way to tell the proper course of treatment or dosage for a hemophilia patient

other than through trial and error by an experienced physician.

25.    Proper dosage depends on the weight and size of the patient,

the severity of the Factor VIII deficiency, the location and extent of the bleeding,

and the patient's clinical condition.    Package inserts for recombinant (i.e.,

synthetic) Factor medicine contain recommended dosage levels, but these are just

back-of-the-envelope calculations that do not take into account the particular needs

of individual patients.  Therefore, the package insert for ADVATE warns:

> The dose and frequency of administration should be based on
> the individual clinical response. Patients may vary in their
> pharmacokinetic (e.g. half-life, *in vivo* recovery) and clinical
> responses to ADVATE. Although you can estimate the dose by
> the calculations above, it is highly recommended that, whenever
> possible, appropriate laboratory tests including serial Factor VIII
> activity assays be performed.

26.    The appropriate dosage for any particular patient may, and

often does, change throughout the patient's lifetime.    This is so because the

amount of factor product a patient uses depends on such patient's size and weight,

as well as the type of factor deficiency such patient suffers from and whether such

patient has an inhibitor (i.e., a condition which required a different type of factor product be dispensed to the patient). For instance, as a child with hemophilia grows and gains weight, the appropriate dosage of Factor medicine to treat that child will increase.

27.     Due to the relative rarity of hemophilia, the expense of the synthetic clotting Factor medicine, and the medicine's limited shelf life, most pharmacies do not stock Factor medicine.

28.     Hemophiliacs must either relocate with their families to the vicinity of a hemophilia treatment center – often located hundreds or thousands of miles from their home – or make their own arrangements to obtain Factor medicine as needed.

29.     Due to the critical importance of obtaining this drug and keeping sufficient quantities on hand, and the mistrust many in the hemophilia community have toward those outside of the hemophilia community, people with hemophilia generally seek out independent "specialty" pharmacies that have experience with the unique needs of the hemophilia community and who have earned the trust of the hemophilia community.

30.     On information and belief, the large chain pharmacies and pharmacy benefits managers that are preferred by the insurance companies over smaller, independent pharmacies, do not provide a personal level of service like the independent specialty pharmacies do, and do not have the trust of the community. The large chain pharmacies and pharmacy benefits managers do, however, have

11

much greater financial resources than the smaller, independent pharmacies, and, on information and belief, are willing to use those resources to undercut the independent pharmacies' pricing – even though the insurer sets the maximum prices it will pay for any particular dispensed drug – and offer financial incentives – i.e., "discounts" or "kickbacks" – to the insurers for steering business to the chain pharmacies and pharmacy benefits managers.

**B.    Background on Pharmacy Industry**

31.    There are more than 56,000 community pharmacies, including traditional chain pharmacies, food and pharmacy combinations, mass merchandise pharmacies and independent pharmacies, including "niche" pharmacies, providing ambulatory prescriptions to patients across the United States.

32.    "Specialty" drugs are prescription medications for complex conditions that require special handling, administration, or monitoring. Not only are the drugs for these conditions high in cost, they can be high maintenance, meaning that they require specialized delivery and administration on an ongoing basis.

33.    Not all community pharmacies will dispense specialty drugs.

34.    These products tend to present challenges of inventory, product knowledge, administration tools and delivery.  The challenges inherent in dealing with specialty drugs are exacerbated when dealing with a small community of critically-ill patients, like the hemophilia community, who require regular and emergency deliveries of Factor medicine.

35.     Independent pharmacies, such as Feldman's, have traditionally become successful businesses by serving these niche specialty markets.

36.     In fact, prior to March 2009 when Feldman's was forced out of the business of dispensing Factor medicine to hemophiliacs, Feldman's was extremely profitable, with revenue growing to approximately $3.7 million and gross profit of nearly $1 million.

37.     But for the wrongdoing complained of herein, PMA would never have sold Feldman's and would have for many years reaped growing profits from its investment in Feldman's.

38.     National chain pharmacies such as CVS Caremark and Walgreen sometimes offer specialty drugs through their mail order services, but not usually through their local pharmacies.   They are also generally large and impersonal businesses, and have not built the trust required to effectively service the hemophilia community.

39.     Each of the five largest pharmacy benefit managers ("PBMs") – Medco Health Solutions, Inc. ("Medco"), CVS Caremark Corp. ("CVS"), Express Scripts, Inc. ("Express Scripts"), Prescription Solutions Inc. and Catalyst Rx – operates its own mail order pharmacies to fill prescriptions directly.

40.     However, the PBMs also have not shown an inclination to build the trust, and provide the personal level of service, demanded by the small community of patients suffering from hemophilia.

13

41.   PBMs are contracted by health insurance companies to act as third party administrators of the insurers' prescription drug programs, with responsibility for processing and paying prescription drug claims.

42.   Typically, the PBM's role includes oversight over independent pharmacies that dispense medicine to an insurer's insureds, including the power to investigate and audit providers on the PBM's own initiative or at the request of a health insurer.

43.   In other words, health insurers often outsource everything related to prescription drugs and pharmacy to PBMs, who administer and process prescription drug claims, as well as investigate and audit providers on their own initiative or at the request of their health insurer clients.

44.   In addition to administering the claims submitted by independent pharmacies, the PBMs aligned with CareFirst and Independence manage all aspects of a prescription drug benefit plan, including creating formularies of preferred medicines, negotiating with drug manufacturers for discounts and rebates, negotiating with pharmacies to establish retail networks for dispensing drugs, and establishing automated processes for determining (often called "adjudicating") coverage eligibility at the point of sale.

45.   PBMs therefore, on the one hand, directly compete with independent pharmacies by owning and operating their own retail and mail order pharmacies and, on the other hand, play a role in the adjudication of claims and the

investigation of pharmacies by health insurers, including the investigation of the very pharmacies with whom the PBMs compete.

46.   PBM, chain and independent pharmacies offering specialty medications through delivery and mail service are required to operate under the same board of pharmacy regulations that govern conventional medication dispensing in the state in which the pharmacy is physically located.

47.   Pharmacies have pharmacy licenses issued by the state that governs the scope of their operations.

48.   State boards of pharmacy set regulations and parameters within which pharmacists practice.   The boards monitor compliance with pharmacy standards so the pharmacists clearly understand what is expected of them.

49.   Under Maryland law, patients are free to use the licensed pharmacy of their choosing.

50.   Nevertheless, on information and belief CareFirst and Independence tried to push Feldman's patients to abandon Feldman's and get their Factor medicine from PBMs and chain pharmacies such as CVS Caremark and ICORE Healthcare, even though the patients were satisfied with the services they received from Feldman's, and wary of the limited customer service offered by the PBMs and chain pharmacies.

## C.   Background on Feldman's

51.   Feldman's Medical Center Pharmacy, Inc., along with its sister company Feldman's Pharmacy at Chartwell, LLC, (together, "Feldman's") are wholly-owned subsidiaries of PMA.

52.   Feldman's is a retail pharmacy serving principally the Baltimore – Washington, D.C. metropolitan area and, during the time it was owned by PMA, was increasingly focused on providing specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease, hepatitis and HIV.

53.   At all times that Feldman's was operated by PMA, Feldman's was nationally accredited by The Joint Commission, formerly the Joint Commission on Accreditation of Healthcare Organizations.   At all relevant times Feldman's was also properly licensed by the Board of Pharmacy of the State of Maryland.

54.   At all times relevant hereto, Feldman's was a pharmacy that dispensed and delivered life-saving medicine to patients suffering from hemophilia.

55.   Defendants' purposeful and malicious actions caused Feldman's severe financial difficulties which led to Feldman's defaulting on its bank loans and ultimately forced Feldman's out of business.   In December 2009 PMA was forced to sell all of Feldman's assets, excluding receivables which were retained by Feldman's.

56.   After the crisis of the 1980s and 1990s, when 6,000 to 10,000 hemophiliacs (estimates vary) – out of a total population of approximately

22,000 people – were infected with HIV and other incurable viral diseases transmitted through the tainted blood supply, blood Factor was in short supply.

57.   In addition, hemophiliacs and their families became extremely distrustful of the medical and pharmaceutical communities, including government regulators, who failed to protect the hemophilia community from tainted blood products.

58.   In fact, the hemophilia community became, and still is today, distrustful of anyone who does not have hemophilia, or does not at least have a family member who suffers from hemophilia.

59.   Of equal weight to their sense of distrust, hemophiliacs constantly live with the risk that they may not be able to get adequate supplies of factor dispensed and delivered within a narrow time frame in the event of a catastrophic bleed.  As mentioned previously, PMA's acquisition of Feldman's was to ensure that the patients it served would be able to receive their necessary factor products within a six hour time frame.

60.   In October 2007, PMA, a special purpose company, purchased Feldman's from its founder, Les Feldman, with a plan to expand Feldman's from a small, independent pharmacy into a leading provider of specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease (a bleeding disorder more common, and typically less severe than, hemophilia, that affects both men and women), hepatitis C, and HIV.

61.    PMA bought Feldman's from its founder in October 2007 in order to better serve patients who suffered from "specialty" diseases.

62.    PMA planned to grow the newly-acquired Feldman's business by using it as a platform to (i) expand and diversify Feldman's existing business, (ii) add additional pharmacies, giving Feldman's a local presence in its patients' geographic areas, and (iii) offer additional specialized products and services to patients suffering from other specialty disease states, including but not limited to von Willebrand disease, hepatitis and HIV.

