# HealthAffairs

At the Intersection of Health, Health Care and Policy

Cite this article as:
James C. Robinson
For-Profit Non-Conversion And Regulatory Firestorm At CareFirst BlueCross BlueShield
*Health Affairs*, 23, no.4 (2004):68-83

doi: 10.1377/hlthaff.23.4.68

The online version of this article, along with updated information and services, is available at:
http://content.healthaffairs.org/content/23/4/68.full.html

**For Reprints, Links & Permissions:**
http://healthaffairs.org/1340_reprints.php

**E-mail Alerts :** http://content.healthaffairs.org/subscriptions/etoc.dtl

**To Subscribe:** http://content.healthaffairs.org/subscriptions/online.shtml

*Health Affairs* is published monthly by Project HOPE at 7500 Old Georgetown Road, Suite 600, Bethesda, MD 20814-6133. Copyright © 2004 by Project HOPE - The People-to-People Health Foundation. As provided by United States copyright law (Title 17, U.S. Code), no part of *Health Affairs* may be reproduced, displayed, or transmitted in any form or by any means, electronic or mechanical, including photocopying or by information storage or retrieval systems, without prior written permission from the Publisher. All rights reserved.

Not for commercial use or unauthorized distribution

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

# For-Profit Non-Conversion And Regulatory Firestorm At CareFirst BlueCross BlueShield

Nonprofit ownership does not guarantee social accountability.

**by James C. Robinson**

**PROLOGUE:** The once-unstoppable trend toward the for-profit conversion of health insurers appears to have been stopped. The rejection of Blue Cross conversion petitions by state officials in Maryland and Kansas and the voluntary withdrawal of conversion petitions by Blues plans in New Jersey and North Carolina seem to have ended the conversion efforts by nonprofit insurers, at least temporarily. What remains unclear, however, is whether the health plans that remain nonprofit will pursue product, pricing, and policy initiatives that differ from those of their for-profit competitors. Indeed, some might argue that allowing for-profit conversion of a Blue Cross plan, if the value of the insurer is fully transferred to a charitable foundation or state treasury, is better than denying conversion and leaving the conversion-oriented management in place.

The market and regulatory battle over the proposed for-profit conversion of CareFirst BlueCross BlueShield broke policy ground, not only in denying conversion but in legislating a comprehensive framework within which the nonprofit insurer must operate and document its pursuit of public-spirited policies. However, what sounded like a victory of people over profits in Maryland sounded in Delaware and the District of Columbia like an expropriation by one state of the Blue Cross assets of its neighbors. In this paper Jamie Robinson details the troubled history of CareFirst, from scandal and near-insolvency through a remarkable financial turnaround and then to the conversion strategy and the ensuing battle with the regulators and legislators in the mid-Atlantic. This paper builds directly on Robinson's earlier *Health Affairs* analysis of the conversion of Empire BlueCross BlueShield in New York and highlights the different political cultures that produced different market outcomes. As Blue Cross and Blue Shield plans enjoy ever-larger enrollment and earnings, many state policymakers are searching for a new framework within which to monitor and motivate these nonprofit behemoths.

Robinson is a professor of health economics at the University of California, Berkeley, and a contributing editor to *Health Affairs*. His work on managed care, medical groups, and capital markets in this and other journals is widely cited in the health services literature, among Wall Street analysts, and within the health care industry itself.

DOI 10.1377/hlthaff.23.4.68 ©2004 Project HOPE–The People-to-People Health Foundation, Inc.

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

**ABSTRACT:** The attempted for-profit conversion of CareFirst BlueCross BlueShield culminated in two decades of drift from its nonprofit mission and opened a window of opportunity for Maryland to deny the proposal, replace the board majority, and impose oversight. Maryland rejected the approach used by some states, which have permitted conversion and used the erstwhile nonprofit's assets to endow a health-related foundation, because it sought an insurer with dominant market share to promote coverage expansions. Coupled with the ensuing conflict with insurance commissioners and nearby Blues plans, this incident signals the end of the "trust-me" era of nonprofit accountability in health insurance.

T HE ABORTIVE ATTEMPT at for-profit conversion by CareFirst BlueCross BlueShield, and the ensuing regulatory firestorm that swept across Maryland, Delaware, and the District of Columbia, temporarily stalled the nation's rush toward investor ownership in health insurance.[1] Conversion initiatives in other jurisdictions henceforth stand accused, rightly or wrongly, of mission drift and managerial inurement. But the denouement of the CareFirst drama does not celebrate the virtues of nonprofit organization as a third path for health insurance, a structure of ownership and mechanism of accountability balanced between the regulatory state and the investor-owned corporation. Rather, it signals the end of the "trust me" era of nonprofit accountability and the assertion of control by the state. Nonprofit plans can thrive in the contemporary health insurance market but, in the experience and expectation of Maryland's political establishment, will serve the interests of the public rather than those of the plan executives only if subjected to relentless monitoring and regulatory oversight.

Blue Cross has never been just one insurer among many in Maryland but, rather, a keystone in the arch of benefit mandates, price controls, tax subsidies, risk pools, and political expectations in the most regulated U.S. health care market. During the 1990s, however, CareFirst steadily reduced its involvement with and dependence on state government by expanding through affiliation with Blues plans in the District of Columbia and Delaware and by retreating from politically attractive but financially unattractive products and customers. The for-profit conversion and simultaneous sale to a larger investor-owned corporation, which emerged as the firm's publicly avowed strategy in 2000, would have consummated CareFirst's escape from control by any one jurisdiction and positioned it to participate in the consolidation of Blue Cross plans nationally.