63.    PMA acquired Feldman's in order to better service what was, and continues to be, an existing and growing market of hemophiliac patients.  In furtherance of the legitimate business purpose of both PMA and its parent company, Factor Health Management, LLC, PMA acquired Feldman's in order to ensure that Feldman's proximity to its patients was within a six hour delivery radius, which improved the services rendered to and received by its hemophiliac patients as well as allowed for cost savings in the form of volume discounts provided by the manufacturers of blood factor products used by hemophiliacs.

64.    Profit margins for drugs used to treat specialty disease states are greater than those for drugs used to treat common ailments.

65.    Reimbursement rates for the Factor drugs that are referred to in this complaint were always set by CareFirst and/or Independence.

66.    Feldman's quickly became one of the leading providers of medicine and supplies for hemophiliacs in certain regions of the United States and

spent significant amounts of money building a business that catered to the unique needs of the vulnerable hemophilia community.

67.   Feldman's was sensitive to the needs of hemophilia patients and their families, and worked hard to earn the trust of a community that was very mistrustful of outsiders.

68.   Feldman's did this, in part, by not just focusing on profits but on people; Feldman's worked with other concerned entities that focused on education and advocacy for the hemophilia community.  On information and belief, few other specialty pharmacies, and certainly not the big pharmacy chains and pharmacy benefit managers, had this depth of focus.

69.   Feldman's had a relationship with CareFirst and its predecessors that went back to Feldman's inception in the 1970s.  From Feldman's inception until approximately 2008, Feldman's regularly submitted claims to, and was reimbursed by, CareFirst and its predecessors, for drugs including many injectible medicines and high dollar value medicines.

70.   As with all other drugs, the reimbursement rates Feldman's was paid for Factor drugs was set unilaterally by CareFirst and/or Independence.

71.   After PMA acquired Feldman's, however, everything changed. As Feldman's raised its profile as a trusted partner of the hemophilia community, its business grew substantially in a short period of time.  That growth, however, put Feldman's on CareFirst's and the BCBSA's radar as a company that dispensed large amounts of Factor drugs to hemophilia patients.

72.     Independence became aware of Feldman's when Feldman's submitted claims to CareFirst – pursuant to the BlueCard System – for patients insured by Independence.

73.     CareFirst, Independence, and the BCBSA then focused on ways to remove those patients from the insurance rolls of CareFirst, Independence, and the other BCBSA licensees.

74.     By March 2009, when Feldman's began to wind down its business as a result of Defendants' conspiracy, Feldman's had revenues of approximately $3.7 million and gross profit of nearly $1 million.

75.     PMA had no intention of selling Feldman's until forced to do so by the wrongdoing complained of herein.

D.     **Background on CareFirst**

76.     CareFirst is, by a wide margin, the dominant health insurance company in Maryland.  CareFirst has an exclusive license from the BCBSA to use the "Blue Cross" and "Blue Shield" names and logos in Maryland, as well as in Northern Virginia, Washington, D.C., and parts of West Virginia and North Carolina. Along with its affiliates CareFirst of Maryland, Inc. ("CFMI") and Group Hospitalization and Medical Services, Inc. ("GHMSI"), CareFirst does business as CareFirst BlueCross BlueShield.

77.     As a licensee of the BCBSA, CareFirst directly and/or through its subsidiaries provides commercial and other health insurance products to 3.3 million people out of a total potential market of 6.3 million people in Maryland,

Northern Virginia, West Virginia, North Carolina, and Washington, D.C.   This represents 43 percent of an otherwise fractured market; the next largest competitor has 15 percent of the market.

78.   For fiscal year 2009, CareFirst had $6.8 billion of revenue and $96.8 million of net income.  CareFirst has approximately $3.7 billion in assets.

79.   CareFirst was incorporated as a non-profit corporation on January 16, 1998, the result of a merger between GHMSI and CFMI.

80.   GHMSI operates under a federal charter issued in 1939 that requires GHMSI "to be a charitable and benevolent institution" and "conducted for the benefit of [policyholders]."

81.   CFMI is also organized as a non-profit entity.

i.   **CareFirst Abuses its Non-Profit Status**

82.   Despite the non-profit status of the various CareFirst entities, the Insurance Commissioner for the State of Maryland has stated that CareFirst "strayed significantly from its nonprofit mission" and "assumed all the operating characteristics and corporate goals and mission of a for-profit company."

83.   For years, CareFirst has had a reputation for abusing its non-profit status and neglecting its obligations to its insureds and other stakeholders in order to provide excessive compensation, benefits and perks to its senior executives.

84.   One key program CareFirst devised to accomplish this was labeled "loss savings," a cover for holding up or denying payment for any baseless, bogus or suspect reason or reasons that CareFirst could concoct.

85.   In the 1980s and 1990s, according to the peer reviewed journal Health Affairs, CareFirst's predecessor companies in Maryland and the District of Columbia

> were poster children of nonprofit corruption and incompetence, squandering their assets on ego-building but money-losing diversification initiatives and on lavish executive lifestyles that devoted more days per year to jetting around the globe than to paying insurance claims back home.
>
> * * *
>
> The chief executive officer (CEO) of the D.C. Blues managed to spend 202 days in one year on the road, running up half a million dollars in direct travel expenses alone, while his senior vice president toured resorts worldwide to ascertain their suitability for subsequent corporate gatherings. The Blues rented skyboxes at the Orioles baseball stadium, hosted parties at horse-racing events, flew dozens of managers to the winter and summer Olympics, and spent $44,000 per year on golf balls and greens fees. Because these were nonprofit organizations, managerial stock options were not a possibility, but the insurers paid their executives salaries commensurate with those of investor-owned corporations, engineered financial accounts to facilitate inflated pension and expense-account contributions, and engaged in loss-generating contracts with firms controlled by executives and their families.

A copy of the *Health Affairs* article, "For-Profit Non-Conversion And Regulatory Firestorm At CareFirst BlueCross BlueShield" is attached hereto as Exhibit A.

86.   In or about 1993, a new CEO was installed at CareFirst and new regulations were passed by the State of Maryland to curb CareFirst's abuses.

22

87.   On information and belief, the for-profit culture at CareFirst remained in place, as it still does today.

88.   Eager to get out from under the newly-tightened controls imposed by the Maryland legislature, in 1998 GHMSI and CFMI merged and formed CareFirst, Inc. as a holding company for GHMSI (the D.C.-based insurer) and CFMI (the Maryland-based insurer).   As part of the reorganization, some of CFMI's operations were removed from the jurisdiction of the Maryland insurance commissioner to the lighter touch of the D.C. regulator.

ii.   **CareFirst Puts "Profits" Over Patients**

89.   A few years later, in 2001, CareFirst attempted to become a for-profit company, and entered into merger negotiations with two for-profit insurance behemoths, Trigon, the then-BCBSA licensee in Virginia, and Wellpoint, the BCBSA licensee in California.

90.   In later testimony under oath in a hearing before the Maryland Insurance Administration (the "MIA"), Trigon executives testified that the financial bonuses demanded by CareFirst executives – reported to be in excess of $120 million, of which $40 million, on information and belief, was slated for CareFirst's CEO – were "greedy, stupid, and illegal."

91.   Trigon further testified that it was willing to significantly raise its offer for CareFirst and informed CareFirst's executives of that fact, but that the CareFirst executives were only interested in bonuses and post-merger retention commitments and did not negotiate the highest possible price for the company.

23

92.   Wellpoint was the winning bidder for CareFirst.  Its CEO, also in testimony before the MIA, asserted that CareFirst's executives made it clear that without payment of large bonuses to CareFirst's executives, there would be no deal to purchase CareFirst.

93.   According to a Report issued by the Maryland Insurance Administration in March 2003, a copy of which can be found at http://www.mdinsurance.state.md.us/sa/documents/FinalMIAReport-CareFirst3-5-03.pdf and is incorporated herein by reference, Wellpoint's CEO testified that "it was only through the agreement to pay the executive bonuses that would [sic] Wellpoint be granted the privilege of purchasing CareFirst."  Report of the MIA at p. 133.  In other words, according to the MIA's Report, the CareFirst Board viewed the financial interests of the executives as more important than the interests of the company, the Maryland taxpayers, and the patients insured by CareFirst.

94.   Estimates of the tax benefits that accrue to CareFirst from its non-profit status range from $12 – 21 million per year in Maryland alone.  In exchange, CareFirst has an obligation to act in an ethical manner, serving the community that subsidizes its activities.  Yet CareFirst's executives sought to convert the subsidy provided to them by the taxpayers of Maryland into massive bonus payments for themselves in the sale of the company.

95.   The MIA denied CareFirst's petition to convert to a for profit entity, accusing CareFirst's Board and executives of violating their fiduciary obligations to the company.

24

96.    Despite this colossal failure, CareFirst's CEO earned $16.5 million from 2001 to 2006, plus an additional $1.6 million in deferred compensation.   Upon the CEO's retirement in 2006 in the wake of the stinging 2003 rebuke by the MIA, the CEO was awarded nearly $18 million in severance payments by CareFirst's Board.

97.    The for-profit culture at CareFirst continues today.   On information and belief, CareFirst routinely seeks additional "profits" – or, to use CareFirst's preferred nomenclature, to avoid "exposure" – by denying claims for benefits submitted by patients and practitioners, including claims submitted by Feldman's.