The conversion and consolidation almost succeeded. But the hubris of the CareFirst management, which somehow believed that it could extract $120 million in perquisites under the eyes of an aroused public, created a window of opportunity in 2003 for the state to deny the conversion; replace the board majority; rewrite the organization's mission; specify key operational procedures; and subject the firm to tighter oversight by the insurance commissioner, the attorney general, and a special committee formed by the legislature. Maryland consciously rejected the approach to wayward Blue Cross plans used in some states, which have

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

permitted conversion and then used the insurer's assets to endow an independent foundation with a mission to improve health and health care. Maryland did not want a charity with a diffuse mandate but, rather, an insurer with dominant market share that would forestall entry by out-of-state competitors, cooperate with hospital price controls, participate in Medicaid, support special risk-pooling arrangements, and generally lose money where it was supposed to and cover its losses by seeking new favors from, and incurring new obligations to, the state.

In health care, as elsewhere, it's not over until it's over, and the politics of nonprofit conversion remain contentious for Maryland and its neighbors. But for the moment the lesson to be learned from the long struggle between Blue Cross and its regulators is that nonprofit ownership does not guarantee social accountability and that the market dominance enjoyed by Blues firms often tempts their executives to substitute personal interests for those of the larger community. One solution to accountability failure is to permit for-profit conversion while ensuring full valuation and transfer of the erstwhile nonprofit's assets to a charitable foundation, which can pursue the social mission while the insurer becomes accountable to its new investors and owners. Another solution, chosen by Maryland, is to seek social accountability through subjection to political authority. Here the risk is that politics and bureaucracy will undermine operational efficiency and direct the firm's assets to financing programs that should be paid for through taxation or, as in the case of politically attractive but socially wasteful projects, not paid for at all. The original Blue Cross ideal—that a nonprofit, nongovernmental insurer could finance the largest industry in the economy free from oversight by either Wall Street or the regulatory Leviathan—has fallen victim to the enormous financial flows and consequent temptations of health care.

## A History Of Mission Drift

The contemporary assertion of regulatory control reenacts many of the scenes of an earlier crisis in Maryland health insurance, one where nonprofit ownership seemed to be the problem rather than the solution. Fifteen years ago Blue Cross Blue Shield of Maryland and its sister plan in the District of Columbia were poster children of nonprofit corruption and incompetence, squandering their assets on ego-building but money-losing diversification initiatives and on lavish executive lifestyles that devoted more days per year to jetting around the globe than to paying insurance claims back home. Federal investigations, national media coverage, and the ensuing uproar ended numerous careers and produced new boards of directors, new management teams, and a new commissioner of insurance. The 1990s witnessed a financial turnaround by both firms but also the creation of an organizational culture that viewed the state regulatory apparatus as an obstacle to further growth and success.

■ **A taste for glamour projects.** The nonprofit Blue Cross model of health insurance, successful in extending coverage to wide segments of the employed popu-

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

lation, suffers from a built-in weakness in accountability that grows with the success of the organization. To support subsidies to high-risk and low-income consumers, Blues plans historically needed dominant shares in their local insurance markets, exemptions from income and premium taxes, rate discounts from hospitals, and special relationships with regulators and legislators.[2] To this standard framework, Maryland added its hospital rate regulation program, which forbids price competition and negotiated discounts so as to subsidize academic medical centers (AMCs) and uncompensated care.[3] Without shareholders to demand profitability, the large Blues plans can devote their energies to extending affordable and accessible coverage or, alternatively, to diversifying into glamour projects and padding managerial expense accounts. Faced with those two options, many, including the Maryland and D.C. Blues plans in the 1980s, pursued the latter.[4]

Over the course of the 1980s, when for-profit conversion was only a twinkle in the eyes of some nonprofit executives, the Blue Cross plans in Maryland and the District employed their dominant market position and free cash flow to create dozens of for-profit and nonprofit subsidiaries in sectors related and unrelated to health insurance in geographic regions adjacent to and distant from their home turf.[5] It was important that these subsidiaries be headquartered in "hardship posts" such as Paris, the Channel Islands, Singapore, Hong Kong, Jamaica, and elsewhere and that top executives and board members regularly check on their status by traveling on the Concorde and residing in five-star hotels and golf resorts around the globe.[6] The chief executive officer (CEO) of the D.C. Blues managed to spend 202 days in one year on the road, running up half a million dollars in direct travel expenses alone, while his senior vice president toured resorts worldwide to ascertain their suitability for subsequent corporate gatherings. The Blues rented skyboxes at the Orioles baseball stadium, hosted parties at horse-racing events, flew dozens of managers to the winter and summer Olympics, and spent $44,000 per year on golf balls and greens fees. Because these were nonprofit organizations, managerial stock options were not a possibility, but the insurers paid their executives salaries commensurate with those of investor-owned corporations, engineered financial accounts to facilitate inflated pension and expense-account contributions, and engaged in loss-generating contracts with firms controlled by executives and their families.[7] The Maryland and D.C. Blues lost $156 million in their subsidiaries during the late 1980s and suffered drops in market share from 50 percent to 40 percent in Maryland and from 53 percent to 30 percent in the District of Columbia and its suburbs.[8]

■ **Relationship with insurance regulators.** The Blues maintained a cozy, if sometimes conflicted, relationship with the insurance commissioners in their jurisdictions, allowing them the use of skyboxes while underreporting losses, overvaluing assets, stonewalling requests for financial accounts, and overbilling Medicare and other federal programs.[9] The Blues were victims and virtuosi of the peculiar political geography of the mid-Atlantic states, where Maryland Blue Cross Blue Shield