98.    Feldman's claims for Factor medicines were undoubtedly very costly for CareFirst, and CareFirst sought to keep its "exposure" – i.e., the cost of the medicine necessary to keep its insureds alive – as low as possible and to drive its insureds' preferred pharmacy out of business.

99.    By this conduct, CareFirst acted in contravention of its mandate.

100.  As nonprofit health service plans, CareFirst, CFMI and GHMSI are mandated by their state and federal charters to act in the interest of the public and their insureds and provide affordable and accessible health insurance to their insureds.

### iii.   Other Litigation Between Feldman's and CareFirst and Independence

101.   In June 2009, Feldman's sued CareFirst in the Circuit Court for Baltimore County, Maryland for more than $1.5 million in unpaid claims for Factor medicine dispensed to patients insured by CareFirst, or for whom CareFirst acted as the "host plan" under the rules of the BlueCard system.

102.   On February 1, 2010, the case was removed by CareFirst to the United States District Court for the District of Maryland, Civil Action No. 1:10-cv-00254-WDQ.   In August 2010, CareFirst finally conceded its liability for the claims and began to pay the principal amount of the claims.   The litigation continues in the District Court regarding Feldman's entitlement to attorneys' fees.

103.   According to the BCBSA's website, "BlueCard is a national program that enables members of one Blue company to obtain healthcare services while traveling or living in another Blue company's service area. The program links participating healthcare providers with the independent Blue companies across the country and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement."

104.   The BCBSA licensee that insures the patient – typically the BCBSA licensee operating in the geographic region where the patient's primary residence or employer is located – is referred to as the "home plan" under the BlueCard Program.

105. The BCBSA licensee that is located in the geographic region where the healthcare provider is located – whether a doctor, or a pharmacist – is referred to as the "host plan" under the BlueCard Program. The "host plan" acts as administrator of a claim submitted by a provider and purportedly has the authority to block processing or payment of any claim.

106. But, in the interim, CareFirst—by the wrongdoing complained of herein—had managed to eliminate Feldman's from the specialty pharmacy business in CareFirst's geographic region.

107. Independence's role in the conspiracy cannot de discounted.

108. On or about June 2, 2008, Independence personnel contacted employees at Feldman's seeking information and documents.   Thereafter, Feldman's received no further communication nor did it get paid on the outstanding claims. Rather it was only in response to a demand letter to IBC sent by Feldman's counsel on February 12, 2009 that Independence advised Feldman's for the first time by letter dated February 13, 2009 that all claims submitted by Feldman's which involved shipments of Factor outside of Maryland were rejected based upon CareFirst's determination that Feldman's did not have the appropriate licensing.

109. Accordingly, based upon Independence's failure to pay Feldman's claims and additional claims of Independence's insureds, on September 9, 2009, Feldman's and FCS Pharmacy LLC ("FCS"), a company that shares the same ultimate equityholders as Feldman's, filed a complaint against Independence

27

and CareFirst in the Eastern District of Pennsylvania seeking payment of approximately $2.2 million in outstanding invoices.

110. On April 19, 2010, pursuant to a directive from the Court, the parties met in Philadelphia to discuss the outstanding claims.  At that meeting CareFirst and Independence pointed fingers at each other concerning the failure to pay alleging, in turn, that there was paperwork missing, that there had been processing errors on the part of Independence and CareFirst and that the failure to hold a valid license precluded the payment of the Feldman's claims.  There was no resolution of the claims at this meeting in light of the charade engaged in by both Independence and CareFirst.

111.  Thereafter, the Court ordered that the parties proceed to an administrative review of the claims at issue.

112.  After a first level appeal done on papers, Independence issued a determination continuing to deny all claims.  The parties then proceeded to a second level appeal.

113.  On October 14, 2010, at the in-person hearing of the appeal required by the Court, Independence presented no witnesses, testimony or argument.  CareFirst failed to attend the "hearing."  Notwithstanding this, for reasons that are still unknown to Feldman's on October 29, 2010 Independence issued a determination to pay the outstanding claims.  Despite this decision, the claims were not fully paid until February 13, 2011.

E.    **Background on the BCBSA**

114. Led by Calvin Sneed, a Senior Anti-Fraud Consultant for the BCBSA, the BCBSA spearheaded and coordinated with CareFirst and Independence a conspiracy to (a) drive Feldman's out of business, (b) direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, (c) purge hemophiliacs from the rosters of their insureds and push Feldman's hemophilia patients to government programs such as Medicare and Medicaid, and/or (d) steer Feldman's hemophilia patients to large pharmacies and pharmacy benefit managers from whom CareFirst and/or Independence receives a financial benefit or in whom CareFirst and/or Independence has a financial interest.

115. On information and belief, prior to joining the BCBSA, Sneed was employed as a Supervisory Special Agent with the Office of the Inspector General for the U.S. Department of Health and Human Services. For more than 26 years, Sneed was involved in a wide range of investigative activities on behalf of the federal government, including conducting health care fraud investigations.

116. On information and belief, as a result of Sneed's government investigation experience he knew the buzzwords and theories to promote in order to get the FDA, FBI, and other government investigatory agencies interested in a baseless investigation of Feldman's.

117. The 39 independent licensees of the BCBSA provide health insurance coverage to more than 100 million Americans, or approximately one-half of all Americans with private health insurance.

118. In addition, more than 90 percent of hospitals and 80 percent of physicians contract with BCBSA licensees – more than any other insurer. Individually and collectively, the BCBSA and its licensees possess significant market power in their respective geographic markets and across the United States.

## F.   Background on Independence

119. As a licensee of the BCBSA, Independence directly and/or through its subsidiaries provides commercial and other health insurance products to insureds primarily in eastern Pennsylvania, covering approximately 3.1 million people.

120. In 2010, Independence had revenue of $9.7 billion and profit of $211 million.

121. Independence conspired with CareFirst and the BCBSA to deny Feldman's payment for Factor drugs Feldman's dispensed to Independence's insureds, which payments Feldman's was entitled to by contract and law. Independence so conspired solely for the purpose of injuring Feldman's.

## FACTUAL ALLEGATIONS

122. Defendants, acting with a unity of purpose and a common design, intent and understanding, conspired to drive Feldman's out of business. As a result, Feldman's suffered serious financial hardship and eventually was indeed forced out of the business of providing life-saving medicine to chronically-ill hemophiliacs.

123. Aside from the damage caused to Feldman's, Defendants' conspiracy had a pernicious effect on competition in the market to provide hemophilia drugs in the State of Maryland, preventing CareFirst's insureds from doing business with their preferred pharmacy and preventing Feldman's from conducting (and growing) its lawfully-operated business.

124. Defendants accomplished all this without ever proving any wrongdoing, illegality, or breach of contract on the part of Feldman's.

125. In fact, an alphabet-soup of federal, state, and local law enforcement agencies investigated Feldman's based on allegations made by Defendants, yet on information and belief, all investigations regarding Feldman's were closed without any finding of material wrongdoing on the part of Feldman's. On information and belief, such agencies were intentionally misled by Defendants with regard to the information supplied to them by Defendants.

### The Conspiracy Against Feldman's

126. On information and belief, Defendants were involved in a number of conspiracies against Feldman's, including a conspiracy to drive Feldman's out of business, a conspiracy to purge hemophiliacs from the rosters of their insureds and push Feldman's patients to government-run Hemophilia Treatment Centers and programs such as Medicare and Medicaid, and a conspiracy to steer Feldman's patients to pharmacies that provided financial benefits to CareFirst and/or Independence and its affiliate QCC.

A.          The Conspiracy to Drive Feldman's Out of Business

127.  CareFirst is a non-profit company, but it consistently operated as a profit seeking entity, in order to enrich its executive "leadership." On information and belief, CareFirst employees were expected to limit CareFirst's "exposure" to expensive treatments or patients.

128.  When CareFirst became aware that Feldman's was submitting claims for relatively large numbers of hemophilia patients – i.e., that CareFirst had serious "exposure" to hemophilia patients – CareFirst became extremely concerned.

129.  CareFirst balked at paying the high cost of the Factor medicine and, along with its co-conspirators Independence, QCC, the BCBSA and John Does 1 – 10, engaged in a witch hunt to find reasons to deny payment to Feldman's, in an effort to drive Feldman's out of business and hemophilia patients to other insurance companies, to Medicaid or to federal-government funded Hemophilia Treatment Centers.

130.  At all times relevant hereto, it was CareFirst alone that set the rates at which Factor drugs were to be reimbursed.

131.  CareFirst's efforts as part of the conspiracy were coordinated by its Special Investigations Unit, primarily Jaime Hanson and Elizabeth Foreman, supervised by Andrea Cherenzia, along with CareFirst's pharmacy director, Winston Wong and took the form of an amateurish, but secret, "investigation" that had as its purpose the identification of any and all reasons – valid or not – to deny

Feldman's the reimbursements to which it was entitled by law and contract and which it needed to survive.

132.  The BCBSA's participation in the conspiracy was led by Calvin Sneed, who spearheaded and coordinated the conspiratorial "investigation" to (a) deny Feldman's the cash to which by contract and law it was entitled, thereby increasing Feldman's receivables to astronomical levels and causing Feldman's to default on its debt, (b) drive Feldman's out of business, (c) purge hemophiliacs from the rosters of their insureds and direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, and (d) steer hemophilia patients to PBMs and Hemophilia Treatment Centers and away from independent pharmacies that were not "preferred" by the conspirators.