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

had exclusive use of the Blues trademarks in that state except in two populous suburban counties, which along with analogous suburban areas in Virginia and the District itself were the domain of the D.C. Blues, and hence where insurance regulators in three jurisdictions could claim oversight without having effective authority. The diversification and emoluments could have continued indefinitely except for the hemorrhaging in assets and the 1990 bankruptcy of the Blues plan in West Virginia, which stimulated extensive congressional hearings.[10] The consequent arousal of the regulators led to the resignation or dismissal of both Blue Cross board chairmen and many board members, both CEOs and many senior executives, and, in Maryland, of the insurance commissioner himself, who provoked the ire of his governor by his impolitic candor on the dire state of affairs.[11]

## The Rising Tide Of Political Conflict

Maryland responded to the Blue Cross scandals of the early 1990s with a series of statutory carrots and sticks that sought to bring its wayward insurer back onto the straight and narrow path.[12] In 1993 and subsequent years the state reconstituted the Blue Cross board, codified the responsibilities of board members, required all subsidiaries to be licensed and related to the business of health insurance, created a regulatory oversight commission, specified a minimum medical loss ratio, extended rate regulation to the small-group market, and, with a prescient eye to future eventualities, began creating a framework within which conversion initiatives would be evaluated. It sustained the Blue Cross exemption from corporate income taxes, exempted it from a 2 percent insurance premium tax, and ensured it a 4 percent discount off the regulated "all-payer" hospital rates. (In 2002 the income tax exemption was worth $6 million, the premium tax exemption $13 million, and the hospital rate reduction $31 million.)[13]

If much was given to the insurer, much also was demanded. The state expected Blue Cross to participate in all customer segments, including those where it lost money, to cooperate with the Medicaid managed care program, and to launch a Medicare health maintenance organization (HMO) to extend drug coverage to low-income seniors. Maryland viewed the HMO as integral to the political effort to promote insurance accessibility. These insurance initiatives supported the state's hospital rate regulation program by reducing the volume of uncompensated care and hence the subsidies that the regulated rates needed to move from facility to facility.

■ **Timid oversight.** Viewed with the benefit of hindsight, Maryland's efforts at nonprofit accountability were too timid and too trusting, allowing Blue Cross to enjoy the advantages while escaping many of the obligations of its favored status. Management adopted a perspective on the firm's mission that was distinctly at odds with that dominant in the legislature, leading to continuing conflict over which opportunities the firm should pursue and how. Blue Cross adopted the view that all products and customer segments should be profitable and hence felt authorized to exit

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

sectors where costs exceeded revenues. When the federal Balanced Budget Act (BBA) of 1997 crippled Medicare HMOs, Blue Cross dropped its senior product, first in rural areas, then statewide in 2001. When the state's Medicaid managed care program tightened spending that same year, Blue Cross dropped out even though provider-sponsored and for-profit HMOs stayed in. More than 100,000 enrollees lost coverage as a consequence.[14] As its guaranteed-issue product incurred losses in the individual market, Blue Cross minimized marketing, sought to limit enrollment, and in 2001 declared that it would exit that market segment altogether.[15]

■ **An early merger.** In what would prove to be its economically most brilliant and politically most fateful move, in 1998 the Maryland Blues merged with Group Hospitalization and Medical Services Inc. (GHMSI), the parent organization of Blue Cross and Blue Shield of the National Capital Area, which included the District of Columbia, northern Virginia, and two suburban counties in Maryland. GHMSI had undergone its own turnaround since a 1993 nadir of scandal and financial ruin, and it was positioned to expand its penetration of the Federal Employees Health Benefits Program (FEHBP) and the commercial sector in the Washington metropolitan area. The merger between the two Blues plans simplified management and marketing throughout the region and served as a prelude to the affiliation by the Delaware Blues plan two years later. The newly created CareFirst Inc. holding company was eventually subject to regulators in three states and one federal jurisdiction (the District of Columbia, where GHMSI holds a federal charter), simultaneously increasing its political responsibilities but reducing its subservience to any one master. The political cultures in Delaware, Virginia, and the District were distinct from that of Maryland, with Delaware being the home state of many of the nation's investor-owned corporations because of its supportive legal framework, Virginia having facilitated the for-profit conversion of its Blue Cross plan one year earlier, and the District maintaining a vigilant posture with respect to the tendency of suburban commuters to use city services without paying their share of supportive taxes (partially compensated by the flow of suburban premium dollars to GHMSI rather than to the Blues plans in Maryland and Virginia).

CareFirst put its diversification across jurisdictions to work when it closed two money-losing HMO subsidiaries in Maryland and transferred the membership to its D.C. HMO, renaming the consolidated subsidiary BlueChoice and marketing it throughout the region. Individual enrollees in the Maryland HMOs were required to meet underwriting criteria as a condition of enrollment in BlueChoice. Approximately 6,000 people in poor health failed to do so and lost their coverage.[16] The Maryland legislature was angered not merely by the short-term consequences of the underwriting policy, which forced legislators to find coverage in a high-risk pool for the erstwhile Blue Cross enrollees, but by the shift in regulatory oversight from their insurance commissioner to that of the District. Although co-owned by the Blues plans of Maryland and the District, BlueChoice is chartered and regulated in the District of Columbia.