133.  Independence and QCC participated in the conspiracy primarily through Independence's Senior Financial Investigator, Michael Ebner, who regularly met with, spoke to, and/or emailed with Jaime Hanson and Calvin Sneed.  Ebner was assisted by Christopher Deery, also a Senior Financial Investigator for Independence.

134.  Edward Litchko, head of Independence's Corporate and Financial Investigations Department, who, on information and belief, rarely became personally involved in investigations, was also personally involved in the efforts to deny Feldman's the cash to which by contract and law it was entitled.

135.  CareFirst and Independence worked hard to make sure that Feldman's could not operate as typical pharmacies operate in Maryland because

CareFirst and Independence did not want to bear the expense of insuring people who were seriously ill.

136. As part of their "investigation" of Feldman's, CareFirst, Independence, and the BCBSA came up with an ever-shifting set of completely bogus reasons for not paying Feldman's.

137. CareFirst at various times claimed that Feldman's was committing fraud by diverting Factor drugs to the purported "grey market," that the Factor replacement treatments lacked medical necessity, that Feldman's did not have a valid contract with CareFirst and that the claims paperwork was out of order.

138. Each one of these excuses was shown to be unequivocally wrong.

139. CareFirst finally settled on the excuse that Feldman's did not have a particular type of home health care license – a Residential Service Agency ("RSA") license – but it was ultimately conclusively proven that Feldman's did not need an RSA license.

140. Independence accepted CareFirst's false representations about Feldman's supposed lack of proper licensure and even filed legal papers repeating CareFirst's false and malicious statements.

141. Independence dispatched its own investigators, who although quickly establishing that Feldman's engaged in no wrongdoing of any type, worked

hard to intimidate Feldman's patients in an effort to cause them to question Feldman's bona fides so that they would discontinue their patronage of Feldman's.

142. Ultimately, Independence denied payment to Feldman's – or put a "hold" on Feldman's claims without ever denying the claims – based only on the representations made by CareFirst and the BCBSA and, on information, in total violation of Independence's standard operating procedures.

143. Even though CareFirst ultimately acknowledged that it had no valid reason to deny Feldman's claims, and even though CareFirst and Independence ultimately paid Feldman's outstanding claims – but not interest on such claims as required by Pennsylvania, Maryland, and/or federal law – the damage to Feldman's was already done.

144. By the time Feldman's was vindicated and the claims that had been unpaid for up to three years were finally paid, Feldman's had defaulted on its bank loans and was out of the Factor drug business. Feldman's had already moved its patients to other Factor providers.

145. PMA ultimately sold Feldman's assets at fire sale prices, losing current and future profits from an extremely lucrative line of business that PMA had spent significant time and money building.

i.  **CareFirst, Independence and the BCBSA**
    **Conspire to Limit Hemophilia "Exposure"**

146.  Almost immediately after PMA acquired Feldman's in October 2007, CareFirst became suspicious of Feldman's.

147.  On October 26, 2007, Calvin Sneed sent a memo to all BCBSA Licensee Anti-Fraud Unit Managers/Directors alerting them about a pharmacy named FCS Pharmacy ("FCS") and asking them to contact the BCBSA licensee in Louisiana with any information about any exposure to FCS.

148.  FCS and PMA share the same ultimate equityholders.

149.  On information and belief, at this point CareFirst began exploring the connections between FCS and Feldman's.

150.  After the 2007 Alert was sent, a "Factor VIII Strike Force" was formed by the BCBSA and the Special Investigation Units ("SIUs") of the BCBSA licensees, including CareFirst's SIU and Independence's Corporate and Financial Investigations Department ("CFID"), to coordinate their "investigations" into FCS and other pharmacies dispensing Factor medicine to hemophilia patients.

151.  On December 5, 2007, Jaime Hanson, an investigator for CareFirst, sent an email to Elizabeth (Betty) Foreman, another investigator for CareFirst, stating that CareFirst had some "serious exposure" to FCS that warrants investigation.

152.  On information and belief, it was the investigation of FCS that led CareFirst to investigate Feldman's.

153. CareFirst, in coordination with the BCBSA and Independence, sought and utilized illegitimate reasons to deny payment to independent providers of the Factor medicine the providers were dispensing. Notably, however, none of CareFirst, the BCBSA, or Independence contacted FCS or Feldman's or asked for any explanations or information prior to launching their investigation.

154. On February 6, 2008, Sneed of the BCBSA coordinated a conference call for medical directors of BCBSA licensees, including, on information and belief, CareFirst's medical director and Independence's medical director. In advance of the meeting, Sneed distributed a memorandum which asked, among other things, whether it was possible to establish coverage and/or payment restrictions on Factor drugs due to the high cost of such drugs.

155. On information and belief, CareFirst and the BCBSA were not actually interested in investigating a purported fraud; CareFirst simply did not want any "exposure" to claims for expensive Factor medicine and was willing to purge hemophiliacs from its rosters of insureds to reduce such "exposure."

156. On information and belief, a consultant working for a large PBM confirmed the real rationale for the bogus "investigation" when, on information and belief, he admitted that insurers do not want too many hemophilia patients on their insurance rolls.

157. On February 12, 2008, four months after PMA acquired Feldman's, Sneed sent out a request to all BCBSA licensees, seeking data relating to the amount of payments made to pharmacies dispensing Factor VIII. The data

request specifically excluded patients who received factor from large, national or institutional providers such as CVS/Caremark.

158.   On information and belief, CareFirst and the BCBSA targeted small, independent pharmacies because CareFirst and other BCBSA licensees received lucrative financial benefits from the large, national and institutional providers and therefore sought to drive hemophilia patients from the small, independent specialty pharmacies to the large national providers and PBMs.

159.   On information and belief, CareFirst had not found any evidence of any wrongdoing by Feldman's.

160.   On March 13, 2008, CareFirst's Pharmacy Director Wong wrote to Jaime Hanson, telling Ms. Hanson that they had not found any real problems with Feldman's business.

161.   Nevertheless, CareFirst and the BCBSA continued to "investigate" but were never able to find anything wrong.

162.   In April 2008, the National Health Care Antifraud Association held its annual Pharmacy Conference which, on information and belief, was attended by investigators for various health insurance companies.   At the conference, an FBI agent apparently made a presentation and requested that any of the participants dealing with hemophiliacs contact him. Jaime Hanson was there and contacted him.

163. On information and belief, the FBI was not impressed with the information they received from CareFirst regarding Feldman's and never pursued a formal investigation of Feldman's.

164. Nevertheless, on June 19, 2008 CareFirst officially opened its own investigation of Feldman's.

165. On information and belief, the massive and entirely bogus "investigation" of Feldman's and other independent pharmacies was triggered by a spike in claims for Factor drugs that resulted from Feldman's success at building relationships with patients in the hemophilia community.

166. CareFirst and the BCBSA, in searching for a way to save on the costs associated with covering expensive treatments for a small, chronically-ill community so that they could keep "profits" and executive compensation at the BCBSA licensees inflated, decided to destroy Feldman's and remove it as a provider of the Factor medicine, thereby forcing patients to get their medicine from PBMs and large chain pharmacies that offered better financial terms to CareFirst.

167. Under the scheme, even if CareFirst was ultimately required to pay the claims for Factor medicine, CareFirst would nevertheless be able to inflict severe financial damage on Feldman's and the other independent providers of the medicine.

168. These independent pharmacies and wholesalers, particularly Feldman's, could not survive dispensing millions of dollars in Factor medicine

without consistent, periodic reimbursement and with the uncertainty of ever getting reimbursed.

### ii.   CareFirst, Independence, and the BCBSA Focus on Feldman's

169. On June 26, 2008, Betty Foreman and Jaime Hanson conducted an on-site audit of Feldman's. At that time, a Feldman's employee provided Hanson and Foreman an in-depth description of Feldman's strategy to focus on specialty diseases, such as hemophilia.

170. Shortly after the audit, at which again no wrongdoing was discovered by CareFirst, on information and belief CareFirst put a "hold" on all claims submitted by Feldman's. The "hold" meant that no payments were permitted on such claims, even if the "home plan" – i.e., the BCBSA licensee that insured the patient – wished to make such payments.

171. On information and belief Independence, as the home plan for certain insureds, simply followed CareFirst's lead and put a "hold" on all Feldman's claims, or, in Independence's parlance, "flagged" the claims without conducting any independent review of the claims on behalf of its own insureds.

172. The "holds" placed by CareFirst and Independence were improper under both Maryland's and Pennsylvania's "prompt pay" laws.

173. Section 15-1005 of the Insurance Article of the Annotated Code of Maryland requires health insurers to pay, deny or dispute a claim for benefits within 30 days after receipt of a claim for reimbursement that is

accompanied by properly completed paperwork containing all reasonably necessary information.

174. Section 991.2166 of the Pennsylvania Quality Health Care Accountability and Protection Act, provides that "[a] licensed insurer or managed care plan shall pay a clean claim submitted by a health care provider within forty-five (45) days of receipt of the clean claim."

175. On information and belief, the BCBSA, CareFirst, and Independence violated their own internal procedures in placing the "hold" on Feldman's claims. According to the BCBSA's own BlueCard Claims Processing Manual, all clean claims are to be forwarded to home plans by host plans, even in cases of suspected fraud or abuse.

176. Clean claims are defined as claims for which the required documentation is provided with the claim.

177. On information and belief, some claims submitted by Feldman's to CareFirst were not forwarded to the relevant "home plan" by CareFirst. When CareFirst did forward a claim to the "home plan," CareFirst instructed the "home plan" not to pay the claim.