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

■ **Financial turnaround.** An important driver in the political conflict was the remarkable financial turnaround of the Maryland and D.C. Blue Cross plans during the 1990s and, especially, after their combination into CareFirst in 1998. In 1992, at the height of the diversification scandals, the Maryland plan had 1.4 million enrollees and GHMSI had approximately 1.1 million, with both in decline numerically and both facing accusations of financial instability and accounting irregularities.[17] Divestment of subsidiaries unrelated to the core business of health insurance bounced the Maryland plan quickly into the black ink, and a new management team consolidated itself and launched the firm on a strategy of managed care and operational efficiency. It then engaged in a series of largely unsuccessful forays into capitation and integrated delivery but was able to build enrollment and refurbish its product designs and claims payment functions. GHMSI lagged behind its neighbor, enduring several more years of poor performance. After consolidation in 1998, however, CareFirst surged on all measures of performance and by 2002 covered 3.2 million enrollees, brought in $4.12 billion in revenue, and earned $102 million in net income.[18]

The financial improvement at CareFirst did not occur evenly across its three affiliates, a fact that became a major source of contention during and after the conversion debate. Between 1999 and 2002, enrollment grew by 0.9 percent in the Maryland plan, by 47 percent at GHMSI, and by 62 percent at the Delaware Blues plan (which did not join CareFirst until 2000). In 2002 the Maryland Blues accounted for 42 percent of revenue and 21 percent of earnings, compared with 51 percent of revenue and 62 percent of earnings for the D.C. plan, and 6 percent of revenues and 16 percent of earnings for the Delaware plan.[19] Considerable differences of opinion exist as to whether the firm's revival was attributable to managerial acumen or, rather, to larger environmental changes that favored both nonprofit and for-profit Blues plans nationwide. Had CareFirst been an investor-owned firm during the 1990s, the improvements in enrollment and earnings would have led to stock options and performance bonuses not dissimilar in magnitude to the executive bonuses demanded as part of the attempted conversion process. But CareFirst was not an investor-owned firm.

## The Strategy Of For-Profit Conversion

For-profit Blue Cross conversions emerged in the early 1990s as plans in Indiana, California, and other jurisdictions created for-profit subsidiaries as a prelude to public stock offerings.[20] In 1994 Blue Cross Blue Shield of Maryland proposed the creation of a for-profit holding company to include its HMO subsidiaries, its third-party administrator (TPA), an indemnity insurer, and an insurance brokerage, taking with it 1,900 of the parent plan's 2,200 employees.[21] The Maryland Insurance Administration (MIA) denied the proposal on the grounds that it would lead to effective conversion of the entire firm without transfer of any assets to the public. There ensued a five-year struggle between the firm and the polity, with

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

Blue Cross pursuing a market strategy that positioned it for conversion, the state creating a nonprofit foundation to receive social assets in case of a conversion, and both sides apparently doing their best to influence and antagonize the other.

■ **Wooing Trigon.** The conversion strategy reappeared at a CareFirst board meeting in 1999, where it was presented as a means to access financial capital, invest in information technology (IT), develop consumer-oriented insurance products, and grow through mergers and acquisitions.[22] By 1999 the first movers in the national Blues consolidation had already moved, however, and the Maryland plan had to consider joining with an established leader rather than seeking an independent role as a consolidator in its own right. The Maryland Blues rejected Highmark and Anthem, the cash-rich and expansion-oriented Blues plans in Pennsylvania and Indiana, because they were not investor-owned, and narrowed the range of potential partners to Trigon, the Blues plan in Virginia, and WellPoint, the Blue Cross plan in California. Trigon was the obvious merger partner, if a for-profit partner was necessary, given its geographic contiguity and cultural consanguinity with the Maryland Blues plan. Trigon had converted to investor ownership in 1997, transferring $170 million to the State of Virginia; the firm was purchased by Anthem five years later for $4.2 billion. In elaborating the conversion strategy, CareFirst's consultants had touted the potential synergies from merging with an adjacent firm and dismissed as trivial the efficiencies from a merger with any entity outside the mid-Atlantic.

Whatever the potential virtues of a Trigon merger from the perspective of CareFirst as a firm, however, the Virginia suitor apparently suffered from several vices from the perspective of CareFirst as a management team. Despite assurances of retaining jobs and responsibilities in Maryland and the District, it was clear that a merger with Trigon would be an acquisition by Trigon and would have ended the CareFirst executives' aspirations to lead a larger corporate entity.[23] The Trigon leadership held a more sophisticated view of the Maryland political environment than the Maryland Blues had and believed that the financial bonuses demanded by the CareFirst executives would further antagonize the already hostile regulators and ensure the rejection. In the technical discourse of the Trigon executives, administered under oath at governmental hearings in Maryland, the bonuses demanded by the CareFirst executives were "greedy, stupid, and illegal."[24] CareFirst put Trigon on ice and shifted its attention to WellPoint.

■ **Ditching Trigon for WellPoint.** The deliberations and negotiations among CareFirst, Trigon, and WellPoint; their lawyers, consultants, and investment bankers; the regulatory authorities of Maryland, Delaware, and the District of Columbia; and their lawyers, consultants, and investment bankers were complex and often murky. The hearings held by the MIA, which got the jump over Delaware and the District in reviewing the conversion proposal, showcased the ever-changing tactics, offers, counteroffers, valuations, revaluations, and understandings of what was at stake and for whom. The inference by the Maryland insurance commissioner, based on the documents, oral presentations, and his own history of regulating CareFirst,

Downloaded from content.healthaffairs.org by Health Affairs on December 20, 2011
by guest

was that by April 2001 the firm had decided to be acquired by WellPoint and had continued discussions with Trigon only to create the appearance of a good-faith effort to find the best buyer for the firm. Trigon testified that it was willing to raise the purchase price from $1.3 billion to $1.5 billion, if asked, but that the CareFirst executives were solely interested in bonuses and postmerger retention commitments and did not seek to negotiate the highest possible price for their firm. WellPoint objected to the bonuses demanded by the CareFirst management but apparently viewed them as a cost of doing business in a banana republic. (In testimony to the MIA, the WellPoint CEO described the bonuses as essential if his firm were to be permitted by the CareFirst executives to acquire the nonprofit organization: "No bonus, no deal.")[25] Midway through the regulatory hearings, when CareFirst reduced the demanded executive perquisites by $70 million under pressure from the regulators, WellPoint simply added that amount to the sum it was prepared to transfer to whichever charitable foundations Maryland, Delaware, and the District designated as recipients for the nonprofit assets.