178. CareFirst informed Independence on numerous occasions that CareFirst was denying Feldman's claims for "improper licensure" or other fabricated reasons.

179. Independence understood CareFirst's implicit message – that Independence was to deny, or "hold," claims for similar reasons.

180. Independence followed CareFirst's lead and did not pay Feldman's claims, for no reason other than CareFirst's made unfounded – and unconfirmed by Independence – allegations against Feldman's.

181. On information and belief, Independence continued this approach even after it – and CareFirst – had determined that they had not a single legitimate basis upon which to deny Feldman's reimbursements for the drugs that Feldman's supplied to the insureds of Independence and CareFirst.

182. On October 29, 2008, representatives of CareFirst and Independence, as well as Calvin Sneed of the BCBSA, attended a meeting of the Strike Force at the offices of Highmark Blue Cross in Camp Hill, Pennsylvania.

183. On information and belief, Feldman's was one of the main topics of discussion.

184. At the Camp Hill meeting, on information and belief, CareFirst, Independence, and the BCBSA developed the "theories" that would be used to deny, or place "holds" on, claims submitted by Feldman's.

185. On information and belief, at the Camp Hill meeting and at numerous other meetings of the Factor VIII Task Force, CareFirst defamed Feldman's.

186. CareFirst regularly told fellow BCBSA licensees and law enforcement that Feldman's was involved in "fraud" and was diverting the Factor medicine to a "grey market", each of which are serious felonies, if they were true.

187. On at least one occasion, Jamie Hanson, an investigator for CareFirst, also trafficked in rumors about Feldman's, passing a rumor about Feldman's supposed bankruptcy to an investigator working for the BCBSA's Louisiana licensee.

188. On information and belief, CareFirst's knew or should have known that these statements were false, but CareFirst made the statements with the intention of turning its fellow BCBSA licensees against Feldman's, as well as to instill fear among hemophilia patients that they would not be able to obtain their vital Factor medicine from Feldman's, causing the patients to seek out an alternative source for the medicine.

189. On information and belief, Defendants tried very hard to interest the United States Department of Justice, the Office of Criminal Investigation of the United States Food and Drug Administration (the "FDA") and the Attorney General of the Commonwealth of Pennsylvania in prosecuting Feldman's based on facts and theories that CareFirst and Independence knew, or should have known, had no basis in truth or reality. Defendants were successful in baiting at least the FDA.

iii.   **The Bogus "Diversion" Claim**

190. At the request of the BCBSA and its licensees, the FDA investigated FCS on allegations of diversion of Factor medicine to the "grey market."

191. Based upon information provided by CareFirst, the FDA conducted a similar investigation of Feldman's.

43

192. Apparently, the allegations involved Feldman's somehow dispensing more Factor medicine than a patient needed, even though the amount of Factor medicine dispensed to a patient is set by the patient's prescribing doctor, not the patient's pharmacy.

193. Feldman's is not aware of any investigation by CareFirst, Independence, or the BCBSA into doctors who allegedly write prescriptions for Factor medicine in excess of amounts that CareFirst, Independence, or the BCBSA consider "medically necessary."

194. Under CareFirst's "theory," Feldman's would divert the excess Factor medicine from a patient – unbeknownst to the patient – to a supposed "grey market" that existed for the Factor medicine, and Feldman's would make even more money selling the excess Factor medicine for cash.

195. This theory is beyond ridiculous, has absolutely no basis in fact, and CareFirst and Independence knew so at the time it was proposed.

196. On February 20, 2008, the FDA closed its investigation because it found no evidence of the suspected diversion.

197. Despite the FDA's closed investigation, CareFirst continued to assert that it suspected Feldman's of diversion to the grey market and to deny payment to Feldman's.

198. For example, on October 6, 2008, Jaime Hanson sent an email to her CareFirst colleagues informing them that Sneed was talking to FDA and FBI agents in Texas regarding a possible diversion case.

199. CareFirst knew, however, that the allegations of grey market diversion were baseless. On October 21, 2008 a consultant employed by Catalyst Rx, working for CareFirst, who had experience with hemophiliacs and the anti-hemophilic Factor medicine responded to a question about such a "grey market" by informing his contacts at CareFirst that he had never heard of any instance of diversion of Factor medicine.

200. Catalyst Health Solutions Inc., parent of Catalyst Rx, recently bought Walgreen Co.'s PBM subsidiary, Walgreens Health Initiatives Inc. ("WHI"), for $525 million in cash. WHI has been CareFirst's PBM since 2005, and on information and belief has participated in the "investigation" of Feldman's, as has Catalyst Rx. On information and belief, CareFirst has tried to drive Feldman's hemophilia customers to have their prescriptions filled with WHI, because CareFirst received financial incentives from WHI for such "referrals."

201. Unsurprisingly, no evidence of diversion of Factor medicine has ever been shown.

202. Yet Feldman's has been severely damaged by CareFirst's promotion of its "theory," even in the absence of any evidence. CareFirst's defamation of Feldman's resulted in the loss of Feldman's business relationships with Independence and other BCBSA licensees, other non-BCBSA insurance companies, and with potential patients who were concerned about doing business with a company even accused of such unsavory tactics as diverting medicine from chronically ill patients.

45

203. Ultimately, PMA was forced to sell Feldman's operating assets for considerably less than fair market value, in part because of the false, malicious, and defamatory rumors spread by the BCBSA and CareFirst that Feldman's diverted Factor medicine to the non-existent "grey market" and in part because of the uncertainty of whether Feldman's would be paid by CareFirst and/or Independence for Factor drugs dispensed to their insureds.

### iv.   CareFirst Attacks Feldman's Contract With CareFirst

204. In addition to placing a "hold" on Feldman's claims, and defaming Feldman's by accusing it of diverting patients' Factor medicine to a non-existent "grey market," CareFirst also attempted to attack Feldman's contract with CareFirst and to assert that Feldman's was not entitled to reimbursement under that contract.

205. Even though CareFirst had previously been processing claims for Factor medicine dispensed by Feldman's without question, CareFirst claimed to have suddenly realized that Feldman's did not have the "correct" contract to dispense Factor drugs as a CareFirst participating provider.

206. In fact, it is mostly irrelevant whether or not Feldman's was a CareFirst participating provider.

207. Feldman's dispensed expensive, medicine to CareFirst's insureds, and CareFirst is legally required to pay Feldman's for those drugs.

208. Feldman's provider status with CareFirst only affected the price CareFirst was required to pay for the drugs.

46

209. By contract and law, patients are permitted to obtain their medicine at the licensed pharmacies of their choosing and are reimbursed at the rates set by the insurance companies.

210. CareFirst, Independence, and QCC however, without basis refused to pay the claims that resulted from Feldman's dispensing Factor medicine to hemophilia patients.

211. Nevertheless, the contract under which Feldman's was dispensing was the correct contract. According to CareFirst, Feldman's had a durable medical equipment ("DME") contract that covered equipment such as wheelchairs and walkers, equipment that is, by definition, durable. Yet the contract does not mention DME, or any other restriction on the type of item dispensed.

212. Furthermore, Feldman's was billing tens of thousands of dollars a month for Factor drugs under a contract that CareFirst purports was a DME contract. On information and belief, CareFirst has sophisticated fraud detection software running on its claims processing network. Yet CareFirst asserts that it failed to detect recurring claims for injectible medicine – with its own separate claims code – were being billed under a purported DME contract.

213. In fact, CareFirst was only looking for *ex post* justification for its unwarranted decision to deny Feldman's money it was due by contract and by law.

214. For example, on March 25, 2009, Hanson wrote a memo to Stacy Breidenstein, Associate Director of Network Management at CareFirst, who, on information and belief, played a significant role in the decision whether to extend a new CareFirst contract to Feldman's. The memo requested that CareFirst Special Investigations be included in the decision whether to extend a new contract to Feldman's. The memo specifically identified "possible diversion" as the reason for the scrutiny to be given to Feldman's.

215. CareFirst's true motives were made clear on April 30, 2009, when Hanson wrote an email to Sneed informing Sneed that CareFirst had decided not to offer Feldman's a new contract and that CareFirst was just looking for the strongest *ex post* justification for its denial.

v.    CareFirst and Independence Use the
      Bogus RSA Issue to Deny Feldman's Claims

216. In or around the summer of 2008, CareFirst – after much "research" – "determined" that Feldman's could not dispense Factor medicine because Feldman's did not have an RSA license.

217. On information and belief, CareFirst made up the RSA excuse in order to justify its continued denial of payment to Feldman's, despite no evidence of any wrongdoing by Feldman's. If CareFirst could not find any wrongdoing, it would invent a reason to deny payment.

218. RSA licenses are issued by the State of Maryland's Office of Health Care Quality of the Maryland Department of Health and Mental Hygiene

("OHCQ") to, among other providers, home health agencies, which are medical providers providing medical services in a patient's home.

219. According to the Program Manager for the Ambulatory care unit of the OHCQ, which administers the RSA licensure program, a residential service agency is an option for a patient to receive care in the home as opposed to going to an assisted living or a nursing home. If a provider does not cross the threshold of a patient's home and provide medical services in that home, an RSA is not needed.

220. At no time did any Feldman's employee enter a patient's home to provide medical services, and, on information and belief, CareFirst knew this at all times.