■ **From frustration to fury.** By the spring of 2002, however, no amount of money would have purchased acquiescence to a CareFirst conversion by the Maryland legislature and insurance administration.[26] The political establishment had moved from frustration to fury as it watched CareFirst exploit the benefits while avoiding the obligations of nonprofit ownership, exiting unprofitable markets, denying coverage to vulnerable citizens, shifting products to other jurisdictions, aiming lobbying and electoral campaigns at the legislative and executive branches, and providing inconsistent accounts of what it was doing and why. An underlying source of anxiety concerned the potential effect of a sale of the state's dominant insurer, which had traditionally played an important supportive role in Maryland's larger health policy framework and, especially, in the elaborate system of hospital price regulation, certificate-of-need, and cross-subsidies for inner-city hospitals and AMCs. WellPoint was well known for the aggressive rate discounts it demanded from providers in other states, and the Maryland physician and hospital associations feared that the firm would use its market and political clout to undermine the all-payer rate-setting system, perhaps by inducing the federal government to withdraw Medicare from participation. A broad coalition of provider organizations, labor unions, and liberal advocacy groups mobilized to oppose ownership conversion and for-profit health care generally. It would have been hard to imagine a more unlikely pairing than one between WellPoint, one of the most stridently for-profit insurers in the nation, with Maryland, one of the most stridently regulated states in the nation.

■ **Political theatre.** Political theatre displaced other forms of entertainment as the Maryland insurance commissioner held fifteen days of formal hearings, gathered testimony from 250 speakers, and collected 87,000 pages of documents. The valuation estimates for the firm ranged from a low of $1.30 billion (the price demanded by CareFirst management) to a high of $2.27 billion (determined by a consultant hired by an alliance of community organizations), and included $1.37 billion from Care-

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

First's investment bankers; $1.5 billion, the amount Trigon testified that it would have offered; $1.55 billion, the estimate from the MIA's consultants; and $1.70 billion, the estimate from the D.C. insurance commissioner's investment bankers.[27] The ensuing insurance administration report demolished CareFirst's business case for conversion (economies of scale and investments in IT), alleged that executive enrichment ($120 million in bonuses) was the principal motivation for conversion, pronounced that the CareFirst board of directors had fully abandoned its nonprofit mission, and formally denied the firm's petition to convert.[28]

## The Politics Of Regulation

The regulatory rejection of the CareFirst conversion proposal was followed by a rewriting of insurance law and the Blue Cross enabling statute in Maryland, which codified the nonprofit mission of the firm; expanded the oversight powers of the insurance commissioner, the attorney general, and a joint committee of legislators, providers, and business leaders; mandated more direct involvement by the CareFirst board in the daily operations of the firm; limited the compensation of board members and executives; and placed a five-year moratorium on for-profit conversion. Most importantly, the new legislation created a process by which the Maryland members of the CareFirst board would be replaced by people nominated by a legislatively appointed committee, with the implicit presumption that a new board would replace the conversion-oriented executives with people who were philosophically committed to the legislature's policy goals.

■ **Reactions to legislation.** After its public thrashing at the hands of the insurance commissioner, CareFirst initially adopted a conciliatory stance during the legislative process but worked behind the scenes to dilute the statute and, when it became evident that the legislature would indeed use the opportunity to assert full control of the firm, made a strong push for a gubernatorial veto.[29] CareFirst was aided in its opposition to political oversight by the national Blue Cross Blue Shield Association (BCBSA), which had voiced no concerns over the conversion-related bonuses but now threatened to withdraw the Blues trademarks, thereby greatly weakening CareFirst and opening the way for competitive entry by another large Blues firm, if the legislature succeeded in replacing the board. Help also was forthcoming from the Delaware and D.C. insurance commissioners, who were concerned that a neighboring state had rejected a conversion that would have generated millions of dollars for health-related projects and seemed intent on forcing the firm to subsidize unprofitable products in Maryland with surpluses earned elsewhere.

The new governor of Maryland was favorably inclined toward the CareFirst management and repeatedly asserted his concerns over the legislative attack on the firm. But a veto would have been political suicide in the face of the bipartisan, unanimous legislative vote, the enraged citizenry, and the firm's apparently incorrigible behavior. The bill was signed 22 May 2003, prompting a lawsuit by the BCBSA, a countersuit by the State of Maryland, and ultimately a face-saving modi-

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

fication in the way in which the CareFirst board would be replaced.[30] The Maryland attorney general and insurance commissioner proposed civil charges against the CareFirst CEO and board chairman but then held off as the federal government announced a regulatory fishing expedition, subpoenaing thousands of documents without articulating which federal law might have been violated.[31]

The Delaware and D.C. insurance commissioners lobbied strenuously against the Maryland legislation and threatened litigation after its passage, because what played in Maryland as a victory of people over profits played in the neighboring jurisdictions as denial of their sovereignty and potential seizure of their assets. The Delaware commissioner brokered an agreement with CareFirst to permit the reconstitution of an independent board for Blue Cross Blue Shield of Delaware and with the national BCBSA to license the Blues trademarks directly to the Delaware affiliate rather than as part of the larger CareFirst.[32] Similar initiatives, also designed to create a framework for disaffiliation, were pursued by GHMSI and the D.C. insurance commissioner. The Delaware and D.C. initiatives kept the Care-First executives as management for the various Blue Cross plans, reflecting the strong ties between the regulators and regulatees in those jurisdictions. A tense standoff ensued, with the D.C. commissioner mandating that CareFirst ignore Maryland law, Maryland legislators threatening to block any effort at GHMSI disaffiliation, and out-of-state Blue Cross plans prospecting for potential relationships.[33] Tempers rose even higher as UnitedHealthcare announced the acquisition of Mid-Atlantic Medical Services Inc. (MAMSI), the second-largest health plan in the region, signaling a major expansion effort, and as Anthem and WellPoint announced their merger and the formation of a truly national investor-owned Blue Cross plan (presumably willing to acquire any Blues entity that disaffiliated from CareFirst).