221. If CareFirst had any doubts about this, it could have just asked Feldman's or the patients.

222. In connection with the claims that Defendants refused to pay for years, Feldman's role was limited to filling the patients' prescriptions by dispensing the medication indicated in the prescription by an authorized prescriber (COMAR 10.13.12.01) either (a) to the patient in Feldman's retail pharmacy or (b) by delivery of the prescription via common carrier to the home of the patient or to an agent authorized by the patient.

223. CareFirst, as Maryland's largest insurance company with a near monopoly on the health insurance business in the state, dealt with a wide variety of medical practitioners and pharmacies, and undoubtedly knew when an RSA

license was required by a provider. In fact, Andrea Cherenzia, CareFirst's Director of Special Investigations – and Hanson's and Foreman's boss – has testified that the determination that Feldman's did not have the right license was made by Hanson, after "much research" and in consultation with "other people in the company" including Lisa Anuszewski – CareFirst's Contract Manager for Institutional Contracting – and members of CareFirst's legal staff.

224.   Yet with this crack investigative task force researching the licensure requirements for a pharmacy in Maryland, they still got it totally wrong and expect Feldman's to believe that it was an innocent mistake.

225.   Independence apparently went along with CareFirst's mistaken determination, and on information and belief did not do any independent research into whether Feldman's actually needed an RSA license.

226.   Independence, which was also looking for any excuse to deny claims for Factor medicine, grabbed hold of CareFirst's "findings" and just denied – or placed a "hold" on – Feldman's claims based on CareFirst's representations.

227.   On information and belief, Independence also represented to other BCBSA licensees that Feldman's did not have the necessary licenses to dispense Factor drugs, even though no separate license is actually required, in Maryland or Pennsylvania, to dispense Factor drugs.

a.     **Feldman's Informed CareFirst It Did Not Need An RSA License**

228. However, even if CareFirst and Independence had a mistaken understanding of whether the RSA license was required, their refusal to pay is nevertheless inexcusable.

229. Feldman's told CareFirst on numerous occasions beginning in August 2008 that Feldman's did not carry out any activities that would subject it to an RSA.

230. CareFirst simply chose to ignore Feldman's entreaties and continued to withhold payment of Feldman's claims.

231. CareFirst also did not see fit to inform Independence of Feldman's protestations regarding the RSA issue.

232. Indeed, CareFirst was well aware that Capital Blue Cross, the BCBSA licensee located in central Pennsylvania, had previously taken the position that Feldman's was not required to have an RSA license.

233. On August 21, 2008, Feldman's application for a new contract was denied by CareFirst Credentialing, purportedly for lack of an RSA license.

234. On August 22, 2008, Joel Yerton, an employee of PMA's parent company, sent an email to CareFirst explaining that "I think we might have gotten confused on IV vs. Med Specialty. Feldman's Pharmacy is not a traditional Home Infusion company. They would be more aligned with your Medical Specialty Agency. Does this help?"

235.  Chavarria, a recipient of Yerton's August 22 email, understood Yerton's statement to mean "he's saying [Feldman's is] not a home infusion company."

236.  On December 11, 2008, the Maryland Department of Health issued an RSA certificate to Feldman's.

237.  But for CareFirst's insistence, Feldman's did not need and never would have sought an RSA license.

     b.     **Even After Feldman's Got Its RSA License, CareFirst and Independence Continued to Deny Claims**

238.  Now that Feldman's had its RSA license, CareFirst and Independence had no reason to deny further payment to Feldman's, at least for claims that had a service date after Feldman's obtained its RSA license.

239.  Yet CareFirst did not pay such post-December 11, 2008 claims. In fact, CareFirst did not pay such claims until nearly two years later, in September 2010, in the course of litigation.

240.  In that litigation, CareFirst had repeatedly told the court that the only issue in the case was whether or not Feldman's needed an RSA license.  But CareFirst refused to pay claims even after Feldman's obtained its RSA license.

241.  Maryland law permits any pharmacy with a valid pharmacy license to dispense medication to patients with a valid prescription, including but not limited to Factor drugs.

242.  At all relevant times, Feldman's was regulated under Title 12 of the Maryland Code and COMAR 10.34 and held a permit issued by the Maryland

Board of Pharmacy. Feldman's employed pharmacists who were licensed by the Maryland Board of Pharmacy.

243. Pursuant to 12-406 of the Maryland Code, a pharmacy that has a permit issued by the Maryland Board of Pharmacy is authorized to establish and operate the pharmacy while the pharmacy permit is effective."

244. Feldman's pharmacy permit was effective throughout the relevant period of the claims at issue in this case.

### c.   CareFirst Finally Researches the RSA Issue

245. It was not until July 2010, approximately two years after CareFirst refused to pay the Feldman's claims at issue, and after CareFirst's actions put Feldman's out of the business of providing high value drugs to vulnerable patients, that CareFirst put the RSA question to the Maryland Board of Pharmacy.

246. On July 1, 2010 Patrick de Gravelles, Esq., Litigation General Counsel for CareFirst, wrote a letter to the Maryland Board of Pharmacy. In Mr. de Gravelles' letter, he posed two questions to the Board of Pharmacy, the most relevant of which was: "Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?"

247. On July 26, 2010 CareFirst wrote a letter to the District Court. Even though Mr. de Gravelles had recently asked the Board of Pharmacy whether a

pharmacy like Feldman's needed an RSA license to ship Factor products to patients' homes, CareFirst nevertheless asserted to the Court – in no uncertain terms – that "the plain language of the statutes makes home delivery of medicines and items like needles and syringes enough to require an RSA."

248.   On August 18, 2010, the Maryland Board of Pharmacy conducted a public meeting to discuss, among other things, Mr. de Gravelles' July 1, 2010 letter.

249.   In August 2010, the Board of Pharmacy unequivocally opined that Feldman's did not need an RSA license to ship medication to a patient's home. Specifically, on August 23, 2010, LaVerne G. Naesea, Executive Director of the Maryland Board of Pharmacy, wrote a letter to Mr. de Gravelles advising that shipping Factor products and supplies to patients' homes via common carrier was acting in accordance with its pharmacy license and the Maryland Pharmacy Act, and that no RSA was required to conduct such activities.

250.   Based on the Board of Pharmacy's opinion, CareFirst was finally forced to concede the issue and to acknowledge its liability for the claims.  In fact, CareFirst did not disclose to either Feldman's or the Court that it had raised the issue with the Board of Pharmacy and disclosed the adverse opinion only because the Board of Pharmacy posted a public hearing notice concerning the RSA issue to the internet.

251.   But even as of this date, CareFirst has not paid certain claims.

252.   The damage to Feldman's, however, had already been done. Feldman's accounts receivable had ballooned from approximately $430,000 in January 2008 to more than $3.8 million in December 2009, after peaking at $3.95 million in July 2009, causing Feldman's to default on its bank loans.

253.   On December 17, 2009, PMA sold Feldman's assets – excluding receivables which were retained by Feldman's – for a depressed price that did not reflect the profitability of Feldman's only months earlier.

**B.     The Conspiracy to Drive Feldman's Customers
         to CareFirst's and Independence's Preferred Pharmacies**

254.   Large chain pharmacies and PBMs have in the past paid kickbacks to health insurers that drive business to the pharmacy.

255.   On information and belief, these kickbacks often take the form of "rebates" that are built into long term contracts for the chain pharmacy or PBM to be the insurer's preferred provider, linked with the insurer's website and promoted in its marketing materials.

256.   On information and belief, this practice continues.

257.   These same PBMs also process and adjudicate claims from other pharmacies, and participate in investigations and audits of those very same pharmacies on behalf of the insurers.

258.   This presents an inherent conflict of interest.

259.   On information and belief, four of the five largest PBMs were involved in the "investigation" of Feldman's by CareFirst, Independence, and the BCBSA.  This includes the three largest PBMs, Medco, CVS Caremark and Express

Scripts, who administer 80 percent of all insured prescriptions in the United States and 90 percent of insured mail order prescriptions.

260. On information and belief, Express Scripts, Walgreen, CVS Caremark, and a division of Medco, Medco Corporate Investigations, assisted CareFirst, Independence, and the BCBSA in their "investigation" of Feldman's. Representatives of these PBMs participated in conference calls in which the BCBSA, Independence, and CareFirst discussed Feldman's and their strategy to deny Feldman's claims. Representatives of these PBMs also participated in interviews of Feldman's patients on behalf of CareFirst, Independence, and the BCBSA.

261. On information and belief, CareFirst, Independence, and the BCBSA conducted interviews of numerous Feldman's patients and employees, and other hemophilia patients that were not Feldman's patients, including interviews of Jeryl Marks, Doreen Rhodes, Viola Hendrick and Christopher Templin. At those interviews, CareFirst, Independence and the BCBSA made false and defamatory statements about Feldman's and the ways it conducted its business.

262. In addition to the defamation of Feldman's at patient interviews, CareFirst, Independence, the BCBSA and the PBMs attempted to steer Feldman's customers to use the specialty pharmacy services of the PBMs, from whom CareFirst received better "pricing" in the form of "discounts," or as they are more commonly known, kickbacks.

56

263. CareFirst, Independence, and the BCBSA left sales literature for their preferred PBMs with Feldman's patients after interviewing such patients and making serious, unfounded accusations about Feldman's and "recommended" that patients consider a switch to the preferred PBM, even though Feldman's offered the patients a level of services that could not be matched by a PBM.

264. As a result of CareFirst's, Independence's, and the BCBSA's actions, on information and belief, numerous Feldman's patients switched to another pharmacy after hearing the defamation of Feldman's by CareFirst, Independence, and the BCBSA.