■ **The fight for CareFirst's assets.** A disaffiliation by the Delaware Blues would hurt CareFirst but likely would not be of major consequence, as there had not yet been major integration of products and data systems between Delaware and Maryland. Unscrambling the omelet mixed between GHMSI and the Maryland Blues would be another matter altogether. Most contentious would be the right to use the Blues trademarks in the Maryland counties traditionally served by GHMSI and the control of the jointly owned BlueChoice HMO. The Maryland political establishment made it very clear that it would seek to prevent GHMSI from marketing insurance anywhere in Maryland if it disaffiliated from CareFirst, although the D.C. plan's federal charter might override state insurance law. In the case of disaffiliation, Maryland would insist that the assets of the parent CareFirst company be divided according to the relative values of the two plans at the time of affiliation in 1998, when Blue Cross Blue Shield of Maryland was larger and more profitable, rather than their relative values now, when GHMSI accounts for the majority of assets and earnings. According to a "snapshot" study commissioned by Maryland in 1998, Maryland would be due two-thirds of the CareFirst assets, with GHMSI (District of Columbia) ob-

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

taining the remainder.[34] A more recent study, commissioned by the D.C. insurance commissioner, would accord 55 percent of the CareFirst value to the D.C. plan, 28 percent to Maryland, and 16 percent to Delaware.[35]

The CareFirst Watch Coalition, an assembly of community-based, provider, and nonprofit organizations in the District and northern Virginia, parted company with similar entities in Maryland by not opposing for-profit conversion in principle, as conversion was not for them the worst of possible evils.[36] The worst of possible evils would be the continued operation of GHMSI, together with or separated from CareFirst, on a de facto for-profit basis without a formal conversion to transfer assets to a charitable health-oriented foundation. The coalition decided to work with GHMSI to fashion a nonprofit business strategy while continuing to monitor the financial value of the firm to obtain a full asset transfer in what they considered to be a likely future bid for GHMSI from the merged Well-Point and Anthem. The D.C.-based community coalition also took the precaution of hiring its own financial consultant, who estimated that the majority of the CareFirst assets should be allocated to the District of Columbia rather than to Maryland in the event of a subsequent for-profit conversion.[37]

## Alternative Responses To Nonprofit Mission Drift

The CareFirst effort at for-profit conversion will take its place in history as the definitive illustration of mission drift and attempted executive enrichment by a nonprofit health insurance plan. The national tide of public opinion now has shifted decisively against conversions and most Blue Cross plans that until recently considered that option, overtly or covertly, since have returned to the fold.[38] The CareFirst drama has national importance not solely as a rejection of for-profit conversion, however, but as a repudiation of the trusting attitude by states toward nonprofit organizations generally and Blue Cross plans specifically. Four accountability frameworks now present themselves for consideration, each of which has been pursued by one or more states when faced with Blues conversion proposals.

■ **For-profit conversion and endowment of a foundation.** The decision by a state to permit the for-profit conversion of its Blue Cross plan often has sought justification on business grounds, as driven by an imperative to access financial capital to invest in information technology or achieve economies of scale through mergers and acquisitions. Whatever the validity of these arguments for other nonprofits in other time periods, the "business case" clearly fails to justify conversion of Blue Cross plans in the contemporary environment. As detailed in the CareFirst debate and evident in other states, Blues plans have adequate cash flow to finance investments in IT without recourse to equity capital and in fact are investing at rates similar to their for-profit competitors.[39] Most Blues dominate their local markets and would face antitrust objections to local mergers and acquisitions. Antitrust considerations play little role in national Blues consolidations, but the economies of scale to be expected from nonlocal mergers are few, and the diseconomies of scale from incompatible cul-

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

tures and operational processes are many. The fact that a Blue Cross plan does not need to convert to thrive financially is not, however, a sufficient argument for rejecting conversion. If conducted fairly, conversion separates the social assets from the insurance firm and transfers them to a charitable foundation, which can use these funds to pursue health-related programs.[40]

Blue Cross conversion to for-profit ownership and transfer of the value of the social assets to a charitable foundation was pioneered by California and subsequently pursued by other jurisdictions. This framework embodies the view that organizational success in a competitive insurance market requires a culture of financial performance that does not mix well with the broader constituencies and mandates relevant to nonprofit organization. The challenge facing this mechanism, of course, is that it transfers the weak accountability of a nonprofit insurer to the equally weak accountability of a charitable foundation, whose board and management are largely free to pursue their idiosyncratic vision of the public good. The Maryland legislature and regulators considered but rejected this response to the proposed CareFirst conversion, explicitly arguing that they wanted an insurance company, not a charitable foundation, to do their bidding.

■ **For-profit conversion and transfer of assets to the public treasury.** The limitations of charitable foundations do not necessarily invalidate for-profit conversion as an accountability mechanism for the social assets of Blue Cross plans. As pursued by Virginia, New York, and Wisconsin, a state can permit for-profit conversion but transfer the social assets to the state budget (or to state-sponsored medical schools, as in Wisconsin). States support many worthy programs, face resistance to tax increases, and can put conversion funds to good work if they are so inclined. Needless to say, democracy faces its own accountability challenges, and politicians are tempted to use budgetary windfalls of this sort to repay political debts and further their personal careers, as well as to make the world a better place.[41] Seizure without compensation of private charitable assets also raises political, if not constitutional, concerns over the legitimate boundaries and powers of the state.