265. This departure of customers had catastrophic implications for Feldman's business, ultimately causing Feldman's to default on its bank loans, driving Feldman's from the hemophilia business and causing PMA to sell Feldman's assets at fire-sale prices.

### Effect of Conspiracy on Feldman's

266. The practical effect of the conspiracy has destroyed a once-thriving business.

267. CareFirst's and Independence's refusal to pay Feldman's claims, combined with Feldman's legal expenses incurred chasing CareFirst and Independence for payment, left Feldman's unable to satisfy its creditors.

268. Feldman's was forced to find other reputable and customer service oriented pharmacies to service its hemophilia patients, who faced grave risks without a trustworthy source to dispense their Factor drugs.

269. Finally, on December 17, 2009, PMA was forced to sell Feldman's assets. PMA only sold Feldman's because of the financial difficulties caused by CareFirst's and Independence's refusal to pay Feldman's claims and its defamatory comments regarding Feldman's.

### Damages

270. PMA and Feldman's suffered great injury as a result of Defendants' individual and collective actions.

271. The sale of Feldman's assets was forced and against the will of PMA, precipitated solely because Defendants' individual and collective conduct meant that Feldman's could not carry out the purpose for which PMA acquired it— to provide services for serious and complex disease states.

272. The sale, which PMA would not have contemplated but for the wrongdoing complained of herein, was conducted on a rushed and desperate basis, and resulted in a significant decrease in the value of PMA's equity in Feldman's.

273. In addition, PMA lost the opportunity to reap substantial and growing future profits from a thriving business that Defendants destroyed.

274. The wrongdoing complained of herein caused the serious disease state patients who relied upon Feldman's to, of course, abandon it once Feldman's declared that it could no longer serve them on a reliable basis.

## CLAIMS FOR RELIEF

### COUNT I
### (Intentional Interference With Economic Relations
### as to all Defendants)

275. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

276. Plaintiffs had a strong business relationship with their patients, primarily members of the hemophilia community.

277. Plaintiffs spent millions of dollars forming their business to best serve the unique needs of the hemophilia community.

278. Plaintiffs also had strong business relationships with their vendors, from whom Plaintiffs purchased millions of dollars worth of Factor drugs.

279. Defendants clearly were aware of the business relationship Plaintiffs had with their vendors, whom Plaintiffs had to pay for the Factor drugs, and with their hemophilia patients, who were CareFirst's and Independence's insureds.

280. Defendants' concerted and calculated actions to investigate, harass, delay payment to, boycott, and destroy Plaintiffs' business were intentional and unjustified.

281. Defendants provided false information to Plaintiffs' patients about Plaintiffs.

282. Defendants' conduct was intentional, willful, and calculated to cause damage to Plaintiffs' business.

283. The conduct of Defendants was perpetrated with the intentional and improper purpose of causing damage to Plaintiffs and was without justifiable cause.

284. As a result of Defendants' conduct, patients stopped ordering medicine from Plaintiffs.

285. In fact, that was the only real purposes of the "investigation," as evidenced by the fact that there was no evidence, even after years of investigations, that Plaintiffs were engaged in any wrongdoing.

286. As a result of Defendants' intentional efforts to destroy Plaintiffs' business, Plaintiffs' business was, in fact, destroyed.

287. Feldman's accounts receivables ballooned from approximately $430,000 in January 2008 to $3.95 million in July 2009, exclusively due to CareFirst's and Independence's refusal to pay for the medicine that Feldman's dispensed to CareFirst's and Independence's insureds.

288. As a result, Feldman's defaulted on its bank loan, and in December 2009 PMA sold all of Feldman's assets, excluding receivables which were retained by Feldman's.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT II
### (Defamation as to CareFirst and the BCBSA)

289.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

290.  In the course of its "investigation" of Feldman's, CareFirst regularly made false and defamatory statements to law enforcement, the BCBSA and BCBSA licensees, including accusing Feldman's of fraud and other serious felonies.

291.  On information and belief, CareFirst and the BCBSA – and in particular Calvin Sneed of the BCBSA – also regularly fabricated theories and told agents of the FBI, the FDA, and other government agencies that Feldman's was involved in fraud through diversion of Factor drugs to a "grey market."

292.  In fact, Feldman's ordered Factor medicine consistent with the prescriptions written by the patients' doctors and never ordered more Factor medicine than the prescriber authorized, nor did Feldman's ever sell any Factor medicine to any "grey market."

293.  CareFirst knew or should have known that Feldman's never sold any Factor medicine on the grey market because CareFirst knew that no such grey market existed.

294.  In October 2008 a consultant working for CareFirst who had experience with hemophiliacs and the anti-hemophilic Factor medicine responded to a question about such a "grey market" by informing his contacts at CareFirst that he had never heard of any instance of diversion of Factor medicine.

295.  On information and belief, CareFirst and the BCBSA conducted interviews of numerous Feldman's patients, and other hemophilia patients that were not Feldman's patients, at which CareFirst implied or even outright stated Feldman's involvement in a massive fraud.

296.  On information and belief, the interviews of patients – or family members of patients – including Doreen Rhodes, Viola Hendrick and Christopher Templin, were meant to cast doubt as to Feldman's legitimacy.

297.  CareFirst also told Independence on numerous occasions that Feldman's did not have the necessary licensees to dispense Factor drugs, even though CareFirst knew – or certainly should have known, because Feldman's told them so – that Feldman's never needed an RSA license, or any other special license, to dispense Factor drugs.

298.  On February 12, 2009, Jamie Hanson, an investigator for CareFirst, wrote an email to Michael Ebner, Senior Financial Investigator for Independence, and Christopher Deery, an Investigator for Independence, falsely informing them that Feldman's did not have the proper license to dispense Factor drugs.

299.  In fact, Feldman's always had the proper licenses to conduct its business, but on information and belief Ms. Hanson was trying to influence Independence to support CareFirst's decision to not pay Feldman's.

300.  Feldman's obtained the RSA license it did not actually need for its business, which it only obtained based on CareFirst's demand, on December 11,

2008, two months prior to Ms. Hanson's false and malicious statements to Mr. Ebner and Mr. Deery. Ms. Hanson knew when she made her false and defamatory statements on February 12, 2009 that Feldman's had its RSA license and that her statements in her email were false. On information and belief, Independence denied or "held" payment to Feldman's based on CareFirst's false representations.

301. In addition, on information and belief, employees of CareFirst – acting in their official capacity – spread false and malicious rumors of Feldman's bankruptcy, designed to scare Feldman's patients into seeking their vital Factor medicine from a different pharmacy.

302. On August 7, 2009, Ms. Hanson sent an email to Kandyce Cowart, her counterpart at Blue Cross Blue Shield of Louisiana, "informing" Ms. Cowart that Feldman's had filed for bankruptcy when, on information and belief, Ms. Hanson knew such assertions were false.

303. On information and belief, on or about that same date, Ms. Hanson spread the same false and malicious lies to other BCBSA licensee and to hemophilia patients.

304. On information and belief, Ms. Hanson also spread rumors among the BCBSA licensees that Feldman's and/or FCS, a related company, was a problem company.

305. On information and belief, these statements were made on an April 16, 2009 conference call that included representatives of BCBSA licensees in Louisiana, South Carolina, North Eastern Pennsylvania, Florida, Michigan, Western

Pennsylvania (Highmark) and representative of the BCBSA. The statements were designed to influence the way the other BCBSA licensees dealt with Feldman's, and on information and belief, the statements worked as designed.

306. CareFirst, led by Ms. Hanson, knew that the various statements it made regarding Feldman's licensure, Feldman's reputation, and Feldman's finances, were false when it made them, yet CareFirst and Ms. Hanson showed complete disregard for Feldman's or the law and continued with such knowingly false statements.

307. As a result of such defamatory statements, Feldman's indeed suffered harm.

308. Other BCBSA licensees treated Feldman's and its affiliates as a criminal enterprise, refusing to reimburse Feldman's for medicine dispensed to CareFirst's insureds.

309. Patients, unnerved by rumors of Feldman's bankruptcy and by "suggestions" from BCBSA licensee that the patients seek their medicine from a different pharmacy, abandoned Feldman's in droves.

310. Feldman's was also unable to acquire any new patients, as rumors of its purported criminal activity and financial distress spread like wildfire through the hemophilia community.

311. Defendants acted with malice and intent to harm Plaintiffs.

312. As a result of the malicious and deliberate actions of Defendants, Plaintiffs suffered an economic loss.

313. Ultimately, Feldman's was forced out of business by Defendants' defamation.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

### COUNT III
### (Fraud and Fraudulent Misrepresentation as to CareFirst)

314. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

315. Prior to dispensing the Factor drugs to patients, Feldman's always checked the patients' benefits with CareFirst and received a verbal precertification for the prescription from CareFirst.

316. The precertification was a representation by CareFirst that – so long as the claim paperwork was in order and there was no fraud – CareFirst would pay the claim.

317. In fact, during the time period in which CareFirst insisted (without merit) that Feldman's obtain an RSA, CareFirst represented that Feldman's should continue to dispense Factor medicine to its patients because all aspects of the claims reimbursement issue would be addressed retroactively to the first claim in question.

318. CareFirst continued to give Feldman's precertification for claims even after it put a "hold" on any claims for Factor drugs submitted by Feldman's.

319.  CareFirst did not inform Feldman's of the "hold", nor did any of the communications from CareFirst to either Feldman's or the patients – for example, the explanations of benefits forms sent in connection with every claim – indicate that there was a "hold" or any other problem with the claims.