■ **Nonprofit ownership with detailed regulatory control.** The third framework to support accountability for the social assets embodied in Blue Cross plans is that pursued by Maryland in dealing with CareFirst: rejection of conversion and the subsequent imposition of continual oversight by the legislature and regulatory authorities. This approach combines a nonsentimental acknowledgment of the tendency toward mission drift in nonprofit organizations with a perspective that state government can benefit from cooperation with an entity that has the skills of an insurance corporation but the soul of a nonprofit organization. Some might see the Maryland approach as a stepping-stone on the way to the elimination of private ownership in insurance and its replacement by a public (single-payer) system. For its part, the Maryland legislature seems no more interested in owning Blue Cross than it is in owning hospitals but seeks to extend rate regulation and enforced cross-subsidies from the hospital sector to the insurance sector.

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011 by guest

41–49; T. Heath, "Blue Cross Customers Felt Subsidiaries' Losses," *Washington Post*, 17 September 1992; K. Riley, "Washington Blues Face Fund-Commingling Probe," *Washington Times*, 22 January 1993; P. Meisol, "MD Blues Cash Supply Falls Sharply," *Baltimore Sun*, 14 November 1992; C.E. Shepard and T. Heath, "Losses Said to Threaten Health Insurers," *Washington Post*, 9 August 1992; T. Heath, "Insurer Barred from Creating New Spinoffs," *Washington Post*, 27 August 1992; and T. Heath, "Credit Card Spinoff of Blue Cross of Maryland Lost $13 Million," *Washington Post*, 22 August 1992.

6. T. Heath and A.B. Crenshaw, "Blue Cross Spent Freely on Perks: Area Plan Financed Trips, Parties, Cars as Losses Mounted," *Washington Post*, 15 November 1992; and L. Williamson, "State to Grill Insurer: Panel Seeks Facts on Blues Expenses," *Annapolis Capital*, 1 October 1992.

7. A.B. Crenshaw, "Senate Panel Rips D.C. Blue Cross: Executives Spent Lavishly, Probe Finds," *Washington Post*, 27 January 1993; T. Heath, "Two Ex-Officials of Blue Cross Indicted in MD," *Washington Post*, 30 March 1994; T. Heath, "MD Insurance Chief Has Been Blue Cross's Guest at Ballpark," *Washington Post*, 28 September 1992; and P. Meisol and A. LoLordo, "Blues Official Got $3.6 Million Retirement Plan," *Baltimore Sun*, 23 October 1992.

8. Shepard and Heath, "Losses Said to Threaten Health Insurers."

9. Heath, "MD Insurance Chief Has Been Blue Cross's Guest at Ballpark"; T. Heath and A.B. Crenshaw, "Treasurer Says MD Blue Cross Is Overvalued by $80 Million," *Washington Post*, 26 September 1992; K. Riley, "Blues Unit Agrees to Settle Fraud Suit," *Washington Times*, 18 November 1992; P. Meisol, "Report Uncovers Pattern of Hiding Facts," *Baltimore Sun*, 25 September 1992; and S.K. Cooper, "GAO Reports MD Blues Owe Medicare $8.8M," *Healthweek News*, 11 February 1991.

10. A.B. Crenshaw and T. Heath, "Six Blues Said to Be in Trouble," *Washington Post*, 29 November 1992.

11. T. Heath, "Blues President Sardegna Removed from Chairmanship of Board," *Washington Post*, 9 October 1992; Meisol and LoLordo, "Blues Official Got $3.6 Million Retirement Plan"; T. Heath and A.B. Crenshaw, "Maryland Insurance Chief Considering Resignation," *Washington Post*, 17 December 1992; T. Stuckey, "Top Insurance Official Says MD Blue Cross Is Gaining Strength," *Washington Post*, 21 July 1993; T. Heath and A.B. Crenshaw, "Maryland Blue Cross Head Quits," *Washington Post*, 5 December 1992; T. Heath and A.B. Crenshaw, "Financial Officer Quits in Blue Cross Shake-Up," *Washington Post*, 19 November 1992; and A.B. Crenshaw, "Executive Who Led Insurer Downhill Won't Testify," *Washington Post*, 28 January 1993.

12. Maryland Office of Policy Analysis, *Legislative Guide to Nonprofit Health Plan Conversions* (Annapolis: Maryland Department of Legislative Services, January 2002).

13. C.J. Schramm, *Blue Cross Conversion: Policy Considerations Arising from a Sale of the Maryland Plan* (Baltimore: Abel Foundation, November 2001).

14. Maryland Department of Legislative Services, "Health and Health Insurance: Nonprofit Health Entity Accessibility," *Issue Papers, 2001 Legislative Session* (Annapolis: MDLS, December 2000).

15. MDLS, "Health and Health Insurance: Nonprofit Health Entity Conversion," *Issue Papers, 2002 Legislative Session* (Annapolis: MDLS, December 2001).

16. M.W. Salganik, "Insurer Held to Put Profit over Patients," *Baltimore Sun*, 20 October 2001.

17. Shepard and Heath, "Losses Said to Threaten Health Insurers."

18. Cain Brothers, *Valuation Report on CareFirst, Inc. Prepared for Government of the District of Columbia, Office of the Corporation Counsel and Department of Insurance and Securities Regulation* (New York: Cain Brothers, 23 January 2003). The numbers cited in the text refer to the twelve-month period through 30 September 2002, the end of the third financial quarter. Revenues are calculated as premiums (insured business) and administrative services fees (self-insured business), rather than as premiums for insured business plus "premium equivalents" (inferred premium revenues had self-insured business been insured) for self-insured business. CareFirst Inc. reports revenues on a premium-equivalent basis.

19. Ibid.

20. L. Scism, "Blue Cross Plans Rush to Spin Off Units amid Boom in Managed Care Shares," *Wall Street Journal*, 1 July 1994; M. Freudenheim, "For-Profit Shift at Blue Cross: A Dozen Area Plans May Seek Investors," *New York Times*, 30 June 1994; and Cunningham and Cunningham, *The Blues*.