320.  Therefore, every time CareFirst gave Feldman's precertification for a claim, CareFirst made a knowingly false representation.

321.  CareFirst also knew that Feldman's would continue to dispense medicine to its patients, but CareFirst did not care because CareFirst had no intention of ever paying those claims.

322.  In fact, on information and belief, CareFirst preferred that Feldman's keep dispensing Factor drugs to its patients.  For CareFirst, that was the best of all worlds – its insureds kept receiving the expensive, life-saving medicine they needed, while CareFirst did not have to pay one penny.

323.  Based on CareFirst's precertification, its representation that claims issues would be addressed retroactively, and Feldman's deep concern for its sick patients, Feldman's kept dispensing the Factor medicine to its patients even after it became clear that there were issues in their relationship with CareFirst.

324.  Feldman's, of course, still had to pay for the expensive drugs it was dispensing to its patients.  Feldman's spent hundreds of thousands of dollars on drugs for which it was not receiving reimbursement from CareFirst, and also incurred indebtedness to fund its continued operations during the period it did not receive reimbursements from CareFirst.

325. Additionally, Feldman's had incurred indebtedness to fund its expansion, but its reduced cash flow as a result of CareFirst's refusal to pay reimbursements made it impossible for Feldman's to satisfy its payment obligations to its creditors.

326. As a result of CareFirst's misrepresentations, Feldman's accounts receivables ballooned from approximately $430,000 in January 2008 to $3.95 million July 2009 and Feldman's defaulted on its bank loans.

327. In December 2009 Feldman's was forced to sell its assets – excluding receivables – and cease operations as a specialty pharmacy.

328. Feldman's incurred millions of dollars in legal fees, and lost additional millions of dollars in potential profits for an extremely profitable and fast-growing business.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT IV
### (Unfair Competition as to CareFirst and Independence)

329. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

330. Under Maryland common law, no one is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any kind.   Rather, all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

331.  CareFirst and Independence deliberately and systematically damaged and jeopardized Feldman's business by fraud, deceit, and trickery.

332.  CareFirst and Independence, for no legitimate reason, refused to pay Feldman's the millions of dollars they owed Feldman's for life-saving medicine Feldman's dispensed to CareFirst's and Independence's insureds, even after CareFirst encouraged Feldman's to continue to dispense the medicine to their insureds.  CareFirst and Independence did this knowing that their conduct would ruin Feldman's.

333.  CareFirst and Independence insisted that Feldman's was missing a crucial RSA license to operate its business, even though (i) CareFirst knew that Feldman's did not need the RSA license in order to operate, (ii) Independence made no attempt to independently verify whether Feldman's needed an RSA license and just took CareFirst's representations as facts, and (iii) Feldman's informed CareFirst that it did not need an RSA license.

334.  Feldman's employees spent many hours chasing their tails in order to receive reimbursement from CareFirst and Independence, when CareFirst and Independence had no intention of reimbursing Feldman's, even for claims submitted after Feldman's obtained its RSA license.

335.  CareFirst and Independence knew their conduct would ruin Feldman's.

336.  CareFirst and Independence encouraged (and intimidated) Feldman's patients to abandon Feldman's and find another pharmacy from which to

get their Factor drugs.  CareFirst and Independence did this for the purpose of injuring Feldman's.

337.  CareFirst made baseless and false defamatory statements and spread malicious rumors about Feldman's to hemophilia patients – including Feldman's customers – employees of Federal agencies, to other BCBSA licensees and to others.  CareFirst and Independence in this wrongdoing solely for the purpose of injuring Feldman's.

338.  As a result of these unfair methods, Feldman's was forced to default on its bank loans and was ultimately put out of business.  Defendants' actions destroyed Feldman's current and future profitability.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT V
### (Conspiracy as to all Defendants)

339.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

340.  Each of Defendants acted with unity of purpose as part of a conspiracy to increase their "profits" and their executive compensation by limiting their "exposure" to expensive claims for Factor medicine and unreasonably restrain competition by denying and delaying payment to Feldman's for Factor medicine Feldman's provided to hemophiliac patients insured by CareFirst and Independence, with the ultimate goal of driving Feldman's out of the specialty pharmacy business.

341. A further goal of the conspiracy was to purge hemophiliacs from the rosters of their insureds and drive the hemophilia patients insured by CareFirst and Independence to other insurance companies.

342. If those goals were not achievable, Defendants hedged their bets by conspiring to "encourage" hemophilia patients to get their medicine from large chain pharmacies and PBMs.

343. CareFirst and Independence are, by far, the dominant health insurers in their geographic areas.

344. CareFirst and Independence, aided and abetted by the BCBSA and John Does 1 – 10, exercised their power of coercion over Feldman's by delaying and denying claims made by Feldman's without any proof of wrongdoing, by "suggesting" that people suffering from hemophilia switch to other pharmacies that CareFirst and/or Independence preferred, and by perpetuating continual baseless investigations of Feldman's – even after scores of law enforcement and regulatory agencies, working in consultation with CareFirst, Independence, and the BCBSA, found no evidence of any wrongdoing by Feldman's.

345. Defendants' purpose was to harass Feldman's and drive it out of the pharmacy business.

346. As a result of the conspiracy and the acts committed by Defendants in furtherance of the conspiracy, Feldman's suffered significant economic damage and hardship, including but not limited to lost profits on a business that had previously been generating significant profits; the shotgun sale of

Feldman's; and the outlay of significant amounts for attorneys' fees to collect the money rightfully owned to Feldman's by CareFirst and Independence.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

### COUNT VI
#### (Violation of § 11-204(a)(1) of the Maryland Antitrust Act as to all Defendants)

347.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

348.   Maryland law prohibits any combination or conspiracy to unreasonably restrain trade or commerce.

349.   Defendants conspired to harass, intimidate, and drive Feldman's out of business by (i) putting a "hold" on Feldman's claims that lasted nearly three years, during which time CareFirst and Independence refused to pay any of the millions of dollars they owed Feldman's, (ii) "investigating" Feldman's without any basis for suspecting wrongdoing, (iii) driving Feldman's customers and potential customers to other pharmacies by conducting interviews of Feldman's customers – in some cases, on information and belief, accompanied by law enforcement officers – and spreading defamatory and malicious rumors of Feldman's purported criminal behavior and its purported financial difficulties, and (iv) "recommending" that Feldman's customers take their business to pharmacy benefits managers and chain

pharmacies in which, on information and belief, CareFirst and/or Independence had a financial interest.

350. But for the lawsuits previously filed by Feldman's against CareFirst and Independence, CareFirst and Independence would still not have paid any of the claims submitted by Feldman's.

351. CareFirst, Independence, and the BCBSA regularly corresponded through numerous conversations and emails, discussing ways to avoid paying Feldman's claims and to prevent other BCBSA licensees from paying any Feldman's claims.

352. As a direct result of the conspiracy among Defendants, Feldman's was forced out of the business of dispensing Factor medicine to chronically-ill hemophilia patients. With Feldman's no longer in the business of dispensing the Factor medicine to patients suffering from hemophilia, competition is clearly and obviously lessened. Feldman's was not just another provider of medicine and supplies to hemophiliacs, but was one of the largest providers for hemophiliacs – and the one most trusted by the hemophilia community – in the entire United States. Feldman's had spent years and significant amounts of money building a business that catered to the unique needs of its most vulnerable patients, and had managed to build trust with chronically-ill patients whose trust was very difficult to come by. On information and belief, there are no other pharmacies in the United States – other than pharmacies that were affiliated with Feldman's – that enjoyed such a close relationship with the hemophilia community. As a result

of Defendants' actions, CareFirst's and Independence's insureds – including Feldman's patients – and the hemophilia community have been deprived of their chosen and trusted provider for the Factor medicine they need to live.

353. Furthermore, Defendants' conspiracy has a chilling effect on other specialty pharmacies and other independent pharmacies, which see that Defendants were able to put Feldman's out of business without ever providing even one piece of evidence that shows anything Feldman's did wrong.

354. Defendants' conspiracy results in the unwillingness of pharmacies to dispense Factor medicine to hemophiliacs out of fear that doing so will subject them to harassment by the insurers on whom they rely for payment for the extremely expensive Factor medicine. Pharmacies may also be unwilling to dispense other expensive specialty drugs based on the same fears. The net effect of this will be to reduce the number of independent pharmacies in the specialty drug business, leaving only the large chain pharmacies and the mail-order arms of the PBMs – none of whom are particularly known for their customer service, a major reason hemophiliacs choose independent pharmacies over chain pharmacies in the first place – to service these special needs patients.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest, treble damages, and attorney's fees pursuant to §11-209 of the Maryland Code.

Plaintiffs demand trial by jury.

Date:  Baltimore, Maryland
       January 18, 2012

                         BAROODY & O'TOOLE

                    By: _____

                         Thomas O'Toole
                         201 N. Charles Street, Suite 2102
                         Baltimore, Maryland 21201
                         (410) 539-8412 (telephone)
                         (410) 539-8411 facsimile)
                         totoole@aol.com


Counsel seeking to appear *pro hac vice*

PADUANO & WEINTRAUB LLP
Anthony Paduano
Jason Snyder
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jjs@pwlawyers.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on this 25th day of January that a copy of the

foregoing First Amended Complaint and redlined First Amended Complaint is to be

served upon each of the Defendants along with the writ of summons and the Complaint.


Thomas O'Toole