21. MDLS, "Insurance: Restructuring Blue Cross Blue Shield," *Issue Papers, 1995 Legislative Session* (Annapolis: MDLS, December 1995).

22. Credit Suisse First Boston, Presentation to the Board of Directors, Project Chesapeake (CareFirst), 20 November 2001. PowerPoint presentation included in *Selected Documents Related to the Conversion and Acquisition of CareFirst BlueCross BlueShield*, State of Maryland, General Assembly, No date (Materials collated as background for legislative response to proposed CareFirst conversion).

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011
by guest

23. S.B. Larsen, *Report of the Maryland Insurance Administration Regarding the Proposed Conversion of CareFirst Inc. to For-Profit Status and Acquisition by WellPoint Health Networks, Inc.* (Baltimore: Maryland Insurance Administration, March 2003).

24. M.W. Salganik and R. Little, "Officials Trade Accusations on CareFirst-Trigon Deal," *Baltimore Sun,* 1 October 2002.

25. Larsen, *Report of the Maryland Insurance Administration.*

26. For a perspective on the CareFirst history by the Speaker of the Maryland House of Delegates, see M.E. Busch, "General Assembly Deals with CareFirst Conversion," *Maryland Medicine* (Spring 2002): 17–20.

27. The $2.27 billion estimate was from R.F. Meyer, *The Valuation of the DC, Maryland, and Delaware Blue Cross Blue Shields,* Supplement to Report of 4 March 2003, Prepared for DC Appleseed Center, 4 September 2003, www.dcappleseed.org/images/MeyerAllocationFinal.pdf (12 May 2004). The $1.37 billion estimate was from Credit Suisse First Boston, Presentation to the Board of Directors, Project Chesapeake (CareFirst), 20 November 2001, in *Selected Documents Related to the Conversion and Acquisition of CareFirst BlueCross BlueShield.* The $1.55 billion estimate was from Blackstone Group, *Valuation Report on CareFirst, Inc.,* Report to Maryland Insurance Administration, 11 February 2003, www.mdinsurance.state.md.us/documents/blackstonefinal valuationreport2-13-03.pdf (12 May 2004). The $1.70 billion estimate was from Cain Brothers, *Valuation Report on CareFirst, Inc.*

28. Larsen, *Report of the Maryland Insurance Administration.*

29. D.T. Dang and M.W. Salganik, "Stealth Effort to Kill Reform of CareFirst," *Baltimore Sun,* 1 June 2003.

30. D.T. Dang and M.W. Salganik, "Blues, MD Gain Tentative Deal on CareFirst," *Baltimore Sun,* 4 June 2003.

31. A.W. Redmer (Insurance Commissioner), *Legislative Report of the Maryland Insurance Administration on MIA Order No. 2003-02-032* (Baltimore: Maryland Insurance Administration, 8 July 2003); D.T. Dang, "Insurance Chief Targets CareFirst Executives," *Baltimore Sun,* 9 July 2003; M.W. Salganik, "Insurer Says Subpoenas Are Received; Federal Investigation of CareFirst Expected to Be Long, Detailed; A Fishing Expedition; Curran to Weigh In with Report Next Week," *Baltimore Sun,* 15 August 2003; and M.W. Salganik, "Care-First Customer Shield Is Suggested; Curran Seeks More than a Year to File Charges in Insurance Cases," *Baltimore Sun,* 3 September 2003.

32. D.L. Williams (Delaware Insurance Commissioner), *In the Matter of Proposed Affiliation of BCBSD, Inc. Doing Business as Blue Cross Blue Shield of Delaware, with CareFirst, Inc. Decision and Amended Order,* Docket No. 99-09 (Dover: Delaware Insurance Commission, 1 December 2003); and J.D. Epstein, "CareFirst to Cede Control to Del. Plan; Restoring Blue Cross Independence Proposed as Response to Regulators," (Delaware) *News Journal,* 18 September 2003.

33. B. Brubaker, "DC Official Tells CareFirst to Ignore MD Law," *Washington Post,* 25 October 2003; B. Brubaker, "Mergers Pressure CareFirst: Competition Adds to Worries of Investigation, Maryland Law," *Washington Post,* 3 November 2003; and M.W. Salganik, "DC Wants MD CareFirst Law Altered," *Baltimore Sun,* 25 November 2003.

34. Ellin and Tucker, Chartered, *Maryland Insurance Administration, RFP D80R200005, Analysis Report* ("Snapshot Report") (Baltimore: Ellin and Tucker, 16 January 1998).

35. Cain Brothers, *Valuation Report on CareFirst, Inc.*

36. The perspectives of this community and provider coalition based in the District of Columbia can be obtained from www.dcappleseed.org (19 January 2004).

37. Meyer, *The Valuation of the DC, Maryland, and Delaware Blue Cross Blue Shields.*

38. J.R. Raskin, *Anthem Inc. Company Update: It's Not Easy Being Blue* (New York: Lehman Brothers Equity Research, 7 August 2003).

39. Blackstone Group, *Analysis of CareFirst Inc. Business Case;* and Schramm, *Blue Cross Conversion.*

40. J.C. Robinson, "Capital Finance and Ownership Conversions in Health Care," *Health Affairs* 19, no. 1 (2000): 56–71.

41. J.C. Robinson, "The Curious Conversion of Empire Blue Cross," *Health Affairs* 22, no. 4 (2003): 100–118.

42. Immanuel Kant (1784), cited in I. Berlin, *The Crooked Timber of Humanity: Chapters in the History of Ideas* (Princeton, N.J.: Princeton University Press, 1959).

Downloaded from content.healthaffairs.org by *Health Affairs* on December 20, 2011 by guest