**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FELDMAN'S MEDICAL CENTER PHARMACY, INC., and PHARMACY MANAGEMENT ASSOCIATES, LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. WDQ-12-613 |
| | ) | |
| v. | ) | |
| | ) | |
| CAREFIRST, INC., INDEPENDENCE BLUE CROSS, QCC INSURANCE COMPANY, THE BLUE CROSS AND BLUE SHIELD ASSOCIATION, and JOHN DOES 1 – 10, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

**DECLARATION OF ANTHONY PADUANO
IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND AND
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

ANTHONY PADUANO, under penalty of perjury, deposes and says:

1.     I am admitted to practice before this Court *pro hac vice* and a member of the firm of Paduano & Weintraub LLP, attorneys for Plaintiffs Feldman's Medical Center Pharmacy, Inc. and Pharmacy Management Associates, LLC ("Plaintiffs").  I submit this Declaration in support of Plaintiffs' Motion for Remand.

**Procedural History of the Case**

2.     On December 22, 2011, Plaintiffs filed the First Amended Complaint in the Circuit Court for Baltimore City.  A copy of the First Amended Complaint is attached hereto as Exhibit A.

3.     On February 23, 2012, Defendant Independence Blue Cross and QCC Insurance Company (together, the "IBC Defendants") filed a Notice of Removal, removing the case from the Circuit Court for Baltimore County to this Court. (Docket No. 1)

4.     On March 2, 2012, the IBC Defendants filed their Motion to Dismiss the First Amended Complaint. (Docket No. 8)

5.     On March 5, 2012, Defendant CareFirst, Inc. ("CareFirst") filed a Combined Motion to Dismiss and Joinder in the IBC Defendants' Motion to Dismiss. (Docket No. 9).  On the same date, CareFirst also filed a Joinder in IBC's Notice of Removal. (Docket No. 10)

6.     On March 6, 2012, Defendant the Blue Cross and Blue Shield Association ("BCBSA") filed a Joinder in the Notice of Removal. (Docket No. 12)

7.     On March 19, 2012, BCBSA filed a Motion to Dismiss the First Amended Complaint. (Docket No. 36)

**The FMCP ERISA Case**

8.     In June 2009, Feldman's filed a lawsuit against Defendant CareFirst in the Circuit Court for Baltimore County, captioned Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc, Case No. 03-C-09-6257 seeking payment

of nearly $2 million in claims for life-saving Factor drugs dispensed to hemophiliac patients insured by CareFirst or insured by other licensees of BCBSA and for whom CareFirst acted as the payment "gatekeeper" under the rules of the BlueCard system in which the BCBSA's licensees participated.  A copy of the Complaint is attached hereto as Exhibit B.

9.     On February 1, 2010, CareFirst removed the case from the Circuit Court for Baltimore County to this Court.  A copy of the Notice of Removal is attached hereto as Exhibit C.  In this Court, the case was captioned in Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc., Case No. 10-254 (SKG) (the "FMCP ERISA Case").

10.     On March 3, 2010, Feldman's moved to remand the FMCP ERISA Case to State Court.  A copy of Feldman's Motion to Remand is attached hereto as Exhibit D.

11.     On March 17, 2010, CareFirst filed its Opposition to Feldman's Motion to Remand (Exhibit E hereto).  In its Opposition, CareFirst argued that although Feldman's asserted state law claims in its Complaint, ERISA preempted the state law claims because Feldman's also asserted an alternate theory of recovery based on general assignments of benefits Feldman's had received from its patients.  The legal effect of the assignments was to put Feldman's in the patients' shoes for purposes of recovery of the unpaid claims.

12.     On June 29, 2010, the Court denied Feldman's Motion to Remand, finding that the only reason the lawsuit for unpaid claims was removable

to federal court was because Feldman's asserted a theory of recovery based on the patient assignments.   A copy of the Court's June 29, 2010 Order is attached hereto as Exhibit F.

13.    On October 24, 2011, after CareFirst had paid all of the outstanding claims, the parties each filed motions for summary judgment.   On October 24, 2011, Magistrate Judge Gauvey issued a Memorandum Opinion and Order granting in part and denying in part each of the motions which was limited exclusively to the issue of prejudgment interest.   In so doing, the Court granted prejudgment interest to Feldman's. On November 9, 2011, the Court issued an Amended Memorandum Opinion and Order in connection with the case.   A copy of the Amended Memorandum Opinion and Order, reported at 2011 WL 5433754, is attached hereto as Exhibit G.

14.    The case remains *sub judice* on the issue of Feldman's application for attorneys' fees and costs.

**The Templin Case**

15.    On September 8, 2009, Feldman's, along with FCS Pharmacy LLC ("FCS") and two individuals who were participants in an ERISA plan – Christopher Templin and Viola Hendrick – filed a lawsuit against IBC, QCC, and CareFirst in the United States District Court for the Eastern District of Pennsylvania captioned Templin v. Independence Blue Cross, Civil Action No. JHS-09–4092 (the "Templin Case").

16.    In that Complaint, Feldman's and its co-plaintiffs asserted federal question jurisdiction based on the participation in the lawsuit of the two ERISA plan participants – one who was a patient of Feldman's and/or FCS and other who was the guardian and caregiver of a patient of Feldman's and/or FCS – as well as based on the assignments of benefits Feldman's and FCS had received from the patients whose claims were at issue in that case.

17.    On December 21 and December 22, 2009, respectively CareFirst and IBC each filed a Motion to Dismiss the Plaintiffs' First Amended Complaint.  CareFirst, IBC and QCC asserted that Feldman's and FCS did not have standing to bring an ERISA claim because the assignments from the patients were invalid under anti-assignment clauses in the insurance contracts.  The Memoranda of Law in Support of the Motions to Dismiss are attached hereto collectively as Exhibit H.

18.    In October 2010, CareFirst, IBC and QCC agreed to pay all of the outstanding claims.  Because significant claims remained unpaid despite the promise to pay, on November 15, 2010, Plaintiffs filed a Second Amended Complaint with leave of Court.  On December 3, 2010, IBC and QCC filed their combined Motion to Dismiss the Second Amended Complaint.  In the Motion, they argued that Appellants' claims should be dismissed as moot, because Defendants – for reasons that were still not disclosed – had decided to pay all of the claims.  CareFirst did not move to dismiss and instead, filed its Answer on December 2, 2010.

19.     On May 13, 2011, the Court granted IBC's and QCC's Motion to Dismiss the Second Amended Complaint with prejudice.  The District Court held that because Plaintiffs had received payment, the case was now moot.  In addition, the District Court, <u>sua sponte</u>, dismissed all claims against CareFirst, although CareFirst never moved to dismiss the Second Amended Complaint.  A copy of the Court's May 13, 2011 Order is annexed hereto as <u>Exhibit I</u>.

20.     Subsequent to the dismissal, both Plaintiffs and Defendants IBC and QCC filed cross-motions for awards of attorneys' fees and costs.  The Court denied those motions.  Cross-appeals of these various orders are currently pending before the Third Circuit.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 23, 2012.**

/s/ Anthony Paduano
Anthony Paduano

# EXHIBIT A

FELDMAN'S MEDICAL CENTER
PHARMACY, INC. and PHARMACY
MANAGEMENT ASSOCIATES, LLC,

        Plaintiffs,

v.

CAREFIRST, INC.,
1501 South Clinton Street
Baltimore, Maryland 21224

INDEPENDENCE BLUE CROSS,
1901 Market Street
Philadelphia, Pennsylvania 19103

QCC INSURANCE COMPANY,
1333 Chestnut Street
Philadelphia, Pennsylvania 19107

THE BLUE CROSS BLUE SHIELD
ASSOCIATION,
7004 Security Boulevard
Baltimore, Maryland 21207

and JOHN DOES 1-10,

        Defendants,

IN THE

CIRCUIT COURT FOR

BALTIMORE CITY

Civil Action No. 24-C-11-008977

**JURY TRIAL DEMANDED**

---

## FIRST AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, as and for their First Amended Complaint,

allege:

        Plaintiffs Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and

Pharmacy Management Associates, LLC ("PMA" and, together with Feldman's,

"Plaintiffs") bring this action to seek redress for the deliberate, concerted and

abusive actions of Defendants CareFirst, Inc. ("CareFirst"), Independence Blue Cross ("Independence"), QCC Insurance Company ("QCC"), John Does 1-10, and the Blue Cross and Blue Shield Association (the "BCBSA"), which have resulted in the destruction of Feldman's once-thriving retail pharmacy and business of providing life-saving medicine to individuals suffering from hemophilia, and caused PMA to sell Feldman's operating assets at a fire-sale price. Defendants put profits and executive compensation above their responsibility to their insureds and vendors and participated in a scheme to: (a) drive Feldman's out of business, (b) direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, (c) purge hemophiliacs from the rosters of their insureds and push Feldman's hemophilia patients to government programs such as Medicare and Medicaid, and/or (d) steer Feldman's hemophilia patients to large pharmacies and pharmacy benefit managers from whom Defendants receive a financial benefit or in whom Defendants have a financial interest. Under the guise of a completely bogus and never-ending "investigation," Defendants worked hard and steadily to defame Feldman's, to violate applicable laws pertinent to their dealings with Feldman's, to defraud Feldman's, and to interfere in Feldman's business with the ultimate purpose of destroying Feldman's ability to supply "high value" and very expensive medicines to Feldman's patients. Because it was focused on "loss savings," i.e. not paying claims, CareFirst wrecked Feldman's business and PMA's investment therein.

2

As a result of Defendants' purposeful and unjustified actions, Feldman's accounts receivable grew to nearly $4 million, forcing Feldman's to default on its bank loans. On information and belief, CareFirst, Independence, QCC and the BCBSA knew or should have known that Feldman's accounts receivable were growing and were untenable for a company of Feldman's size. CareFirst had audited Feldman's in the past and knew that mounting accounts receivable would lead to the destruction of Feldman's. Feldman's serious financial hardship and ultimate default caused by Defendants' actions set in motion a chain of events that forced Feldman's out of the business of providing life-saving medicine to chronically-ill hemophiliacs and forced PMA to sell its interest in Feldman's.

## PARTIES

1.      Feldman's is a Maryland corporation, with its principal place of business located at 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201. Until the events complained of herein, Feldman's had a highly profitable and thriving business that included the dispensing of Factor drugs to hemophiliacs.

2.      Pharmacy Management Associates, LLC is a Maryland limited liability company, with its principal place of business located at 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201. Until the events complained of herein, PMA owned and profitably operated all aspects of Feldman's and had no intention whatsoever of diminishing or liquidating its investment in Feldman's. PMA is a wholly-owned subsidiary of Factor Health Management, LLC.

3

3.     Defendant CareFirst, Inc. is a Maryland corporation with its principal office located at 1501 South Clinton Street, Baltimore, Maryland 21224.

4.     Defendant BCBSA is a national federation of 39 independent, community-based and locally operated Blue Cross and Blue Shield companies and an Illinois corporation that has its national headquarters at 225 North Michigan Avenue, Chicago, Illinois 60601. BCBSA also maintains an office in Maryland at 7004 Security Boulevard, Baltimore, Maryland 21207 and in Washington D.C. at 1310 G Street, N.W., Washington, D.C. 20005. BCBSA does business in the State of Maryland directly, and indirectly through its licensees.

5.     Defendant Independence Blue Cross is a Pennsylvania non-profit corporation and health insurer in southeastern Pennsylvania with its principal place of business located at 1901 Market Street, Philadelphia, Pennsylvania 19103. On information and belief, Independence operates under a license from the BCBSA.

6.     On information and belief, defendant QCC Insurance Company is a Pennsylvania corporation with its principal place of business located at 1333 Chestnut Street, Philadelphia, Pennsylvania 19107. On information and belief, QCC is a wholly-owned subsidiary of AmeriHealth, Inc. which in turn is a wholly-owned subsidiary of Independence. According to information obtained from the Independence website (www.ibx.com), insurance benefits offered through Independence are underwritten or administered by QCC, and both QCC and Independence operate under licenses from the BCBSA. QCC knew that if it did not promptly pay good and valid claims for reimbursements submitted by Feldman's for

4

Factor — given the enormous cost of the Factor — that Feldman's business would be severely impaired or destroyed.

7.     On information and belief, John Does 1 – 10 are individuals or entities who conspired with CareFirst, Independence, and the BCBSA to drive Feldman's out of business, to purge hemophiliacs from the rosters of their insureds and to push the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees. In the event they were unable to achieve the primary objectives of the conspiracy, on information and belief, John Does 1 – 10 conspired with CareFirst, Independence, and BCBSA to drive the very profitable business of providing medication to hemophilia patients from Feldman's to pharmacy benefit managers or large chain pharmacies in exchange for some form of compensation paid to John Does 1 – 10, to CareFirst, to Independence, or to each of CareFirst, Independence, and John Does 1 - 10.

8.     The true names and identities of John Does 1 - 10 are currently unknown to Plaintiffs. If necessary, Plaintiffs will seek leave of the Court to amend the First Amended Complaint to state the true names and identities of John Does 1 – 10 when this information is ascertained through discovery in this action.

## JURISDICTION

9.     Jurisdiction is appropriate in this Court pursuant to §§ 6-102, 6-103, and 6-201 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, because (i) CareFirst resides in, and maintains its principal place

of business in, Baltimore City, (ii) BCBSA transacts business in Maryland, performs services in Maryland, and caused tortious injury in Maryland based on acts both inside and outside the State, and (iii) Independence and QCC transact business in Maryland, perform services in Maryland, and caused tortious injury in Maryland based on acts both inside and outside the State, and (iv) John Does 1 – 10 caused tortious injury in Maryland based on acts both inside and outside the State.

## BACKGROUND INFORMATION

### A.    Background on Hemophilia

10.    Hemophilia is an hereditary genetic disorder that impairs the body's natural ability to control blood clotting. Blood clotting is the mechanism used by the body to stop bleeding. Hemophiliac patients therefore experience prolonged bleeding from the slightest wound, as well as painful internal bleeding without apparent cause. As a result, hemophiliacs are literally in mortal danger any time they suffer a cut or a bruise. There is no cure for hemophilia but it can be treated acutely and prophylactically.

11.    Internal bleeding – often spontaneous – is common in hemophiliacs, especially in their joints and their head, and in addition to the risk of death such internal bleeding often results in severe and permanent joint damage and disfigurement.

12.    Clotting Factors are proteins in the blood that help strengthen blood platelet plugs that form at the site of injury to a blood vessel. Blood clotting is impaired in hemophiliacs because their bodies do not produce sufficient blood

clotting Factor to clot their blood. In a "normal" person's body, the blood's normal clotting Factor would stop the bleeding in short order. However, for a hemophiliac, the deficiency of natural blood clotting Factor means that a scab will form at the site of the wound, but the clot cannot be maintained. The result is bleeds that can last for days and weeks, and can ultimately be fatal. For these individuals, an injection of the deficient clotting Factor is necessary so that the patient does not "bleed out" and die.

13. Prior to 1993, the typical treatment for hemophilia was an infusion of replacement clotting Factor that was derived from human blood plasma that had been donated to a blood bank. In the 1980s and 1990s, much of the blood supply in the United States became tainted with blood infected with hepatitis and/or the HIV virus. Out of approximately 22,000 hemophiliacs in the United States at the time, approximately 6,000 to 10,000 became infected with HIV as a result of this contamination of the blood bank supply. The most famous instance of HIV infection of a hemophilia patient was Ryan White, a 12 year old boy who became infected through blood products used to clot his bleeds, who died of AIDS in 1990. Many hemophiliacs also became infected with hepatitis. As a result of the mass infection of hemophiliacs with HIV and hepatitis, the hemophilia community became extremely mistrustful of "outsiders," or those without a personal experience with hemophilia, and sought out pharmacies and other service providers with experience with the hemophilia community.

14.     In response to the tragic circumstances of a vulnerable population of hemophiliacs contracting incurable viral illnesses, pharmaceutical companies developed recombinant, or synthetic, products that replace the missing clotting Factor in a hemophiliac patient without subjecting that patient to the risks and diseases inherent in the human blood supply. For example, ADVATE, Antihemophilic Factor (Recombinant) (Plasma/Albumin Free), is administered directly into the bloodstream by simple injection and works by temporarily raising the level of Factor VIII in the blood, thus allowing the body's blood clotting process to function properly. Such synthetic drugs are very expensive – costing in the tens of thousands of dollars a month – due to the length of time it takes to manufacture the drugs, the small number of hemophilia patients in the United States, and the frequency of the required injection treatments.

15.     The Factor medicine is administered by self-injection. After a minimal amount of training, the patient or the patient's family member(s) can administer the injection without the presence of a nurse or other medical professional.

16.     With proper care and access to medication, hemophiliacs can and do live productive lives. But without such care or medication, hemophilia is debilitating and ultimately fatal.

17.     For example, prior to the development of effective treatments in the 1960s, the average life expectancy for a hemophiliac was only 11 years. By the 1980s, the average life expectancy for a hemophiliac receiving Factor

8

replacement treatment derived from human blood was 50–60 years.  Today, with proper treatment with synthetic Factor drugs, hemophiliacs have life expectancies equal to the average life expectancies of non-hemophiliacs.

18.    Since the 1980s, the primary cause of death among hemophiliacs is no longer bleeds, but rather complications from HIV/AIDS acquired through treatment with contaminated blood products.  The second leading cause of death for hemophiliacs is intracranial hemorrhage, or bleeding in the skull, which today accounts for one-third of all deaths of patients suffering from hemophilia.

19.    Many hemophiliacs can inject themselves with the Factor medicine after they suffer a bleed and they will recover in due course.  But for many others, they must treat themselves prophylactically pursuant with regular infusions of the Factor medicine in order to keep clotting levels sufficiently high to prevent spontaneous bleeding episodes.

20.    Although prophylactic treatment with Factor medicine can cost tens of thousands of dollars each month and more than acute treatment with Factor medicine, in 2007 the New England Journal of Medicine published a study that showed the overwhelming effectiveness of prophylactic treatment compared to on-demand treatment.

21.    As a result of the study, the United States Food and Drug Administration ("FDA") approved Factor medicine for prophylactic use.

22.    The FDA has approved for prophylactic use clotting Factor replacement drugs that replace Factor VIII.  Factor VIII refers to the particular

9

protein that is deficient in some hemophiliacs. Other hemophiliacs suffer deficiencies in other proteins, but 80 percent of hemophilia cases involve Factor VIII deficiencies.

23. Prophylactic use of Factor drugs also reduces the frequency and length of hospital visits and stays for hemophilia patients.

24. Each person who suffers from hemophilia is different and there is no way to tell the proper course of treatment or dosage for a hemophilia patient other than through trial and error by an experienced physician.

25. Proper dosage depends on the weight and size of the patient, the severity of the Factor VIII deficiency, the location and extent of the bleeding, and the patient's clinical condition. Package inserts for recombinant (i.e., synthetic) Factor medicine contain recommended dosage levels, but these are just back-of-the-envelope calculations that do not take into account the particular needs of individual patients. Therefore, the package insert for ADVATE warns:

> The dose and frequency of administration should be based on the individual clinical response. Patients may vary in their pharmacokinetic (e.g. half-life, *in vivo* recovery) and clinical responses to ADVATE. Although you can estimate the dose by the calculations above, it is highly recommended that, whenever possible, appropriate laboratory tests including serial Factor VIII activity assays be performed.

26. The appropriate dosage for any particular patient may, and often does, change throughout the patient's lifetime. This is so because the amount of factor product a patient uses depends on such patient's size and weight, as well as the type of factor deficiency such patient suffers from and whether such

patient has an inhibitor (i.e., a condition which required a different type of factor product be dispensed to the patient). For instance, as a child with hemophilia grows and gains weight, the appropriate dosage of Factor medicine to treat that child will increase.

27.   Due to the relative rarity of hemophilia, the expense of the synthetic clotting Factor medicine, and the medicine's limited shelf life, most pharmacies do not stock Factor medicine.

28.   Hemophiliacs must either relocate with their families to the vicinity of a hemophilia treatment center – often located hundreds or thousands of miles from their home – or make their own arrangements to obtain Factor medicine as needed.

29.   Due to the critical importance of obtaining this drug and keeping sufficient quantities on hand, and the mistrust many in the hemophilia community have toward those outside of the hemophilia community, people with hemophilia generally seek out independent "specialty" pharmacies that have experience with the unique needs of the hemophilia community and who have earned the trust of the hemophilia community.

30.   On information and belief, the large chain pharmacies and pharmacy benefits managers that are preferred by the insurance companies over smaller, independent pharmacies, do not provide a personal level of service like the independent specialty pharmacies do, and do not have the trust of the community. The large chain pharmacies and pharmacy benefits managers do, however, have

11

much greater financial resources than the smaller, independent pharmacies, and, on information and belief, are willing to use those resources to undercut the independent pharmacies' pricing – even though the insurer sets the maximum prices it will pay for any particular dispensed drug – and offer financial incentives – i.e., "discounts" or "kickbacks" – to the insurers for steering business to the chain pharmacies and pharmacy benefits managers.

**B.**  **Background on Pharmacy Industry**

31.    There are more than 56,000 community pharmacies, including traditional chain pharmacies, food and pharmacy combinations, mass merchandise pharmacies and independent pharmacies, including "niche" pharmacies, providing ambulatory prescriptions to patients across the United States.

32.    "Specialty" drugs are prescription medications for complex conditions that require special handling, administration, or monitoring. Not only are the drugs for these conditions high in cost, they can be high maintenance, meaning that they require specialized delivery and administration on an ongoing basis.

33.    Not all community pharmacies will dispense specialty drugs.

34.    These products tend to present challenges of inventory, product knowledge, administration tools and delivery.  The challenges inherent in dealing with specialty drugs are exacerbated when dealing with a small community of critically-ill patients, like the hemophilia community, who require regular and emergency deliveries of Factor medicine.

12

35.     Independent pharmacies, such as Feldman's, have traditionally become successful businesses by serving these niche specialty markets.

36.     In fact, prior to March 2009 when Feldman's was forced out of the business of dispensing Factor medicine to hemophiliacs, Feldman's was extremely profitable, with revenue growing to approximately $3.7 million and gross profit of nearly $1 million.

37.     But for the wrongdoing complained of herein, PMA would never have sold Feldman's and would have for many years reaped growing profits from its investment in Feldman's.

38.     National chain pharmacies such as CVS Caremark and Walgreen sometimes offer specialty drugs through their mail order services, but not usually through their local pharmacies.  They are also generally large and impersonal businesses, and have not built the trust required to effectively service the hemophilia community.

39.     Each of the five largest pharmacy benefit managers ("PBMs") – Medco Health Solutions, Inc. ("Medco"), CVS Caremark Corp. ("CVS"), Express Scripts, Inc. ("Express Scripts"), Prescription Solutions Inc. and Catalyst Rx – operates its own mail order pharmacies to fill prescriptions directly.

40.     However, the PBMs also have not shown an inclination to build the trust, and provide the personal level of service, demanded by the small community of patients suffering from hemophilia.

13

41.    PBMs are contracted by health insurance companies to act as third party administrators of the insurers' prescription drug programs, with responsibility for processing and paying prescription drug claims.

42.    Typically, the PBM's role includes oversight over independent pharmacies that dispense medicine to an insurer's insureds, including the power to investigate and audit providers on the PBM's own initiative or at the request of a health insurer.

43.    In other words, health insurers often outsource everything related to prescription drugs and pharmacy to PBMs, who administer and process prescription drug claims, as well as investigate and audit providers on their own initiative or at the request of their health insurer clients.

44.    In addition to administering the claims submitted by independent pharmacies, the PBMs aligned with CareFirst and Independence manage all aspects of a prescription drug benefit plan, including creating formularies of preferred medicines, negotiating with drug manufacturers for discounts and rebates, negotiating with pharmacies to establish retail networks for dispensing drugs, and establishing automated processes for determining (often called "adjudicating") coverage eligibility at the point of sale.

45.    PBMs therefore, on the one hand, directly compete with independent pharmacies by owning and operating their own retail and mail order pharmacies and, on the other hand, play a role in the adjudication of claims and the

14

investigation of pharmacies by health insurers, including the investigation of the very pharmacies with whom the PBMs compete.

46.    PBM, chain and independent pharmacies offering specialty medications through delivery and mail service are required to operate under the same board of pharmacy regulations that govern conventional medication dispensing in the state in which the pharmacy is physically located.

47.    Pharmacies have pharmacy licenses issued by the state that governs the scope of their operations.

48.    State boards of pharmacy set regulations and parameters within which pharmacists practice.    The boards monitor compliance with pharmacy standards so the pharmacists clearly understand what is expected of them.

49.    Under Maryland law, patients are free to use the licensed pharmacy of their choosing.

50.    Nevertheless, on information and belief CareFirst and Independence tried to push Feldman's patients to abandon Feldman's and get their Factor medicine from PBMs and chain pharmacies such as CVS Caremark and ICORE Healthcare, even though the patients were satisfied with the services they received from Feldman's, and wary of the limited customer service offered by the PBMs and chain pharmacies.

## C.    Background on Feldman's

51.    Feldman's Medical Center Pharmacy, Inc., along with its sister company Feldman's Pharmacy at Chartwell, LLC, (together, "Feldman's") are wholly-owned subsidiaries of PMA.

52.    Feldman's is a retail pharmacy serving principally the Baltimore – Washington, D.C. metropolitan area and, during the time it was owned by PMA, was increasingly focused on providing specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease, hepatitis and HIV.

53.    At all times that Feldman's was operated by PMA, Feldman's was nationally accredited by The Joint Commission, formerly the Joint Commission on Accreditation of Healthcare Organizations.  At all relevant times Feldman's was also properly licensed by the Board of Pharmacy of the State of Maryland.

54.    At all times relevant hereto, Feldman's was a pharmacy that dispensed and delivered life-saving medicine to patients suffering from hemophilia.

55.    Defendants' purposeful and malicious actions caused Feldman's severe financial difficulties which led to Feldman's defaulting on its bank loans and ultimately forced Feldman's out of business.  In December 2009 PMA was forced to sell all of Feldman's assets, excluding receivables which were retained by Feldman's.

56.    After the crisis of the 1980s and 1990s, when 6,000 to 10,000 hemophiliacs (estimates vary) – out of a total population of approximately

16

22,000 people – were infected with HIV and other incurable viral diseases transmitted through the tainted blood supply, blood Factor was in short supply.

57. In addition, hemophiliacs and their families became extremely distrustful of the medical and pharmaceutical communities, including government regulators, who failed to protect the hemophilia community from tainted blood products.

58. In fact, the hemophilia community became, and still is today, distrustful of anyone who does not have hemophilia, or does not at least have a family member who suffers from hemophilia.

59. Of equal weight to their sense of distrust, hemophiliacs constantly live with the risk that they may not be able to get adequate supplies of factor dispensed and delivered within a narrow time frame in the event of a catastrophic bleed. As mentioned previously, PMA's acquisition of Feldman's was to ensure that the patients it served would be able to receive their necessary factor products within a six hour time frame.

60. In October 2007, PMA, a special purpose company, purchased Feldman's from its founder, Les Feldman, with a plan to expand Feldman's from a small, independent pharmacy into a leading provider of specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease (a bleeding disorder more common, and typically less severe than, hemophilia, that affects both men and women), hepatitis C, and HIV.

17

61.     PMA bought Feldman's from its founder in October 2007 in order to better serve patients who suffered from "specialty" diseases.

62.     PMA planned to grow the newly-acquired Feldman's business by using it as a platform to (i) expand and diversify Feldman's existing business, (ii) add additional pharmacies, giving Feldman's a local presence in its patients' geographic areas, and (iii) offer additional specialized products and services to patients suffering from other specialty disease states, including but not limited to von Willebrand disease, hepatitis and HIV.

63.     PMA acquired Feldman's in order to better service what was, and continues to be, an existing and growing market of hemophiliac patients. In furtherance of the legitimate business purpose of both PMA and its parent company, Factor Health Management, LLC, PMA acquired Feldman's in order to ensure that Feldman's proximity to its patients was within a six hour delivery radius, which improved the services rendered to and received by its hemophiliac patients as well as allowed for cost savings in the form of volume discounts provided by the manufacturers of blood factor products used by hemophiliacs.

64.     Profit margins for drugs used to treat specialty disease states are greater than those for drugs used to treat common ailments.

65.     Reimbursement rates for the Factor drugs that are referred to in this complaint were always set by CareFirst and/or Independence.

66.     Feldman's quickly became one of the leading providers of medicine and supplies for hemophiliacs in certain regions of the United States and

18

spent significant amounts of money building a business that catered to the unique needs of the vulnerable hemophilia community.

67. Feldman's was sensitive to the needs of hemophilia patients and their families, and worked hard to earn the trust of a community that was very mistrustful of outsiders.

68. Feldman's did this, in part, by not just focusing on profits but on people; Feldman's worked with other concerned entities that focused on education and advocacy for the hemophilia community. On information and belief, few other specialty pharmacies, and certainly not the big pharmacy chains and pharmacy benefit managers, had this depth of focus.

69. Feldman's had a relationship with CareFirst and its predecessors that went back to Feldman's inception in the 1970s. From Feldman's inception until approximately 2008, Feldman's regularly submitted claims to, and was reimbursed by, CareFirst and its predecessors, for drugs including many injectible medicines and high dollar value medicines.

70. As with all other drugs, the reimbursement rates Feldman's was paid for Factor drugs was set unilaterally by CareFirst and/or Independence.

71. After PMA acquired Feldman's, however, everything changed. As Feldman's raised its profile as a trusted partner of the hemophilia community, its business grew substantially in a short period of time. That growth, however, put Feldman's on CareFirst's and the BCBSA's radar as a company that dispensed large amounts of Factor drugs to hemophilia patients.

19

72.     Independence became aware of Feldman's when Feldman's submitted claims to CareFirst – pursuant to the BlueCard System – for patients insured by Independence.

73.     CareFirst, Independence, and the BCBSA then focused on ways to remove those patients from the insurance rolls of CareFirst, Independence, and the other BCBSA licensees.

74.     By March 2009, when Feldman's began to wind down its business as a result of Defendants' conspiracy, Feldman's had revenues of approximately $3.7 million and gross profit of nearly $1 million.

75.     PMA had no intention of selling Feldman's until forced to do so by the wrongdoing complained of herein.

**D.     Background on CareFirst**

76.     CareFirst is, by a wide margin, the dominant health insurance company in Maryland.  CareFirst has an exclusive license from the BCBSA to use the "Blue Cross" and "Blue Shield" names and logos in Maryland, as well as in Northern Virginia, Washington, D.C., and parts of West Virginia and North Carolina. Along with its affiliates CareFirst of Maryland, Inc. ("CFMI") and Group Hospitalization and Medical Services, Inc. ("GHMSI"), CareFirst does business as CareFirst BlueCross BlueShield.

77.     As a licensee of the BCBSA, CareFirst directly and/or through its subsidiaries provides commercial and other health insurance products to 3.3 million people out of a total potential market of 6.3 million people in Maryland,

Northern Virginia, West Virginia, North Carolina, and Washington, D.C. This represents 43 percent of an otherwise fractured market; the next largest competitor has 15 percent of the market.

78.     For fiscal year 2009, CareFirst had $6.8 billion of revenue and $96.8 million of net income. CareFirst has approximately $3.7 billion in assets.

79.     CareFirst was incorporated as a non-profit corporation on January 16, 1998, the result of a merger between GHMSI and CFMI.

80.     GHMSI operates under a federal charter issued in 1939 that requires GHMSI "to be a charitable and benevolent institution" and "conducted for the benefit of [policyholders]."

81.     CFMI is also organized as a non-profit entity.

i.     **CareFirst Abuses its Non-Profit Status**

82.     Despite the non-profit status of the various CareFirst entities, the Insurance Commissioner for the State of Maryland has stated that CareFirst "strayed significantly from its nonprofit mission" and "assumed all the operating characteristics and corporate goals and mission of a for-profit company."

83.     For years, CareFirst has had a reputation for abusing its non-profit status and neglecting its obligations to its insureds and other stakeholders in order to provide excessive compensation, benefits and perks to its senior executives.

84.     One key program CareFirst devised to accomplish this was labeled "loss savings," a cover for holding up or denying payment for any baseless, bogus or suspect reason or reasons that CareFirst could concoct.

85.     In the 1980s and 1990s, according to the peer reviewed journal Health Affairs, CareFirst's predecessor companies in Maryland and the District of Columbia

> were poster children of nonprofit corruption and incompetence, squandering their assets on ego-building but money-losing diversification initiatives and on lavish executive lifestyles that devoted more days per year to jetting around the globe than to paying insurance claims back home.
>
> * * *
>
> The chief executive officer (CEO) of the D.C. Blues managed to spend 202 days in one year on the road, running up half a million dollars in direct travel expenses alone, while his senior vice president toured resorts worldwide to ascertain their suitability for subsequent corporate gatherings. The Blues rented skyboxes at the Orioles baseball stadium, hosted parties at horse-racing events, flew dozens of managers to the winter and summer Olympics, and spent $44,000 per year on golf balls and greens fees. Because these were nonprofit organizations, managerial stock options were not a possibility, but the insurers paid their executives salaries commensurate with those of investor-owned corporations, engineered financial accounts to facilitate inflated pension and expense-account contributions, and engaged in loss-generating contracts with firms controlled by executives and their families.

A copy of the *Health Affairs* article, "For-Profit Non-Conversion And Regulatory Firestorm At CareFirst BlueCross BlueShield" is attached hereto as Exhibit A.

86.     In or about 1993, a new CEO was installed at CareFirst and new regulations were passed by the State of Maryland to curb CareFirst's abuses.

22

87. On information and belief, the for-profit culture at CareFirst remained in place, as it still does today.

88. Eager to get out from under the newly-tightened controls imposed by the Maryland legislature, in 1998 GHMSI and CFMI merged and formed CareFirst, Inc. as a holding company for GHMSI (the D.C.-based insurer) and CFMI (the Maryland-based insurer). As part of the reorganization, some of CFMI's operations were removed from the jurisdiction of the Maryland insurance commissioner to the lighter touch of the D.C. regulator.

ii. **CareFirst Puts "Profits" Over Patients**

89. A few years later, in 2001, CareFirst attempted to become a for-profit company, and entered into merger negotiations with two for-profit insurance behemoths, Trigon, the then-BCBSA licensee in Virginia, and Wellpoint, the BCBSA licensee in California.

90. In later testimony under oath in a hearing before the Maryland Insurance Administration (the "MIA"), Trigon executives testified that the financial bonuses demanded by CareFirst executives – reported to be in excess of $120 million, of which $40 million, on information and belief, was slated for CareFirst's CEO – were "greedy, stupid, and illegal."

91. Trigon further testified that it was willing to significantly raise its offer for CareFirst and informed CareFirst's executives of that fact, but that the CareFirst executives were only interested in bonuses and post-merger retention commitments and did not negotiate the highest possible price for the company.

23

92. Wellpoint was the winning bidder for CareFirst. Its CEO, also in testimony before the MIA, asserted that CareFirst's executives made it clear that without payment of large bonuses to CareFirst's executives, there would be no deal to purchase CareFirst.

93. According to a Report issued by the Maryland Insurance Administration in March 2003, a copy of which can be found at http://www.mdinsurance.state.md.us/sa/documents/FinalMIAReport-CareFirst3-5-03.pdf and is incorporated herein by reference, Wellpoint's CEO testified that "it was only through the agreement to pay the executive bonuses that would [sic] Wellpoint be granted the privilege of purchasing CareFirst." Report of the MIA at p. 133. In other words, according to the MIA's Report, the CareFirst Board viewed the financial interests of the executives as more important than the interests of the company, the Maryland taxpayers, and the patients insured by CareFirst.

94. Estimates of the tax benefits that accrue to CareFirst from its non-profit status range from $12 – 21 million per year in Maryland alone. In exchange, CareFirst has an obligation to act in an ethical manner, serving the community that subsidizes its activities. Yet CareFirst's executives sought to convert the subsidy provided to them by the taxpayers of Maryland into massive bonus payments for themselves in the sale of the company.

95. The MIA denied CareFirst's petition to convert to a for profit entity, accusing CareFirst's Board and executives of violating their fiduciary obligations to the company.

24

96. Despite this colossal failure, CareFirst's CEO earned $16.5 million from 2001 to 2006, plus an additional $1.6 million in deferred compensation. Upon the CEO's retirement in 2006 in the wake of the stinging 2003 rebuke by the MIA, the CEO was awarded nearly $18 million in severance payments by CareFirst's Board.

97. The for-profit culture at CareFirst continues today. On information and belief, CareFirst routinely seeks additional "profits" – or, to use CareFirst's preferred nomenclature, to avoid "exposure" – by denying claims for benefits submitted by patients and practitioners, including claims submitted by Feldman's.

98. Feldman's claims for Factor medicines were undoubtedly very costly for CareFirst, and CareFirst sought to keep its "exposure" – i.e., the cost of the medicine necessary to keep its insureds alive – as low as possible and to drive its insureds' preferred pharmacy out of business.

99. By this conduct, CareFirst acted in contravention of its mandate.

100. As nonprofit health service plans, CareFirst, CFMI and GHMSI are mandated by their state and federal charters to act in the interest of the public and their insureds and provide affordable and accessible health insurance to their insureds.

### iii.   Other Litigation Between Feldman's and CareFirst and Independence

101. In June 2009, Feldman's sued CareFirst in the Circuit Court for Baltimore County, Maryland for more than $1.5 million in unpaid claims for Factor medicine dispensed to patients insured by CareFirst, or for whom CareFirst acted as the "host plan" under the rules of the BlueCard system.

102. On February 1, 2010, the case was removed by CareFirst to the United States District Court for the District of Maryland, Civil Action No. 1:10-cv-00254-WDQ. In August 2010, CareFirst finally conceded its liability for the claims and began to pay the principal amount of the claims. The litigation continues in the District Court regarding Feldman's entitlement to attorneys' fees.

103. According to the BCBSA's website, "BlueCard is a national program that enables members of one Blue company to obtain healthcare services while traveling or living in another Blue company's service area. The program links participating healthcare providers with the independent Blue companies across the country and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement."

104. The BCBSA licensee that insures the patient – typically the BCBSA licensee operating in the geographic region where the patient's primary residence or employer is located – is referred to as the "home plan" under the BlueCard Program.

105. The BCBSA licensee that is located in the geographic region where the healthcare provider is located – whether a doctor, or a pharmacist – is referred to as the "host plan" under the BlueCard Program. The "host plan" acts as administrator of a claim submitted by a provider and purportedly has the authority to block processing or payment of any claim.

106. But, in the interim, CareFirst—by the wrongdoing complained of herein—had managed to eliminate Feldman's from the specialty pharmacy business in CareFirst's geographic region.

107. Independence's role in the conspiracy cannot de discounted.

108. On or about June 2, 2008, Independence personnel contacted employees at Feldman's seeking information and documents. Thereafter, Feldman's received no further communication nor did it get paid on the outstanding claims. Rather it was only in response to a demand letter to IBC sent by Feldman's counsel on February 12, 2009 that Independence advised Feldman's for the first time by letter dated February 13, 2009 that all claims submitted by Feldman's which involved shipments of Factor outside of Maryland were rejected based upon CareFirst's determination that Feldman's did not have the appropriate licensing.

109. Accordingly, based upon Independence's failure to pay Feldman's claims and additional claims of Independence's insureds, on September 9, 2009, Feldman's and FCS Pharmacy LLC ("FCS"), a company that shares the same ultimate equityholders as Feldman's, filed a complaint against Independence

27

and CareFirst in the Eastern District of Pennsylvania seeking payment of approximately $2.2 million in outstanding invoices.

110. On April 19, 2010, pursuant to a directive from the Court, the parties met in Philadelphia to discuss the outstanding claims. At that meeting CareFirst and Independence pointed fingers at each other concerning the failure to pay alleging, in turn, that there was paperwork missing, that there had been processing errors on the part of Independence and CareFirst and that the failure to hold a valid license precluded the payment of the Feldman's claims. There was no resolution of the claims at this meeting in light of the charade engaged in by both Independence and CareFirst.

111. Thereafter, the Court ordered that the parties proceed to an administrative review of the claims at issue.

112. After a first level appeal done on papers, Independence issued a determination continuing to deny all claims. The parties then proceeded to a second level appeal.

113. On October 14, 2010, at the in-person hearing of the appeal required by the Court, Independence presented no witnesses, testimony or argument. CareFirst failed to attend the "hearing." Notwithstanding this, for reasons that are still unknown to Feldman's on October 29, 2010 Independence issued a determination to pay the outstanding claims. Despite this decision, the claims were not fully paid until February 13, 2011.

E.   **Background on the BCBSA**

114. Led by Calvin Sneed, a Senior Anti-Fraud Consultant for the BCBSA, the BCBSA spearheaded and coordinated with CareFirst and Independence a conspiracy to (a) drive Feldman's out of business, (b) direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, (c) purge hemophiliacs from the rosters of their insureds and push Feldman's hemophilia patients to government programs such as Medicare and Medicaid, and/or (d) steer Feldman's hemophilia patients to large pharmacies and pharmacy benefit managers from whom CareFirst and/or Independence receives a financial benefit or in whom CareFirst and/or Independence has a financial interest.

115. On information and belief, prior to joining the BCBSA, Sneed was employed as a Supervisory Special Agent with the Office of the Inspector General for the U.S. Department of Health and Human Services. For more than 26 years, Sneed was involved in a wide range of investigative activities on behalf of the federal government, including conducting health care fraud investigations.

116. On information and belief, as a result of Sneed's government investigation experience he knew the buzzwords and theories to promote in order to get the FDA, FBI, and other government investigatory agencies interested in a baseless investigation of Feldman's.

117. The 39 independent licensees of the BCBSA provide health insurance coverage to more than 100 million Americans, or approximately one-half of all Americans with private health insurance.

29

118. In addition, more than 90 percent of hospitals and 80 percent of physicians contract with BCBSA licensees – more than any other insurer. Individually and collectively, the BCBSA and its licensees possess significant market power in their respective geographic markets and across the United States.

F.     Background on Independence

119. As a licensee of the BCBSA, Independence directly and/or through its subsidiaries provides commercial and other health insurance products to insureds primarily in eastern Pennsylvania, covering approximately 3.1 million people.

120. In 2010, Independence had revenue of $9.7 billion and profit of $211 million.

121. Independence conspired with CareFirst and the BCBSA to deny Feldman's payment for Factor drugs Feldman's dispensed to Independence's insureds, which payments Feldman's was entitled to by contract and law. Independence so conspired solely for the purpose of injuring Feldman's.

## FACTUAL ALLEGATIONS

122. Defendants, acting with a unity of purpose and a common design, intent and understanding, conspired to drive Feldman's out of business. As a result, Feldman's suffered serious financial hardship and eventually was indeed forced out of the business of providing life-saving medicine to chronically-ill hemophiliacs.

30

123. Aside from the damage caused to Feldman's, Defendants' conspiracy had a pernicious effect on competition in the market to provide hemophilia drugs in the State of Maryland, preventing CareFirst's insureds from doing business with their preferred pharmacy and preventing Feldman's from conducting (and growing) its lawfully-operated business.

124. Defendants accomplished all this without ever proving any wrongdoing, illegality, or breach of contract on the part of Feldman's.

125. In fact, an alphabet-soup of federal, state, and local law enforcement agencies investigated Feldman's based on allegations made by Defendants, yet on information and belief, all investigations regarding Feldman's were closed without any finding of material wrongdoing on the part of Feldman's. On information and belief, such agencies were intentionally misled by Defendants with regard to the information supplied to them by Defendants.

## The Conspiracy Against Feldman's

126. On information and belief, Defendants were involved in a number of conspiracies against Feldman's, including a conspiracy to drive Feldman's out of business, a conspiracy to purge hemophiliacs from the rosters of their insureds and push Feldman's patients to government-run Hemophilia Treatment Centers and programs such as Medicare and Medicaid, and a conspiracy to steer Feldman's patients to pharmacies that provided financial benefits to CareFirst and/or Independence and its affiliate QCC.

31

## A.       The Conspiracy to Drive Feldman's Out of Business

127.   CareFirst is a non-profit company, but it consistently operated as a profit seeking entity, in order to enrich its executive "leadership." On information and belief, CareFirst employees were expected to limit CareFirst's "exposure" to expensive treatments or patients.

128.   When CareFirst became aware that Feldman's was submitting claims for relatively large numbers of hemophilia patients – i.e., that CareFirst had serious "exposure" to hemophilia patients – CareFirst became extremely concerned.

129.   CareFirst balked at paying the high cost of the Factor medicine and, along with its co-conspirators Independence, QCC, the BCBSA and John Does 1 – 10, engaged in a witch hunt to find reasons to deny payment to Feldman's, in an effort to drive Feldman's out of business and hemophilia patients to other insurance companies, to Medicaid or to federal-government funded Hemophilia Treatment Centers.

130.   At all times relevant hereto, it was CareFirst alone that set the rates at which Factor drugs were to be reimbursed.

131.   CareFirst's efforts as part of the conspiracy were coordinated by its Special Investigations Unit, primarily Jaime Hanson and Elizabeth Foreman, supervised by Andrea Cherenzia, along with CareFirst's pharmacy director, Winston Wong and took the form of an amateurish, but secret, "investigation" that had as its purpose the identification of any and all reasons – valid or not – to deny

Feldman's the reimbursements to which it was entitled by law and contract and which it needed to survive.

132. The BCBSA's participation in the conspiracy was led by Calvin Sneed, who spearheaded and coordinated the conspiratorial "investigation" to (a) deny Feldman's the cash to which by contract and law it was entitled, thereby increasing Feldman's receivables to astronomical levels and causing Feldman's to default on its debt, (b) drive Feldman's out of business, (c) purge hemophiliacs from the rosters of their insureds and direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, and (d) steer hemophilia patients to PBMs and Hemophilia Treatment Centers and away from independent pharmacies that were not "preferred" by the conspirators.

133. Independence and QCC participated in the conspiracy primarily through Independence's Senior Financial Investigator, Michael Ebner, who regularly met with, spoke to, and/or emailed with Jaime Hanson and Calvin Sneed. Ebner was assisted by Christopher Deery, also a Senior Financial Investigator for Independence.

134. Edward Litchko, head of Independence's Corporate and Financial Investigations Department, who, on information and belief, rarely became personally involved in investigations, was also personally involved in the efforts to deny Feldman's the cash to which by contract and law it was entitled.

135. CareFirst and Independence worked hard to make sure that Feldman's could not operate as typical pharmacies operate in Maryland because

CareFirst and Independence did not want to bear the expense of insuring people who were seriously ill.

136. As part of their "investigation" of Feldman's, CareFirst, Independence, and the BCBSA came up with an ever-shifting set of completely bogus reasons for not paying Feldman's.

137. CareFirst at various times claimed that Feldman's was committing fraud by diverting Factor drugs to the purported "grey market," that the Factor replacement treatments lacked medical necessity, that Feldman's did not have a valid contract with CareFirst and that the claims paperwork was out of order.

138. Each one of these excuses was shown to be unequivocally wrong.

139. CareFirst finally settled on the excuse that Feldman's did not have a particular type of home health care license – a Residential Service Agency ("RSA") license – but it was ultimately conclusively proven that Feldman's did not need an RSA license.

140. Independence accepted CareFirst's false representations about Feldman's supposed lack of proper licensure and even filed legal papers repeating CareFirst's false and malicious statements.

141. Independence dispatched its own investigators, who although quickly establishing that Feldman's engaged in no wrongdoing of any type, worked

hard to intimidate Feldman's patients in an effort to cause them to question Feldman's bona fides so that they would discontinue their patronage of Feldman's.

142. Ultimately, Independence denied payment to Feldman's – or put a "hold" on Feldman's claims without ever denying the claims – based only on the representations made by CareFirst and the BCBSA and, on information, in total violation of Independence's standard operating procedures.

143. Even though CareFirst ultimately acknowledged that it had no valid reason to deny Feldman's claims, and even though CareFirst and Independence ultimately paid Feldman's outstanding claims – but not interest on such claims as required by Pennsylvania, Maryland, and/or federal law – the damage to Feldman's was already done.

144. By the time Feldman's was vindicated and the claims that had been unpaid for up to three years were finally paid, Feldman's had defaulted on its bank loans and was out of the Factor drug business. Feldman's had already moved its patients to other Factor providers.

145. PMA ultimately sold Feldman's assets at fire sale prices, losing current and future profits from an extremely lucrative line of business that PMA had spent significant time and money building.

i.   **CareFirst, Independence and the BCBSA**
     **Conspire to Limit Hemophilia "Exposure"**

146.  Almost immediately after PMA acquired Feldman's in October 2007, CareFirst became suspicious of Feldman's.

147.  On October 26, 2007, Calvin Sneed sent a memo to all BCBSA Licensee Anti-Fraud Unit Managers/Directors alerting them about a pharmacy named FCS Pharmacy ("FCS") and asking them to contact the BCBSA licensee in Louisiana with any information about any exposure to FCS.

148.  FCS and PMA share the same ultimate equityholders.

149.  On information and belief, at this point CareFirst began exploring the connections between FCS and Feldman's.

150.  After the 2007 Alert was sent, a "Factor VIII Strike Force" was formed by the BCBSA and the Special Investigation Units ("SIUs") of the BCBSA licensees, including CareFirst's SIU and Independence's Corporate and Financial Investigations Department ("CFID"), to coordinate their "investigations" into FCS and other pharmacies dispensing Factor medicine to hemophilia patients.

151.  On December 5, 2007, Jaime Hanson, an investigator for CareFirst, sent an email to Elizabeth (Betty) Foreman, another investigator for CareFirst, stating that CareFirst had some "serious exposure" to FCS that warrants investigation.

152.  On information and belief, it was the investigation of FCS that led CareFirst to investigate Feldman's.

153. CareFirst, in coordination with the BCBSA and Independence, sought and utilized illegitimate reasons to deny payment to independent providers of the Factor medicine the providers were dispensing. Notably, however, none of CareFirst, the BCBSA, or Independence contacted FCS or Feldman's or asked for any explanations or information prior to launching their investigation.

154. On February 6, 2008, Sneed of the BCBSA coordinated a conference call for medical directors of BCBSA licensees, including, on information and belief, CareFirst's medical director and Independence's medical director. In advance of the meeting, Sneed distributed a memorandum which asked, among other things, whether it was possible to establish coverage and/or payment restrictions on Factor drugs due to the high cost of such drugs.

155. On information and belief, CareFirst and the BCBSA were not actually interested in investigating a purported fraud; CareFirst simply did not want any "exposure" to claims for expensive Factor medicine and was willing to purge hemophiliacs from its rosters of insureds to reduce such "exposure."

156. On information and belief, a consultant working for a large PBM confirmed the real rationale for the bogus "investigation" when, on information and belief, he admitted that insurers do not want too many hemophilia patients on their insurance rolls.

157. On February 12, 2008, four months after PMA acquired Feldman's, Sneed sent out a request to all BCBSA licensees, seeking data relating to the amount of payments made to pharmacies dispensing Factor VIII. The data

request specifically excluded patients who received factor from large, national or institutional providers such as CVS/Caremark.

158. On information and belief, CareFirst and the BCBSA targeted small, independent pharmacies because CareFirst and other BCBSA licensees received lucrative financial benefits from the large, national and institutional providers and therefore sought to drive hemophilia patients from the small, independent specialty pharmacies to the large national providers and PBMs.

159. On information and belief, CareFirst had not found any evidence of any wrongdoing by Feldman's.

160. On March 13, 2008, CareFirst's Pharmacy Director Wong wrote to Jaime Hanson, telling Ms. Hanson that they had not found any real problems with Feldman's business.

161. Nevertheless, CareFirst and the BCBSA continued to "investigate" but were never able to find anything wrong.

162. In April 2008, the National Health Care Antifraud Association held its annual Pharmacy Conference which, on information and belief, was attended by investigators for various health insurance companies. At the conference, an FBI agent apparently made a presentation and requested that any of the participants dealing with hemophiliacs contact him. Jaime Hanson was there and contacted him.

163. On information and belief, the FBI was not impressed with the information they received from CareFirst regarding Feldman's and never pursued a formal investigation of Feldman's.

164. Nevertheless, on June 19, 2008 CareFirst officially opened its own investigation of Feldman's.

165. On information and belief, the massive and entirely bogus "investigation" of Feldman's and other independent pharmacies was triggered by a spike in claims for Factor drugs that resulted from Feldman's success at building relationships with patients in the hemophilia community.

166. CareFirst and the BCBSA, in searching for a way to save on the costs associated with covering expensive treatments for a small, chronically-ill community so that they could keep "profits" and executive compensation at the BCBSA licensees inflated, decided to destroy Feldman's and remove it as a provider of the Factor medicine, thereby forcing patients to get their medicine from PBMs and large chain pharmacies that offered better financial terms to CareFirst.

167. Under the scheme, even if CareFirst was ultimately required to pay the claims for Factor medicine, CareFirst would nevertheless be able to inflict severe financial damage on Feldman's and the other independent providers of the medicine.

168. These independent pharmacies and wholesalers, particularly Feldman's, could not survive dispensing millions of dollars in Factor medicine

without consistent, periodic reimbursement and with the uncertainty of ever getting reimbursed.

### ii.    CareFirst, Independence, and the BCBSA Focus on Feldman's

169. On June 26, 2008, Betty Foreman and Jaime Hanson conducted an on-site audit of Feldman's. At that time, a Feldman's employee provided Hanson and Foreman an in-depth description of Feldman's strategy to focus on specialty diseases, such as hemophilia.

170. Shortly after the audit, at which again no wrongdoing was discovered by CareFirst, on information and belief CareFirst put a "hold" on all claims submitted by Feldman's. The "hold" meant that no payments were permitted on such claims, even if the "home plan" – i.e., the BCBSA licensee that insured the patient – wished to make such payments.

171. On information and belief Independence, as the home plan for certain insureds, simply followed CareFirst's lead and put a "hold" on all Feldman's claims, or, in Independence's parlance, "flagged" the claims without conducting any independent review of the claims on behalf of its own insureds.

172. The "holds" placed by CareFirst and Independence were improper under both Maryland's and Pennsylvania's "prompt pay" laws.

173. Section 15-1005 of the Insurance Article of the Annotated Code of Maryland requires health insurers to pay, deny or dispute a claim for benefits within 30 days after receipt of a claim for reimbursement that is

accompanied by properly completed paperwork containing all reasonably necessary information.

174. Section 991.2166 of the Pennsylvania Quality Health Care Accountability and Protection Act, provides that "[a] licensed insurer or managed care plan shall pay a clean claim submitted by a health care provider within forty-five (45) days of receipt of the clean claim."

175. On information and belief, the BCBSA, CareFirst, and Independence violated their own internal procedures in placing the "hold" on Feldman's claims. According to the BCBSA's own BlueCard Claims Processing Manual, all clean claims are to be forwarded to home plans by host plans, even in cases of suspected fraud or abuse.

176. Clean claims are defined as claims for which the required documentation is provided with the claim.

177. On information and belief, some claims submitted by Feldman's to CareFirst were not forwarded to the relevant "home plan" by CareFirst. When CareFirst did forward a claim to the "home plan," CareFirst instructed the "home plan" not to pay the claim.

178. CareFirst informed Independence on numerous occasions that CareFirst was denying Feldman's claims for "improper licensure" or other fabricated reasons.

179. Independence understood CareFirst's implicit message – that Independence was to deny, or "hold," claims for similar reasons.

41

180. Independence followed CareFirst's lead and did not pay Feldman's claims, for no reason other than CareFirst's made unfounded – and unconfirmed by Independence – allegations against Feldman's.

181. On information and belief, Independence continued this approach even after it – and CareFirst – had determined that they had not a single legitimate basis upon which to deny Feldman's reimbursements for the drugs that Feldman's supplied to the insureds of Independence and CareFirst.

182. On October 29, 2008, representatives of CareFirst and Independence, as well as Calvin Sneed of the BCBSA, attended a meeting of the Strike Force at the offices of Highmark Blue Cross in Camp Hill, Pennsylvania.

183. On information and belief, Feldman's was one of the main topics of discussion.

184. At the Camp Hill meeting, on information and belief, CareFirst, Independence, and the BCBSA developed the "theories" that would be used to deny, or place "holds" on, claims submitted by Feldman's.

185. On information and belief, at the Camp Hill meeting and at numerous other meetings of the Factor VIII Task Force, CareFirst defamed Feldman's.

186. CareFirst regularly told fellow BCBSA licensees and law enforcement that Feldman's was involved in "fraud" and was diverting the Factor medicine to a "grey market", each of which are serious felonies, if they were true.

42

187. On at least one occasion, Jamie Hanson, an investigator for CareFirst, also trafficked in rumors about Feldman's, passing a rumor about Feldman's supposed bankruptcy to an investigator working for the BCBSA's Louisiana licensee.

188. On information and belief, CareFirst's knew or should have known that these statements were false, but CareFirst made the statements with the intention of turning its fellow BCBSA licensees against Feldman's, as well as to instill fear among hemophilia patients that they would not be able to obtain their vital Factor medicine from Feldman's, causing the patients to seek out an alternative source for the medicine.

189. On information and belief, Defendants tried very hard to interest the United States Department of Justice, the Office of Criminal Investigation of the United States Food and Drug Administration (the "FDA") and the Attorney General of the Commonwealth of Pennsylvania in prosecuting Feldman's based on facts and theories that CareFirst and Independence knew, or should have known, had no basis in truth or reality. Defendants were successful in baiting at least the FDA.

### iii. The Bogus "Diversion" Claim

190. At the request of the BCBSA and its licensees, the FDA investigated FCS on allegations of diversion of Factor medicine to the "grey market."

191. Based upon information provided by CareFirst, the FDA conducted a similar investigation of Feldman's.

43

192. Apparently, the allegations involved Feldman's somehow dispensing more Factor medicine than a patient needed, even though the amount of Factor medicine dispensed to a patient is set by the patient's prescribing doctor, not the patient's pharmacy.

193. Feldman's is not aware of any investigation by CareFirst, Independence, or the BCBSA into doctors who allegedly write prescriptions for Factor medicine in excess of amounts that CareFirst, Independence, or the BCBSA consider "medically necessary."

194. Under CareFirst's "theory," Feldman's would divert the excess Factor medicine from a patient – unbeknownst to the patient – to a supposed "grey market" that existed for the Factor medicine, and Feldman's would make even more money selling the excess Factor medicine for cash.

195. This theory is beyond ridiculous, has absolutely no basis in fact, and CareFirst and Independence knew so at the time it was proposed.

196. On February 20, 2008, the FDA closed its investigation because it found no evidence of the suspected diversion.

197. Despite the FDA's closed investigation, CareFirst continued to assert that it suspected Feldman's of diversion to the grey market and to deny payment to Feldman's.

198. For example, on October 6, 2008, Jaime Hanson sent an email to her CareFirst colleagues informing them that Sneed was talking to FDA and FBI agents in Texas regarding a possible diversion case.

44

199. CareFirst knew, however, that the allegations of grey market diversion were baseless. On October 21, 2008 a consultant employed by Catalyst Rx, working for CareFirst, who had experience with hemophiliacs and the anti-hemophilic Factor medicine responded to a question about such a "grey market" by informing his contacts at CareFirst that he had never heard of any instance of diversion of Factor medicine.

200. Catalyst Health Solutions Inc., parent of Catalyst Rx, recently bought Walgreen Co.'s PBM subsidiary, Walgreens Health Initiatives Inc. ("WHI"), for $525 million in cash. WHI has been CareFirst's PBM since 2005, and on information and belief has participated in the "investigation" of Feldman's, as has Catalyst Rx. On information and belief, CareFirst has tried to drive Feldman's hemophilia customers to have their prescriptions filled with WHI, because CareFirst received financial incentives from WHI for such "referrals."

201. Unsurprisingly, no evidence of diversion of Factor medicine has ever been shown.

202. Yet Feldman's has been severely damaged by CareFirst's promotion of its "theory," even in the absence of any evidence. CareFirst's defamation of Feldman's resulted in the loss of Feldman's business relationships with Independence and other BCBSA licensees, other non-BCBSA insurance companies, and with potential patients who were concerned about doing business with a company even accused of such unsavory tactics as diverting medicine from chronically ill patients.

45

203. Ultimately, PMA was forced to sell Feldman's operating assets for considerably less than fair market value, in part because of the false, malicious, and defamatory rumors spread by the BCBSA and CareFirst that Feldman's diverted Factor medicine to the non-existent "grey market" and in part because of the uncertainty of whether Feldman's would be paid by CareFirst and/or Independence for Factor drugs dispensed to their insureds.

### iv.   CareFirst Attacks Feldman's Contract With CareFirst

204. In addition to placing a "hold" on Feldman's claims, and defaming Feldman's by accusing it of diverting patients' Factor medicine to a non-existent "grey market," CareFirst also attempted to attack Feldman's contract with CareFirst and to assert that Feldman's was not entitled to reimbursement under that contract.

205. Even though CareFirst had previously been processing claims for Factor medicine dispensed by Feldman's without question, CareFirst claimed to have suddenly realized that Feldman's did not have the "correct" contract to dispense Factor drugs as a CareFirst participating provider.

206. In fact, it is mostly irrelevant whether or not Feldman's was a CareFirst participating provider.

207. Feldman's dispensed expensive, medicine to CareFirst's insureds, and CareFirst is legally required to pay Feldman's for those drugs.

208. Feldman's provider status with CareFirst only affected the price CareFirst was required to pay for the drugs.

46

209. By contract and law, patients are permitted to obtain their medicine at the licensed pharmacies of their choosing and are reimbursed at the rates set by the insurance companies.

210. CareFirst, Independence, and QCC however, without basis refused to pay the claims that resulted from Feldman's dispensing Factor medicine to hemophilia patients.

211. Nevertheless, the contract under which Feldman's was dispensing was the correct contract. According to CareFirst, Feldman's had a durable medical equipment ("DME") contract that covered equipment such as wheelchairs and walkers, equipment that is, by definition, durable. Yet the contract does not mention DME, or any other restriction on the type of item dispensed.

212. Furthermore, Feldman's was billing tens of thousands of dollars a month for Factor drugs under a contract that CareFirst purports was a DME contract. On information and belief, CareFirst has sophisticated fraud detection software running on its claims processing network. Yet CareFirst asserts that it failed to detect recurring claims for injectible medicine – with its own separate claims code – were being billed under a purported DME contract.

213. In fact, CareFirst was only looking for *ex post* justification for its unwarranted decision to deny Feldman's money it was due by contract and by law.

47

214. For example, on March 25, 2009, Hanson wrote a memo to Stacy Breidenstein, Associate Director of Network Management at CareFirst, who, on information and belief, played a significant role in the decision whether to extend a new CareFirst contract to Feldman's. The memo requested that CareFirst Special Investigations be included in the decision whether to extend a new contract to Feldman's. The memo specifically identified "possible diversion" as the reason for the scrutiny to be given to Feldman's.

215. CareFirst's true motives were made clear on April 30, 2009, when Hanson wrote an email to Sneed informing Sneed that CareFirst had decided not to offer Feldman's a new contract and that CareFirst was just looking for the strongest *ex post* justification for its denial.

v. **CareFirst and Independence Use the Bogus RSA Issue to Deny Feldman's Claims**

216. In or around the summer of 2008, CareFirst – after much "research" – "determined" that Feldman's could not dispense Factor medicine because Feldman's did not have an RSA license.

217. On information and belief, CareFirst made up the RSA excuse in order to justify its continued denial of payment to Feldman's, despite no evidence of any wrongdoing by Feldman's. If CareFirst could not find any wrongdoing, it would invent a reason to deny payment.

218. RSA licenses are issued by the State of Maryland's Office of Health Care Quality of the Maryland Department of Health and Mental Hygiene

("OHCQ") to, among other providers, home health agencies, which are medical providers providing medical services in a patient's home.

219. According to the Program Manager for the Ambulatory care unit of the OHCQ, which administers the RSA licensure program, a residential service agency is an option for a patient to receive care in the home as opposed to going to an assisted living or a nursing home. If a provider does not cross the threshold of a patient's home and provide medical services in that home, an RSA is not needed.

220. At no time did any Feldman's employee enter a patient's home to provide medical services, and, on information and belief, CareFirst knew this at all times.

221. If CareFirst had any doubts about this, it could have just asked Feldman's or the patients.

222. In connection with the claims that Defendants refused to pay for years, Feldman's role was limited to filling the patients' prescriptions by dispensing the medication indicated in the prescription by an authorized prescriber (COMAR 10.13.12.01) either (a) to the patient in Feldman's retail pharmacy or (b) by delivery of the prescription via common carrier to the home of the patient or to an agent authorized by the patient.

223. CareFirst, as Maryland's largest insurance company with a near monopoly on the health insurance business in the state, dealt with a wide variety of medical practitioners and pharmacies, and undoubtedly knew when an RSA

license was required by a provider. In fact, Andrea Cherenzia, CareFirst's Director of Special Investigations – and Hanson's and Foreman's boss – has testified that the determination that Feldman's did not have the right license was made by Hanson, after "much research" and in consultation with "other people in the company" including Lisa Anuszewski – CareFirst's Contract Manager for Institutional Contracting – and members of CareFirst's legal staff.

224. Yet with this crack investigative task force researching the licensure requirements for a pharmacy in Maryland, they still got it totally wrong and expect Feldman's to believe that it was an innocent mistake.

225. Independence apparently went along with CareFirst's mistaken determination, and on information and belief did not do any independent research into whether Feldman's actually needed an RSA license.

226. Independence, which was also looking for any excuse to deny claims for Factor medicine, grabbed hold of CareFirst's "findings" and just denied – or placed a "hold" on – Feldman's claims based on CareFirst's representations.

227. On information and belief, Independence also represented to other BCBSA licensees that Feldman's did not have the necessary licenses to dispense Factor drugs, even though no separate license is actually required, in Maryland or Pennsylvania, to dispense Factor drugs.

### a. Feldman's Informed CareFirst It Did Not Need An RSA License

228. However, even if CareFirst and Independence had a mistaken understanding of whether the RSA license was required, their refusal to pay is nevertheless inexcusable.

229. Feldman's told CareFirst on numerous occasions beginning in August 2008 that Feldman's did not carry out any activities that would subject it to an RSA.

230. CareFirst simply chose to ignore Feldman's entreaties and continued to withhold payment of Feldman's claims.

231. CareFirst also did not see fit to inform Independence of Feldman's protestations regarding the RSA issue.

232. Indeed, CareFirst was well aware that Capital Blue Cross, the BCBSA licensee located in central Pennsylvania, had previously taken the position that Feldman's was not required to have an RSA license.

233. On August 21, 2008, Feldman's application for a new contract was denied by CareFirst Credentialing, purportedly for lack of an RSA license.

234. On August 22, 2008, Joel Yerton, an employee of PMA's parent company, sent an email to CareFirst explaining that "I think we might have gotten confused on IV vs. Med Specialty. Feldman's Pharmacy is not a traditional Home Infusion company. They would be more aligned with your Medical Specialty Agency. Does this help?"

235. Chavarria, a recipient of Yerton's August 22 email, understood Yerton's statement to mean "he's saying [Feldman's is] not a home infusion company."

236. On December 11, 2008, the Maryland Department of Health issued an RSA certificate to Feldman's.

237. But for CareFirst's insistence, Feldman's did not need and never would have sought an RSA license.

**b.      Even After Feldman's Got Its RSA License, CareFirst and Independence Continued to Deny Claims**

238. Now that Feldman's had its RSA license, CareFirst and Independence had no reason to deny further payment to Feldman's, at least for claims that had a service date after Feldman's obtained its RSA license.

239. Yet CareFirst did not pay such post-December 11, 2008 claims. In fact, CareFirst did not pay such claims until nearly two years later, in September 2010, in the course of litigation.

240. In that litigation, CareFirst had repeatedly told the court that the only issue in the case was whether or not Feldman's needed an RSA license. But CareFirst refused to pay claims even after Feldman's obtained its RSA license.

241. Maryland law permits any pharmacy with a valid pharmacy license to dispense medication to patients with a valid prescription, including but not limited to Factor drugs.

242. At all relevant times, Feldman's was regulated under Title 12 of the Maryland Code and COMAR 10.34 and held a permit issued by the Maryland

Board of Pharmacy. Feldman's employed pharmacists who were licensed by the Maryland Board of Pharmacy.

243. Pursuant to 12-406 of the Maryland Code, a pharmacy that has a permit issued by the Maryland Board of Pharmacy is authorized to establish and operate the pharmacy while the pharmacy permit is effective."

244. Feldman's pharmacy permit was effective throughout the relevant period of the claims at issue in this case.

### c. CareFirst Finally Researches the RSA Issue

245. It was not until July 2010, approximately two years after CareFirst refused to pay the Feldman's claims at issue, and after CareFirst's actions put Feldman's out of the business of providing high value drugs to vulnerable patients, that CareFirst put the RSA question to the Maryland Board of Pharmacy.

246. On July 1, 2010 Patrick de Gravelles, Esq., Litigation General Counsel for CareFirst, wrote a letter to the Maryland Board of Pharmacy. In Mr. de Gravelles' letter, he posed two questions to the Board of Pharmacy, the most relevant of which was: "Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?"

247. On July 26, 2010 CareFirst wrote a letter to the District Court. Even though Mr. de Gravelles had recently asked the Board of Pharmacy whether a

pharmacy like Feldman's needed an RSA license to ship Factor products to patients' homes, CareFirst nevertheless asserted to the Court – in no uncertain terms – that "the plain language of the statutes makes home delivery of medicines and items like needles and syringes enough to require an RSA."

248.  On August 18, 2010, the Maryland Board of Pharmacy conducted a public meeting to discuss, among other things, Mr. de Gravelles' July 1, 2010 letter.

249.  In August 2010, the Board of Pharmacy unequivocally opined that Feldman's did not need an RSA license to ship medication to a patient's home. Specifically, on August 23, 2010, LaVerne G. Naesea, Executive Director of the Maryland Board of Pharmacy, wrote a letter to Mr. de Gravelles advising that shipping Factor products and supplies to patients' homes via common carrier was acting in accordance with its pharmacy license and the Maryland Pharmacy Act, and that no RSA was required to conduct such activities.

250.  Based on the Board of Pharmacy's opinion, CareFirst was finally forced to concede the issue and to acknowledge its liability for the claims. In fact, CareFirst did not disclose to either Feldman's or the Court that it had raised the issue with the Board of Pharmacy and disclosed the adverse opinion only because the Board of Pharmacy posted a public hearing notice concerning the RSA issue to the internet.

251.  But even as of this date, CareFirst has not paid certain claims.

252. The damage to Feldman's, however, had already been done. Feldman's accounts receivable had ballooned from approximately $430,000 in January 2008 to more than $3.8 million in December 2009, after peaking at $3.95 million in July 2009, causing Feldman's to default on its bank loans.

253. On December 17, 2009, PMA sold Feldman's assets – excluding receivables which were retained by Feldman's – for a depressed price that did not reflect the profitability of Feldman's only months earlier.

**B.    The Conspiracy to Drive Feldman's Customers to CareFirst's and Independence's Preferred Pharmacies**

254. Large chain pharmacies and PBMs have in the past paid kickbacks to health insurers that drive business to the pharmacy.

255. On information and belief, these kickbacks often take the form of "rebates" that are built into long term contracts for the chain pharmacy or PBM to be the insurer's preferred provider, linked with the insurer's website and promoted in its marketing materials.

256. On information and belief, this practice continues.

257. These same PBMs also process and adjudicate claims from other pharmacies, and participate in investigations and audits of those very same pharmacies on behalf of the insurers.

258. This presents an inherent conflict of interest.

259. On information and belief, four of the five largest PBMs were involved in the "investigation" of Feldman's by CareFirst, Independence, and the BCBSA. This includes the three largest PBMs, Medco, CVS Caremark and Express

Scripts, who administer 80 percent of all insured prescriptions in the United States and 90 percent of insured mail order prescriptions.

260. On information and belief, Express Scripts, Walgreen, CVS Caremark, and a division of Medco, Medco Corporate Investigations, assisted CareFirst, Independence, and the BCBSA in their "investigation" of Feldman's. Representatives of these PBMs participated in conference calls in which the BCBSA, Independence, and CareFirst discussed Feldman's and their strategy to deny Feldman's claims. Representatives of these PBMs also participated in interviews of Feldman's patients on behalf of CareFirst, Independence, and the BCBSA.

261. On information and belief, CareFirst, Independence, and the BCBSA conducted interviews of numerous Feldman's patients and employees, and other hemophilia patients that were not Feldman's patients, including interviews of Jeryl Marks, Doreen Rhodes, Viola Hendrick and Christopher Templin. At those interviews, CareFirst, Independence and the BCBSA made false and defamatory statements about Feldman's and the ways it conducted its business.

262. In addition to the defamation of Feldman's at patient interviews, CareFirst, Independence, the BCBSA and the PBMs attempted to steer Feldman's customers to use the specialty pharmacy services of the PBMs, from whom CareFirst received better "pricing" in the form of "discounts," or as they are more commonly known, kickbacks.

263. CareFirst, Independence, and the BCBSA left sales literature for their preferred PBMs with Feldman's patients after interviewing such patients and making serious, unfounded accusations about Feldman's and "recommended" that patients consider a switch to the preferred PBM, even though Feldman's offered the patients a level of services that could not be matched by a PBM.

264. As a result of CareFirst's, Independence's, and the BCBSA's actions, on information and belief, numerous Feldman's patients switched to another pharmacy after hearing the defamation of Feldman's by CareFirst, Independence, and the BCBSA.

265. This departure of customers had catastrophic implications for Feldman's business, ultimately causing Feldman's to default on its bank loans, driving Feldman's from the hemophilia business and causing PMA to sell Feldman's assets at fire-sale prices.

**Effect of Conspiracy on Feldman's**

266. The practical effect of the conspiracy has destroyed a once-thriving business.

267. CareFirst's and Independence's refusal to pay Feldman's claims, combined with Feldman's legal expenses incurred chasing CareFirst and Independence for payment, left Feldman's unable to satisfy its creditors.

268. Feldman's was forced to find other reputable and customer service oriented pharmacies to service its hemophilia patients, who faced grave risks without a trustworthy source to dispense their Factor drugs.

269. Finally, on December 17, 2009, PMA was forced to sell Feldman's assets. PMA only sold Feldman's because of the financial difficulties caused by CareFirst's and Independence's refusal to pay Feldman's claims and its defamatory comments regarding Feldman's.

## Damages

270. PMA and Feldman's suffered great injury as a result of Defendants' individual and collective actions.

271. The sale of Feldman's assets was forced and against the will of PMA, precipitated solely because Defendants' individual and collective conduct meant that Feldman's could not carry out the purpose for which PMA acquired it— to provide services for serious and complex disease states.

272. The sale, which PMA would not have contemplated but for the wrongdoing complained of herein, was conducted on a rushed and desperate basis, and resulted in a significant decrease in the value of PMA's equity in Feldman's.

273. In addition, PMA lost the opportunity to reap substantial and growing future profits from a thriving business that Defendants destroyed.

274. The wrongdoing complained of herein caused the serious disease state patients who relied upon Feldman's to, of course, abandon it once Feldman's declared that it could no longer serve them on a reliable basis.

## CLAIMS FOR RELIEF

### COUNT I
### (Intentional Interference With Economic Relations
### as to all Defendants)

275. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

276. Plaintiffs had a strong business relationship with their patients, primarily members of the hemophilia community.

277. Plaintiffs spent millions of dollars forming their business to best serve the unique needs of the hemophilia community.

278. Plaintiffs also had strong business relationships with their vendors, from whom Plaintiffs purchased millions of dollars worth of Factor drugs.

279. Defendants clearly were aware of the business relationship Plaintiffs had with their vendors, whom Plaintiffs had to pay for the Factor drugs, and with their hemophilia patients, who were CareFirst's and Independence's insureds.

280. Defendants' concerted and calculated actions to investigate, harass, delay payment to, boycott, and destroy Plaintiffs' business were intentional and unjustified.

281. Defendants provided false information to Plaintiffs' patients about Plaintiffs.

282. Defendants' conduct was intentional, willful, and calculated to cause damage to Plaintiffs' business.

283. The conduct of Defendants was perpetrated with the intentional and improper purpose of causing damage to Plaintiffs and was without justifiable cause.

284. As a result of Defendants' conduct, patients stopped ordering medicine from Plaintiffs.

285. In fact, that was the only real purposes of the "investigation," as evidenced by the fact that there was no evidence, even after years of investigations, that Plaintiffs were engaged in any wrongdoing.

286. As a result of Defendants' intentional efforts to destroy Plaintiffs' business, Plaintiffs' business was, in fact, destroyed.

287. Feldman's accounts receivables ballooned from approximately $430,000 in January 2008 to $3.95 million in July 2009, exclusively due to CareFirst's and Independence's refusal to pay for the medicine that Feldman's dispensed to CareFirst's and Independence's insureds.

288. As a result, Feldman's defaulted on its bank loan, and in December 2009 PMA sold all of Feldman's assets, excluding receivables which were retained by Feldman's.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT II
### (Defamation as to CareFirst and the BCBSA)

289.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

290.  In the course of its "investigation" of Feldman's, CareFirst regularly made false and defamatory statements to law enforcement, the BCBSA and BCBSA licensees, including accusing Feldman's of fraud and other serious felonies.

291.  On information and belief, CareFirst and the BCBSA – and in particular Calvin Sneed of the BCBSA – also regularly fabricated theories and told agents of the FBI, the FDA, and other government agencies that Feldman's was involved in fraud through diversion of Factor drugs to a "grey market."

292.  In fact, Feldman's ordered Factor medicine consistent with the prescriptions written by the patients' doctors and never ordered more Factor medicine than the prescriber authorized, nor did Feldman's ever sell any Factor medicine to any "grey market."

293.  CareFirst knew or should have known that Feldman's never sold any Factor medicine on the grey market because CareFirst knew that no such grey market existed.

294.  In October 2008 a consultant working for CareFirst who had experience with hemophiliacs and the anti-hemophilic Factor medicine responded to a question about such a "grey market" by informing his contacts at CareFirst that he had never heard of any instance of diversion of Factor medicine.

295. On information and belief, CareFirst and the BCBSA conducted interviews of numerous Feldman's patients, and other hemophilia patients that were not Feldman's patients, at which CareFirst implied or even outright stated Feldman's involvement in a massive fraud.

296. On information and belief, the interviews of patients – or family members of patients – including Doreen Rhodes, Viola Hendrick and Christopher Templin, were meant to cast doubt as to Feldman's legitimacy.

297. CareFirst also told Independence on numerous occasions that Feldman's did not have the necessary licensees to dispense Factor drugs, even though CareFirst knew – or certainly should have known, because Feldman's told them so – that Feldman's never needed an RSA license, or any other special license, to dispense Factor drugs.

298. On February 12, 2009, Jamie Hanson, an investigator for CareFirst, wrote an email to Michael Ebner, Senior Financial Investigator for Independence, and Christopher Deery, an Investigator for Independence, falsely informing them that Feldman's did not have the proper license to dispense Factor drugs.

299. In fact, Feldman's always had the proper licenses to conduct its business, but on information and belief Ms. Hanson was trying to influence Independence to support CareFirst's decision to not pay Feldman's.

300. Feldman's obtained the RSA license it did not actually need for its business, which it only obtained based on CareFirst's demand, on December 11,

2008, two months prior to Ms. Hanson's false and malicious statements to Mr. Ebner and Mr. Deery. Ms. Hanson knew when she made her false and defamatory statements on February 12, 2009 that Feldman's had its RSA license and that her statements in her email were false. On information and belief, Independence denied or "held" payment to Feldman's based on CareFirst's false representations.

301. In addition, on information and belief, employees of CareFirst – acting in their official capacity – spread false and malicious rumors of Feldman's bankruptcy, designed to scare Feldman's patients into seeking their vital Factor medicine from a different pharmacy.

302. On August 7, 2009, Ms. Hanson sent an email to Kandyce Cowart, her counterpart at Blue Cross Blue Shield of Louisiana, "informing" Ms. Cowart that Feldman's had filed for bankruptcy when, on information and belief, Ms. Hanson knew such assertions were false.

303. On information and belief, on or about that same date, Ms. Hanson spread the same false and malicious lies to other BCBSA licensee and to hemophilia patients.

304. On information and belief, Ms. Hanson also spread rumors among the BCBSA licensees that Feldman's and/or FCS, a related company, was a problem company.

305. On information and belief, these statements were made on an April 16, 2009 conference call that included representatives of BCBSA licensees in Louisiana, South Carolina, North Eastern Pennsylvania, Florida, Michigan, Western

Pennsylvania (Highmark) and representative of the BCBSA. The statements were designed to influence the way the other BCBSA licensees dealt with Feldman's, and on information and belief, the statements worked as designed.

306. CareFirst, led by Ms. Hanson, knew that the various statements it made regarding Feldman's licensure, Feldman's reputation, and Feldman's finances, were false when it made them, yet CareFirst and Ms. Hanson showed complete disregard for Feldman's or the law and continued with such knowingly false statements.

307. As a result of such defamatory statements, Feldman's indeed suffered harm.

308. Other BCBSA licensees treated Feldman's and its affiliates as a criminal enterprise, refusing to reimburse Feldman's for medicine dispensed to CareFirst's insureds.

309. Patients, unnerved by rumors of Feldman's bankruptcy and by "suggestions" from BCBSA licensee that the patients seek their medicine from a different pharmacy, abandoned Feldman's in droves.

310. Feldman's was also unable to acquire any new patients, as rumors of its purported criminal activity and financial distress spread like wildfire through the hemophilia community.

311. Defendants acted with malice and intent to harm Plaintiffs.

312. As a result of the malicious and deliberate actions of Defendants, Plaintiffs suffered an economic loss.

313. Ultimately, Feldman's was forced out of business by Defendants' defamation.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT III
### (Fraud and Fraudulent Misrepresentation as to CareFirst)

314. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

315. Prior to dispensing the Factor drugs to patients, Feldman's always checked the patients' benefits with CareFirst and received a verbal precertification for the prescription from CareFirst.

316. The precertification was a representation by CareFirst that – so long as the claim paperwork was in order and there was no fraud – CareFirst would pay the claim.

317. In fact, during the time period in which CareFirst insisted (without merit) that Feldman's obtain an RSA, CareFirst represented that Feldman's should continue to dispense Factor medicine to its patients because all aspects of the claims reimbursement issue would be addressed retroactively to the first claim in question.

318. CareFirst continued to give Feldman's precertification for claims even after it put a "hold" on any claims for Factor drugs submitted by Feldman's.

319. CareFirst did not inform Feldman's of the "hold", nor did any of the communications from CareFirst to either Feldman's or the patients – for example, the explanations of benefits forms sent in connection with every claim – indicate that there was a "hold" or any other problem with the claims.

320. Therefore, every time CareFirst gave Feldman's precertification for a claim, CareFirst made a knowingly false representation.

321. CareFirst also knew that Feldman's would continue to dispense medicine to its patients, but CareFirst did not care because CareFirst had no intention of ever paying those claims.

322. In fact, on information and belief, CareFirst preferred that Feldman's keep dispensing Factor drugs to its patients. For CareFirst, that was the best of all worlds – its insureds kept receiving the expensive, life-saving medicine they needed, while CareFirst did not have to pay one penny.

323. Based on CareFirst's precertification, its representation that claims issues would be addressed retroactively, and Feldman's deep concern for its sick patients, Feldman's kept dispensing the Factor medicine to its patients even after it became clear that there were issues in their relationship with CareFirst.

324. Feldman's, of course, still had to pay for the expensive drugs it was dispensing to its patients. Feldman's spent hundreds of thousands of dollars on drugs for which it was not receiving reimbursement from CareFirst, and also incurred indebtedness to fund its continued operations during the period it did not receive reimbursements from CareFirst.

325. Additionally, Feldman's had incurred indebtedness to fund its expansion, but its reduced cash flow as a result of CareFirst's refusal to pay reimbursements made it impossible for Feldman's to satisfy its payment obligations to its creditors.

326. As a result of CareFirst's misrepresentations, Feldman's accounts receivables ballooned from approximately $430,000 in January 2008 to $3.95 million July 2009 and Feldman's defaulted on its bank loans.

327. In December 2009 Feldman's was forced to sell its assets – excluding receivables – and cease operations as a specialty pharmacy.

328. Feldman's incurred millions of dollars in legal fees, and lost additional millions of dollars in potential profits for an extremely profitable and fast-growing business.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT IV
### (Unfair Competition as to CareFirst and Independence)

329. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

330. Under Maryland common law, no one is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any kind. Rather, all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

67

331. CareFirst and Independence deliberately and systematically damaged and jeopardized Feldman's business by fraud, deceit, and trickery.

332. CareFirst and Independence, for no legitimate reason, refused to pay Feldman's the millions of dollars they owed Feldman's for life-saving medicine Feldman's dispensed to CareFirst's and Independence's insureds, even after CareFirst encouraged Feldman's to continue to dispense the medicine to their insureds. CareFirst and Independence did this knowing that their conduct would ruin Feldman's.

333. CareFirst and Independence insisted that Feldman's was missing a crucial RSA license to operate its business, even though (i) CareFirst knew that Feldman's did not need the RSA license in order to operate, (ii) Independence made no attempt to independently verify whether Feldman's needed an RSA license and just took CareFirst's representations as facts, and (iii) Feldman's informed CareFirst that it did not need an RSA license.

334. Feldman's employees spent many hours chasing their tails in order to receive reimbursement from CareFirst and Independence, when CareFirst and Independence had no intention of reimbursing Feldman's, even for claims submitted after Feldman's obtained its RSA license.

335. CareFirst and Independence knew their conduct would ruin Feldman's.

336. CareFirst and Independence encouraged (and intimidated) Feldman's patients to abandon Feldman's and find another pharmacy from which to

get their Factor drugs. CareFirst and Independence did this for the purpose of injuring Feldman's.

337. CareFirst made baseless and false defamatory statements and spread malicious rumors about Feldman's to hemophilia patients – including Feldman's customers – employees of Federal agencies, to other BCBSA licensees and to others. CareFirst and Independence in this wrongdoing solely for the purpose of injuring Feldman's.

338. As a result of these unfair methods, Feldman's was forced to default on its bank loans and was ultimately put out of business. Defendants' actions destroyed Feldman's current and future profitability.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

## COUNT V
### (Conspiracy as to all Defendants)

339. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

340. Each of Defendants acted with unity of purpose as part of a conspiracy to increase their "profits" and their executive compensation by limiting their "exposure" to expensive claims for Factor medicine and unreasonably restrain competition by denying and delaying payment to Feldman's for Factor medicine Feldman's provided to hemophiliac patients insured by CareFirst and Independence, with the ultimate goal of driving Feldman's out of the specialty pharmacy business.

341. A further goal of the conspiracy was to purge hemophiliacs from the rosters of their insureds and drive the hemophilia patients insured by CareFirst and Independence to other insurance companies.

342. If those goals were not achievable, Defendants hedged their bets by conspiring to "encourage" hemophilia patients to get their medicine from large chain pharmacies and PBMs.

343. CareFirst and Independence are, by far, the dominant health insurers in their geographic areas.

344. CareFirst and Independence, aided and abetted by the BCBSA and John Does 1 – 10, exercised their power of coercion over Feldman's by delaying and denying claims made by Feldman's without any proof of wrongdoing, by "suggesting" that people suffering from hemophilia switch to other pharmacies that CareFirst and/or Independence preferred, and by perpetuating continual baseless investigations of Feldman's – even after scores of law enforcement and regulatory agencies, working in consultation with CareFirst, Independence, and the BCBSA, found no evidence of any wrongdoing by Feldman's.

345. Defendants' purpose was to harass Feldman's and drive it out of the pharmacy business.

346. As a result of the conspiracy and the acts committed by Defendants in furtherance of the conspiracy, Feldman's suffered significant economic damage and hardship, including but not limited to lost profits on a business that had previously been generating significant profits; the shotgun sale of

70

Feldman's; and the outlay of significant amounts for attorneys' fees to collect the money rightfully owned to Feldman's by CareFirst and Independence.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest and costs as allowed by law.

<div align="center">

**COUNT VI**
**(Violation of § 11-204(a)(1) of the Maryland Antitrust Act**
**as to all Defendants)**

</div>

347. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this First Amended Complaint.

348. Maryland law prohibits any combination or conspiracy to unreasonably restrain trade or commerce.

349. Defendants conspired to harass, intimidate, and drive Feldman's out of business by (i) putting a "hold" on Feldman's claims that lasted nearly three years, during which time CareFirst and Independence refused to pay any of the millions of dollars they owed Feldman's, (ii) "investigating" Feldman's without any basis for suspecting wrongdoing, (iii) driving Feldman's customers and potential customers to other pharmacies by conducting interviews of Feldman's customers – in some cases, on information and belief, accompanied by law enforcement officers – and spreading defamatory and malicious rumors of Feldman's purported criminal behavior and its purported financial difficulties, and (iv) "recommending" that Feldman's customers take their business to pharmacy benefits managers and chain

pharmacies in which, on information and belief, CareFirst and/or Independence had a financial interest.

350. But for the lawsuits previously filed by Feldman's against CareFirst and Independence, CareFirst and Independence would still not have paid any of the claims submitted by Feldman's.

351. CareFirst, Independence, and the BCBSA regularly corresponded through numerous conversations and emails, discussing ways to avoid paying Feldman's claims and to prevent other BCBSA licensees from paying any Feldman's claims.

352. As a direct result of the conspiracy among Defendants, Feldman's was forced out of the business of dispensing Factor medicine to chronically-ill hemophilia patients. With Feldman's no longer in the business of dispensing the Factor medicine to patients suffering from hemophilia, competition is clearly and obviously lessened. Feldman's was not just another provider of medicine and supplies to hemophiliacs, but was one of the largest providers for hemophiliacs – and the one most trusted by the hemophilia community – in the entire United States. Feldman's had spent years and significant amounts of money building a business that catered to the unique needs of its most vulnerable patients, and had managed to build trust with chronically-ill patients whose trust was very difficult to come by. On information and belief, there are no other pharmacies in the United States – other than pharmacies that were affiliated with Feldman's – that enjoyed such a close relationship with the hemophilia community. As a result

of Defendants' actions, CareFirst's and Independence's insureds – including Feldman's patients – and the hemophilia community have been deprived of their chosen and trusted provider for the Factor medicine they need to live.

353. Furthermore, Defendants' conspiracy has a chilling effect on other specialty pharmacies and other independent pharmacies, which see that Defendants were able to put Feldman's out of business without ever providing even one piece of evidence that shows anything Feldman's did wrong.

354. Defendants' conspiracy results in the unwillingness of pharmacies to dispense Factor medicine to hemophiliacs out of fear that doing so will subject them to harassment by the insurers on whom they rely for payment for the extremely expensive Factor medicine. Pharmacies may also be unwilling to dispense other expensive specialty drugs based on the same fears. The net effect of this will be to reduce the number of independent pharmacies in the specialty drug business, leaving only the large chain pharmacies and the mail-order arms of the PBMs – none of whom are particularly known for their customer service, a major reason hemophiliacs choose independent pharmacies over chain pharmacies in the first place – to service these special needs patients.

WHEREFORE, Plaintiffs demand judgment against Defendants in the amount of eight million dollars ($8,000,000) in compensatory damages, plus interest, treble damages, and attorney's fees pursuant to §11-209 of the Maryland Code.

Plaintiffs demand trial by jury.

Date: Baltimore, Maryland
      January 18, 2012

                          BAROODY & O'TOOLE

              By:

                  Thomas O'Toole
                  201 N. Charles Street, Suite 2102
                  Baltimore, Maryland 21201
                  (410) 539-8412 (telephone)
                  (410) 539-8411 facsimile)
                  totoole@aol.com

Counsel seeking to appear *pro hac vice*

PADUANO & WEINTRAUB LLP
Anthony Paduano
Jason Snyder
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jjs@pwlawyers.com

Attorneys for Plaintiffs

74

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on this 25th day of January that a copy of the

foregoing First Amended Complaint and redlined First Amended Complaint is to be

served upon each of the Defendants along with the writ of summons and the Complaint.


Thomas O'Toole

# EXHIBIT B

FELDMAN'S MEDICAL CENTER ) IN THE
PHARMACY, INC., )
          Plaintiff, ) CIRCUIT COURT
      v. )
CAREFIRST, INC. ) FOR BALTIMORE COUNTY
      Defendant. )
                ) Civil Action No.
SERVE ON: )
   John A. Picciotto, Esquire )
   Resident Agent )
   1501 South Clinton Street )
   Baltimore, Maryland  21224 )

## COMPLAINT

     Plaintiff, as and for its Complaint, alleges:

## PARTIES

     1.    Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's") is a Maryland corporation, with its principal place of business located at 11055 Little Patuxent Parkway, Columbia, Maryland 21044. Feldman's is a retail pharmacy serving the Baltimore – Washington, D.C. metropolitan area and is increasingly focused on providing specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease, hepatitis, and HIV.  Feldman's is a wholly-owned subsidiary of Factor Health Management, LLC.

     2.    On information and belief, Defendant CareFirst, Inc. ("CareFirst") is a Maryland corporation and health insurer with its principal office located at 10455 Mill Run Circle, Owings Mills, Maryland 21117.   On information and belief CareFirst operates under a license from the Blue Cross Blue Shield Association (the "BCBS Association").

RECEIVED AND FILED

2009 JUN -1  PM 12: 08

CLERK OF THE CIRCUIT COURT
BALTIMORE COUNTY

## JURISDICTION AND VENUE

3.    Venue is proper in this County pursuant to Maryland Stat. §6-201, because Defendant resides in, and maintains its principal place of business in, Baltimore County.

## STATEMENT OF FACTS

4.    This action arises from the Plaintiff's desire to have its insurance claims paid promptly and correctly by Defendant, a health insurance company, in accordance with the applicable insurance policies issued, underwritten and/or administered by Defendant.    Plaintiff brings this action seeking damages for the unlawful and illegal acts of Defendant, which have resulted in a financial loss to Plaintiff.

5.    In an effort to resolve collection issues with Defendant early on in the Summer of 2008, Plaintiff relied in good faith on Defendant CareFirst's suggestion that Feldman's pursue a Home Infusion Therapy qualification.  Feldman's did become so qualified and thereafter continued to rely on CareFirst's representation that it would be paid for the services it rendered without issue.

6.    Hemophilia is a life-threatening disease that requires those afflicted to use very expensive blood-clotting factor treatment ("factor"). Plaintiff is a nationally accredited specialty pharmacy located in Columbia, Maryland, which provides factor to patients.   Plaintiff has provided pharmacy and health management care coordination services to patients since 1986.  This action is commenced to require Defendant to honor its contractual obligations and to pay the legitimate insurance claims that are currently outstanding.

7.     Upon receipt of prescriptions from licensed physicians, Plaintiff verifies that the patient has in and/or out of network benefits, as applicable. Patients' status as in or out of network merely affects the attributes of the benefits the member is entitled to receive under his or her policy.

8.     Once Plaintiff receives confirmation of the patient's active status as a customer of CareFirst or one of its BCBS Association affiliates, Plaintiff dispenses specialized medications, products, and services, including factor, directly to the patients, who, relevant to the present case, are participants or beneficiaries of health plans insured, underwritten and/or administered by CareFirst for by one of the BCBS Association affiliates. Pursuant to the Participating Professional Provider Agreement between Plaintiff and Defendant (the "PPP Agreement"), after providing the Covered Services to a patient, Plaintiff submits a claim for the applicable charges to Defendant for payment. Plaintiff is only permitted to seek payment from Defendant and is not permitted to collect from Members for any Covered Services other than deductibles, coinsurance and copayments (PPP Agreement, ¶¶ 22 and 23). A copy of the PPP Agreement is attached hereto as Exhibit A.

9.     Despite Plaintiff's rendering of covered products and timely submittal of insurance claims for payment for such products, in breach of the PPP Agreement, Defendant has failed and refused to correctly and timely pay $1,588,127.77 in legitimate claims submitted by Plaintiff. A list of the outstanding and unpaid claims as of April 14, 2009 is attached hereto as Exhibit B.

10.   For each of the claims listed on <u>Exhibit B</u>, Plaintiff verified the patient's insurance, and the patient's benefits were cleared with the CareFirst administrator.

11.   On the basis of, and in reliance on, such verification, Plaintiff dispensed the appropriate medication to the patient.

12.   Plaintiff has complied with all of Defendant's requests regarding clarification of Plaintiff's provider status as a Durable Medical Equipment provider or a Home Infusion Therapy provider.  Yet CareFirst has still not paid any of the outstanding claims.  CareFirst has repeatedly requested that Plaintiff resubmit paperwork that Plaintiff has previously submitted, and has otherwise delayed Plaintiff's payment through bureaucratic maneuverings.

**Provider Agreement**

13.   Plaintiff is party to the PPP Agreement with Defendant.

14.   Pursuant to the PPP Agreement, Plaintiff provided Covered Services to CareFirst members and submitted claims to CareFirst in accordance with all policies and procedures.  CareFirst, however, has breached the terms and conditions of the PPP Agreement by failing to timely pay Plaintiff for many of the claims properly submitted.

15.   Paragraph 20 of the PPP Agreement requires Defendant to pay Plaintiff no later than 30 days after Plaintiff submits a claim.  Specifically, paragraph 20 provides:

> We agree to pay claims for Covered Services rendered to Members
> and/or to provide notification to you and the Members of the denial
> of a claim stating the specific reasons for the denial, in a timely
> manner, as provided by Maryland Law. We retain sole authority to

4

determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claim or any portion thereof in accordance with Maryland law.

16.     Paragraph 3 of the PPP Agreement defines "Covered Services" as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled."

17.     As discussed below in paragraph 22 of this Complaint, Maryland law requires payment of a claim within 30 days after receipt of such a claim for reimbursement.   This requirement is irrespective of whether the patient seeks and obtains Covered Services from an in-network or out-of-network provider.

## Plaintiff's Attempts to Resolve the Dispute with Defendant

18.     Although Plaintiff has repeatedly complained to Defendant about the delays in its claims processing throughout the relevant time period and tried to accommodate and work with Defendant in any way possible to resolve these issues, including detrimentally relying on Defendant's false and misleading representations inducing Plaintiff into a year of delay through a so-called "contracting process," Plaintiff's efforts have proved wasted and have not led to prompt and timely payment of its claims as more than $1,588,127.77 in unpaid claims remain outstanding.   Plaintiff has exhausted every avenue available to it to obtain payment from Defendant on these outstanding claims prior to instituting this suit, and any further attempts at resolving these issues short of litigation would be futile.

19.     Since at least August 2008, Plaintiff has engaged in exhaustive efforts to try and resolve the outstanding claims prior to instituting suit.   Plaintiff has, to its detriment, relied on CareFirst's false and misleading representations and produced, delivered, and complied with every request for documentation from CareFirst, and in

some cases has provided the same documentation on several different occasions to several different departments within CareFirst. Numerous telephone calls were made and emails sent to Defendant, but no progress was made on resolution of the outstanding claims, except CareFirst's continual response of more delays.

20. Each time Plaintiff submitted the requested paperwork to CareFirst, months went by before CareFirst again requested either the same or additional documentation. In the meantime, Plaintiff's claims continue to go unpaid.

21. To the extent Plaintiff is subject to any requirements or prerequisites to exhaust all informal and administrative remedies prior to instituting suit and such remedies have not been exhausted by Plaintiff, any further attempts would be futile. As detailed above, Plaintiff has attempted to resolve these issues with Defendant for almost one year, even relying in good faith on Defendant's representations that all of the claims would be resolved via further contracting with the Defendant when in fact no such need ever existed. Plaintiff has gone through all the proper channels at Defendant to resolve the non-payment of Plaintiff's claims, but Defendant has been largely uncooperative. As a result, Plaintiff is stuck in Defendant's bureaucracy, and has been passed among various CareFirst departments, with no department taking responsibility for resolving the issues with Plaintiff. Defendant has refused to resolve these issues with Plaintiff, and has exhibited a long pattern of abuse and denial, making further pursuit of reimbursement under the claims process futile. Plaintiff can no longer withstand the financial impact of waiting for payment for the life saving medication it has dispensed to Defendant's members.

## Relevant Statutes

22.     Section 15-1005 of Insurance Article of the Annotated Code of

Maryland requires a health insurer to promptly pay, deny or dispute a claim for benefits

that is accompanied by properly completed paperwork containing all reasonably

necessary information.  Specifically, Section 15-1005(c) provides that:

> (c)     Within 30 days after receipt of a claim for reimbursement from a
> person entitled to reimbursement under § 15-701(a) of this title or
> from a hospital or related institution, as those terms are defined in §
> 19-301 of the Health--General Article, an insurer, nonprofit health
> service plan, or health maintenance organization shall:
>
> > (1)     mail or otherwise transmit payment for the claim in
> > accordance with this section; or
> >
> > (2)     send a notice of receipt and status of the claim that states:
> >
> > > (i)      that the insurer, nonprofit health service plan, or
> > > health maintenance organization refuses to reimburse
> > > all or part of the claim and the reason for the refusal;
> > >
> > > (ii)     that, in accordance with § 15-1003(d)(1)(ii) of this
> > > subtitle, the legitimacy of the claim or the appropriate
> > > amount of reimbursement is in dispute and additional
> > > information is necessary to determine if all or part of
> > > the claim will be reimbursed and what specific
> > > additional information is necessary; or
> > >
> > > (iii)    that the claim is not clean and the specific additional
> > > information necessary for the claim to be considered
> > > a clean claim.

23.     Pursuant to Section 15-1005(f), an insurer that does not comply

with the provisions of § 15-1005(c) is required to pay interest on claims that are

outstanding for more than 30 days.  Specifically, Section 15-1005(f) provides:

> (f)(1)   If an insurer, nonprofit health service plan, or health maintenance
> organization fails to comply with subsection (c) of this section, the
> insurer, nonprofit health service plan, or health maintenance
> organization shall pay interest on the amount of the claim that

remains unpaid 30 days after the claim is received at the monthly rate of:

(i) 1.5% from the 31st day through the 60th day;

(ii) 2% from the 61st day through the 120th day; and

(iii) 2.5% after the 120th day.

24.     Pursuant to Section 15-1009, if an insurance company has preauthorized or approved of a certain health care service, the insurer cannot thereafter deny payment for such service, except under extenuating circumstances.  Specifically, Section 15-1009(b) provides:

(b)     If a health care service for a patient has been preauthorized or approved by a carrier or the carrier's private review agent, the carrier may not deny reimbursement to a health care provider for the preauthorized or approved service delivered to that patient unless:

(1) the information submitted to the carrier regarding the service to be delivered to the patient was fraudulent or intentionally misrepresentative;

(2) critical information requested by the carrier regarding the service to be delivered to the patient was omitted such that the carrier's determination would have been different had it known the critical information;

(3) a planned course of treatment for the patient that was approved by the carrier was not substantially followed by the health care provider; or

(4) on the date the preauthorized or approved service was delivered:

(i)      the patient was not covered by the carrier;

(ii)     the carrier maintained an automated eligibility verification system that was available to the contracting provider by telephone or via the Internet; and

(iii)    according to the verification system, the patient was not covered by the carrier.

### Feldman's Has Suffered Irreparable Injury

25.     By reason of Defendant's actions described above, Plaintiff has suffered injury to its reputation and its ability to obtain credit, and will suffer actual and impending irreparable injury, namely, the potential insolvency of Plaintiff.

26.     Plaintiff is without adequate or speedy remedy at law for the above-mentioned conduct of Defendant.

27.     As such, Plaintiff is entitled to (i) an injunction ordering Defendant to immediately pay all outstanding and unpaid claims and (ii) an injunction ordering Defendant to comply with the PPP Agreement, including the provisions requiring prompt and full payment of all claims for past and future Covered Services, in each case in order to enable Plaintiff to make payments to its creditors and continue providing lifesaving medication to its patients pending trial on the merits.

### CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)

28.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 27 of this Complaint.

29.     Plaintiff has duly satisfied all of its obligations and requirements set forth in the PPP Agreement.  Plaintiff properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder; in the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.

30.     In accordance with the express terms and conditions of the PPP Agreement, Defendant became obligated to pay to Feldman's $1,588,127.77.

31.     Despite such amounts being due and owing, Defendant has failed to remit payment to Plaintiff.

32.     Defendant's failure to make payment for the claims submitted by Plaintiff constitutes a material breach of the PPP Agreement.

33.     By reason of the foregoing, Plaintiff has been damaged, will continue to be damaged and is entitled to actual, consequential, and punitive damages in an amount of no less than $1,588,127.77, plus interest.

## COUNT II
### (Unjust Enrichment)

34.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 of this Complaint.

35.     By providing lifesaving medication to Defendant's insureds, Plaintiff has provided a benefit to Defendant.  Plaintiff properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder; in the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.

36.     Defendant was aware of this benefit, solicited it, and accepted it.

37.     Defendant, however, retains a portion of the benefit by improperly denying, diminishing, and delaying payment for Plaintiff's products and services as set forth above.

38.     It would be inequitable to allow Defendant to retain the benefit under the circumstances, and Defendant has been unjustly enriched thereby and continues to unjustly enrich itself.

39.    Defendant has been unjustly enriched in an amount equal to $1,588,127.77.

40.    By reason of the foregoing, Plaintiff has been damaged, will continue to be damaged and is entitled to actual, consequential, and punitive damages in an amount of no less than $1,588,127.77, plus interest.

### COUNT III
### (Bad Faith)

41.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 40 of this Complaint.

42.    Defendant's failure to comply with its duties and obligations and pay the claims outstanding is arbitrary, capricious, and/or made with willful or wanton disregard of the rights of Plaintiff.  Defendant has articulated no basis in fact or law for its refusal to pay.

43.    As a direct and proximate result of Defendant's bad faith conduct, Plaintiff has been damaged, will continue to be damaged and is entitled to actual and consequential damages in an amount of no less than $1,588,127.77, plus attorneys' fees, interest, and costs and punitive damages in an amount to be proved at trial..

WHEREFORE Plaintiff respectfully requests that judgment be entered in its favor and against Defendant as follows:

A.    On the First Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest.

B.    On the Second Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest.

C.    On the Third Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest and costs and punitive damages in an amount to be proved at trial.

D.    Awarding Plaintiff a preliminary and permanent injunction (i) ordering Defendant to immediately pay all outstanding and unpaid claims and (ii) ordering Defendant to comply with the PPP Agreement including the provisions requiring prompt and full payment of all claims for past and future Covered Services, in each case in order to enable Plaintiff to make payments to its creditors and continue its operations pending trial on the merits.

E.    Awarding Plaintiff its reasonable attorneys' fees and the costs of this proceeding;

F.    Awarding Plaintiff interest on the outstanding claims computed pursuant to § 15-1005(f)(1) of the Maryland Code;

G.    Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:  June 1, 2009

BAROODY & O'TOOLE

By: _Neal C Baroody_

Neal C. Baroody
201 N. Charles Street, Suite 2102
Baltimore, MD 21201
(410) 539-8412 (telephone)
(410) 539-8411 facsimile)
nbaroody@aol.com

Counsel seeking to appear *pro hac vice*
PADUANO & WEINTRAUB LLP
Anthony Paduano
Jordan D. Becker
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jdb@pwlawyers.com

Attorneys for Plaintiff

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER    *
PHARMACY, INC.    *
11055 Little Patuxent Parkway    *
Columbia, MD 21044    *
Howard County, MD    *
   *
   *
Plaintiff and Counter-Defendant    *    Civil Action No.:
   *
v.    *
   *
CAREFIRST, INC.    *
1501 South Clinton St.,    *
Baltimore, MD 21224    *
Baltimore City    *
   *
   *
Defendant, Counter-Plaintiff and    *
  Third-Party Plaintiff    *
   *
v.    *
   *
John DOE 1    *
36 Craig Court    *
Conowingo, MD 21918    *
Cecil County    *
   *
  and    *
   *
John DOE 2    *
1272 Oates St., N.E.    *
Washington, DC 21918    *
   *
Third-Party Defendants    *
   *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    *    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441 and 1446, Defendant, Counter-Plaintiff and

Third-Party Defendant CareFirst, Inc. ("CareFirst"), through undersigned counsel, hereby

files this Notice of Removal of the above-captioned action currently pending before The Circuit Court for Baltimore County, Case No.: 03-C-09-006257. In support thereof, CareFirst states as follows.

1.    Feldman's Medical Center Pharmacy, Inc. ("Feldman's") initiated this civil action by filing a Complaint on June 1, 2009 in The Circuit Court for Baltimore County, Maryland. A true copy of the Complaint, along with all process, pleadings and orders served upon CareFirst thus far are attached as Exhibit A.

2.    As originally pled, the case purports to be a contract action founded upon an agreement between Feldman's and BlueCross BlueShield of Maryland, Inc. ("BCBSM"). BCBSM is the former name of CareFirst of Maryland, Inc. ("CFMIA"), which is an affiliate of CareFirst.

3.    The dispute focuses on claims for payment of factor products that Feldman's purportedly sent to individuals insured by CareFirst (although in reality, those individuals are insured by CFMI or CareFirst's other affiliate, Group Hospitalization and Medical Services, Inc. ("GHMSI").)

4.    Factor products are used to treat hemophiliacs. CareFirst has maintained throughout this litigation that the contract on which Feldman's sued covers only durable medical equipment, which is also known as "DME". There is no real dispute that factor products do not fall within the definition of DME. Feldman's maintains that the contract is not so limited and therefore it has a contract under which it is entitled to payment for the factor products.

5.    The individuals who received the factor products from Feldman's obtained their health insurance from CFMI or GHMSI through private employers. Those various

2

health insurance plans are governed by and subject to the Employee Retirement Income Security Act of 1977, 29 U.S.C. § 1001, *et seq*. ("ERISA").

6. Although for several months Feldman's maintained that it was seeking relief under the contract with CFMI, that posture changed on December 31, 2009.

7. Shortly before then, CareFirst filed an Interpleader action in which it sought to pay into the registry of The Circuit Court for Baltimore County certain funds to pay for some of the claims that had been processed.

8. The gist of the Interpleader action was that although CareFirst continues to maintain that it owes no money for factor products shipped prior to December 11, 2008 because prior to that date Feldman's lacked the necessary Maryland license to dispense those products, CareFirst had processed claims for factor products provided after that date.

9. However, in CareFirst's view, CareFirst, and more accurately CFMI, was obligated to pay only the insureds, rather than Feldman's because, as noted above, CareFirst does not believe the contract covers factor products.

10. As explained in the Interpleader, CareFirst wanted a judicial determination whether it should pay the post-December 11, 2008 claims to John DOES 1 and 2 or to Feldman's (although payment to Feldman's is potentially subject to a counterclaim and offset to be filed once a stipulated order allowing CFMI to intervene is signed).

11. As was required under Maryland law, CareFirst named and served John DOES 1 and 2.[1] (Because they are third-party defendants, their consent to removal is not required. *Hydro-Action, Inc. v. James*, 233 F.Supp.2d 836, 840-41 (E.D. Tex. 2002).)

_____

[1] These individuals were named as DOES in the public version of the Interpleader because that document necessarily reveals protected health information. CareFirst has

12.     In response to the Interpleader Action, for the first time in this litigation Feldman's asserted that it had assignments from the insureds and it was basing its claims at least in part on those assignments.

13.     Notwithstanding what appears on the face Feldman's Complaint, in reality Feldman's is at least in part seeking to enforce rights that arise under ERISA. Although a plaintiff is typically the master of the pleadings, the U.S. Supreme Court on numerous occasions has recognized that a claim to enforce ERISA rights is an exception to the well-pleaded complaint rule, giving rise to complete preemption and thus removal jurisdiction. *See* 29 U.S.C. § 1441: *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208-209 (2004); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987). In short, because Feldman's attempts to assert its supposed rights as an assignee of ERISA claims, the case centers on the enforcement of benefits due under an employee welfare benefits plan. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-53 (1987). Thus, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

14.     As Feldman's has asserted a cause of action arising under the laws of the United States, this Court has original jurisdiction to hear Plaintiff's claims. *See* 28 U.S.C. §§ 1331 and 1441.

15.     Because CareFirst only became aware of Feldman's assertion of its rights as an assignee of claims for ERISA benefits when it received papers that were mailed on December 31, 2009, this case is being removed in a timely fashion under 28 U.S.C. § 1446(b). *Lovern v. Gen. Motors Corp.*, 126 F.3d 160, 162-63 (4th Cir. 1997); *Quality*

---

filed a motion to file the Interpleader with the individuals' names under seal. In any event, DOES summonses have been issued for those individuals and counsel for Feldman's, who also represents the DOES, accepted service of those summonses.

*Dialysis One LP v. Aetna Life Ins. Co.*, CA No. H-08-1121, 2009 WL 3247370 at *3 (S.D. Tex., Sept. 29, 2009)

16. A Notice of Filing for Removal to Federal Court is being filed contemporaneously with The Circuit Court for Baltimore County.

17. Written notice of this pleading has been given to Feldman's.

18. Removal to this Court is appropriate because Feldman's action is pending in this District and Division. *See* 28 U.S.C. § 1441(a).

WHEREFORE, Defendant CareFirst, respectfully notices the removal of this action to this Court from the Circuit Court for Baltimore County.

Respectfully submitted,

A. Dean Stocksdale
Bar No. 28416
Associate General Counsel
Group Hospitalization and Medical Services, Inc.
10455 Mill Run Circle
Owings Mills, Maryland 21117
(410) 998-5487
Attorney for CareFirst

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February 2010, a copy of the foregoing Notice of Removal was mailed, first-class, postage prepaid to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201 attorney for Plaintiff Feldman's Medical Center Pharmacy, Inc. and Third-Party Defendants.

A. Dean Stocksdale

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

     Plaintiff,

v.

CAREFIRST, INC.

     Defendant,

v.

John DOES 1 and 2

     Third-Party-

     Defendants.

Civil Action No. WDQ-10-254

_____

## <u>MOTION FOR REMAND</u>

Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's" or "Plaintiff"), through undersigned counsel, files this Motion for Remand.  For the reasons set forth in this motion and as more fully explained in the accompanying Memorandum of Law in Support of the Motion for Remand, and the Declaration of Jordan D. Becker dated March 3, 2010, attached as <u>Exhibit 1</u>, Plaintiff requests that this Court remand this action pursuant to 28 U.S.C. § 1447 to the Circuit Court for Baltimore County, Maryland, and requests an oral hearing on all issues

raised herein pursuant to Local Rule 105.6.

1.    A Complaint was filed in the Circuit Court for Baltimore County, Maryland, on June 1, 2009.  In the Complaint, Plaintiff pleads state-law causes of action, charging Defendant Carefirst, Inc. ("Carefirst" or "Defendant") with failure to provide payment for unpaid claims due under the Professional Provider Agreement: (i) breach of contract, (ii) unjust enrichment, and (iii) statutory bad faith.  The claims against the Defendant are based solely on state law and the Complaint does not plead an ERISA claim or defense.

2.    Plaintiff is a citizen of Maryland.  Defendant Carefirst is also a citizen of Maryland.

3.    On February 1, 2010, Defendant filed a Notice of Removal with this Court, alleging that Plaintiff is seeking to enforce rights that arise under ERISA and thus Plaintiff has asserted a cause of action arising under the laws of the United States, and this court has original jurisdiction to hear Plaintiff's claims.  See 28 U.S.C. §§ 1331 and 1441.

4.    Because this Court lacks subject-matter jurisdiction, and Defendant failed to remove this case within the required 30-days as proscribed in 28 U.S.C. § 1446(b), this case must be remanded under 28 U.S.C. § 1447(c). Additionally, Plaintiff requests that the Court require the removing Defendant to pay Plaintiff's costs and expenses, including attorney's fees, incurred as a result of

the removal, under 28 U.S.C. § 1447(c).

WHEREFORE, Plaintiff respectfully requests that the Court: (1) grant oral argument on this motion; (2) grant this motion and remand this case to the Circuit Court for Baltimore County, Maryland; and (3) order the removing Defendant to pay all Plaintiff's costs and expenses, including attorney's fees, incurred because of the wrongful removal of this action.

Dated: March 3, 2010

<div style="margin-left:40%;">

BAROODY & O'TOOLE
By: __/s/_____

Neal C. Baroody
Thomas O'Toole
201 N. Charles Street, Suite 2102
Baltimore, MD 21201
(410) 539-8410 (telephone)
(410) 539-8411 facsimile)
nbaroody@aol.com
totoolelaw@aol.com

Counsel appearing pro hac vice
PADUANO & WEINTRAUB LLP
Anthony Paduano
Jordan D. Becker
Matthew Schweber
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jdb@pwlawyers.com
ms@pwlawyers.com
Attorneys for Plaintiff

</div>

To:  Patrick de Gravelles
      Litigation General Counsel
      CareFirst Blue Cross Blue Shield
      Office of Corporate Counsel
      840 1st Street, N.E., DC12-08
      Washington, D.C.  20065
      Tel:  202-680-7457
      Fax: 202-680-7620

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

            Plaintiff,

v.

CAREFIRST, INC.

            Defendant,

v.

John DOES 1 and 2

            Third-Party-
            Defendants,

Civil Action No. WDQ-10-254

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR REMAND**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

Preliminary Statement ......................................................................1

  A.  Introduction...........................................................................2

  B.  The Maryland Action ..............................................................4

  C.  The Interpleader Complaint.....................................................5

  D.  The Removal Petition..............................................................6

FACTUAL AND PROCEDURAL SUMMARY .............................................8

ARGUMENT ..................................................................................11

I. DEFENDANT'S REMOVAL PETITION IS FATALLY FLAWED BECAUSE A FEDERAL
  COURT DOES NOT POSSESS ORIGINAL JURISDICTION OVER THE INSTANT SUIT 11

  A.  Plaintiff's Action Satisfies Neither Statutory Ground Necessary For A Federal
    Court to Exercise Subject Matter Juristiction ...............................11

  B.  ERISA Does Not Preempt Plaintiff's Claims And Therefore Does Not Grant
    This Court Subject Matter Juristiction Over the Instant Suit ...........12

  C.  Plaintiff Has Not Asserted A Derivative ERISA Claim Because Its Patients
    Have Assigned Plaitiff Their Right to Payment ............................16

II.  THIS COURT SHOULD REMAND THE INSTANT ACTION BECAUSE THE REMOVAL
  PETITION WAS FILED OUT OF TIME ...............................................20

III. THIS COURT SHOULD GRANT PLAINTIFF ATTORNEY'S FEES...........23

Conclusion ...................................................................................26

## TABLE OF AUTHORITIES

**Cases**

Aetna Health Inc. v. Davila,
542 U.S. 200, 124 S. Ct. 2488 (2004) ............................................................. 11, 13

Blue Cross of California v. Anesthesia Care Assoc. Medical Group, Inc.,
187 F.3d 1045 (9th Cir. 1999) ................................................................ 14, 17, 18

Caterpillar Inc. v. Williams,
482 U.S. 386, 107 S. Ct. 2425 (1987) .............................................................. 11n, 18

Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.,
591 F.3d 1337 (11th Cir. 2009) .............................................................. 13, 15, 19

FutureCare Health and Management Corp. v. CareFirst BlueChoice,
2005 WL 1279209 (D. Md. 2005) ................................................................ 23, 25

Hewett v. Tri-State Radiology, P.C.,
2009 WL 3048675 (D. Md. 2009) ......................................................................... 12

Hobbs v. Blue Cross Blue Shield of Ala.,
276 F.3d 1236 (11th Cir.2001) ............................................................................... 15

In re Lowe,
102 F.3d 731 (4th Cir.1996) ................................................................................. 25

Link Telecommunications, Inc. v. Sapperstein,
119 F. Supp. 2d 536 (D. Md. 2000) ....................................................................... 21

Lontz v. Tharp,
413 F.3d 435, 439 (4th Cir. 2005) ............................................................. 11, 12, 13

Lovern v. General Motors Corp.,
121 F.3d 160 (4th Cir.1997) ................................................................................. 23

Marin General Hosp. v. Modesto & Empire Traction Co.,
581 F.3d 941 (9th Cir. 2009) ................................................................. 13, 15, 19

Metro Ford Truck Sales, Inc. v. Ford Motor Co.,
145 F.3d 320 (5th Cir. 1998) ........................................................ 17, 21

Mulcahey v. Columbia Organic Chemistry,
29 F.3d 148 (4th Cir.1994) ............................................................... 11

Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan,
388 F.3d 393 (3rd Cir. 2004) ................................................... 14, 15, 20

RLI Ins. Co. v. John H. Hampshire, Inc.,
461 F. Supp. 2d 364 (D. Md. 2006) .................................................. 17

Roche v. Lincoln Prop. Co.,
373 F.3d 610 (4th Cir. 2004) ............................................................ 11

Virgilio v. Motorola, Inc.,
307 F. Supp. 2d 504 (S.D.N.Y. 2004) ................................................ 17

**Statutes**

28 U.S.C § 1447 ................................................................... 7, 24

28 U.S.C. § 1331 .................................................................. 7, 12

28 U.S.C. § 1441 ...................................................................... 7

28 U.S.C. § 1446 .................................................................. 22, 23

28 U.S.C. § 1447 .................................................................. 7, 24

ERISA § 502 ..................................................................... passim

28 U.S.C § 1332 ................................................................. 7n, 11

Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's Pharmacy" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in support of its Motion for Remand.

Pursuant to 28 U.S.C § 1447(c), Plaintiff, respectfully, asks this Court to remand the instant suit to the Circuit Court of Baltimore County ("State Court"). As explained in further detail below, the United States District Court for the District of Maryland lacks federal subject matter jurisdiction over Plaintiff's action. Furthermore, Defendant Carefirst Inc.'s ("Defendant" or "Carefirst") filed its Notice of Removal (the "Removal Petition") after the removal statute's 30-day time limit elapsed. See 28 U.S.C § 1446(b).

Plaintiff also requests oral argument pursuant to Local Rule 105.6. Oral argument will assist this Court in resolving the Removal Petition's intricate issues of law and fact and will provide the parties an opportunity for a full and fair hearing.

### Preliminary Statement

Defendant's removal of the instant suit suffers from fatal defects that require this Court to remand Plaintiff's case to State Court. See 28 U.S.C § 1447(c).

First and foremost, this Court lacks federal subject matter jurisdiction over Plaintiff's action because it is a commonplace contract dispute governed by Maryland state law. In June 2009, Plaintiff Feldman's Pharmacy, a medical provider, sued Defendant Carefirst, a health insurance company, seeking reimbursement for in excess of $1.5 million dollars in unpaid health care claims owed Plaintiff under an insurance provider agreement.

Plaintiff's suit, as such, does not raise a question of federal law or otherwise

present a statutory basis for a federal court to hear its merits.[1] Plaintiff has not alleged a federal claim, under ERISA or any other federal statute. Contrary to Defendant's central argument in the Removal Petition, Plaintiff's action neither implicates an ERISA defense nor triggers ERISA's complete preemption doctrine.

Secondly, the Removal Petition is untimely.

Either of the two foregoing reasons alone warrants remand of the instant suit. 28 U.S.C § 1447(c).

## A. Introduction

This case is a simple breach of contract case. Plaintiff has provided more than $1.5 million worth of products and services to patients who were covered by health insurance from CareFirst. Plaintiff had a contract with CareFirst that set out Plaintiff's right to payment for products and services provided to CareFirst's insureds. When CareFirst refused to pay Plaintiff for the products Plaintiff provided to CareFirst's insureds, CareFirst breached its contract with Plaintiff.

Plaintiff's Removal Petition is nothing more than a transparent continuation of CareFirst's strategy to delay payment and to raise Plaintiff's legal fees. These tactics are standard operating procedure for health insurance companies and can be extremely effective at placing a plaintiff under such severe financial distress that it no longer can prosecute its

---

[1] Defendant does not base its Removal Petition on diversity jurisdiction, and because both parties are Maryland corporations, Defendant cannot claim federal jurisdiction on such grounds. See 28 U.S.C § 1332(1).

legal action or pursue its claims for reimbursement.

There is no doubt however that CareFirst is responsible for paying Plaintiff for the factor[2] it provided to CareFirst's insureds. If a court ultimately decides that such factor was covered under the contract, then Plaintiff will be considered an "in network provider" for CareFirst and CareFirst will be required to pay damages for its breach of contract. If a court somehow decides that the factor products were not covered under the contract and that CareFirst did not breach the contract, then Plaintiff will be considered an "out of network provider" for CareFirst. In that instance, Plaintiff will pursue its entitlement to payment as an "out of network provider" just as any other pharmacy that does not have a contract with CareFirst. The only material differences between being an "in network provider" and an "out of network provider" in fact are (i) an "in network provider" gets a higher reimbursement rate, and (ii) an "in network provider" receives payment directly from CareFirst while an "out of network" provider receives payment from the patient/insured, who receives payment from CareFirst. In either scenario, CareFirst must pay, and in either scenario, Plaintiff ultimately receives payment.[3]

It is unconscionable to think that CareFirst could even attempt to evade paying for medications that saved the lives of <u>its own customers</u>. Plaintiff had all the necessary

---

[2] Blood factor is a very expensive blood-clotting medication critical to hemophiliacs' survival. Hemophiliacs suffer from a life-threatening disease that requires them to inject factor to avoid bleeding to death.

[3] Indeed Carefirst has acknowledged Plaintiff's alternate right to payment as an "out of network provider." However, it bears emphasizing that Plaintiff is only asserting its right to

3

licenses to operate its business and complied with all of Maryland state laws. When CareFirst's insureds were dying and called Plaintiff with emergency orders for factor, Plaintiff relied on its contract with CareFirst, the patients' contracts with CareFirst, and Plaintiff's pre-clearance of eligibility with CareFirst, and shipped the enormously expensive factor medications to the patients. CareFirst is obligated to pay for the factor delivered to CareFirst's insureds, at the price set by CareFirst for pharmacy providers.

## B. The Maryland Action

The basis for Plaintiff's dispute with Defendant lies in the subscriber agreement (the "Participating Professional Provider Agreement" or "PPP")[4] the parties executed in August 1997. The PPP established Feldman's Pharmacy as a participating provider in Blue Cross Blue Shield's Maryland network and fixed Plaintiff's entitlement to payment for insurance claims submitted for covered services.

Prior to 2008, Carefirst paid Plaintiff for the claims Plaintiff submitted. Then, in early 2008, without warning or explanation, Carefirst began to refuse to reimburse Feldman's Pharmacy for the medication Feldman's Pharmacy dispensed to its hemophilia patients.[5] Ever since, Defendant has seized upon one subterfuge after another to deny Plaintiff's claims, to delay paying them, and/or to withhold payment entirely. Defendant has invoked bogus

---

payment as "in network provider" in the present case.

[4]    A copy of the PPP Agreement is annexed to the Becker Declaration as <u>Exhibit A</u>.

[5]    Hemophilia is a life-threatening disease that requires those afflicted to inject a very expensive blood-clotting factor treatment because their bodies don't generate a sufficient supply of clotting proteins to stanch bleeding naturally.

interpretations of the PPP, has embroiled Plaintiff in its corporate bureaucracy, has demanded Defendant apply for redundant contracts and undergo unnecessary licensing, has smeared Plaintiff's integrity, and has enlisted federal government agencies to investigate Plaintiff on spurious and trumped-up fraud charges,[6] among other false allegations.  After making a demand on CareFirst and exhausting all other avenues to get payment, Plaintiff filed suit on June 1, 2009 in State Court (the "Complaint")[7] charging Defendant with breaching the PPP and asserting three related causes of action—(i) breach of contract, (ii) unjust enrichment, and (iii) bad faith under Maryland state law.

## C.  The Interpleader Complaint

Defendant's Removal Petition is an attempt to avoid accountability for its breaches of the PPP.  That maneuver began with Defendant's filing of the baseless Third-Party Complaint and Counter-Complaint For Interpleader Defendant, filed in State Court in November of 2009 (the "Interpleader Complaint"), Becker Dec., Exhibit C. After months of contesting Plaintiff's right to payment, Defendant, suddenly, offered to pay a small set of the claims outstanding.  But Defendant asserted that Plaintiff and Plaintiff's patients, John Does 1 and 2, had adverse claims to the sum, even though John Does 1 and 2 had not asserted a right to payment at all. (the Interpleader Complaint, ¶¶ 32-40), Becker Dec., Exhibit C; See also the Complaint's Exhibit B, (Becker Dec., Exhibit B).

---

[6]    Every participating government agency has determined, to date, Defendant's charges are unfounded.

[7]    Plaintiff annexes the Complaint, dated June 1, 2009, to the Becker Dec. as Exhibit B.

5

Defendant clearly knew all along that Plaintiff and its patients did not hold adverse claims. Defendant's "concern" about whom to pay was part of Defendant's strategy. By laying the groundwork in the Interpleader Complaint, Defendant intended to remove this case to Federal court and to argue that ERISA preempted Plaintiff's causes of action because the patients previously had assigned Plaintiff their right to payment. See the Service Agreement/Assignment of Benefits (the "Assignments"), Becker Dec., Exhibit D; See also Memorandum of Law In Support of Plaintiff/Counter-Defendant's Motion for Summary Judgment And In Response To Defendant/Counter-Claimant/Third-Party Plaintiff's Motion For Order Directing Clerk To Accept Interpleader Amount, Bostwick Affidavit, Exhibits A and B ("Plaintiff's Response to the Interpleader Complaint"), Becker Dec., Exhibit E.

But the Assignments are not relevant to this litigation, because Plaintiff sued Defendant for breach of contract. The Assignments grant Feldman's Pharmacy an alternative ground for payment it reserves but nonetheless has not exercised in its current lawsuit.

**D. The Removal Petition**

The Removal Petition is frivolous because the action Plaintiff originally filed on June 1, 2009 in State Court (i) confines itself to the interpretation of the PPP, a health care provider agreement; and as such, (ii) asserts state claims arising exclusively under state law-- breach of contract, unjust enrichment, and bad faith.

The Complaint certainly does not plead an ERISA claim or defense. Nor for that matter does the Complaint plead a state-law cause of action that duplicates, supplements,

6

supplants, or conflicts with ERISA. The Assignments that form the basis for the Removal Petition do not implicate ERISA because Plaintiff has not asserted a right to payment under the Assignments in this case. Defendant's claims to the contrary belie the rulings of numerous Federal Circuit Courts in cases similar, if not identical, to the facts at issue in this case. Plaintiff's suit therefore does not meet the criteria for federal subject matter jurisdiction and the case should be remanded accordingly. (Removal Petition, ¶ 13) <u>See</u> <u>also</u> 28 U.S.C. § 1441(b) and 28 U.S.C. § 1331[8].

In addition, Defendant filed the Removal Petition on February 1, 2010, well after the 30-day time limit 28 U.S.C § 1447(c) sets for removal had expired. Defendant received Plaintiff's initial pleading, the Complaint, over seven months ago. The "other papers" in which Defendant professes to see a jurisdictional basis (Removal Petition, ¶¶ 6, 12), furthermore, placed Defendant on notice in excess of 30 days before Defendant filed the Removal Petition on February 1, 2010. This Court should remand the instant suit pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1447 accordingly for either or both of the reasons explained above.

---

[8] Besides ERISA, the Removal Petition has not attributed to the Complaint another United States law, treaty, or the U.S. Constitution. Moreover, because Defendant is a Maryland corporation, this Court does not possess original jurisdiction based upon the parties' diverse citizenship 28 U.S.C. § 1332. Indeed, the Removal Petition does not contend to the contrary.

7

**FACTUAL AND PROCEDURAL SUMMARY**

Plaintiff Feldman's Pharmacy is a nationally accredited specialty pharmacy located in Columbia, Maryland, which has provided pharmacy and health management care coordination services to patients since 1986.  More recently, Feldman's Pharmacy has provided a very expensive blood-clotting factor treatment vital for hemophilia patients to survive bleeds.  These medications are not available at every local pharmacy, and because time is of the essence in treating a hemophiliac's bleed, patients seek out pharmacies that provide them with extremely quick, efficient and effective service.

In August 1997, Plaintiff and CareFirst entered into the PPP, which established Plaintiff as a participating provider for CareFirst.  Pursuant to the PPP, Plaintiff submits a claim to Defendant for payment after Plaintiff provides "Covered Services" to a patient in the amount of the applicable charges.

Plaintiff at all time has complied with the terms of the PPP and has followed CareFirst's procedures for submitting claims for factor dispensed to CareFirst's insureds. Plaintiff has dispensed medications that are covered under the PPP Agreement; has submitted insurance claims corresponding to those medications in a timely fashion; and has complied with all of Defendant's often redundant requests for information.  Yet even though Plaintiff jumped through all of CareFirst's hoops, Defendant has still failed and/or refused to pay the $1,588,127.77 it owes Plaintiff.  This attempted removal is just another maneuver by CareFirst to avoid being held to the contract it freely entered into.

8

Defendant's refusal to pay the money it owes to Plaintiff has caused Plaintiff severe financial distress, and Plaintiff had no choice but to file suit in State Court on June 1, 2009, seeking, <u>inter alia</u>, (i) an injunction ordering Defendant immediately to pay all outstanding and unpaid claims, (ii) an injunction ordering Defendant to comply with the PPP Agreement, including the provisions requiring prompt and full payment of all claims for past and future Covered Services, thus enabling Plaintiff to make payments to its creditors and to continue providing lifesaving medication to its patients pending trial on the merits, and (iii) actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest and costs and additional damages in an amount to be proved at trial.

On November 25, 2009, Defendant filed the Interpleader Complaint, Becker Dec., <u>Exhibit C</u>. The Interpleader Complaint attempted to join John DOES 1 and 2 (the "DOES") to Plaintiff's action and made allegations that Plaintiff's claims for reimbursement are adverse to those of the DOES (Interpleader Complaint ¶¶ 2, 3, 32-40). <u>Id</u>. In response, Feldman's Pharmacy filed Plaintiff's Response to the Interpleader Complaint on December 31, 2009. Becker Dec., <u>Exhibit C</u>. Plaintiff argued, <u>inter alia</u>, that because the Assignments and the affidavits it submitted from the DOES clearly indicated that the DOES did not assert, nor did they have any basis for asserting, any right to repayment[9], there was no basis for the

---

[9] At no time did any of the patients make a payment to Feldman's Pharmacy for the factor they received, so there would be no basis for making a "repayment" to the patients. If CareFirst ever made payment directly to the patients, the patients would be unjustly enriched

Interpleader Complaint.  Accordingly, Plaintiff moved for summary judgment, asking the State Court to dismiss the Interpleader Complaint.  See Plaintiff's Response to the Interpleader Complaint, Becker Dec., Exhibit E.

Using the Assignments as pretexts, Defendant then filed the Removal Petition on February 1, 2010, removing Plaintiff's action to federal court.  See, generally, the Removal Petition.  However, neither the facts pled nor the claims asserted in the Complaint raise a federal question.  Instead, the Removal Petition mischaracterizes Plaintiff's suit as an ERISA action and ascribes to Plaintiff ERISA claims that Plaintiff has not asserted in this action nor has it invoked indirectly.

As explained in greater detail in Section I.C. below, Defendant has misconstrued the significance of the Assignments.  Although Defendant continues to cite the Assignments in order to muddle the merits of Plaintiff's case, the Assignments are actually immaterial to the instant suit.  (Removal Petition, ¶ 13); See also Opposition of Defendant, Counter-Claimant and Third-Party Plaintiff CareFirst, Inc. to Plaintiff/Counter-Defendant Feldman's Motion for Summary Judgment As To Interpleader Action), Becker Dec., Exhibit F.

To the contrary, Plaintiff's claims for breach of contract, unjust enrichment, and bad faith all rest upon the PPP's separate and independent foundation.  Redress of Plaintiff's claims does not implicate the Assignments whatsoever.

---

unless the payment was turned over to Plaintiff, even in the absence of the Assignments.

10

# ARGUMENT

## I.

## DEFENDANT'S REMOVAL PETITION IS FATALLY FLAWED BECAUSE A FEDERAL COURT DOES NOT POSSESS ORIGINAL JURISDICTION OVER THE INSTANT SUIT

The propriety of Defendant's Removal Petition depends on whether this Court possesses original jurisdiction over the instant suit. See Lontz v. Tharp, 413 F.3d 435, 439 (4th Cir. 2005). As the party seeking removal, Defendant must establish with certainty that the instant action qualifies for federal jurisdiction. See Mulcahey v. Columbia Organic Chemistry, 29 F.3d 148, 151 (4th Cir.1994). Any doubt will weigh against Defendant's Removal Petition and in favor of remanding Plaintiff's action to state court. See Roche v. Lincoln Prop. Co., 373 F.3d 610, 615 (4th Cir. 2004)(federalism enjoins courts to resolve doubts against party seeking removal).

### A. Plaintiff's Action Satisfies Neither Statutory Ground Necessary For A Federal Court to Exercise Subject Matter Jurisdiction

Defendant's Removal Petition does not satisfy the stringent standard for removal necessitated by the principles of federalism. As a consequence, this Court must remand Plaintiff's action.

The strict construction of the Complaint—as respect for federalism and the well-pleaded complaint rule[10] prescribes -- reveals that Plaintiff's action qualifies for neither of the

---

[10] The well-pleaded complaint rule obligates a federal court to determine whether it possesses subject matter jurisdiction from what necessarily appears in the plaintiff's

two traditional bases for federal subject matter jurisdiction: (i) a legal question arising under the United States' laws, treaties, or its Constitution or (ii) alternatively, where the parties are diverse.  Becker Dec., Exhibit B; 28 U.S.C § 1331 and 28 U.S.C § 1332.

First, the Complaint clearly sets forth three state-law claims: (i) breach of contract, (ii) unjust enrichment, and (iii) bad faith--each arising from Defendant's breach of the PPP.  Neither the Complaint's plead facts, nor its asserted grounds for relief, then, presents a federal question.  See Lontz v. Tharp, 413 F.3d 435, 439 (4th Cir. 2005)(state law complaints must stay in state court when they assert what appears, on their face, to be state law claims);  Hewett v. Tri-State Radiology, P.C., 2009 WL 3048675, *2 (D. Md. 2009).  Second, the Maryland state citizenship of both parties forecloses diversity jurisdiction (Complaint, ¶¶ 1-2). Becker Dec., Exhibit B.

### B.  ERISA Does Not Preempt Plaintiff's Claims And Therefore Does Not Grant This Court Subject Matter Jurisdiction Over the Instant Suit.

Relying instead on a narrow exception to the well-pleaded complaint rule known as "complete preemption," Defendant contends that Plaintiff's action actually amounts to an ERISA case.  As such, Defendant contends that ERISA both completely preempts Plaintiff's state-law claims and vests this Court with federal subject matter jurisdiction.  See Removal Petition, ¶¶ 5, 12-13;  Lontz v. Tharp, 413 F.3d 435, 439-40 (4th Cir. 2005)(a narrow

---

statement of his own claim.  See Aetna Health Inc. v. Davila, 542 U.S. 200, 207-8, 124 S. Ct. 2488, 2494-5 (2004); Caterpillar Inc. v. Williams, 482 U.S. 386, 398-99, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (the well-pleaded complaint safeguards the principle that the

exception to the well-pleaded complaint rule known as the 'complete preemption' doctrine' provides that if federal law completely subsumes a putative state law claim-then removal is appropriate); see also Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S. Ct. 2488, 2494-5 (2004)(when a federal statute wholly displaces the state-law cause of action through complete pre-emption the state claim can be removed; ERISA is one of these statutes).

However, the complete preemption doctrine does not apply to the instant suit because Plaintiff's state-law claims do not "duplicate, supplement, or supplant" the civil enforcement remedies ERISA provides under § 502(a)(1)(B). See Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 2495 (2004); Lontz v. Tharp, 413 F.3d 435, 439-40 (4th Cir. 2005). Plaintiff's case fulfills neither of the two criteria for complete preemption under ERISA § 502(a)(1)(B) that Davila and its progeny have established: (i) does the Complaint rely on a legal duty that arises independently of ERISA; (ii) could the Plaintiff have brought its three state-law claims instead under ERISA § 502(a)(1)(B)? Marin General Hosp. v. Modesto & Empire Traction Co., 581 F.3d 941, 946-7 (9th Cir. 2009)(ERISA § 502(a)(1)(B) only preempts a state-law cause of action if both prongs of the test are satisfied); Connecticut State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1347-8 (11th Cir. 2009)(noting 3rd, 5th, and 9th Circuits have applied these principles to ascertain line of demarcation between ERISA and state law claims).

---

party who brings suit is master of the complaint and the law upon which he will rely upon).

13

First of all, examination of the Complaint reveals incontrovertibly that the three state-law claims asserted — (i) breach of contract, (ii) unjust enrichment, and (ii) bad faith — derive from, and seek remedy for, a legal duty separate and independent from ERISA. Each stems from Plaintiff's allegations that Defendant has breached the PPP, a provider agreement, by refusing or withholding reimbursement for factor drugs Plaintiff dispensed to Plaintiff's customers and/or Carefirst's patients (Complaint, ¶¶ 8-12, 28-43). Plaintiff contends that factor qualifies as a "Covered Service" under the PPP; Defendant contends to the contrary. See Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 402 (3rd Cir. 2004)(where crux of the parties' dispute is the meaning of "Covered Services furnished to Eligible Persons" under a subscriber agreement, provider's state law claims are predicated on a legal duty independent of ERISA); Blue Cross of California v. Anesthesia Care Assoc. Medical Group, Inc., 187 F.3d 1045, 1050-2 (9th Cir. 1999)(claims under provider agreements implicate a separate legal duty from patients' claims under ERISA plans because § 502(a)(1)(B) exclusively regulates patient-employee health plans).

Secondly, Plaintiff could not have brought its three state-law claims under ERISA § 502(a)(1)(B) because ERISA regulates patient-employee health plans and therefore confers standing to sue exclusively on "participants" and "beneficiaries". ERISA defines a (i) "participant" and a (ii) "beneficiary," respectively, as follows:

> (i) "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan

14

which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit" 29 U.S.C. § 1002(7) and (ii) "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit there under." 29 U.S.C. § 1002(8); <u>Hobbs v. Blue Cross Blue Shield of Ala.</u>, 276 F.3d 1236, 1241 (11th Cir.2001)

Of course, Plaintiff, a health care provider, is neither. <u>See</u> <u>Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.</u>, 591 F.3d 1337, 1346-7 (11th Cir. 2009)(healthcare provider claims not subject to complete preemption because providers are not considered 'beneficiaries' or 'participants' under ERISA); <u>Blue Cross of California v. Anesthesia Care Assoc. Medical Group, Inc.</u>, 187 F.3d 1045, 1050-2 (9th Cir. 1999). <u>Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan</u>, 388 F.3d 393, 402 (3rd Cir. 2004); <u>Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.</u>, 591 F.3d 1337, 1347 (11th Cir. 2009); <u>Marin General Hospital v. Modesto & Empire Traction Company,</u> 581 F.3d 941, 947-950 (9th Cir. 2009)((<u>affirming</u> <u>Blue Cross of California</u>, supra, at 1051) (no ERISA preemption where providers were suing based upon the terms of the "executed provider agreements")).

ERISA § 502(a)(1)(B), as such, does not redress Defendant's breach of the PPP, a provider agreement. Nor do the three state-law claims the Complaint has pled as a result of this breach duplicate, supplement, or supplant ERISA. Defendant's Removal Petition, then, has not proven—and cannot prove—that the Complaint meets both prongs of <u>Davila</u>'s two-part test for complete preemption. This Court accordingly lacks a legal basis for federal jurisdiction.

15

C.  **Plaintiff Has Not Asserted A Derivative ERISA Claim Because
Its Patients Have Assigned Plaintiff Their Right To Payment**

Implicit in the Removal Petition, in fact, is Defendant's concession that ERISA §

502(a)(1)(B) does not preempt Plaintiff's state-law claims emanating from the PPP.

Defendant instead bases its preemption argument on the Assignments Plaintiff's customers

have executed.[11]  The mere existence of the Assignments, Defendant argues, implies that

Plaintiff, in this action, has invoked the right of remedy they confer.   The Removal Petition

reads as follows:

> "in reality Feldman's is at least in part seeking to enforce rights that arise
> under ERISA...[B]ecause Feldman's attempts to assert its supposed rights
> as an assignee of ERISA claims, the case centers on the enforcement of
> benefits due under an employee welfare benefits plan" (Removal Petition,
> ¶ 13).

Defendant's above characterization of Plaintiff's case is completely false however.  Plaintiff

has never claimed any right of action or right of remedy in this proceeding via the

Assignments.   Plaintiff only raised the Assignment in the Interpleader Complaint, in fact, to

prove that the individual patients did not possess a right adverse to Feldman's Pharmacy.

Indeed, all along, Plaintiff has explained that the Assignments merely grant Feldman's

Pharmacy a secondary and contingent right to payment it has yet to exercise (Response to

Interpleader Complaint, p. 6), Becker Dec., <u>Exhibit E</u>.

---

[11]     The Assignments provide as follows, "I hereby assign and transfer to FHM [Plaintiff]
and FCS all rights, title and interest to reimbursement payable to me for services provided by
FHM, FCS, and its associated contract providers."  Becker Dec., <u>Exhibit D</u>)

16

At some future unspecified date, Plaintiff may or may not choose to pursue this alternative basis should the State Court decide that the PPP does not entitle Plaintiff to full reimbursement for factor. However, courts do not adjudicate potential causes of action nor should a court construe Plaintiff Feldman's Pharmacy's responses in a collateral proceeding to alter the Complaint. See RLI Ins. Co. v. John H. Hampshire, Inc., 461 F. Supp. 2d 364, 369 (D. Md. 2006); see also Virgilio v. Motorola, Inc., 307 F. Supp. 2d 504, 512 (S.D.N.Y. 2004)(federal court will not consider Defendant's criticism of Plaintiff's characterization of its claims to create subject matter jurisdiction); Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 326-27 (5th Cir. 1998)(third-party claim cannot not change the character of the plaintiff's complaint any more than does the defendant's other pleadings).

Defendant's argument therefore incorrectly combines the actual and direct claims Plaintiff has asserted in this action with separate and independent claims that Plaintiff has not asserted. Plaintiff's action does not invoke any rights resulting from the Assignments, in whole, or in part. To the contrary, Plaintiff's claims for breach of contract, unjust enrichment, and bad faith (i) emanate from a separate and independent legal duty and (ii) present this Court with separate and independent legal questions: whether or not the factor Plaintiff dispensed constitutes a "Covered Service" under the PPP; whether Plaintiff is entitled to payment for the insurance claims Defendant, to date, has refused to pay; and whether Defendant has willfully violated its contractual obligations. See Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.,187 F.3d 1045, 1050-1(9th

17

Cir.1999). The Assignments are immaterial and superfluous to Plaintiff's case. See Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 2439 (1987) (plaintiff is the master of the case and may avoid federal jurisdiction by exclusive reliance on state law).

Actually, the Interpleader Complaint attests to the distinction between the (i) right of action Plaintiff possesses directly as a health care provider—a right of relief Plaintiff has asserted in this litigation; and (ii) the derivative right of action under ERISA the Plaintiff possesses as the beneficiary of the patient-insured's rights in the Assignments—a right of relief Plaintiff has not asserted in this litigation. In Paragraph 6 of the Interpleader Complaint, Defendant asserts,

> "Despite its assertions that it is an 'accredited specialty pharmacy'... prior to December 11, 2008, Feldman's was not licensed to provide factor to patients homes because before that date, Feldman's lacked a Residential Service Agency license ("RSA"), as required by § 19-4A-01 *et seq.* of the Health-General Article." (Interpleader Complaint, ¶ 6), Becker Dec., Exhibit C.

A patient-insured's right to payment does not depend upon the presence or absence of a "Residential Service Agency license." The claim to payment rise or falls on the terms of his health plan. A "Residential Service Agency license," by contrast, only can govern a health care provider's right to payment. The two legal duties and the legal questions to which they give rise are therefore discrete and independent of each other. See Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc., 187 F.3d 1045, 1050-1(9th Cir.1999)(although beneficiaries of ERISA-covered plans assigned their rights to reimbursement to the Providers, the Providers are asserting state law claims arising out of

18

separate agreements for the provision of goods and services; mere fact of assignment does not convert the Providers' claims into an ERISA case).

Defendant's Removal Petition, moreover, misconstrues the applicable case law. To be sure, the Assignments may vest the Plaintiff with standing to assume the patient-insured's rights under their respective employee health plans. See Marin General Hospital v. Modesto & Empire Traction Company, 581 F.3d 941, 947-950 (3d Cir. 2009)((provider-assignee stands in the shoes of the beneficiary, [and hence] has standing to sue under ERISA § 502(a)(1)(B) to recover benefits due under the plan)(citing Blue Cross of California, supra, at 1051)). Should Plaintiff choose to do so at some future date, Plaintiff may exercise the right the Assignments yield it and sue Defendant under ERISA § 502(a)(1)(B). However, Plaintiff has not proceeded as such in the instant case. That the right to payment via state law Plaintiff has pursued, happens to coincide with the remedies ERISA § 502(a)(1)(B) provides makes neither Plaintiff's claims, nor the legal duty underpinning them, duplicative of ERISA nor warrants their preemption. Marin General Hospital v. Modesto & Empire Traction Company, 581 F.3d 941, 950 (3d Cir. 2009)(under Davila touchstone is whether an "independent legal duty" is implicated not whether that legal duty provides for a similar remedy, such as the payment of money).

Decisions from the Third, Ninth, and Eleventh Circuits all draw this critical distinction. Health care providers possess one right of action under their provider contract which ERISA § 502(a)(1)(B) does not preempt. And if their patients assign them their right,

19

health care providers accrue another discrete, independent, and derivative right of action under their patients' health plans which ERISA § 502(a)(1)(B) does control. See Connecticut State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1347 (11th Cir. 2009)(provider receiving an assignment of benefits holds two separate claims and may assert a claim for benefits under ERISA, the state law claim, or both)(citing with approval Third, Fifth and Ninth's Circuits' identical approach); Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 403 (3rd Cir. 2004)(mere fact of assignment does not convert the Providers' claims into claims to recover benefits under the terms of an ERISA plan); Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.,187 F.3d 1045, 1051 (9th Cir.1999)(assignment of patient-beneficiary rights to provider does not result in ERISA's enforcement mechanism extinguishing providers state-law claims).

Because Plaintiff has pursued relief instead under state law for the separate and independent wrongs to which Defendant's breach of the PPP gives rise, ERISA's preemption doctrine has no relevance to Plaintiff's suit.   A federal court therefore does not possess subject matter jurisdiction over the instant proceeding.

## II.

### THIS COURT SHOULD REMAND THE INSTANT ACTION
### BECAUSE THE REMOVAL PETITION WAS FILED OUT OF TIME

Plaintiff commenced the instant suit on June 1, 2009.  The posture of Plaintiff's case has not changed since then.  Plaintiff has not amended its Complaint.  Plaintiff has not augmented it three state-law causes of action.  Nor, for that matter, has Plaintiff altered the

factual and legal foundation upon which its suit rests, the PPP. See Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 326-27 (5th Cir. 1998).

The Complaint furnished Defendant ample notice accordingly in June of 2009 whether ERISA preempted Plaintiff's claims and/or granted Defendant an ostensible ground for removal. Becker Dec., Exhibit B. As such, the thirty-day time period 28 U.S.C.A § 1446(b) prescribes expired long ago. And, for this reason alone, the Removal Petition is fatally defective and this Court should remand the instant action accordingly. Link Telecommunications, Inc. v. Sapperstein, 119 F. Supp. 2d 536, 544 (D. Md. 2000)(most courts require a defendant to remove a case within thirty days unless the initial pleading provides 'no clue' that the action may be removable).

In the Removal Petition, Defendant nonetheless claims it only received notice of Plaintiff's attempt "to assert its supposed rights as an assignee of ERISA claims" in response to the Interpleader Complaint (Removal Petition, ¶ 12-13). See generally Memorandum of Law In Support of Plaintiff Counter-Defendant's Motion for Summary Judgment (the "Response to the Interpleader Complaint"). The Removal Petition implies that the removal statute's thirty-day limitations period did not begin until Plaintiff submitted the Response to the Interpleader Complaint on December 31, 2009 and that the Removal Petition is therefore timely. See 28 U.S.C. § 1446(b) (if the initial pleading is not removable, defendant can remove within thirty days of an amended pleading, motion, order, or other paper from which defendant first ascertains that the case is removable)(emphasis added). Once again,

21

however, Defendant's own Interpleader Complaint vitiates its premise.

When the Interpleader Complaint joined the patient-insured's to Plaintiff's lawsuit, Defendant set the groundwork for the derivative ERISA claim it now alleges completely preempts Plaintiff's action.[12]  Once the Interpleader Complaint named John Does 1 and 2 as Third-Party Defendants, their presence in the suit as insured patient-beneficiaries enabled Defendant to attribute to Plaintiff a derivative (and imaginary) ERISA claim through the patients--an ERISA claim Plaintiff never actually asserted (Removal Petition, ¶ 12-13). Indeed, Defendant may have intended to accomplish as much all along.

First, the Interpleader Complaint devised an imaginary dispute between Plaintiff and the Third-Party Insureds about whom to pay for outstanding claims.  Becker Dec., <u>Exhibit C</u>.  To dispose of this manufactured dispute, Plaintiff introduced the Assignments to show that the insured had assigned their right of payment to Plaintiff long ago (Response to the Interpleader Complaint, Exhibits A and B).  Becker Dec., <u>Exhibit E</u>.  Defendant then seized upon the Assignments to invoke the ERISA preemption doctrine by mischaracterizing the Assignment's relevance to the instant action.[13]  To countenance Defendant's assertion that only with the Response to the Interpleader Complaint did it discover "that [Feldman's] is at least in part seeking to enforce rights that arise under ERISA" would allow Defendant to profit

---

[12]  The Interpleader Complaint actually combines two procedural vehicles: (i) Defendant's Third-Party Complaint naming John Does 1 and 2 and (ii) a separate Interpleader Counter-Complaint, naming Plaintiff and third-party defendants, John Does 1 and 2.  <u>See</u> The Interpleader Complaint, ¶2, n.1

[13]  As argued above in Section II., the Assignments give Plaintiff a right of action it has

from its own legal maneuvering. The case law interpreting 28 U.S.C. § 1446(b) however expressly precludes such an outcome. See Lovern v. General Motors Corp., 121 F.3d 160, 163 (4th Cir.1997)(the extension of the removal period in the case where the initial pleading does not state the factual or legal bases for removal should not be allowed to cover defendant's strategic delay).

The Court therefore should conclude that Defendant had notice of federal grounds for removing this case once Defendant's Interpleader Complaint laid the first brick of ERISA's alleged foundation. FutureCare Health and Management Corp. v. CareFirst BlueChoice, 2005 WL 1279209, *2 (D. Md. 2005)(court may rely on the face of the initial pleading and on the documents parties exchanged to determine when the defendant had notice of the grounds for removal). This occurred on November 25, 2009, the date Defendant certifies it served the Interpleader Complaint (the Interpleader Complaint, p. 9). Becker Dec., Exhibit C. The Removal Petition's filing on February 1st therefore overextends the thirty-day time period allotted Defendant under 28 U.S.C. § 1446(b). This Court should remand the instant action to state court under 28 U.S.C § 1447(c) accordingly.

<div align="center">III.</div>

<div align="center">**THIS COURT SHOULD GRANT PLAINTIFF ATTORNEY'S FEES**</div>

In accordance with Section § 1447(c), the Plaintiff further asks the Court to award it attorneys' fees, just costs, and all actual expenses Plaintiff has incurred in pursuing

---

chosen not to exercise.

its motion to remand the instant action. 28 U.S.C. § 1447(c)("an order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal").

The Removal Petition only serves as Defendant's latest in a series of transparent legal maneuvers to avoid paying Plaintiff for the valid insurance claims it has submitted for duly dispensed factor.   Indeed, the Complaint indisputably reveals-- and Defendant's own pleadings further corroborate-- that the PPP forms the gravamen of Plaintiff's case; that Plaintiff's causes of action are anchored in state law; and that Plaintiff's right of relief, moreover, exists separately and independently of patient-beneficiaries' assigned rights under ERISA.   Yet Defendant has asserted one theory after another, ranging from bogus investigations conducted in coordination with the Blue Cross Blue Shield Association[14] and various government agencies[15], to unfounded interpretations of the PPP, to lack of licensure, to ERISA preemption, in order to delay or avoid making payment to Plaintiff.

When Defendant filed the Interpleader Complaint on November 25, 2009, it necessarily was on notice of a putative federal question. Becker Dec., <u>Exhibit C</u>. Defendant nonetheless filed its Removal Petition on February 1, 2010, well in excess of thirty-days after

---

[14]   The Blue Cross Blue Shield Association ("BCBSA") is the national federation of Blue Cross Blue Shield companies, including CareFirst.   On information and belief, the BCBSA has coordinated "investigations" of Plaintiff and several affiliated companies for no other reason than the medication provided to their insureds was too expensive.   Plaintiff is not aware of any material wrongdoing uncovered by any of these "investigations."

[15]   Every participating government agency has determined, to date, Defendant's charges

24

it possessed constructive notice of its grounds for removal.   Plaintiff is entitled to an award

of costs, including attorney's fees, incurred as result of the Removal Petition's fatal defects.

See FutureCare Health and Management Corp. v. CareFirst BlueChoice, 2005 WL 1279209,

*5 (D. Md. 2005)(plaintiff entitled to recover costs, including attorney's fees, incurred from

untimely removal as a matter of fairness);   In re Lowe, 102 F.3d 731, 733 n. 2 (4th

Cir.1996).

---

unfounded.

**Conclusion**

For the reasons set forth herein, Plaintiff's Motion to Remand should be granted.

Dated:     March 3, 2010

                      BAROODY & O'TOOLE
                      By: _____

                      Neal C. Baroody
                      201 N. Charles Street, Suite 2102
                      Baltimore, MD 21201
                      (410) 539-8412 (telephone)
                      (410) 539-8411 facsimile
                      nbaroody@aol.com

                      Counsel seeking to appear *pro hac vice*
                      PADUANO & WEINTRAUB LLP
                      Anthony Paduano
                      Jordan D. Becker
                      1251 Avenue of the Americas, Ninth Floor
                      New York, New York 10020
                      (212) 785-9100 (telephone)
                      (212) 785-9099 (facsimile)
                      ap@pwlawyers.com
                      jdb@pwlawyers.com
                      Attorneys for Plaintiff

To:  Patrick de Gravelles
     Litigation General Counsel
    CareFirst Blue Cross Blue Shield
    Office of Corporate Counsel
    840 1st Street, N.E., DC12-08
    Washington, D.C.  20065
    Tel:  202-680-7457
     Fax: 202-680-7620

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

       Plaintiff,

v.

CAREFIRST, INC.

       Defendant,

v.

John DOES 1 and 2

       Third-Party-

       Defendants.

Civil Action No. WDQ-10-254

---

## DECLARATION OF JORDAN D. BECKER

JORDAN D. BECKER, under penalty of perjury, affirms as follows:

1.    I am admitted to practice law in the State of New York and admitted to practice *pro hac vice* before this Court. I am a member of Paduano & Weintraub LLP attorneys, along with the firm Baroody & O'Toole for Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's" or "Plaintiff"). I am fully familiar with the facts and circumstances set forth herein.

2.    This affirmation is submitted in support of Plaintiff's Motion for Remand of the instant suit under 28 U.S.C. § 1447(c) to the Circuit Court of Baltimore County because the District of Maryland lacks federal subject matter jurisdiction over the instant action according 28 U.S.C. § 1331 and Defendant Carefirst Inc. ("Carefirst" or "Defendant") first filed its Notice of Removal after the removal statute's 30-day time limit elapsed pursuant to 28 U.S.C. § 1446(b).

3.    Plaintiff was, at the time of the commencement of this action, and still is, a citizen and resident of the State of Maryland, residing at 11055 Little Patuxent Parkway in Columbia in that state.

4.    Defendant was, at the time of the commencement of this action, and still is, a citizen and resident of the State of Maryland, residing at 10455 Mill Run Circle in Owings Mills in that state.

5.    On or about August 1997, Plaintiff and Defendant entered into a subscriber agreement (the "Participating Professional Provider Agreement" or "PPP"), marked as <u>Exhibit A</u>, and made a part of this affidavit by reference. The PPP established Plaintiff Feldman's as a participating provider in Blue Cross Blue Shield's Maryland network and fixed Plaintiff's entitlement to payment for insurance claims submitted for covered services.

6.    On June 2, 2009, affiant caused a summons and a copy of Plaintiff's complaint to be personally served on Defendant at 1501 South Clinton

2

Street, Baltimore, Maryland. A copy of the complaint and certificate of service on Defendant is attached to this affidavit, marked <u>Exhibit B</u>, and made a part of this affidavit by reference.

7.     On November 25, 2009, affiant was served by mail the Third-Party Complaint and Counter-Complaint For Interpleader by Defendant, designating Does 1 and 2, as third party defendants ("Interpleader Complaint"). A copy of this Interpleader Complaint is attached, marked as <u>Exhibit C</u>, and made a part of this affidavit.

8.     On December 31, 2009, Plaintiff served by mail, the Assignments of John Does 1 and 2, dated October 11, 2008 and November 7, 2006, respectively, as an attachment to Plaintiff's Answer to the Interpleader. A copy of these Assignments is attached, marked as <u>Exhibit D</u>, and made a part of this affidavit.

9.     On December 31, 2009, affiant served by mail, Plaintiff/Counter-Defendant Feldman's Medical Center Pharmacy Inc.'s Response to Motion for Order Directing Clerk to Accept Interpleader Amount and Motion for Summary Judgment and Request for Hearing, including the Memorandum of Law, and Affidavit of Jarrett Bostwick, Chief Executive Officer and General Counsel of Factor Health Management, Inc., the parent company of Feldman's dated as of December 28, 2009 (the "Bostwick Aff."). A copy of Plaintiff/Counter-

Defendant's Response and Motion for Summary Judgment, including Memorandum of Law and Bostwick Aff. is attached, marked as <u>Exhibit E</u>, and made a part of this affidavit.

       10.    On January 27, 2010, Defendant served Plaintiff by mail its Opposition to Plaintiff/Counter-Defendant Feldman's Motion for Summary Judgment as to Interpleader Action. A copy of this Opposition to Plaintiff/Counter-Defendant Feldman's Motion for Summary Judgment as to Interpleader Action is attached, marked as <u>Exhibit F</u>, and made a part of this affidavit.

       11.    On February 1, 2010, affiant was served by mail with a notice of the filing of a Notice of Removal of the above-entitled action to this Court. A copy of this Notice of Removal is attached, marked <u>Exhibit G</u>, and made a part of this affidavit.

       12.    The Notice of Removal was filed on February 1, 2010.

       13.    Plaintiff has in no way waived the untimeliness of the filing of Defendant's Notice of Removal.

4

WHEREFORE, Plaintiff respectfully requests that the Court remand this action to the Circuit Court of Baltimore County and order the removing Defendant to pay all Plaintiff's costs and expenses, including attorney's fees, incurred because of the wrongful removal of this action.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 3, 2010.**

Jordan D. Becker

# Exhibit   A



# BlueCross BlueShield
## of Maryland
### An Independent Licensee of the
### Blue Cross and Blue Shield Association

## PARTICIPATING PROFESSIONAL PROVIDER AGREEMENT

### SCOPE OF AGREEMENT

This Participating Professional Provider Agreement is between Blue Cross and Blue Shield of Maryland, Inc., (hereinafter referred to as "BCBSM"), and you (hereinafter sometimes referred to as "Provider") and governs your participation as a BCBSM Participating Provider in the BCBSM Program. This Agreement applies to all Covered Services you provide.

### DEFINITIONS

1. **BCBSM Program** means a health care benefit or services program which is partially or wholly underwritten and/or administered by BCBSM; or which is partially or wholly underwritten by a subsidiary or affiliate of BCBSM and for which BCBSM has been identified as the administrator.

2. **Allowed Benefit** for Covered Services under this Agreement is as follows: the Allowed Benefit payable to a Participating Provider for a Covered Service will be the lesser of (1) the practitioner's actual charge or (2) the practitioner's BCBSM profile rate in effect on the date that the service is rendered.

3. **Covered Service** means a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled.

4. **Member** means any eligible person covered under a BCBSM Program.

5. **Participating Provider** means any provider who contracts with BCBSM to be paid directly for rendering Covered Services.

6. **Preferred Provider** means any Participating Provider who has agreed to comply with any and all Preferred Provider policies and procedures, including acceptance of the Preferred Provider Allowed Benefit as payment in full for Covered Services provided to Members enrolled in Preferred BCBSM Programs.

7. **Preferred Provider Allowed Benefit (PPAB)** for Covered Services is 90% of the Allowed Benefit.

8. **Practitioner** means one legally entitled by license to practice the healing arts and perform within the scope of that license in the state where services are rendered.

PAR 10 (4/94)                                    Page 1 of 8

## SERVICES

9. You agree to provide Covered Services to Members in accordance with the terms and conditions of this Agreement; within the scope of your professional license or certification; and in accordance with, and subject to, the provisions of the subscription agreements for the BCBSM Programs.

10. You agree that all services provided to Members under this Agreement shall be provided by you or by a duly licensed or certified person under your direct supervision.

11. You agree to use your best efforts to comply with all reasonable administrative policies and procedures established by BCBSM that are related to the delivery and reimbursement of Covered Services and you agree to comply with the applicable BCBSM Cost Containment Programs.

12. You agree to clearly identify to Members, prior to rendering treatment, your level of participation with BCBSM (Participating, Preferred, etc.). BCBSM shall make available upon request materials which, when prominently posted in Providers office(s), meet this requirement.

13. BCBSM shall perform certain administrative functions relating to BCBSM Programs, which may include but not be limited to, processing claims, marketing, enrollment, issuance of Member identification cards, Member service, and administration of Member complaints and appeal procedures.

14. BCBSM shall be solely responsible for the establishment and coordination of all general policies governing the delivery of Covered Services to Members, including procedures relating to quality management, utilization review, and medical records.

## BILLING

15. You agree to comply with our billing and claims procedures and to submit claims within 30 days after completion of service in an electronic billing format or on an approved billing form, both as approved by BCBSM. In either instance, you accept full responsibility for all claims submitted. You further agree that if submitting electronically, each bill can be associated with a source document and a patient's signature. Claims initially submitted more than 1 year beyond the service date will generally be denied and may not be billed to the Member. If the initial claims submission to BCBSM is made more than one year after the date of service because of circumstances not reasonably within your control, BCBSM at its option shall,

   1. process the claim as if it were timely filed, or

   2. deny payment of claims and direct Provider to balance bill Member, or

   3. uphold the denial and direct Provider not to balance bill the Member.

16. You agree to use the most appropriate procedure and diagnostic codes when billing for services rendered and not to unbundle charges into separate procedure codes when a single code is more appropriate. You agree that if billed codes are re-assigned or rebundled by BCBSM, you will accept the Allowed Benefit for those services as payment in full. If you dispute the re-assignment or rebundling by BCBSM, the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement shall apply.

If a BCBSM Program is the only coverage involved, you agree not to bill, charge, collect or seek compensation from a Member, or any person responsible for a Member, for an amount in excess of the Allowed Benefit for Covered Services provided to a patient under the applicable BCBSM Program.

**All instances of Third Party Liability shall be covered by Paragraph 34 of this Agreement.**

18. We agree to provide you with timely access to claims, benefit, and eligibility information on Members.

## PAYMENT

19. We agree to pay you directly the Allowed Benefit, less any applicable coinsurance, copay or deductible amounts, for Covered Services.

20. We agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claim or any portion thereof in accordance with Maryland law.

21. If Provider renders Covered Services to a subscriber of a Health Maintenance Organization affiliated with BCBSM (hereinafter HMO) and those Covered Services are not rendered pursuant to the authorized HMO referral process, then BCBSM, as administrator, agrees to reimburse Provider directly for said services at Allowed Benefit. This paragraph applies only to those products for which BCBSM has been identified as the out-of-network claims administrator.

22. You agree to charge the Member for any applicable coinsurance, copay or deductible amounts in accordance with and subject to the provisions of the subscription agreements for the relevant BCBSM Program and not to waive the payment of such amounts by the Member.

23. BCBSM agrees that you may bill and collect directly from Members charges for services that have been determined not to be Covered Services. You agree not to bill a Member for any service for which payment is denied due to a BCBSM determination that said service is not medically necessary, unless the member has agreed, in writing, to be personally financially liable for payment for said medically unnecessary services.

24. You agree that if BCBSM overpays you, we have the right to recover such overpayment by offset against future payments. The right of BCBSM to recover said overpayments shall be limited to those periods of time as set forth under the provisions of Annotated Code of Maryland, Health General Article, Section 4-403 (b) (c) as it relates to medical record keeping. If you dispute recovery of all or part of an alleged overpayment, the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement, shall apply.

## QUALITY & UTILIZATION MANAGEMENT

25. You agree to cooperate with us and assist the Member in complying with all contractual provisions in an effort to maximize the benefit available to the Member. For example, certain BCBSM Programs require the Member to obtain approval in advance of rendering services. Reduction of benefits because of the Member's non-compliance shall be and remain the responsibility of the Member.

26. Both parties agree that BCBSM has the right to review any and all documents and medical records reasonably required to adjudicate claims and perform our duties under this Agreement including, but not limited to, post payment audits. You agree, upon the request of BCBSM, to provide copies of these documents and records at no charge.

27. Both parties agree, in accordance with applicable state law, to preserve the confidentiality of the medical information obtained in treating Members, and you agree to permit an on-site audit of medical records of any Member upon reasonable notice and during regular business hours or at such other mutually agreed time and place.

28. You represent that you are a health care provider licensed or certified in the state in which you are practicing and you agree to notify us immediately of the suspension, withdrawal, revocation, termination, or expiration of your professional license or certification, or if debarred, suspended, or voluntarily excluded from participating in Medicare, Medicaid, or Federal Employees Health Benefits Programs.

29. If credentialing information is required for your participation with BCBSM, you agree to supply the requested information and to inform BCBSM on a timely basis of any subsequent material changes in the information supplied, and of any major occurrence that could impair your ability to perform your duties under this Agreement.

30. Any other health professionals employed by or providing services for you shall be duly licensed or certified under applicable law. If you are billing for the services of any other health professionals employed by or providing services for you, you certify that said other health professionals are supervised by you according to currently accepted standards of professional practice.

## RELATIONSHIP OF THE PARTIES

31. You shall perform your duties hereunder as an independent contractor. Both parties acknowledge that this Agreement in no way limits your rights or availability to other employment contemporaneously with or following your performance under this Agreement. As an independent contractor, you shall bear full responsibility for any and all of your taxes and fees. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, employee, or representative of the other.

32. You have a duty to exercise independent medical/professional judgment as required within the scope of your license or certificate (if a license or certificate is required), in your delivery of or referral for services. You agree that eligibility of a service for coverage by BCBSM will not influence your judgment in the decision to recommend or render such service.



## ELECTIONS

33. You agree to provide Covered Services to all Members and not to refuse, withhold from, deny or discriminate against any Member the provision of Covered Services because of the race, gender, creed, color, national origin, marital status, or physical or mental handicap of any Member. You agree to give equal access to BCBSM Members as to any other fee-for-service patient. You retain the right to request that a Member select another provider, if this request results from Member unmanageability and/or history of Member non-compliance with provider recommended treatment modalities which has resulted in the impossibility of the creation or maintenance of the provider/patient relationship between you and the Member.

## COMPENSATION

34. You agree to abide by the applicable BCBSM general policies with regard to filing claims and accepting reimbursement under the Coordination of Benefits (COB), subrogation, Personal Injury Protection (PIP), workers' compensation, Medicare assignment and Medicare non-assignment, TEFRA and other provisions of law.

35. It is recognized by the parties that Provider may have contractual relationships with certain subsidiaries of BCBSM. If a Member seeks care from Provider pursuant to a subscription agreement with a subsidiary of BCBSM, then payments shall be made to Provider in accordance with your agreement with that subsidiary. This agreement is not intended to supersede existing or future contractual relationships which Provider may enter with subsidiaries or affiliates of BCBSM.

## PROCEDURE FOR APPEAL

36. BCBSM agrees to provide you with a procedure to appeal any decisions made in connection with this Agreement. You agree to file any appeal within 90 days of the date you received notice of our determination or policy that is the subject of the appeal. In the course of an appeal process, said appeal may ultimately be referred to a committee which includes physicians or other health care providers. Any decision made by such committee shall be binding on both parties. You agree not to bill the Member for any amounts in dispute during the pendency of the appeal. If the appeal involves a payment dispute, BCBSM agrees not to effect recovery of disputed overpayments during the pendency of the appeal.

## GENERAL PROVISIONS

37. BCBSM and the Provider agree to cooperate fully with each other in administering the various provisions of this Agreement.

38. You agree to notify us in writing within 30 days of any change in business address/location, business name, and/or ownership and any addition or deletion of names of practitioners and/or professionals who are subject to this Agreement.

39. You agree that we may publish or otherwise identify your name as part of a list of Participating Providers that we may use in marketing and administering BCBSM Programs. We agree to represent to Members that you are a specialist in your self-designated field(s) of specialized medical practice: (1) if you are a Maryland physician, if you have been identified as a specialist in that field by the State Board of Physician Quality Assurance as provided by Maryland law; or (2) if you are a physician not practicing in Maryland, you have been identified as a specialist by the appropriate board as recognized by the American Board of Medical Specialties.

40. Any notice required to be given by Provider under this Agreement must be given in writing by registered or certified mail, postage prepaid.

41. The failure of either party to enforce or insist upon compliance with any provisions of this Agreement in any instance shall not be construed as or constitute a waiver of that party's right to enforce or insist upon compliance with such provision, rule, or regulation, either currently or in the future.

42. This Agreement shall be governed by the laws of the State of Maryland and represents the full and complete understanding of the parties with respect to this Agreement and the relationship created therein.

## TERM AND TERMINATION

43. The initial term of this Agreement shall be for one year from the effective date indicated herein. This Agreement shall automatically renew without notice from year to year unless terminated in accordance with the provisions herein.

44. Either party may terminate this Agreement by giving 60 days written notice to the other party. We reserve the right to amend this Agreement, with the exception of your right to terminate, by sending you written notice 30 days prior to the effective date of any amendment. If you choose to terminate on account of a proposed amendment, then the date of said termination will be the effective date of the amendment, notwithstanding the failure of either party to give 60 days written notice. In the event termination of this Agreement occurs, you agree to identify to Members, prior to rendering treatment, that you no longer are participating with BCBSM. BCBSM shall make available upon request materials which, when prominently posted in Provider's office(s), meet this requirement.



DISCLOSURE

45. You hereby expressly acknowledge your understanding that this Agreement constitutes a contract between you and BCBSM, that Blue Cross and Blue Shield of Maryland, Inc. is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (the "Association") permitting Blue Cross and Blue Shield of Maryland, Inc. to use the Blue Cross and Blue Shield Service Marks in a portion of the State of Maryland, and that BCBSM is not contracting as the agent of the Association. You further acknowledge and agree that you have not entered into this Agreement based upon representations by any person other than BCBSM and that no person, entity, or organization other than BCBSM shall be held accountable or liable to you for any of BCBSM's obligations to you created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBSM other than those obligations created under other provisions of this Agreement.

APPLICATION

46. Applications or other documents required by BCBSM for participation under this Agreement shall be incorporated in and made part hereof. Material misrepresentation made in any of said applications or documents may constitute grounds for immediate termination of this Agreement by BCBSM.

PRIOR AGREEMENTS

47. This Agreement upon execution by the parties supersedes and voids any and all prior Participating Provider Agreements between the parties hereto.

Accepted by Provider:

Feldman's Medical Center Pharmacy
Name of Provider/Practice

David Carswell RPh
Authorized Signature

Pharmacist - in - charge
Print Name/Title

Date: August 12, 1997

Accepted by Blue Cross and
Blue Shield of Maryland, Inc.

By:_____

Print Name/Title

For BCBSM Use Only
Agreement
Effective Date:_____

Please supply the following information: If this is a partnership or corporation, please provide a list containing names and specialties of all practitioners.

Billing Address: Feldman's Medical Center Pharmac
11055 Little Patuxent Parkway
Columbia MD 21044

Telephone No: 410-964-8444

Office Address: same as above
_____
_____
_____

Telephone No:_____

NOTE: If you have multiple office addresses, please indicate here (X) and supply addresses and phone numbers on separate attachments.

52 - 1450108          Federal Tax ID

DME - (Pharmacy)     Field of Practice
                        or Specialty

PAR 10 (4/94)                    Page 7 of 8

## ATTACHMENT A



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

| | |
|---|---|
| _Wayne Caldwell_ | _8-12-97_ |
| Authorized Signature | Date |


- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

| | |
|---|---|
| | |
| Authorized Signature | Date |

PAR 10 (4/94)  Page 8 of 8



**BlueCross BlueShield
of Maryland**
An Independent Licensee of the
Blue Cross and Blue Shield Association

## NEW PROVIDER DATA FOR GROUPS

Please complete this form (print or type) and return it with your Blue Cross and Blue Shield of Maryland agreement(s), if applicable; **no agreements required for non-participating status.** The data requested is essential to implement your provider account number. **If this data is incomplete, we cannot assign a provider number.** Your assistance is appreciated.

### GROUP INFORMATION

Name of Group: _Feldman's Medical Center Pharmacy, Inc._

*Check One:*

[X] Corporation    Date of Incorporation: _05/01/85_ (Attach Articles of Incorporation)

[ ] Partnership    Date Partnership Formed: _/ / _ (Attach Partnership Agreement)

Corporate/Partnership Tax ID Number: _52- 1450108_

Method of Billing: [X] Manual/Paper
[ ] Electronic    Vendor Name _____

### PRACTICE INFORMATION

Billing Address: _11055 Little Patuxent Pkwy_

_Columbia MD 21044_

Billing Agent: [X] No   [ ] Yes   Billing Agent Name _____

Contact Person: _Gayle Caldwell_    Phone Number: _(410 )964-8444_

Primary Office Address: _11055 Little Patuxent Pkwy_

_Columbia MD 21044_

Contact Person: _Gayle Caldwell_    Phone Number: _(410 )964-8444_

List additional office locations on bottom of this sheet:    Fax Number: _(410) 740-1377_

_Feldman's Dorsey Hall Pharmacy_

_9501 Old Annapolis Rd._

_Ellicott City MD 21042_

*MM 8-12-93*

## PROVIDER PARTICIPATION

### WITH

### BLUE CROSS AND BLUE SHIELD OF MARYLAND

## ADVANTAGES

Over 80% of health care providers participate with Blue Cross and Blue Shield of Maryland (BCBSM). This unique association affords you several advantages:

* **A competitive edge in the industry**
  BCBSM is the largest health insurance carrier in the state. Our customers know that a "Participating Provider" means a cost savings to them, as they are only responsible for deductible and copayment amounts up to the allowed benefit.

* **Direct reimbursement**
  Only participating providers can receive payment directly from BCBSM.

* **Dedicated account team service**
  BCBCSM has provided the Account Team Structure, dedicated account teams to service telephone and written inquiries from participating providers. Non-participating provider telephone inquiries are sent directly into our voice response system, BLUE LINE.

## THE PARTICIPATING AGREEMENTS

You choose to participate by signing the Participating Provider Agreement.

1. Basic Agreement
2. Attachment A, Preferred Provider Network

The Participating Agreement & Attachment A are arranged as building blocks –
   - you must participate with the Basic program to be eligible for the Preferred Provider Programs

To obtain agreements: You may obtain the Participating Agreement & Attachment A by contacting the Networks Development Department at (410) 528-7160 or (800) 746-1444 or by sending your written request to:

> BLUE CROSS AND BLUE SHIELD OF MARYLAND
> NETWORKS DEVELOPMENT AND PROVIDER CONTRACTING
> 10455 Mill Run Circle
> Owings Mills, Maryland  21117

The first type of preferred provider program, PPO, premiered in 1985 and answered the demands from group accounts to reduce premium payments without reducing employee benefits.

<u>WHAT IS A PPO?</u>

A PPO is a subscriber-driven preferred provider program. This means that:

- the patient/subscriber is responsible for staying within the network of preferred providers. Example: When the preferred provider refers a patient covered by a PPO program to a specialist - it is the patient's responsibility to ensure the specialist is a preferred provider.

- adhering to managed care provisions such as second surgical opinions, admissions review programs etc. is also the subscriber's responsibility. If these provisions are not met and the claim is denied or paid at a reduced amount, the subscriber is financially obligated.

<u>PREFERRED PROVIDER NETWORK (PPN)</u>

To meet the challenges of our larger group accounts, the PPN network was developed. These programs combine cost savings, a wide range of benefits and a network of providers who are willing to be even more responsive to keeping the patient within the family of preferred providers and adhering to managed care provisions.

In contrast to the PPO programs, a PPN is a <u>provider</u> driven program. This means that:

- the PPN provider has agreed to ensure that the managed care provisions are met; if not, the provider may be penalized.

- when a PPN provider refers a patient covered by a PPN program to a specialist, it is the referring provider's responsibility to ENSURE that the specialist is in the PPN network.

<u>OUT-OF-NETWORK REFERRALS</u>
When it is necessary to refer a patient covered by a PPN program to a non-PPN provider, the referring provider has agreed to contact the BCBSM's Provider Referral unit at (410) 581-3521 or (800) 492-2715 to advise BCBSM of the out of network referral. In this way, when the claim is received from the non-PPN provider, the patient will not be financially penalized for going out of network.

<u>REIMBURSEMENT</u>

Reimbursement differs from the allowed benefit. Preferred Providers agree to accept a Preferred Provider Allowance (PPA) as payment in full. The PPA is 90% of the allowed benefit.

<u>WHAT ARE YOUR RESPONSIBILITIES?</u>



**Blue Cross Blue Shield
of Maryland**

An Independent Licensee of the
Blue Cross and Blue Shield Association

### 1996 Disclosure Document

This disclosure document explains the structure of the Blue Cross and Blue Shield system, the independent nature of every Blue Cross and Blue Shield Plan and the financial condition of Blue Cross and Blue Shield of Maryland, Inc. (BCBSM) and its subsidiaries.

CareFirst,* CFS Health Group, Columbia Medical Plan,* Delmarva Health Plan, FirstCare, FreeState Health Plan,* Panuxent Medical Group, Potomac Health,* Potomac Physicians, P.A. and Willse & Associates are subsidiaries or affiliates of Blue Cross and Blue Shield of Maryland, Inc.

The Blue Cross and Blue Shield Association licenses BCBSM, and other independent licensees, to offer certain products and services under the BLUE CROSS® and BLUE SHIELD® brand names and service marks.

Blue Cross and Blue Shield of Maryland, Inc. is an independent organization governed by its own Board of Directors and is solely responsible for its own debts and other obligations.

Neither the Blue Cross and Blue Shield Association nor any other organization using the BLUE CROSS® and BLUE SHIELD® brand names acts as the guarantor of Blue Cross and Blue Shield of Maryland's obligations or those of any other licensee.

### Blue Cross and Blue Shield of Maryland, Inc. and Subsidiaries
Condensed Balance Sheets[1] as of December 31, 1995 and 1994
(Dollars in thousands)

|  | 1995 | 1994 |
|---|---|---|
| **ASSETS:** | | |
| Cash and Investments | $385,553 | $302,739 |
| Premiums and Other Receivables | 199,565 | 205,710 |
| Property and Equipment | 52,339 | 49,806 |
| Hospital Advances and Other Assets | 153,926 | 183,414 |
| Total Assets | $791,383 | $741,669 |
| **LIABILITIES AND RESERVES:** | | |
| Unpaid Claims Liability | $241,044 | $235,175 |
| Unearned Premiums and Other Advances | 150,949 | 152,747 |
| Accounts Payable and Other Liabilities | 129,216 | 143,433 |
| Total Liabilities | $521,209 | $531,355 |
| Reserves and Unassigned Funds[2] | 270,174 | 210,314 |
| Total Liabilities and Reserves | $791,383 | $741,669 |

* Independent Licensees of the Blue Cross and Blue Shield Association

® Registered marks of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans.

[1] As derived from the audited financial statement of Blue Cross and Blue Shield of Maryland, Inc. and subsidiaries. For a complete copy of the organization's audited financial statements, which were prepared in accordance with generally accepted accounting principles, please call the Corporate Finance Department at (410) 998-5192. Certain amounts in the 1994 statements have been reclassified to be consistent with the 1995 presentation of condensed statements.

[2] Includes $197.8 million statutory surplus reported to the Maryland Insurance Administration by Blue Cross and Blue Shield of Maryland, Inc. as of 12/31/95.



**BlueCross BlueShield
of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

September 24, 1996

Dear Provider:

Effective November 1, 1996, Blue Cross and Blue Shield of Maryland will be making changes in the processing of certain durable medical equipment and medical supply claims. The following changes will take place on that date:

- All claims must be submitted with valid HCPCS procedure codes. If there is not an applicable code, the claim must be submitted with verbiage only. An invoice or vendor slip must accompany the claim form. The invoice or vendor slip must indicate the description of the item, price and the name of the vendor.

- Procedure codes E1399 and A4649 will no longer be acceptable codes to use on claims submitted by providers. BCBSM will assign these codes to services as necessary.

- If a claim is submitted with verbiage and an invoice or vendor slip is not attached, the claim will reject with remark code 52120 which indicates that the claim is being returned for additional information.

- If a claim is submitted with verbiage, and our Medical Review area can assign an appropriate code, the claim will reject with remark code 50346 which indicates to submit the claim using a valid procedure code. The provider will be responsible for resubmitting the claim with the appropriate procedure code.

If you have any questions concerning these new procedures, please contact the Provider Claims & Benefits Inquiry Department at 410-581-3577 or 800-437-2328.

Sincerely,

Ernest A. Viscuso
Director
Provider Contracting & Network Development

**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

Dear Provider:

In response to your inquiry regarding your request for a Durable Medical Equipment provider account number with Blue Cross Blue Shield of Maryland, Inc. (BCBSM), please provide us with the following information:

1. Legal name and Federal Tax ID number of corporation/partnership
   *Feldman's Medical Center Pharmacy    Tax ID# 52-1458188*

2. Billing address and physical locatino (s), contact person – *Gayle Caldwell*
   and phone number *11055 Little Patuxent Parkway*
   *Columbia, MD 21044   410-964-8444*

3. A list of officers (i.e., President, Vice-President, etc.)
   *President: Leslie S. Feldman*
   *V. Pres: Stefanie Feldman*

4. Are you a contracted provider?        Yes_____   No __X__

   If so, please provide the name of the facility or facilities

   _____

   _____

5. Please provide a <u>detailed</u> description of the services being
   rendered and/or equipment/supplies used.

   *Rental of wheelchairs          Glucometers + supplies*
   *Purchase or*
   *Rental of walkers              Ostomy supplies.*
                                  *Misc small DME*

Please note the following guidelines for DME IV Therapy services when submitting a claim to BCBSM:

1. All services must be itemized.

2. A physician's certificate of necessity must be attached to each claim including the patient's diagnosis and/or condition.

3. Nurses visits or consultations with the physician are non-covered services to you as a provider of care.

Corporation:

Other Pharmacy/billing address

Feldman's Dorsey Hall Pharmacy
9501 Old Annapolis Rd.
Ellicott City, MD 21042

410-730-8200

Fed Tax ID #: 52-1450188

Contact person: Amy Adams

Specialty: DME - Pharmacy.



**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

March 25, 1998

Dear Pharmacy Colleague:

Beginning April 1, 1998, Blue Cross and Blue Shield of Maryland (BCBSMD) will be offering a new **Standardized Prescription Benefit Program.** The goal of the Standard Prescription Program is to both simplify the various pharmacy benefits currently offered by BCBSMD and to help manage the overall increases in prescription costs. The new program, developed primarily for our large employer group customers with HMO or traditional indemnity coverage, will be phased in on an employer/group basis over the next twelve months starting April 1st. Letters and brochures, included in a comprehensive communications plan, will be distributed to all customers as they transition into the new program. As a participating pharmacy, you should continue to reference the API (Advance Paradigm, Inc.) "on-line messaging" system as usual to confirm coverage eligibility guidelines and/or determine any copayment amounts.

Here is an overview of the changes you will see.

**The Standard Prescription Benefit**
The new Standard Prescription Benefit represents a departure from the traditional open formulary benefit currently offered by BCBSMD. Each employer group will select one of two new drug benefit formulary options: PERSONAL (closed formulary) or CHOICE (copay-driven formulary). Only our self-insured group customers will have the option of the current TRADITIONAL (open formulary) benefit structure. The current BCBSMD formulary will serve as the basis for all BCBSMD benefit options:

**Standard Benefit Option 1 - PERSONAL**
BCBSMD members who have the PERSONAL prescription coverage option are entitled to BCBSMD's formulary medications only. In addition, a two-tiered copay is in place, where a lower copay is charged for generic medications, and a higher copay for brand medications. *There is no benefit for non-formulary drugs without an authorization.* Physicians can obtain authorizations for non-formulary medications by calling API at 800-294-5979. In addition, participating pharmacies can call this same number to obtain a one time authorization if you are unable to contact a physician to change to a formulary medication.

**Standard Benefit Option 2 - CHOICE**
Members who select the CHOICE benefit will have coverage for a formulary or a non-formulary medication. A two-tiered copay structure is in place here also, where a lower copay is charged for both generic and formulary branded medications, and a higher copay is charged for non-formulary branded medications. No appeals process is in place for this benefit structure since the patient can still obtain any medication.

**Standard Benefit Option 3 - TRADITIONAL**
The traditional open formulary benefit will be made available to our self-insured customers only. This is the most similar to our current benefit structure and includes mandatory generic substitution. Copays can be either flat or two tiered (generic/brand).

**OTHER Pharmacy NEWS**

**Clinical Prior Authorization**
Each of the new standard benefit options will include the clinical prior authorization program. Drugs requiring prior authorization will be covered if determined to be medically indicated for the treatment of a covered medical condition. Authorizations can be obtained by having the physician call API at 800-294-5979.

**Diabetic Supplies**
New to the BCBSMD prescription benefit is the coverage of diabetic supplies. Diabetic supplies have been added to our maintenance listing, thus correcting problems with day supply limitations experienced earlier this year. No copayments will be collected for diabetic supplies, and the cost of the supplies will not accumulate against deductibles or benefit maximums.

**Maintenance Medication Listing**
The BCBSMD Maintenance Medication Listing will still be the basis for identifying medications available in a maintenance supply. Inclusion of a medication on the maintenance list is based upon the primary indication of the medication, safety profile with long term use, and concerns of patient monitoring that may be compromised with the dispensing of maintenance quantities.

Please call if you have any questions. We are available to work with you to ensure a smooth transition of these and any future pharmacy changes. I can be reached at 410-528-7897, if you have any questions or if you just need a copy of the BCBSMD formulary. Pharmacy customers may direct their questions to API at 800-241-3371 or to the BCBSMD Customer Service phone number listed on their membership card. Thank you.

Sincerely,

*Winston Wong*

Winston Wong, Pharm.D.
*Director, Pharmacy Management*

**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

September 22, 1997

Feldman's Medical Center Pharmacy
11055 Little Patuxent Pkwy.
Columbia, MD 21044

Dear Provider:

Thank you for becoming a **Participating** provider and member of the **Preferred Provider Network** with Blue Cross Blue Shield of Maryland, Inc. (BCBSM). Processing of your contracts has been completed for an effective date of **August 12, 1997** for provider number Y043FE. A copy of your contract will be forwarded to you.

You have been accepted as a member of our PPN. The benefit structure of the PPN encourages our members, through financial incentives, to seek care from PPN Practitioners. To assist our members, we publish directories identifying all health care professionals enrolled in our programs; you will be listed in future directories. In the interim, we have included your name in our telephone referral unit (410-581-3521 or 1-800-492-2715). Our telephone referral unit is operational daily to assist our subscribers and providers in locating PPN practitioners convenient to them.

Using your provider number as listed above on all of the claims that are submitted to us will assure payment directly to you. Claims received without the provider number will be returned to you.

The new state law called the "Uniform Claim Form Regulation" states that health care practitioners shall submit claims on the HCFA 1500.

You may call BCBSM's automated inquiry system "Blue Line" at 410-581-3535 or 1-800-248-8410 for information related to claims status, member eligibility, or benefits. Questions related to proper billing procedures or other claims issues should be directed to Account Team J at 410-581-3577. If you have any further questions about your contract status, you may contact the Professional Database Department at 410-528-7230 or 1-800-352-1448.

We appreciate your participation with BCBSM and your membership in our Preferred Provider Network. Thank you for your continued support as BCBSM strives to meet the healthcare needs of our subscribers.

Sincerely,

*Eldean Krieger*

Eldean Krieger
Professional Database
106lt.mw



## ATTACHMENT A



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

 

| _Dayus Caldwell_ | 8-12-97 |
|---|---|
| Authorized Signature | Date |

 

- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

 

| _____ | _____ |
|---|---|
| Authorized Signature | Date |

Form **W-9**
(Rev. March 1994)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer Identification Number and Certification**

Give form to the requester. Do NOT send to the IRS.

Please print or type

Name (If joint names, list first and circle the name of the person or entity whose number you enter in Part I below. See instructions on page 2 if your name has changed.)

Leslie S. Feldman

Business name (Sole proprietors see instructions on page 2.)

Feldman's Medical Center Pharmacy

Please check appropriate box: ☐ Individual/Sole proprietor ☒ Corporation ☐ Partnership ☐ Other ▶

Address (number, street, and apt. or suite no.)

11055 Little Patuxent Pkwy

City, state, and ZIP code

Columbia MD 21044

Requester's name and address (optional)

**Part I  Taxpayer Identification Number (TIN)**

List account number(s) here (optional)

Enter your TIN in the appropriate box. For Individuals, this is your social security number (SSN). For sole proprietors, see the instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How To Get a TIN below.

Note: If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.

Social security number

| | | | | | | | |

OR

Employer identification number

5 2 | 1 4 5 | 0 1 0 8

**Part II  For Payees Exempt From Backup Withholding (See Part II Instructions on page 2)**

▶

**Part III  Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

**Certification Instructions.**—You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (Also see Part III instructions on page 2.)

Sign Here  Signature ▶ Wayne Caldwell RPL  Date ▶ 8-12-97

Section references are to the Internal Revenue Code.

**Purpose of Form.**—A person who is required to file an information return with the IRS must get your correct TIN to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA. Use Form W-9 to give your correct TIN to the requester (the person requesting your TIN) and, when applicable, (1) to certify the TIN you are giving is correct (or you are waiting for a number to be issued), (2) to certify you are not subject to backup withholding, or (3) to claim exemption from backup withholding if you are an exempt payee. Giving your correct TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding.

**Note:** If a requester gives you a form other than a W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**What Is Backup Withholding?**—Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that could be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. The IRS tells the requester that you furnished an incorrect TIN, or

3. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

4. You do not certify to the requester that you are not subject to backup withholding under 3 above (for reportable

interest and dividend accounts opened after 1983 only), or

5. You do not certify your TIN. See the Part III instructions for exceptions.

Certain payees and payments are exempt from backup withholding and information reporting. See the Part II Instructions and the separate Instructions for the Requester of Form W-9.

**How To Get a TIN.**—If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals), from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for businesses and all other entities), from your local IRS office.

If you do not have a TIN, write "Applied For" in the space for the TIN in Part I, sign and date the form, and give it to the requester. Generally, you will then have 60 days to get a TIN and give it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN.

Cat. No. 10231X

Form **W-9** (Rev. 3-94)

# Exhibit   B

FELDMAN'S MEDICAL CENTER ) IN THE
PHARMACY, INC., )
     Plaintiff, ) CIRCUIT COURT
    v. )
CAREFIRST, INC. ) FOR BALTIMORE COUNTY
  Defendant. )
) Civil Action No.
SERVE ON: )
  John A. Picciotto, Esquire )
  Resident Agent )
  1501 South Clinton Street )
  Baltimore, Maryland 21224 )

## COMPLAINT

Plaintiff, as and for its Complaint, alleges:

## PARTIES

1.    Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's") is a Maryland corporation, with its principal place of business located at 11055 Little Patuxent Parkway, Columbia, Maryland 21044. Feldman's is a retail pharmacy serving the Baltimore – Washington, D.C. metropolitan area and is increasingly focused on providing specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease, hepatitis, and HIV. Feldman's is a wholly-owned subsidiary of Factor Health Management, LLC.

2.    On information and belief, Defendant CareFirst, Inc. ("CareFirst") is a Maryland corporation and health insurer with its principal office located at 10455 Mill Run Circle, Owings Mills, Maryland 21117. On information and belief CareFirst operates under a license from the Blue Cross Blue Shield Association (the "BCBS Association").

RECEIVED AND FILED

2009 JUN -1 PM 12: 08

CLERK OF THE CIRCUIT COURT
BALTIMORE COUNTY

## JURISDICTION AND VENUE

3.      Venue is proper in this County pursuant to Maryland Stat. §6-201, because Defendant resides in, and maintains its principal place of business in, Baltimore County.

## STATEMENT OF FACTS

4.      This action arises from the Plaintiff's desire to have its insurance claims paid promptly and correctly by Defendant, a health insurance company, in accordance with the applicable insurance policies issued, underwritten and/or administered by Defendant.    Plaintiff brings this action seeking damages for the unlawful and illegal acts of Defendant, which have resulted in a financial loss to Plaintiff.

5.      In an effort to resolve collection issues with Defendant early on in the Summer of 2008, Plaintiff relied in good faith on Defendant CareFirst's suggestion that Feldman's pursue a Home Infusion Therapy qualification.  Feldman's did become so qualified and thereafter continued to rely on CareFirst's representation that it would be paid for the services it rendered without issue.

6.      Hemophilia is a life-threatening disease that requires those afflicted to use very expensive blood-clotting factor treatment ("factor"). Plaintiff is a nationally accredited specialty pharmacy located in Columbia, Maryland, which provides factor to patients.  Plaintiff has provided pharmacy and health management care coordination services to patients since 1986.  This action is commenced to require Defendant to honor its contractual obligations and to pay the legitimate insurance claims that are currently outstanding.

2

7.      Upon receipt of prescriptions from licensed physicians, Plaintiff verifies that the patient has in and/or out of network benefits, as applicable.  Patients' status as in or out of network merely affects the attributes of the benefits the member is entitled to receive under his or her policy.

8.      Once Plaintiff receives confirmation of the patient's active status as a customer of CareFirst or one of its BCBS Association affiliates, Plaintiff dispenses specialized medications, products, and services, including factor, directly to the patients, who, relevant to the present case, are participants or beneficiaries of health plans insured, underwritten and/or administered by CareFirst for by one of the BCBS Association affiliates.  Pursuant to the Participating Professional Provider Agreement between Plaintiff and Defendant (the "PPP Agreement"), after providing the Covered Services to a patient, Plaintiff submits a claim for the applicable charges to Defendant for payment.  Plaintiff is only permitted to seek payment from Defendant and is not permitted to collect from Members for any Covered Services other than deductibles, coinsurance and copayments (PPP Agreement, ¶¶ 22 and 23).  A copy of the PPP Agreement is attached hereto as <u>Exhibit A</u>.

9.      Despite Plaintiff's rendering of covered products and timely submittal of insurance claims for payment for such products, in breach of the PPP Agreement, Defendant has failed and refused to correctly and timely pay $1,588,127.77 in legitimate claims submitted by Plaintiff.  A list of the outstanding and unpaid claims as of April 14, 2009 is attached hereto as <u>Exhibit B</u>.

3

10.     For each of the claims listed on <u>Exhibit B</u>, Plaintiff verified the patient's insurance, and the patient's benefits were cleared with the CareFirst administrator.

11.     On the basis of, and in reliance on, such verification, Plaintiff dispensed the appropriate medication to the patient.

12.     Plaintiff has complied with all of Defendant's requests regarding clarification of Plaintiff's provider status as a Durable Medical Equipment provider or a Home Infusion Therapy provider.  Yet CareFirst has still not paid any of the outstanding claims.   CareFirst has repeatedly requested that Plaintiff resubmit paperwork that Plaintiff has previously submitted, and has otherwise delayed Plaintiff's payment through bureaucratic maneuverings.

**Provider Agreement**

13.     Plaintiff is party to the PPP Agreement with Defendant.

14.     Pursuant to the PPP Agreement, Plaintiff provided Covered Services to CareFirst members and submitted claims to CareFirst in accordance with all policies and procedures.  CareFirst, however, has breached the terms and conditions of the PPP Agreement by failing to timely pay Plaintiff for many of the claims properly submitted.

15.     Paragraph 20 of the PPP Agreement requires Defendant to pay Plaintiff no later than 30 days after Plaintiff submits a claim.  Specifically, paragraph 20 provides:

> We agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to

4

determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claim or any portion thereof in accordance with Maryland law.

16.    Paragraph 3 of the PPP Agreement defines "Covered Services" as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled."

17.    As discussed below in paragraph 22 of this Complaint, Maryland law requires payment of a claim within 30 days after receipt of such a claim for reimbursement.   This requirement is irrespective of whether the patient seeks and obtains Covered Services from an in-network or out-of-network provider.

**Plaintiff's Attempts to Resolve the Dispute with Defendant**

18.    Although Plaintiff has repeatedly complained to Defendant about the delays in its claims processing throughout the relevant time period and tried to accommodate and work with Defendant in any way possible to resolve these issues, including detrimentally relying on Defendant's false and misleading representations inducing Plaintiff into a year of delay through a so-called "contracting process," Plaintiff's efforts have proved wasted and have not led to prompt and timely payment of its claims as more than $1,588,127.77 in unpaid claims remain outstanding.   Plaintiff has exhausted every avenue available to it to obtain payment from Defendant on these outstanding claims prior to instituting this suit, and any further attempts at resolving these issues short of litigation would be futile.

19.    Since at least August 2008, Plaintiff has engaged in exhaustive efforts to try and resolve the outstanding claims prior to instituting suit.  Plaintiff has, to its detriment, relied on CareFirst's false and misleading representations and produced, delivered, and complied with every request for documentation from CareFirst, and in

5

some cases has provided the same documentation on several different occasions to several different departments within CareFirst. Numerous telephone calls were made and emails sent to Defendant, but no progress was made on resolution of the outstanding claims, except CareFirst's continual response of more delays.

20.    Each time Plaintiff submitted the requested paperwork to CareFirst, months went by before CareFirst again requested either the same or additional documentation. In the meantime, Plaintiff's claims continue to go unpaid.

21.    To the extent Plaintiff is subject to any requirements or prerequisites to exhaust all informal and administrative remedies prior to instituting suit and such remedies have not been exhausted by Plaintiff, any further attempts would be futile. As detailed above, Plaintiff has attempted to resolve these issues with Defendant for almost one year, even relying in good faith on Defendant's representations that all of the claims would be resolved via further contracting with the Defendant when in fact no such need ever existed. Plaintiff has gone through all the proper channels at Defendant to resolve the non-payment of Plaintiff's claims, but Defendant has been largely uncooperative. As a result, Plaintiff is stuck in Defendant's bureaucracy, and has been passed among various CareFirst departments, with no department taking responsibility for resolving the issues with Plaintiff. Defendant has refused to resolve these issues with Plaintiff, and has exhibited a long pattern of abuse and denial, making further pursuit of reimbursement under the claims process futile. Plaintiff can no longer withstand the financial impact of waiting for payment for the life saving medication it has dispensed to Defendant's members.

6

## Relevant Statutes

22.     Section 15-1005 of Insurance Article of the Annotated Code of Maryland requires a health insurer to promptly pay, deny or dispute a claim for benefits that is accompanied by properly completed paperwork containing all reasonably necessary information. Specifically, Section 15-1005(c) provides that:

> (c)     Within 30 days after receipt of a claim for reimbursement from a person entitled to reimbursement under § 15-701(a) of this title or from a hospital or related institution, as those terms are defined in § 19-301 of the Health--General Article, an insurer, nonprofit health service plan, or health maintenance organization shall:
>
> > (1)     mail or otherwise transmit payment for the claim in accordance with this section; or
> >
> > (2)     send a notice of receipt and status of the claim that states:
> >
> > > (i)     that the insurer, nonprofit health service plan, or health maintenance organization refuses to reimburse all or part of the claim and the reason for the refusal;
> > >
> > > (ii)    that, in accordance with § 15-1003(d)(1)(ii) of this subtitle, the legitimacy of the claim or the appropriate amount of reimbursement is in dispute and additional information is necessary to determine if all or part of the claim will be reimbursed and what specific additional information is necessary; or
> > >
> > > (iii)   that the claim is not clean and the specific additional information necessary for the claim to be considered a clean claim.

23.     Pursuant to Section 15-1005(f), an insurer that does not comply with the provisions of § 15-1005(c) is required to pay interest on claims that are outstanding for more than 30 days. Specifically, Section 15-1005(f) provides:

> (f)(1)  If an insurer, nonprofit health service plan, or health maintenance organization fails to comply with subsection (c) of this section, the insurer, nonprofit health service plan, or health maintenance organization shall pay interest on the amount of the claim that

7

remains unpaid 30 days after the claim is received at the monthly rate of:

(i) 1.5% from the 31st day through the 60th day;

(ii) 2% from the 61st day through the 120th day; and

(iii) 2.5% after the 120th day.

24.    Pursuant to Section 15-1009, if an insurance company has preauthorized or approved of a certain health care service, the insurer cannot thereafter deny payment for such service, except under extenuating circumstances.  Specifically, Section 15-1009(b) provides:

(b)    If a health care service for a patient has been preauthorized or approved by a carrier or the carrier's private review agent, the carrier may not deny reimbursement to a health care provider for the preauthorized or approved service delivered to that patient unless:

(1) the information submitted to the carrier regarding the service to be delivered to the patient was fraudulent or intentionally misrepresentative;

(2) critical information requested by the carrier regarding the service to be delivered to the patient was omitted such that the carrier's determination would have been different had it known the critical information;

(3) a planned course of treatment for the patient that was approved by the carrier was not substantially followed by the health care provider; or

(4) on the date the preauthorized or approved service was delivered:

(i)    the patient was not covered by the carrier;

(ii)    the carrier maintained an automated eligibility verification system that was available to the contracting provider by telephone or via the Internet; and

(iii)    according to the verification system, the patient was not covered by the carrier.

8

### Feldman's Has Suffered Irreparable Injury

25.     By reason of Defendant's actions described above, Plaintiff has suffered injury to its reputation and its ability to obtain credit, and will suffer actual and impending irreparable injury, namely, the potential insolvency of Plaintiff.

26.     Plaintiff is without adequate or speedy remedy at law for the above-mentioned conduct of Defendant.

27.     As such, Plaintiff is entitled to (i) an injunction ordering Defendant to immediately pay all outstanding and unpaid claims and (ii) an injunction ordering Defendant to comply with the PPP Agreement, including the provisions requiring prompt and full payment of all claims for past and future Covered Services, in each case in order to enable Plaintiff to make payments to its creditors and continue providing lifesaving medication to its patients pending trial on the merits.

### CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)

28.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 27 of this Complaint.

29.     Plaintiff has duly satisfied all of its obligations and requirements set forth in the PPP Agreement.  Plaintiff properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder; in the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.

30.     In accordance with the express terms and conditions of the PPP Agreement, Defendant became obligated to pay to Feldman's $1,588,127.77.

9

31.     Despite such amounts being due and owing, Defendant has failed to remit payment to Plaintiff.

32.     Defendant's failure to make payment for the claims submitted by Plaintiff constitutes a material breach of the PPP Agreement.

33.     By reason of the foregoing, Plaintiff has been damaged, will continue to be damaged and is entitled to actual, consequential, and punitive damages in an amount of no less than $1,588,127.77, plus interest.

## COUNT II
### (Unjust Enrichment)

34.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 of this Complaint.

35.     By providing lifesaving medication to Defendant's insureds, Plaintiff has provided a benefit to Defendant.  Plaintiff properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder; in the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.

36.     Defendant was aware of this benefit, solicited it, and accepted it.

37.     Defendant, however, retains a portion of the benefit by improperly denying, diminishing, and delaying payment for Plaintiff's products and services as set forth above.

38.     It would be inequitable to allow Defendant to retain the benefit under the circumstances, and Defendant has been unjustly enriched thereby and continues to unjustly enrich itself.

10

39.     Defendant has been unjustly enriched in an amount equal to $1,588,127.77.

40.     By reason of the foregoing, Plaintiff has been damaged, will continue to be damaged and is entitled to actual, consequential, and punitive damages in an amount of no less than $1,588,127.77, plus interest.

## COUNT III
### (Bad Faith)

41.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 40 of this Complaint.

42.     Defendant's failure to comply with its duties and obligations and pay the claims outstanding is arbitrary, capricious, and/or made with willful or wanton disregard of the rights of Plaintiff.  Defendant has articulated no basis in fact or law for its refusal to pay.

43.     As a direct and proximate result of Defendant's bad faith conduct, Plaintiff has been damaged, will continue to be damaged and is entitled to actual and consequential damages in an amount of no less than $1,588,127.77, plus attorneys' fees, interest, and costs and punitive damages in an amount to be proved at trial..

WHEREFORE Plaintiff respectfully requests that judgment be entered in its favor and against Defendant as follows:

A.      On the First Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest.

B.      On the Second Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest.

11

C.      On the Third Cause of Action, actual damages in an amount to be determined at trial, but in no event less than $1,588,127.77, plus interest and costs and punitive damages in an amount to be proved at trial.

D.      Awarding Plaintiff a preliminary and permanent injunction (i) ordering Defendant to immediately pay all outstanding and unpaid claims and (ii) ordering Defendant to comply with the PPP Agreement including the provisions requiring prompt and full payment of all claims for past and future Covered Services, in each case in order to enable Plaintiff to make payments to its creditors and continue its operations pending trial on the merits.

E.      Awarding Plaintiff its reasonable attorneys' fees and the costs of this proceeding;

F.      Awarding Plaintiff interest on the outstanding claims computed pursuant to § 15-1005(f)(1) of the Maryland Code;

G.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:  June 1, 2009

BAROODY & O'TOOLE

By: _Neal C. Baroody_

Neal C. Baroody
201 N. Charles Street, Suite 2102
Baltimore, MD 21201
(410) 539-8412 (telephone)
(410) 539-8411 facsimile)
nbaroody@aol.com

Counsel seeking to appear *pro hac vice*
PADUANO & WEINTRAUB LLP
Anthony Paduano
Jordan D. Becker
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jdb@pwlawyers.com

Attorneys for Plaintiff

12

# Exhibit   A



# BlueCross BlueShield
## of Maryland
### An Independent Licensee of the
### Blue Cross and Blue Shield Association

## PARTICIPATING PROFESSIONAL PROVIDER AGREEMENT

## SCOPE OF AGREEMENT

This Participating Professional Provider Agreement is between Blue Cross and Blue Shield of Maryland, Inc., (hereinafter referred to as "BCBSM"), and you (hereinafter sometimes referred to as "Provider") and governs your participation as a BCBSM Participating Provider in the BCBSM Program. This Agreement applies to all Covered Services you provide.

## DEFINITIONS

1. **BCBSM Program** means a health care benefit or services program which is partially or wholly underwritten and/or administered by BCBSM; or which is partially or wholly underwritten by a subsidiary or affiliate of BCBSM and for which BCBSM has been identified as the administrator.

2. **Allowed Benefit** for Covered Services under this Agreement is as follows: the Allowed Benefit payable to a Participating Provider for a Covered Service will be the lesser of (1) the practitioner's actual charge or (2) the practitioner's BCBSM profile rate in effect on the date that the service is rendered.

3. **Covered Service** means a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled.

4. **Member** means any eligible person covered under a BCBSM Program.

5. **Participating Provider** means any provider who contracts with BCBSM to be paid directly for rendering Covered Services.

6. **Preferred Provider** means any Participating Provider who has agreed to comply with any and all Preferred Provider policies and procedures, including acceptance of the Preferred Provider Allowed Benefit as payment in full for Covered Services provided to Members enrolled in Preferred BCBSM Programs.

7. **Preferred Provider Allowed Benefit (PPAB)** for Covered Services is 90% of the Allowed Benefit.

8. **Practitioner** means one legally entitled by license to practice the healing arts and perform within the scope of that license in the state where services are rendered.

## SERVICES

9.  You agree to provide Covered Services to Members in accordance with the terms and conditions of this Agreement; within the scope of your professional license or certification; and in accordance with, and subject to, the provisions of the subscription agreements for the BCBSM Programs.

10. You agree that all services provided to Members under this Agreement shall be provided by you or by a duly licensed or certified person under your direct supervision.

11. You agree to use your best efforts to comply with all reasonable administrative policies and procedures established by BCBSM that are related to the delivery and reimbursement of Covered Services and you agree to comply with the applicable BCBSM Cost Containment Programs.

12. You agree to clearly identify to Members, prior to rendering treatment, your level of participation with BCBSM (Participating, Preferred, etc.). BCBSM shall make available upon request materials which, when prominently posted in Providers office(s), meet this requirement.

13. BCBSM shall perform certain administrative functions relating to BCBSM Programs, which may include but not be limited to, processing claims, marketing, enrollment, issuance of Member identification cards, Member service, and administration of Member complaints and appeal procedures.

14. BCBSM shall be solely responsible for the establishment and coordination of all general policies governing the delivery of Covered Services to Members, including procedures relating to quality management, utilization review, and medical records.

## BILLING

15. You agree to comply with our billing and claims procedures and to submit claims within 30 days after completion of service in an electronic billing format or on an approved billing form, both as approved by BCBSM. In either instance, you accept full responsibility for all claims submitted. You further agree that if submitting electronically, each bill can be associated with a source document and a patient's signature. Claims initially submitted more than 1 year beyond the service date will generally be denied and may not be billed to the Member. If the initial claims submission to BCBSM is made more than one year after the date of service because of circumstances not reasonably within your control, BCBSM at its option shall,

   1.  process the claim as if it were timely filed, or

   2.  deny payment of claims and direct Provider to balance bill Member, or

   3.  uphold the denial and direct Provider not to balance bill the Member.

16. You agree to use the most appropriate procedure and diagnostic codes when billing for services rendered and not to unbundle charges into separate procedure codes when a single code is more appropriate. You agree that if billed codes are re-assigned or rebundled by BCBSM, you will accept the Allowed Benefit for those services as payment in full. If you dispute the re-assignment or rebundling by BCBSM, the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement shall apply.

If a BCBSM Program is the only coverage involved, you agree not to bill, charge, collect or seek compensation from a Member, or any person responsible for a Member, for an amount in excess of the Allowed Benefit for Covered Services provided to a patient under the applicable BCBSM Program.

**All instances of Third Party Liability shall be covered by Paragraph 34 of this Agreement.**

18. We agree to provide you with timely access to claims, benefit, and eligibility information on Members.


## PAYMENT

19. We agree to pay you directly the Allowed Benefit, less any applicable coinsurance, copay or deductible amounts, for Covered Services.

20. We agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claim or any portion thereof in accordance with Maryland law.

21. If Provider renders Covered Services to a subscriber of a Health Maintenance Organization affiliated with BCBSM (hereinafter HMO) and those Covered Services are not rendered pursuant to the authorized HMO referral process, then BCBSM, as administrator, agrees to reimburse Provider directly for said services at Allowed Benefit. This paragraph applies only to those products for which BCBSM has been identified as the out-of-network claims administrator.

22. You agree to charge the Member for any applicable coinsurance, copay or deductible amounts in accordance with and subject to the provisions of the subscription agreements for the relevant BCBSM Program and not to waive the payment of such amounts by the Member.

23. BCBSM agrees that you may bill and collect directly from Members charges for services that have been determined not to be Covered Services. You agree not to bill a Member for any service for which payment is denied due to a BCBSM determination that said service is not medically necessary, unless the member has agreed, in writing, to be personally financially liable for payment for said medically unnecessary services.

24. You agree that if BCBSM overpays you, we have the right to recover such overpayment by offset against future payments. The right of BCBSM to recover said overpayments shall be limited to those periods of time as set forth under the provisions of Annotated Code of Maryland, Health General Article, Section 4-403 (b) (c) as it relates to medical record keeping. If you dispute recovery of all or part of an alleged overpay ment, the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement, shall apply.

## QUALITY & UTILIZATION MANAGEMENT

25. You agree to cooperate with us and assist the Member in complying with all contractual provisions in an effort to maximize the benefit available to the Member. For example, certain BCBSM Programs require the Member to obtain approval in advance of rendering services. Reduction of benefits because of the Member's non-compliance shall be and remain the responsibility of the Member.

26. Both parties agree that BCBSM has the right to review any and all documents and medical records reasonably required to adjudicate claims and perform our duties under this Agreement including, but not limited to, post payment audits. You agree, upon the request of BCBSM, to provide copies of these documents and records at no charge.

27. Both parties agree, in accordance with applicable state law, to preserve the confidentiality of the medical information obtained in treating Members, and you agree to permit an on-site audit of medical records of any Member upon reasonable notice and during regular business hours or at such other mutually agreed time and place.

28. You represent that you are a health care provider licensed or certified in the state in which you are practicing and you agree to notify us immediately of the suspension, withdrawal, revocation, termination, or expiration of your professional license or certification, or if debarred, suspended, or voluntarily excluded from participating in Medicare, Medicaid, or Federal Employees Health Benefits Programs.

29. If credentialing information is required for your participation with BCBSM, you agree to supply the requested information and to inform BCBSM on a timely basis of any subsequent material changes in the information supplied, and of any major occurrence that could impair your ability to perform your duties under this Agreement.

30. Any other health professionals employed by or providing services for you shall be duly licensed or certified under applicable law. If you are billing for the services of any other health professionals employed by or providing services for you, you certify that said other health professionals are supervised by you according to currently accepted standards of professional practice.

## RELATIONSHIP OF THE PARTIES

31. You shall perform your duties hereunder as an independent contractor. Both parties acknowledge that this Agreement in no way limits your rights or availability to other employment contemporaneously with or following your performance under this Agreement. As an independent contractor, you shall bear full responsibility for any and all of your taxes and fees. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, employee, or representative of the other.

32. You have a duty to exercise independent medical/professional judgment as required within the scope of you license or certificate (if a license or certificate is required), in your delivery of or referral for services. You agree that eligibility of a service for coverage by BCBSM will not influence your judgment in the decision to recommend or render such service.



## ELECTIONS

33. You agree to provide Covered Services to all Members and not to refuse, withhold from, deny or discriminate against any Member the provision of Covered Services because of the race, gender, creed, color, national origin, marital status, or physical or mental handicap of any Member. You agree to give equal access to BCBSM Members as to any other fee-for-service patient. You retain the right to request that a Member select another provider, if this request results from Member unmanageability and/or history of Member non-compliance with provider recommended treatment modalities which has resulted in the impossibility of the creation or maintenance of the provider/patient relationship between you and the Member.

## COMPENSATION

34. You agree to abide by the applicable BCBSM general policies with regard to filing claims and accepting reimbursement under the Coordination of Benefits (COB), subrogation, Personal Injury Protection (PIP), workers' compensation, Medicare assignment and Medicare non-assignment, TEFRA and other provisions of law.

35. It is recognized by the parties that Provider may have contractual relationships with certain subsidiaries of BCBSM. If a Member seeks care from Provider pursuant to a subscription agreement with a subsidiary of BCBSM, then payments shall be made to Provider in accordance with your agreement with that subsidiary. This agreement is not intended to supersede existing or future contractual relationships which Provider may enter with subsidiaries or affiliates of BCBSM.

## PROCEDURE FOR APPEAL

36. BCBSM agrees to provide you with a procedure to appeal any decisions made in connection with this Agreement. You agree to file any appeal within 90 days of the date you received notice of our determination or policy that is the subject of the appeal. In the course of an appeal process, said appeal may ultimately be referred to a committee which includes physicians or other health care providers. Any decision made by such committee shall be binding on both parties. You agree not to bill the Member for any amounts in dispute during the pendency of the appeal. If the appeal involves a payment dispute, BCBSM agrees not to effect recovery of disputed overpayments during the pendency of the appeal.

## GENERAL PROVISIONS

37. BCBSM and the Provider agree to cooperate fully with each other in administering the various provisions of this Agreement.

38. You agree to notify us in writing within 30 days of any change in business address/location, business name, and/or ownership and any addition or deletion of names of practitioners and/or professionals who are subject to this Agreement.

39. You agree that we may publish or otherwise identify your name as part of a list of Participating Providers that we may use in marketing and administering BCBSM Programs. We agree to represent to Members that you are a specialist in your self-designated field(s) of specialized medical practice: (1) if you are a Maryland physician, if you have been identified as a specialist in that field by the State Board of Physician Quality Assurance as provided by Maryland law; or (2) if you are a physician not practicing in Maryland, you have been identified as a specialist by the appropriate board as recognized by the American Board of Medical Specialties.

40. Any notice required to be given by Provider under this Agreement must be given in writing by registered or certified mail, postage prepaid.

41. The failure of either party to enforce or insist upon compliance with any provisions of this Agreement in any instance shall not be construed as or constitute a waiver of that party's right to enforce or insist upon compliance with such provision, rule, or regulation, either currently or in the future.

42. This Agreement shall be governed by the laws of the State of Maryland and represents the full and complete understanding of the parties with respect to this Agreement and the relationship created therein.

## TERM AND TERMINATION

43. The initial term of this Agreement shall be for one year from the effective date indicated herein. This Agreement shall automatically renew without notice from year to year unless terminated in accordance with the provisions herein.

44. Either party may terminate this Agreement by giving 60 days written notice to the other party. We reserve the right to amend this Agreement, with the exception of your right to terminate, by sending you written notice 30 days prior to the effective date of any amendment. If you choose to terminate on account of a proposed amendment, then the date of said termination will be the effective date of the amendment, notwithstanding the failure of either party to give 60 days written notice. In the event termination of this Agreement occurs, you agree to identify to Members, prior to rendering treatment, that you no longer are participating with BCBSM. BCBSM shall make available upon request materials which, when prominently posted in Provider's office(s), meet this requirement.



SCLOSURE

45. You hereby expressly acknowledge your understanding that this Agreement constitutes a contract between you and BCBSM, that Blue Cross and Blue Shield of Maryland, Inc. is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (the "Association") permitting Blue Cross and Blue Shield of Maryland, Inc. to use the Blue Cross and Blue Shield Service Marks in a portion of the State of Maryland, and that BCBSM is not contracting as the agent of the Association. You further acknowledge and agree that you have not entered into this Agreement based upon representations by any person other than BCBSM and that no person, entity, or organization other than BCBSM shall be held accountable or liable to you for any of BCBSM's obligations to you created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBSM other than those obligations created under other provisions of this Agreement.

## APPLICATION

46. Applications or other documents required by BCBSM for participation under this Agreement shall be incorporated in and made part hereof. Material misrepresentation made in any of said applications or documents may constitute grounds for immediate termination of this Agreement by BCBSM.

## PRIOR AGREEMENTS

47. This Agreement upon execution by the parties supersedes and voids any and all prior Participating Provider Agreements between the parties hereto.

Accepted by Provider:

Feldman's Medical Center Pharmacy
Name of Provider/Practice

David Caldwell RPh
Authorized Signature

Pharmacist-in-Charge
Print Name/Title

Date: August 12, 1997

Accepted by Blue Cross and
Blue Shield of Maryland, Inc.

By: _____

_____
Print Name/Title

For BCBSM Use Only
Agreement
Effective Date: _____

Please supply the following information: If this is a partnership or corporation, please provide a list containing names and specialties of all practitioners.

Billing Address: Feldman's Medical Center Pharmac
11055 Little Patuxent Parkway
Columbia MD 21044

Telephone No: 410-964-8444

Office Address: same as above

_____

_____

Telephone No: _____

NOTE: If you have multiple office addresses, please indicate here (X) and supply addresses and phone numbers on separate attachments.

52- 1450108  _____ Federal Tax ID

DME - (Pharmacy)  _____ Field of Practice or Specialty

## ATTACHMENT A



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

| | |
|---|---|
| _Wayne Caldwell_ | _8-12-97_ |
| Authorized Signature | Date |

- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

| | |
|---|---|
| | |
| Authorized Signature | Date |

PAR 10 (4/94)          Page 8 of 8



**BlueCross BlueShield
of Maryland**
An Independent Licensee of the
Blue Cross and Blue Shield Association

## NEW PROVIDER DATA FOR GROUPS

Please complete this form (print or type) and return it with your Blue Cross and Blue Shield of Maryland agreement(s), if applicable; **no agreements required for non-participating status.** The data requested is essential to implement your provider account number. **If this data is incomplete, we cannot assign a provider number.** Your assistance is appreciated.

### GROUP INFORMATION

Name of Group: _Feldman's Medical Center Pharmacy, Inc._

*Check One:*

[X] Corporation    Date of Incorporation: _05/01/85_ (Attach Articles of Incorporation)

[ ] Partnership    Date Partnership Formed: _/ /_ (Attach Partnership Agreement)

Corporate/Partnership Tax ID Number: _52- 1450108_

Method of Billing:   [X] Manual/Paper
                  [ ] Electronic    Vendor Name _____

### PRACTICE INFORMATION

Billing Address: _11055 Little Patuxent Pkwy_

_Columbia MD 21044_

Billing Agent: [X] No    [ ] Yes    Billing Agent Name _____

Contact Person: _Gayle Caldwell_    Phone Number: _(410) 964-8444_

Primary Office Address: _11055 Little Patuxent Pkwy_

_Columbia MD 21044_

Contact Person: _Gayle Caldwell_    Phone Number: _(410) 964-8444_

List additional office locations on bottom of this sheet:    Fax Number: _(410) 740-1377_

_Feldman's Dorsey Hall Pharmacy_

_9501 Old Annapolis Rd._

_Ellicott City MD 21042_

MM 8-12-93

## PROVIDER PARTICIPATION

### WITH

### BLUE CROSS AND BLUE SHIELD OF MARYLAND

#### ADVANTAGES

Over 80% of health care providers participate with Blue Cross and Blue Shield of Maryland (BCBSM).  This unique association affords you several advantages:

* **A competitive edge in the industry**
  BCBSM is the largest health insurance carrier in the state. Our customers know that a "Participating Provider" means a cost savings to them, as they are only responsible for deductible and copayment amounts up to the allowed benefit.

* **Direct reimbursement**
  Only participating providers can receive payment directly from BCBSM.

* **Dedicated account team service**
  BCBCSM has provided the Account Team Structure, dedicated account teams to service telephone and written inquiries from participating providers.  Non-participating provider telephone inquiries are sent directly into our voice response system, BLUE LINE.

#### THE PARTICIPATING AGREEMENTS

You choose to participate by signing the Participating Provider Agreement.
    1. Basic Agreement       2. Attachment A, Preferred Provider Network

The Participating Agreement & Attachment A are arranged as building blocks -
    - you must participate with the Basic program to be eligible for the Preferred Provider Programs

To obtain agreements:  You may obtain the Participating Agreement & Attachment A by contacting the Networks Development Department at (410) 528-7160 or (800) 746-1444 or by sending your written request to:

        BLUE CROSS AND BLUE SHIELD OF MARYLAND
        NETWORKS DEVELOPMENT AND PROVIDER CONTRACTING
        10455 Mill Run Circle
        Owings Mills, Maryland  21117

The first type of preferred provider program, PPO, premiered in 1985 and answered the demands from group accounts to reduce premium payments without reducing employee benefits.

## WHAT IS A PPO?

A PPO is a subscriber-driven preferred provider program. This means that:

- the patient/subscriber is responsible for staying within the network of preferred providers. Example: When the preferred provider refers a patient covered by a PPO program to a specialist - it is the patient's responsibility to ensure the specialist is a preferred provider.

- adhering to managed care provisions such as second surgical opinions, admissions review programs etc. is also the subscriber's responsibility. If these provisions are not met and the claim is denied or paid at a reduced amount, the subscriber is financially obligated.

## PREFERRED PROVIDER NETWORK (PPN)

To meet the challenges of our larger group accounts, the PPN network was developed. These programs combine cost savings, a wide range of benefits and a network of providers who are willing to be even more responsive to keeping the patient within the family of preferred providers and adhering to managed care provisions.

In contrast to the PPO programs, a PPN is a provider driven program. This means that:
- the PPN provider has agreed to ensure that the managed care provisions are met; if not, the provider may be penalized.

- when a PPN provider refers a patient covered by a PPN program to a specialist, it is the referring provider's responsibility to ENSURE that the specialist is in the PPN network.

## OUT-OF-NETWORK REFERRALS
When it is necessary to refer a patient covered by a PPN program to a non-PPN provider, the referring provider has agreed to contact the BCBSM's Provider Referral unit at (410) 581-3521 or (800) 492-2715 to advise BCBSM of the out of network referral. In this way, when the claim is received from the non-PPN provider, the patient will not be financially penalized for going out of network.

## REIMBURSEMENT

Reimbursement differs from the allowed benefit. Preferred Providers agree to accept a Preferred Provider Allowance (PPA) as payment in full.  The PPA is 90% of the allowed benefit.

## WHAT ARE YOUR RESPONSIBILITIES?



**BlueCross BlueShield
of Maryland**
An Independent Licensee of the
Blue Cross and Blue Shield Association

*1996 Disclosure Document*

This disclosure document explains the structure of the Blue Cross and Blue Shield system, the independent nature of every Blue Cross and Blue Shield Plan and the financial condition of Blue Cross and Blue Shield of Maryland, Inc. (BCBSM) and its subsidiaries.

CareFirst,* CFS Health Group, Columbia Medical Plan,* Delmarva Health Plan, FirstCare, FreeState Health Plan,* Paruxent Medical Group, Potomac Health,* Potomac Physicians, P.A. and Willse & Associates are subsidiaries or affiliates of Blue Cross and Blue Shield of Maryland, Inc.

The Blue Cross and Blue Shield Association licenses BCBSM, and other independent licensees, to offer certain products and services under the BLUE CROSS® and BLUE SHIELD® brand names and service marks.

Blue Cross and Blue Shield of Maryland, Inc. is an independent organization governed by its own Board of Directors and is solely responsible for its own debts and other obligations.

Neither the Blue Cross and Blue Shield Association nor any other organization using the BLUE CROSS® and BLUE SHIELD® brand names acts as the guarantor of Blue Cross and Blue Shield of Maryland's obligations or those of any other licensee.

### Blue Cross and Blue Shield of Maryland, Inc. and Subsidiaries
Condensed Balance Sheets[1] as of December 31, 1995 and 1994
(Dollars in thousands)

|  | 1995 | 1994 |
|---|---|---|
| **ASSETS:** | | |
| Cash and Investments | $385,553 | $302,739 |
| Premiums and Other Receivables | 199,565 | 205,710 |
| Property and Equipment | 52,339 | 49,806 |
| Hospital Advances and Other Assets | 153,926 | 183,414 |
| Total Assets | $791,383 | $741,669 |
| **LIABILITIES AND RESERVES:** | | |
| Unpaid Claims Liability | $241,044 | $235,175 |
| Unearned Premiums and Other Advances | 150,949 | 152,747 |
| Accounts Payable and Other Liabilities | 129,216 | 143,433 |
| Total Liabilities | $521,209 | $531,355 |
| Reserves and Unassigned Funds[2] | 270,174 | 210,314 |
| Total Liabilities and Reserves | $791,383 | $741,669 |

\* Independent Licensees of the Blue Cross and Blue Shield Association

® Registered marks of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans.

[1] As derived from the audited financial statement of Blue Cross and Blue Shield of Maryland, Inc. and subsidiaries. For a complete copy of the organization's audited financial statements, which were prepared in accordance with generally accepted accounting principles, please call the Corporate Finance Department at (410) 998-5192. Certain amounts in the 1994 statements have been reclassified to be consistent with the 1995 presentation of condensed statements.

[2] Includes $197.8 million statutory surplus reported to the Maryland Insurance Administration by Blue Cross and Blue Shield of Maryland, Inc. as of 12/31/95.

208 1/96



**Blue Cross Blue Shield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

September 24, 1996

Dear Provider:

Effective November 1, 1996, Blue Cross and Blue Shield of Maryland will be making changes in the processing of certain durable medical equipment and medical supply claims. The following changes will take place on that date:

- All claims must be submitted with valid HCPCS procedure codes. If there is not an applicable code, the claim must be submitted with verbiage only. An invoice or vendor slip must accompany the claim form. The invoice or vendor slip must indicate the description of the item, price and the name of the vendor.

- Procedure codes E1399 and A4649 will no longer be acceptable codes to use on claims submitted by providers. BCBSM will assign these codes to services as necessary.

- If a claim is submitted with verbiage and an invoice or vendor slip is not attached, the claim will reject with remark code 52120 which indicates that the claim is being returned for additional information.

- If a claim is submitted with verbiage, and our Medical Review area can assign an appropriate code, the claim will reject with remark code 50346 which indicates to submit the claim using a valid procedure code. The provider will be responsible for resubmitting the claim with the appropriate procedure code.

If you have any questions concerning these new procedures, please contact the Provider Claims & Benefits Inquiry Department at 410-581-3577 or 800-437-2328.

Sincerely,

Ernest A. Viscuso
Director
Provider Contracting & Network Development

**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

Dear Provider:

In response to your inquiry regarding your request for a Durable Medical Equipment provider account number with Blue Cross Blue Shield of Maryland, Inc. (BCBSM), please provide us with the following information:

1. Legal name and Federal Tax ID number of corporation/partnership
   *Feldman's Medical Center Pharmacy    TaxID# 52- 1458188*

2. Billing address and physical locatino (s), contact person – *Gayle Caldwell*
   and phone number *11055 Little Patuxent Parkway*
   *Columbia, MD 21044   410-964-8444*

3. A list of officers (i.e., President, Vice-President, etc.)
   *President: Leslie S. Feldman*
   *V. Pres: Stefanie Feldman*

4. Are you a contracted provider?    Yes_____  No __X_____

   If so, please provide the name of the facility or facilities

   _____

   _____

5. Please provide a <u>detailed</u> description of the services being rendered and/or equipment/supplies used.

   | *Rental of wheelchairs* | *Glucometers + supplies* |
   | *Purchase or* | |
   | *Rental of walkers* | *Ostomy supplies.* |
   | | *Misc small DME* |

Please note the following guidelines for DME IV Therapy services when submitting a claim to BCBSM:

1. All services must be itemized.

2. A physician's certificate of necessity must be attached to each claim including the patient's diagnosis and/or condition.

3. Nurses visits or consultations with the physician are non-covered services to you as a provider of care.

Corporation:

Other Pharmacy/billing address

Feldman's Dorsey Hall Pharmacy

9501 Old Annapolis Rd.

Ellicott City, MD 21042

410-730-8200

Fed Tax ID #: 52-1450188

Contact person: Amy Adams

Specialty: DME- Pharmacy.



**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

March 25, 1998

Dear Pharmacy Colleague:

Beginning April 1, 1998, Blue Cross and Blue Shield of Maryland (BCBSMD) will be offering a new **Standardized Prescription Benefit Program.** The goal of the Standard Prescription Program is to both simplify the various pharmacy benefits currently offered by BCBSMD and to help manage the overall increases in prescription costs. The new program, developed primarily for our large employer group customers with HMO or traditional indemnity coverage, will be phased in on an employer/group basis over the next twelve months starting April 1st. Letters and brochures, included in a comprehensive communications plan, will be distributed to all customers as they transition into the new program. As a participating pharmacy, you should continue to reference the API (Advance Paradigm, Inc.) "on-line messaging" system as usual to confirm coverage eligibility guidelines and/or determine any copayment amounts.

Here is an overview of the changes you will see.

**The Standard Prescription Benefit**
The new Standard Prescription Benefit represents a departure from the traditional open formulary benefit currently offered by BCBSMD. Each employer group will select one of two new drug benefit formulary options: PERSONAL (closed formulary) or CHOICE (copay-driven formulary). Only our self-insured group customers will have the option of the current TRADITIONAL (open formulary) benefit structure. The current BCBSMD formulary will serve as the basis for all BCBSMD benefit options:

**Standard Benefit Option 1 - PERSONAL**
BCBSMD members who have the PERSONAL prescription coverage option are entitled to BCBSMD's formulary medications only. In addition, a two-tiered copay is in place, where a lower copay is charged for generic medications, and a higher copay for brand medications. *There is no benefit for non-formulary drugs without an authorization.* Physicians can obtain authorizations for non-formulary medications by calling API at 800-294-5979. In addition, participating pharmacies can call this same number to obtain a one time authorization if you are unable to contact a physician to change to a formulary medication.

**Standard Benefit Option 2 - CHOICE**
Members who select the CHOICE benefit will have coverage for a formulary or a non-formulary medication. A two-tiered copay structure is in place here also, where a lower copay is charged for both generic and formulary branded medications, and a higher copay is charged for non-formulary branded medications. No appeals process is in place for this benefit structure since the patient can still obtain any medication.

**Standard Benefit Option 3 - TRADITIONAL**
The traditional open formulary benefit will be made available to our self-insured customers only. This is the most similar to our current benefit structure and includes mandatory generic substitution. Copays can be either flat or two tiered (generic/brand).

**OTHER Pharmacy NEWS**

**Clinical Prior Authorization**

Each of the new standard benefit options will include the clinical prior authorization program. Drugs requiring prior authorization will be covered if determined to be medically indicated for the treatment of a covered medical condition. Authorizations can be obtained by having the physician call API at 800-294-5979.

**Diabetic Supplies**

New to the BCBSMD prescription benefit is the coverage of diabetic supplies. Diabetic supplies have been added to our maintenance listing, thus correcting problems with day supply limitations experienced earlier this year. No copayments will be collected for diabetic supplies, and the cost of the supplies will not accumulate against deductibles or benefit maximums.

**Maintenance Medication Listing**

The BCBSMD Maintenance Medication Listing will still be the basis for identifying medications available in a maintenance supply. Inclusion of a medication on the maintenance list is based upon the primary indication of the medication, safety profile with long term use, and concerns of patient monitoring that may be compromised with the dispensing of maintenance quantities.

Please call if you have any questions. We are available to work with you to ensure a smooth transition of these and any future pharmacy changes. I can be reached at 410-528-7897, if you have any questions or if you just need a copy of the BCBSMD formulary. Pharmacy customers may direct their questions to API at 800-241-3371 or to the BCBSMD Customer Service phone number listed on their membership card. Thank you.

Sincerely,

*Winston Wong*

Winston Wong, Pharm.D.
*Director, Pharmacy Management*



**BlueCross BlueShield
of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

September 22, 1997

Feldman's Medical Center Pharmacy
11055 Little Patuxent Pkwy.
Columbia, MD 21044

Dear Provider:

Thank you for becoming a **Participating** provider and member of the **Preferred Provider Network** with Blue Cross Blue Shield of Maryland, Inc. (BCBSM). Processing of your contracts has been completed for an effective date of **August 12, 1997** for provider number Y043FE. A copy of your contract will be forwarded to you.

You have been accepted as a member of our PPN. The benefit structure of the PPN encourages our members, through financial incentives, to seek care from PPN Practitioners. To assist our members, we publish directories identifying all health care professionals enrolled in our programs; you will be listed in future directories. In the interim, we have included your name in our telephone referral unit (410-581-3521 or 1-800-492-2715). Our telephone referral unit is operational daily to assist our subscribers and providers in locating PPN practitioners convenient to them.

Using your provider number as listed above on all of the claims that are submitted to us will assure payment directly to you. Claims received without the provider number will be returned to you.

The new state law called the "Uniform Claim Form Regulation" states that health care practitioners shall submit claims on the HCFA 1500.

You may call BCBSM's automated inquiry system "Blue Line" at 410-581-3535 or 1-800-248-8410 for information related to claims status, member eligibility, or benefits. Questions related to proper billing procedures or other claims issues should be directed to Account Team J at 410-581-3577. If you have any further questions about your contract status, you may contact the Professional Database Department at 410-528-7230 or 1-800-352-1448.

We appreciate your participation with BCBSM and your membership in our Preferred Provider Network. Thank you for your continued support as BCBSM strives to meet the healthcare needs of our subscribers.

Sincerely,

*Eldean Krieger*

Eldean Krieger
Professional Database
1061t.mw



## ATTACHMENT A



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

| | |
|---|---|
| _Daryl Caldwell_ | _8-13-97_ |
| Authorized Signature | Date |

- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

| | |
|---|---|
| | |
| Authorized Signature | Date |

Form **W-9**
(Rev. March 1994)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do NOT
send to the IRS.

Name (If joint names, list first and circle the name of the person or entity whose number you enter in Part I below. See instructions on page 2 if your name has changed.)

Leslie S. Feldman

Business name (Sole proprietors see instructions on page 2.)

Feldman's Medical Center Pharmacy

Please check appropriate box:  ☐ Individual/Sole proprietor  ☒ Corporation  ☐ Partnership  ☐ Other ▶

Address (number, street, and apt. or suite no.)

11055 Little Patuxent Pkwy

City, state, and ZIP code

Columbia MD 21044

Requester's name and address (optional)

**Part I  Taxpayer Identification Number (TIN)**

List account number(s) here (optional)

Enter your TIN in the appropriate box. For
individuals, this is your social security number
(SSN). For sole proprietors, see the instructions
on page 2. For other entities, it is your employer
identification number (EIN). If you do not have a
number, see How To Get a TIN below.

Note: If the account is in more than one name,
see the chart on page 2 for guidelines on whose
number to enter.

Social security number

| | | | | | | | | |

OR

Employer identification number

5 2 | 1 4 5 0 | 1 0 8

**Part II**  For Payees Exempt From Backup
Withholding (See Part II
instructions on page 2)

▶

**Part III  Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal
Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified
me that I am no longer subject to backup withholding.

Certification Instructions.—You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup
withholding because of underreporting interest or dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage
interest paid, the acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement
(IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct
TIN. (Also see Part III instructions on page 2.)

Sign
Here   Signature ▶  Dawn Caldwell RPh   Date ▶  8-12-97

Section references are to the Internal
Revenue Code.

**Purpose of Form.**—A person who is
required to file an information return with
the IRS must get your correct TIN to report
income paid to you, real estate
transactions, mortgage interest you paid,
the acquisition or abandonment of secured
property, cancellation of debt, or
contributions you made to an IRA. Use
Form W-9 to give your correct TIN to the
requester (the person requesting your TIN)
and, when applicable, (1) to certify the TIN
you are giving is correct (or you are waiting
for a number to be issued), (2) to certify
you are not subject to backup withholding,
or (3) to claim exemption from backup
withholding if you are an exempt payee.
Giving your correct TIN and making the
appropriate certifications will prevent
certain payments from being subject to
backup withholding.

**Note:** If a requester gives you a form other
than a W-9 to request your TIN, you must
use the requester's form if it is substantially
similar to this Form W-9.

**What Is Backup Withholding?**—Persons
making certain payments to you must
withhold and pay to the IRS 31% of such

payments under certain conditions. This is
called "backup withholding." Payments
that could be subject to backup
withholding include interest, dividends,
broker and barter exchange transactions,
rents, royalties, nonemployee pay, and
certain payments from fishing boat
operators. Real estate transactions are not
subject to backup withholding.

If you give the requester your correct
TIN, make the proper certifications, and
report all your taxable interest and
dividends on your tax return, your
payments will not be subject to backup
withholding. Payments you receive will be
subject to backup withholding if:

1. You do not furnish your TIN to the
requester, or

2. The IRS tells the requester that you
furnished an incorrect TIN, or

3. The IRS tells you that you are subject
to backup withholding because you did not
report all your interest and dividends on
your tax return (for reportable interest and
dividends only), or

4. You do not certify to the requester
that you are not subject to backup
withholding under 3 above (for reportable

interest and dividend accounts opened
after 1983 only), or

5. You do not certify your TIN. See the
Part III instructions for exceptions.

Certain payees and payments are
exempt from backup withholding and
information reporting. See the Part II
instructions and the separate Instructions
for the Requester of Form W-9.

**How To Get a TIN.**—If you do not have a
TIN, apply for one immediately. To apply,
get Form SS-5, Application for a Social
Security Number Card (for individuals),
from your local office of the Social Security
Administration, or Form SS-4, Application
for Employer Identification Number (for
businesses and all other entities), from
your local IRS office.

If you do not have a TIN, write "Applied
For" in the space for the TIN in Part I, sign
and date the form, and give it to the
requester. Generally, you will then have 60
days to get a TIN and give it to the
requester. If the requester does not receive
your TIN within 60 days, backup
withholding, if applicable, will begin and
continue until you furnish your TIN.

Cat. No. 10231X

Form **W-9** (Rev. 3-94)

# Exhibit  B

Feldman's Medical Center
Accounts Receivable - Detailed
Amount Expected as of 04/14/09 by Invoice date

| Inv # | Date of Birth | Payor - Home Plan | Policy | Date of Service | Date Billed | Age | HCPC | NDC # | Units Billed | Amt. Charged | Expected | Total Payments | CPR Outstanding |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12355 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 02/03/09 | 02/07/09 | 454 | JT192 | 00544-2832-10 | 24,400 | 40,392.00 | 30,355.20 | 619.20 | 29,736.00 |
| 14617 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 02/03/09 | 06/25/09 | 254 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 34,660.20 | | 34,660.20 |
| 12597 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 09/23/08 | 09/23/08 | 187 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 34,660.20 | | 34,660.20 |
| 13967 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 10/31/08 | 10/31/08 | 336 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 34,660.20 | | 34,660.20 |
| 13517 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 05/05/08 | 05/05/08 | 366 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 35,228.40 | 346.48 | 34,881.92 |
| 14727 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 06/11/09 | 06/11/09 | 267 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 35,228.40 | | 35,228.40 |
| 12591 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 09/18/09 | 09/22/09 | 225 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 35,228.40 | | 35,228.40 |
| 15500 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 12/04/08 | 12/04/08 | 133 | JT192 | 00544-2833-10 | 29,460 | 48,609.00 | 35,228.40 | | 35,228.40 |
| 13675 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 12/19/08 | 12/19/08 | 141 | JT192 | 00544-2833-10 | 29,460 | 48,609.00 | 35,541.20 | | 35,541.20 |
| 14419 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 07/07/09 | 07/07/09 | 35 | JT192 | 00544-2833-10 | 23,550 | 49,053.00 | 36,051.00 | | 36,051.00 |
| 17260 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 03/04/09 | 03/04/09 | 103 | JT192 | 00544-2833-10 | 28,410 | 46,875.50 | 37,203.33 | | 37,203.33 |
| 13649 | 01/03/79 | BC BS Anthem Virginia | YTP967N63463 | 01/23/09 | 01/23/09 | 103 | JT192 | 00544-2833-10 | 28,800 | 47,500.00 | 38,850.00 | | 38,680.00 |
| 14585 | 11/26/76 | Care First BC BS MD | XIP90035189 | 08/07/08 | 08/07/08 | 271 | JT192 | 00544-2845-10 | 31,055 | 51,510.10 | 41,897.25 | | 41,897.25 |
| 17313 | 10/30/77 | Care First BC BS MD | XIP904225478 | 02/06/09 | 02/06/09 | 69 | JT192 | 00025-0783-50 | 60,810 | 106,454.50 | 106,454.50 | | 74,158.20 |
| 16035 | 10/30/77 | Care First BC BS MD | XIP904225478 | 12/29/08 | 02/07/09 | 85 | JT192 | 00025-0783-50 | 30,405 | 53,238.00 | 37,156.32 | | 37,156.32 |
| 16546 | 10/30/77 | Care First BC BS MD | XIP904225478 | 11/10/08 | 11/10/08 | 168 | JT192 | 00025-0783-50 | 30,060 | 53,340.00 | 37,165.60 | | 37,165.60 |
| 14494 | 10/30/77 | Care First BC BS MD | XIP904225478 | 12/12/08 | 12/12/08 | 145 | JT192 | 00025-0783-50 | 31,464 | 54,138.00 | 37,741.92 | | 37,741.92 |
| 13321 | 10/30/77 | Care First BC BS MD | XIP904225478 | 08/26/08 | 08/26/08 | 257 | JT192 | 00025-0379-30 | 31,464 | 55,062.00 | 38,368.08 | | 38,368.08 |
| 16702 | 10/30/77 | Care First BC BS MD | XIP904225478 | 08/26/08 | 09/23/08 | 225 | JT192 | 00026-0379-30 | 31,464 | 55,078.00 | 38,403.08 | | 38,403.08 |
| 16558 | 12/30/89 | Care First BC BS MD | XIP90035677 | 01/10/09 | 01/10/09 | 113 | JT193 | 00025-0783-30 | 31,596 | 55,283.00 | 38,547.12 | | 38,547.12 |
| 16643 | 12/30/89 | Care First BC BS MD | XIP90035677 | 01/17/09 | 01/17/09 | 103 | JT193 | 68516-3900-42 | 73,650 | 109,002.00 | 75,123.00 | | 75,123.00 |
| 17534 | 12/30/89 | Care First BC BS MD | XIP90035677 | 03/11/09 | 03/18/09 | 49 | JT193 | 68516-3900-42 | 73,890 | 108,536.33 | 75,123.00 | | 75,123.00 |
| 14069 | 12/30/89 | Care First BC BS MD | XIP90035677 | 11/05/08 | 11/05/08 | 183 | JT193 | 68516-3900-42 | 74,100 | 109,705.15 | 75,469.80 | | 75,469.80 |
| 14514 | 12/30/89 | Care First BC BS MD | XIP90035677 | 11/24/08 | 11/24/08 | 163 | JT193 | 68516-3900-42 | 74,550 | 109,916.50 | 75,882.00 | | 75,882.00 |
| 12463 | 07/04/69 | BC BS Highmark W PA | ZAR116503100 | 09/25/08 | 09/25/08 | 254 | JT193 | 00025-0783-50 | 64,632 | 112,058.00 | 75,761.50 | | 75,761.50 |
| 13887 | 07/04/69 | BC BS Highmark W PA | ZAR116503100 | 05/28/08 | 05/28/08 | 343 | JT193 | 00025-0796-30 | 60,474 | 110,160.00 | 84,074.01 | | 84,074.01 |
| 14600 | 11/02/87 | BC BS Louisiana | XUP20042563 | 09/21/08 | 09/21/08 | 257 | JT192 | 58394-0011-04 | 31,050 | 42,228.00 | 82,631.31 | | 82,631.31 |
| 15502 | 11/02/87 | BC BS Louisiana | XUP20042563 | 09/17/08 | 09/17/08 | 230 | JT192 | 58394-0011-04 | 31,050 | 47,800.00 | 37,931.00 | | 37,981.00 |
| 15569 | 11/02/87 | BC BS Louisiana | XUP20042563 | 09/17/08 | 09/17/08 | 230 | JT192 | 58394-0011-04 | 31,050 | 42,278.09 | 37,933.09 | | 37,933.09 |
| 13956 | 07/08/72 | BCBS Keystone Health Plan E | YXN301144790 | 05/06/08 | 05/06/08 | 341 | JT192 | 00544-2833-10 | 31,800 | 52,499.45 | 39,461.45 | 36,269.89 | 3,191.56 |
| 15511 | 07/08/72 | BCBS Keystone Health Plan E | YXN301144790 | 11/01/08 | 11/01/08 | 169 | JT192 | 00544-2833-10 | 31,650 | 27,270.23 | 20,055.00 | 7,568.92 | 12,546.28 |
| 17538 | 07/08/72 | BCBS Keystone Health Plan E | YXN301144791 | 03/14/09 | 03/23/09 | 44 | JT192 | 00544-2833-10 | 30,300 | 39,270.00 | 27,157.00 | | 27,157.00 |
| 17839 | 01/05/93 | BCBS PA - Personal Choice | CC880266590 | 03/20/09 | 03/20/09 | 77 | JT192 | 00025-0782-30 | 28,130 | 50,298.00 | 35,865.00 | | 35,865.00 |
| 13735 | 01/05/93 | BCBS PA - Personal Choice | CC880266590 | 12/24/08 | 12/24/08 | 133 | JT192 | 00544-2833-10 | 28,230 | 49,227.50 | 34,316.60 | | 34,316.60 |
| 13302 | 01/05/93 | BCBS PA - Personal Choice | CC880266590 | 02/26/09 | 12/24/08 | 133 | JT192 | 00025-0782-30 | 28,230 | 37,507.50 | 34,513.80 | | 34,513.80 |
| 13305 | 01/05/93 | BCBS PA - Personal Choice | CC880266590 | 03/26/09 | 04/01/08 | 400 | JT192 | 58394-0005-30 | 33,570 | 53,607.80 | 53,607.80 | | 39,778.00 |
| | | | | | 04/01/08 | 400 | JT192 | 58394-0011-02 | 47,760 | 64,953.60 | 48,715.20 | | 48,715.20 |

**Totals** | | | | | | | | | | 2,221,736.96 | 1,855,588.35 | 45,194.49 | 1,856,127.77 |

Total Accounts Receivable for Feldman's Medical Center as of 04/14/2009 :     $ 1,688,127.77

## A F F I D A V I T   O F   S E R V I C E

Circuit Court Baltimore County
401 Bosley Ave
Towson Md 21204

**Case#-** 03-c-09-006257 Cn
**Plaintiff-** Feldmans Medical Center Pharmacy Inc.
**Defendant-** Carefirst Inc.

**Person Served / Description / Date, Time / Address**
John A Picciotto, Esq., R.A. For Carefirst Inc. ( Served On: Nicole
Pulianas, Legal Secretary/authorized To Accept)
White, Female, 5-6, 145lbs, 45yrs, , HAIR- , EYES-
Served date:6-2-2009 / served time: 11:03 am
1501 S. Clinton St, Baltimore, Md 21224

**Documents Delivered**
Writ Of Summons, Civil Non-domestic Case Information Report,
Business And Technology Case Management Program, Complaint,
Exhibits, Motion For Special Admission Of Out-of-state Attorney
Under Rule 14 Of The Governing Admission To The Bar Of Maryland,
Plaintiff's Motion Got Preliminary Injunction, Request To Schedule A
Hearing For A Preliminary Injunction, And An Order Permitting
Expedited Discovery, Proposed Order

I Have Effected Personal Service Upon The Individual Named Above At
The Address Listed Above, Who Has Instructed Me That They Are Duly
Authorized To Accept Service Of Process.

I hereby certify to be a competent person over 18 years of age,
competent to testify and not a party to the aforesaid action.  I
further declare and affirm under the penalties of perjury that the
matters and facts set forth herein are true and correct to the best
of my personal knowledge, information and belief.

*Demetrius J Stewart*
Demetrius J Stewart / Our File#- 225249
Legal Papers, Inc. 908 York Road, 2nd floor, Towson, Md 21204
(410-823-4444) Server Birth Date-9-2-1979  Attorney File#-. Court
Phone #- 800-938-5802 **ISSUE DATE: 6-1-2009** The Cost of Service:
$70.00

# Exhibit C

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

                  Plaintiff and
                  Counter-
                  Defendant,

v.

CAREFIRST, INC.,

                  Defendant,
                  Counter-
                  Claimant and
                  Third-Party
                  Plaintiff,

v.

John DOE 1
[Address withheld]

                  Third-Party
                  Defendant

    and

John DOE 2
[Address withheld],

                  Third-Party
                  Defendant.

IN THE

CIRCUIT COURT

FOR

BALTIMORE COUNTY

Case No. 03-C-09-006257

## THIRD-PARTY COMPLAINT AND COUNTER-COMPLAINT
## FOR INTERPLEADER [PUBLIC VERSION]

Pursuant to Maryland Rule 2-221, Counter-Claimant and Third-Party Plaintiff CareFirst, Inc. ("CareFirst"), hereby brings this Third-Party Complaint and Counter-Complaint for Interpleader, and in support thereof, alleges as follows:

1.    This suit originated with a Complaint file by Plaintiff and Counter-Defendant Feldman's Medical Center Pharmacy, Inc. ("Feldman's") on June 1, 2009.

2.    Third-Party Defendant John DOE 1 is subject to the jurisdiction of this Court because he resides in Maryland.[1]

3.    Third-Party Defendant John DOE 2 resides in the District of Columbia. This Court has jurisdiction over John DOE 2 for purposes of the Third-Party Complaint because John DOE 2 obtained certain goods which are the subject matter of this lawsuit in Maryland.

4.    The gravamen of the Feldman's Complaint is that it had a Participating Professional Provider Agreement (referred to as a "PPP" in the Complaint) under which Feldman's allegedly is due $1,588,127.77 from CareFirst.  *See* Compl., ¶¶ 8, 9.

5.    The unpaid amount allegedly stems from Feldman's provision of factor, a blood-clotting substance used by hemophiliacs, to individuals insured by CareFirst.  *See id.*, ¶¶ 6-9.

---

[1] CareFirst is concurrently filing a motion for an Order granting CareFirst leave to file a version of this Third-Party Complaint and Counter-Complaint for Interpleader under seal. That version contains the names and addresses of John DOES 1 and 2.  That information has been withheld from this public version in order to protect the confidential health information of those individuals.

2

6.    Despite its assertions that it is an "accredited specialty pharmacy", (*see id.*, ¶ 6), prior to December 11, 2008, Feldman's was not licensed to provide factor to patients homes because before that date, Feldman's lacked a Residential Service Agency license ("RSA"), as required by §§ 19-4A-01 *et seq.* of the Health-General Article.

7.    On December 11, 2008, Feldman's was issued its RSA.

8.    Even after it received its RSA, however, Feldman's never entered into a contract with CareFirst that covered factor products.

9.    The contracts issued by CareFirst that cover providers who send factor products to insureds' homes are referred to as Home Infusion Therapy contracts, or "HIT contracts."

10.    The PPP Agreement referred to in the Complaint did not cover factor products.  Instead, it covered only durable medical equipment ("DME").  The definition of DME in the industry excludes items such as factor products which are used up.  DME by definition is reusable, and includes items such as wheelchairs or prostheses.

11.    Because it had a DME contract, but not a HIT contract, Feldman's was a participating provider for purposes of DME, but a non-participating provider for factor products.

12.    The term "participating provider" refers to a provider who has entered into a contract with CareFirst.

3

13.     Among other things, a participating provider contract provides that CareFirst pays the participating provider directly for services rendered to CareFirst's insureds.

14.     In contrast, CareFirst typically does not pay a non-participating provider for services rendered to CareFirst's insureds. Rather, CareFirst pays the member. It is up to the non-participating provider to seek payment from the insured who received services.

15.     It is not unusual for a provider to be participating with regard to some types of services, but non-participating with regard to others. The critical question is whether the provider has a contract with CareFirst that covers the specific type of service or product at issue.

16.     Although CareFirst and Feldman's had communications with regard to Feldman's desire to enter into a HIT contract, the parties never entered into any such agreement.

17.     In fact, Feldman's never complied with CareFirst's requirements for contracted HIT providers. In particular, CareFirst informed Feldman's and/or Feldman's parent company that in order to become a contracted HIT provider, Feldman's needed to establish what is known as a "segregated fund" for payment of its contracted nurses. (FSA licensees are required to have nursing services available. Providers who do not have nurses on staff, such as Feldman's, typically subcontract for the required nursing services.)

4

18.     In addition, even if Feldman's had fulfilled all of CareFirst's requirements for a HIT contract, CareFirst was under no obligation to enter into a HIT contract with Feldman's or any other provider.

19.     Because Feldman's never had a HIT contract with CareFirst, it was a non-participating provider with regard to factor products.

20.     Regardless of whether a provider is participating or not, CareFirst only covers services rendered by a provider who is licensed to provide the service at issue.

21.     As explained above, because it lacked an RSA prior to December 11, 2008, Feldman's was not properly licensed to deliver factor products to individuals' homes prior to that date.

22.     Consequently, CareFirst is under no obligation to pay anything for factor products supplied by Feldman's prior to December 11, 2008.

23.     For factor products supplied after that date, CareFirst maintains that Feldman's is a non-participating provider.

24.     On several occasions, CareFirst has requested records needed to process claims submitted by Feldman's for factor products supplied after December 11, 2008.

25.     That request was renewed through the parties' counsel in this matter.

26.     On or about October 1, 2009, CareFirst finally received documentation from Feldman's in response to the previous requests for information needed to process the post-December 11, 2008 claims.

5

27.     Based on its review of those records, CareFirst has now processed the post-December 11, 2008 claims, and is prepared to pay certain amounts for those claims.

28.     Some of the claims at issue in this lawsuit relate to factor products supplied to individuals insured by other insurance carriers in other states in which CareFirst does not operate.

29.     The claims for those non-CareFirst insureds have insurance through other licensees of the BlueCross BlueShield Association ("BCBSA").

30.     CareFirst and the other insurers who use the BlueCross BlueShield name are not "affiliates" as alleged by Feldman's. *See* Compl. ¶ 8.

31.     With regard to those individuals insured by other BCBSA licensees, CareFirst will forward the claims information for the post-December 11, 2008 claims to the relevant insurance companies, who are then responsible for paying the claims.

32.     However, two individuals who received factor products from Feldman's after December 11, 2008, are insured by CareFirst.

33.     Those individuals are Third-Party Defendants John DOE 1 and John DOE 2.

34.     The claims for factor products received by John DOE 1 from Feldman's after December 11, 2008 total $150,535.00.

35.     The claims for factor products received by John DOE 2 from Feldman's after December 11, 2008 total $86,329.52.

6

36.     As explained above, if Feldman's is a non-participating provider for the factor products that it provided to John DOES 1 and 2 after December 11, 2008, CareFirst will pay those amounts to each of those individuals.

37.     If, on the other hand, Feldman's is a participating provider (presumably by virtue of the DME contract), then CareFirst would be obligated to pay Feldman's directly for factor products provided by Feldman's to John DOES 1 and 2 after December 11, 2008.

38.     Under this set of circumstances, Feldman's has claim of entitlement that is adverse to the claims of John DOES 1 and 2 for the amounts due under the post-December 11, 2008 claims for factor products supplied to those two individuals.

39.     Under Maryland Rule 2-221, CareFirst is entitled to an Order directing the distribution of the amount in dispute.

40.     Concurrent with the filing of this Third-Party Complaint and Counter-Complaint for Interpleader, CareFirst has filed a Motion seeking an Order permitting CareFirst to pay the sum of $236,864.52 into the registry of the Court.  That sum represents the total amount due for the factor products supplied by Feldman's to John DOES 1 and 2 after December 11, 2008.

WHEREFORE, CareFirst prays for an Order and Judgment directing the Clerk of the Court to distribute either:

1) the sum of $150,535.00 to John DOE 1 and the sum of $86,329.52 to John DOE 2; or, in the alternative,

7

2) the sum of $236,864.52 to Feldman's.

Respectfully submitted,

Patrick P. de Gravelles
A. Dean Stocksdale
CareFirst BlueCross BlueShield
Litigation General Counsel
1501 S. Clinton Street
Baltimore, Maryland 21224
202-680-7457 (voice) (Mr. de Gravelles)
202-680-7620 (fax) (Mr. de Gravelles)
410-528-7923 (voice) (Mr. Stocksdale)
410-720-5847 (fax) (Mr. Stocksdale)

*Attorneys for Defendant CareFirst, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of November, 2009, a copy of the foregoing Third-Party Complaint and Counter-Complaint for Interpleader [Public Version] was mailed, first-class postage prepaid, to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201 and Anthony Paduano, Esq., Paduano & Weintraub, 1251 Avenue of the Americas, Ninth Floor, New York, New York 10020, attorneys for Plaintiff Feldman's Medical Center Pharmacy, Inc.

Patrick de Gravelles

# Exhibit D



**FactorHealth**   Material Redacted   *Expert Care*
FCSPharmacy

## SERVICE AGREEMENT/ASSIGNMENT OF BENEFITS

Patient Name: _____

Patient ID Number: _____     Date: 10/11/08

**Consent for Treatment**
I consent to treatment and services provided by FactorHealth Management, LLC™ (FactorHealth™), FCS Pharmacy, LLC™ (FCS™), and/or associated contract providers consistent with a plan of care authorized by my physician, FactorHealth™ care team, and myself. All pharmacy services will be authorized by my insurance company. I understand that enrollment is my choice and that I can disenroll at any time.

**Consent for Record Retention/Acknowledgement of Receipt of Notice of Privacy Practices/ Patient's Rights and Responsibilities.**
I understand that FactorHealth™, FCS™, and its associated contract providers will keep a record of my care. I acknowledge that I have received a copy of: (i) FactorHealth™ and FCS™ HIPAA Notice of Privacy Practices for Personal Health Information; which describes how FactorHealth™, FCS™, and/or associated contract providers may use and disclose the information contained in my record and explains my rights with respect to such information; (ii) FactorHealth's™ Confidentiality Policy; (iii) a written description of Patient's Rights and Responsibilities; and (iv) FactorHealth's™ Grievance Procedure.

**Assignment of Benefits/Authorization for Payment/ Financial Responsibility**
In consideration of services provided by FactorHealth™, FCS™, and its associated contract providers, I hereby assign and transfer to FactorHealth™ and FCS™ all rights, title, and interest to reimbursement payable to me for services provided by FactorHealth™, FCS™, and its associated contract providers. I agree to immediately turn over to FactorHealth™ any payment I receive, either by endorsing any check I receive or by sending the amount of the payment I receive, for services rendered by FactorHealth™, FCS™, or its associated contract providers. Under no circumstance shall I retain any such payment.

I request that FactorHealth™ act on my behalf to submit charges for services rendered by FCS™ or its associated contract providers, and I hereby authorize payment directly to FactorHealth™, FCS™, or its associated contract providers of any benefits otherwise payable for items/services at a rate not to exceed FactorHealth's™ regular charges for such items/services. I hereby authorize FactorHealth™, FCS™, or its associated contract pharmacies to bill for services and receive payment directly from my private health insurance, Medicare, and/or Medicaid.

I understand that I am responsible for and will pay in full the portion of my bill not covered by insurance companies, government agencies, or third party payors, including, but not limited to, any applicable co-payments, share of cost payments, deductibles, denials, and charges for services not covered by my insurance company, a governmental agency, or third party payor, such as charges for services that are determined by such entity not to be medically necessary or not covered under the terms of my health plan. In consideration of services to be provided, I agree to pay FactorHealth™ and FCS™ in accordance with the regular rates and terms of each applicable provider. Should the account be referred to an attorney or collection agency for collection, I agree to pay reasonable attorneys' fees and collection expenses.

**Relationship between Physician and FactorHealth Management, LLC™**

_____     1

FACTORHEALTH
ALLIANCE™
7700 Congress Avenue, Suite #3109, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (561) 981-8804

**FactorHealth**

**FCSPharmacy**
*Expert Care*
*Because you matter*

FactorHealth™ will work with my physician and incorporate my physician's treatment plan within the FactorHealth™ care plan. I understand that my physician is not an employee, an agent, or associated in any way with FactorHealth™ or FCS™. FactorHealth™, FCS™, and its associated contract pharmacies shall not be liable for any act or omission of my physician or for following my physician's orders.

**Signature of Agreement/Witness**

| | |
|---|---|
| Legal Name of Patient | Date |
| | |
| Signature of Patient, Parent, or Legal Guardian | Date 10/11/08 |
| | |
| Witness | Date |
| Signature of FactorHealth™/FCS™ Representative/Title | Date 10/14/08 |

Material
Redacted

2

**FACTORHEALTH**
**ALLIANCE**
7700 Congress Avenue, Suite #3109, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (551) 981-8804

Material
Redacted

## SERVICE AGREEMENT/ASSIGNMENT OF BENEFITS

Patient Name: —

Patient ID Number: __201265__    Date: __11/07/06__

**Consent for Treatment**
I consent to treatment and services provided by Factor Health Management, LLC (FHM), FCS Pharmacy LLC (FCS) and/or associated contract providers consistent with a plan of care authorized by my physician, FHM care team and myself. All pharmacy services will be authorized by my insurance company. I understand that enrollment is my choice and that I can disenroll at any time.

**Consent for Record Retention/Acknowledgement of Receipt of Notice of Privacy Practices/ Patient's Rights and Responsibilities.**
I understand that FHM, FCS and its associated contract providers will keep a record of my care. I acknowledge that I have received a copy of: (i) FHM and FCS' HIPAA Notice of Privacy Practices for Personal Health Information, which describes how FHM, FCS and/or associated contract providers may use and disclose the information contained in my record and explains my rights with respect to such information; (ii) FHM's Confidentiality Policy; (iii) a written description of Patient's Rights and Responsibilities; and (iv) FHM's Grievance Procedure.

**Assignment of Benefits/Authorization for Payment/ Financial Responsibility**
In consideration of services provided by FHM, FCS and its associated contract providers, I hereby assign and transfer to FHM and FCS all rights, title and interest to reimbursement payable to me for services provided by FHM FCS and its associated contract providers. I agree to immediately turn over to FHM, either by endorsing any check that I receive, or by sending the amount of the payment that I receive, for services rendered by FHM, FCS or its associated contract providers. Under no circumstance shall I retain any such payment.

I request that FHM act on my behalf to submit charges for services rendered by FCS or its associated contract providers and I hereby authorize payment directly to FHM, FCS or its associated contract providers of any benefits otherwise payable for items/services, at a rate not to exceed FHM's regular charges for such items/services. I hereby authorize FHM, FCS or its associated contract pharmacies to bill for services and receive payment directly from my private health insurance, Medicare and/or Medicaid.

I understand that I am responsible for and will pay in full the portion of my bill not covered by insurance companies, governmental agencies or third party payors, including, but not limited to, any applicable co-payments, share of cost payments, deductibles, denials and charges for services not covered by my insurance company, a governmental agency or third party payor, such as charges for services that are determined by such entity not to be medically necessary or not covered under the terms of my health plan. In consideration of services to be provided, I agree to pay FHM and FCS in accordance with the regular rates and terms of each applicable provider. Should the account be referred to an attorney or collection agency for collection, I agree to pay reasonable attorney's fees and collection expenses.

**Relationship between Physician and Factor Health Management**
FHM will work with my physician and incorporate my physician's treatment plan within the FHM care plan. I understand that my physician is not an employee or agent or associated in any way with FHM or FCS. FHM, FCS and its associated contract pharmacies shall not be liable for any act or omission of my physician or for following my physician's orders.

1



**Factor Health
Management, LLC**
(Love, Quality, Community Support)

7700 Congress Avenue, Suite #3105, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (561) 981-8804

Signature of Agreement/ Witness

_____          
Legal Name of Patient                         Date

_____          _____
Signature of Patient, Parent or Legal Guardian     Date

_____          _____
Witness                                       Date

_____          _____
Signature of FHM/FCS Representative/ Title      Date

# Material
# Redacted

Factor Health
Management, LLC

7700 Congress Avenue, Suite #3109, Boca Raton, FL 33487
Tel: (866) 322-3461 Fax: (561) 981-8804

2

# Exhibit E

| | |
|---|---|
| FELDMAN'S MEDICAL CENTER PHARMACY, INC., | IN THE |
| Plaintiff and Counter-Defendant, | CIRCUIT COURT FOR |
| | BALTIMORE COUNTY |
| v. | |
| CAREFIRST, INC. | |
| Defendant, Counter-Claimant and Third-Party Plaintiff, | Civil Action No. 03-C-09-006257 |
| John DOE 1 [Address withheld] | |
| Third-Party Defendant, | |
| John DOE 2 [Address withheld] | |
| Third-Party Defendant. | |

RECEIVED AND FILED
2010 JAN -4 PM 2: 32
CLERK OF THE CIRCUIT COURT
BALTIMORE COUNTY

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANT/COUNTER-CLAIMANT/THIRD PARTY PLAINTIFF'S MOTION FOR ORDER DIRECTING CLERK TO ACCEPT INTERPLEADER AMOUNT

Plaintiff/Counter-Defendant Feldman's Medical Center Pharmacy, Inc. ("Feldman's") respectfully submits this memorandum of law (i) in support of its motion for summary judgment pursuant to Maryland Rule 2-501, and (ii) in response to CareFirst's motion for an order directing the clerk to accept the interpleader amount, in each case on the ground that there is no genuine dispute as to any material fact in the Third Party Complaint and that Feldman's is entitled to judgment as a matter of law. Therefore, the Court should grant Feldman's motion for summary judgment, dismiss the Third Party Complaint, and deny CareFirst's motion for an order directing the clerk to accept the interpleader amount. In support of its motion for summary judgment, Feldman's submits (i) the affidavit of Jarrett Bostwick, Chief Executive Officer and General Counsel of Factor Health Management, Inc., the parent company of Feldman's,

dated as of December 28, 2009, which is attached to the motion as Exhibit 1 (the "Bostwick Aff."), (ii) the affidavit of John DOE 1, dated as of December 28, 2009, which is attached to the motion as Exhibit 2 (the "DOE 1 Aff."), and (iii) the affidavit of John DOE 2, dated as of December 28, 2009, which is attached to the motion as Exhibit 3 (the "DOE 2 Aff.").

### Preliminary Statement

This action arises because CareFirst has failed to pay Feldman's for claims submitted for covered services performed pursuant to written contracts between Feldman's and CareFirst.

Feldman's, a pharmacy in Columbia, Maryland, provides a very expensive blood clotting factor treatment ("factor") to patients throughout the United States who are suffering from hemophilia or other blood clotting disorders. Hemophilia and other blood clotting disorders are life threatening diseases which often require this very costly factor treatment. Feldman's has provided specialty pharmacy and health management care coordination services to patients since 1986. (Bostwick Aff. ¶ 2)

In August 1997, Feldman's and CareFirst entered into the Participating Professional Provider Agreement (the "PPP Agreement"), pursuant to which Feldman's provided factor products to patients who were insured by CareFirst or another licensee of the Blue Cross Blue Shield Association ("BCBSA")[1], and who presented a valid

---

[1] Pursuant to the rules of BCBSA and the BlueCard system, Feldman's is permitted to service any patient who is insured by a BCBSA licensee. The BCBSA licensee that is local to the service provider – the "host plan," in this case CareFirst – is then responsible for administering the claims on behalf of the BCBSA licensee with whom the patient has its insurance. The two patients whose claims are at issue in the Third Party Complaint, however, are directly insured by CareFirst, so CareFirst is solely responsible for the administration and payment of the claims. (Bostwick Aff. ¶ 3)

2

physician prescription.   Pursuant to the PPP Agreement, after providing covered services to a patient, Feldman's submits a claim for payment which is required to be paid within 30 days.   Despite Feldman's' rendering of Covered Services and timely submission of claims for payment, in breach of the PPP Agreement, CareFirst has failed and refused to correctly and timely pay $1,588,127.77 in legitimate claims submitted by Feldman's as of April 14, 2009, the date the Complaint was filed.  (Bostwick Aff. ¶ 4)

CareFirst now proposes to pay certain post-December 11, 2008 claims in respect of factor products provided by Feldman's to two patients who are insured by CareFirst.[2] (Bostwick Aff. ¶ 5) CareFirst asserts, however, that "Feldman's has a claim of entitlement [to the payments to be made CareFirst] that is adverse to the claims of John DOES 1 and 2 for the amounts due under the post-December 11, 2008 claims for factor products supplied to those two individuals." (Third Party Compl. ¶ 38).  Based on its conclusory assertion, CareFirst has filed its Third Party Complaint and its motion requesting an order directing the clerk to accept the interpleader amount.[3]   But CareFirst's assertion is clearly and demonstrably false. (Bostwick Aff. ¶ 6) Each of the patients whose claims CareFirst proposes to pay has (a) signed a Service Agreement/Assignment of benefits in which it assigned and transferred all right to reimbursement for such claims to Factor Health Management, Inc. ("FHM") – the parent company of Feldman's – and FCS Pharmacy, Inc. ("FCS") – an affiliate of Feldman's, and (b) submitted an affidavit to the Court further clarifying that he disclaims any right to

---

[2] CareFirst's responsibility for claims made by Feldman's for factor products supplied to patients prior to December 11, 2008 is still subject to dispute by CareFirst; however, for the purposes of the Motion for Summary Judgment in connection with the Third Party Complaint, the pre-December 11, 2008 claims are irrelevant.

[3] Feldman's disputes the interpleader amount asserted by CareFirst in the Third Party Complaint.

payment in respect of the factor products provided to him by Feldman's. (Bostwick Aff. ¶ 7) Therefore, the Court should grant Feldman's motion for summary judgment, dismiss the Third Party Complaint, and deny CareFirst's motion for an order directing the clerk to accept the interpleader amount.

## ARGUMENT

### Feldman's is Entitled to a Summary Judgment on the Allegations in the Third Party Complaint

### I. Standard for Summary Judgment

Pursuant to Maryland Rule 2-501, "[a]ny party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." MD Rules, Rule 2-501. "Summary judgment procedure . . . is merely a preview to determine whether there exists a factual controversy requiring a trial." Foy v. Prudential Insurance Co., 316 Md. 418 (1989). See also Faulkner v. American Cas. Co. of Reading, Pa., 85 Md. App. 595 (Md. App. 1991) "Where the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact." Foy v. Prudential Insurance Co., 316 Md. at 422; Faulkner, 85 Md. App. at 614.

In the case of the Third Party Complaint, there is no factual controversy requiring a trial. As will be discussed below, an interpleader action requires two or more adverse claimants who each claim to be entitled to certain property. That situation simply does not exist here, where John DOES 1 and 2 have clearly and unequivocally disclaimed any right to monies that CareFirst may pay in respect of factor products provided by Feldman's to John DOES 1 and 2. Under those circumstances, which are

4

indisputable, Feldman's is entitled to summary judgment and to an order directing CareFirst to make any payments in respect of claims for factor products provided to CareFirst's insureds directly to Feldman's.

## II.    There Are No Adverse Claims and No Basis for the Interpleader

"An action for interpleader or in the nature of interpleader may be brought against two or more adverse claimants who claim or may claim to be entitled to property." MD Rules, Rule 2-221. Interpleader "allows the party holding the funds [that are claimed by two parties] to avoid 'double vexation in respect of one liability.'" Mitchell Properties, Inc. v. Real Estate Title Co., Inc., 62 Md. App. 473, 485 (Md. App. 1985). See also Rockwell v. Carroll Printing & Publishing Co., Inc., 191 Md. 542 (1948); Steffey, Inc. v. American Bank Stationary Company, 161 Md. 124 (1931).  Under the undisputable facts of this case, there are not two adverse claimants to the monies to be paid by CareFirst and there is absolutely no risk that CareFirst could be at risk of incurring a second liability.  There is therefore no need – and indeed no purpose – for the Third Party Complaint.

Each of John DOE 1 and John DOE 2 is party to a Service Agreement/Assignment of Benefits, attached to the Bostwick Aff. as Exhibits A and B. Pursuant to such agreement, each of John DOE 1 and John DOE 2 assigned and transferred to Factor Health Management, Inc. ("FHM") – the parent company of Feldman's – and FCS Pharmacy, Inc. ("FCS") – an affiliate of Feldman's – all rights to "reimbursement payable to me for services provided by FHM, FCS and its associated contract providers."  Each of John DOE 1 and John DOE 2 further agreed "to immediately turn over to FHM, either by endorsing any check that I receive, or by sending the amount of the payment that I receive, for services rendered by FHM, FCS

or its associated contract providers. Under no circumstances shall I retain any such payment." See Service Agreement/Assignment of Benefits, attached to the Bostwick Aff. as Exhibits A and B.

    In addition, each of John DOE 1 and John DOE 2 has signed an affidavit in support of the Motion for Summary Judgment, disclaiming any entitlement to payment for the claims submitted to CareFirst relating to factor products John DOE 1 and John DOE 2 received from Feldman's. Feldman's has furthermore offered to indemnify CareFirst in the event that any patient, in respect of whose claims payment is made to Feldman's, files any legal action against, or makes any demand or claim to, CareFirst for payment of such claims. (Bostwick Aff. ¶ 11)

    Under the facts as described above, it is clear that Feldman's does not have an adverse claim to either John DOE 1 or John DOE 2; in fact John DOE 1 and John DOE 2 have acknowledged on multiple occasions that they do not have any claim at all. There is no risk to CareFirst that it will be subject to double payment for any of the two claims under these facts.

    **a.    There Is No Difference if Feldman's is a "Participating Provider" or a "Non-Participating Provider"**

    Whether or not Feldman's is a "Participating Provider" or a "Non-Participating Provider" – one of the critical issues in the underlying lawsuit – makes no difference in determining whether there are any adverse claims at issue in the case of the Third Party Complaint.

    If Feldman's is a participating provider, then even CareFirst acknowledges that "CareFirst would be obligated to pay Feldman's directly for factor product provided by Feldman's to John DOES 1 and 2 after December 11, 2008." (Third Party Compl. ¶

6

37)    If Feldman's is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that Feldman's is the party entitled to receive payment from CareFirst for factor product provided by Feldman's to John DOES 1 and 2.  In either case, there are no adverse claims, no risks to CareFirst, no need for the interpleader/Third Party Complaint, and no reason for CareFirst not to make payment directly to Feldman's in respect of the factor products provided by Feldman's to John DOES 1 and 2.

III.    **The Amount CareFirst Has Proposed Paying in Respect of the Claims for John DOES 1 and 2 Is Inadequate**

In the Third Party Complaint, CareFirst has asserted that the sum of $236,864.52 "represents the total amount due for the factor products supplied by Feldman's to John DOES 1 and 2 after December 11, 2008." (Third Party Compl. ¶ 40).  In fact, as shown on the spreadsheet attached to the Bostwick Aff. as Exhibit C, such amount does not reflect the actual amount owed by CareFirst.  CareFirst apparently made a mistake in the transcription of the number of "Units Billed" in some instances, leading to the error.  Although receiving the correct payment amount is critical for Feldman's as a going concern, the correct number is not critical for this Motion for Summary Judgment, which should turn simply on whether there are any adverse claims at issue in the case.  The answer to that question is clearly "no."

### Conclusion

For the reasons stated above, Feldman's motion for summary judgment should be granted; the Third Party Complaint should be dismissed; the Motion for an Order Directing the Clerk to Accept the Interpleader Amount should be denied; and the

Court should direct CareFirst to make any payment in respect of claims for factor products provided to CareFirst's insureds by Feldman's, directly to Feldman's.

Dated:  December 31, 2009

Respectfully submitted,

By: _____

Thomas O'Toole
Baroody & O'Toole
201 N. Charles Street, Suite 2102
Baltimore, Maryland 21201
(410) 539-8413 (telephone)
(410) 539-8411 facsimile)
totoolelaw@aol.com

Of Counsel:
PADUANO & WEINTRAUB LLP
Anthony Paduano
Jordan D. Becker
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jdb@pwlawyers.com

Attorneys for Feldman's Medical Center
Pharmacy, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of December 2009, a copy of the foregoing document was mailed, first class postage prepaid, to:

> Patrick de Gravelles
> CareFirst Blue Cross Blue Shield
> Office of Corporate Counsel
> 840 1st Street, N.E., DC12-08
> Washington, DC  20065

Thomas O'Toole

9

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

              Plaintiff and
              Counter-Defendant,

v.

CAREFIRST, INC.

              Defendant,
              Counter-Claimant and
              Third-Party Plaintiff,

John DOE 1
[Address withheld]

              Third-Party Defendant,

John DOE 2
[Address withheld]

              Third-Party Defendant.

IN THE

CIRCUIT COURT FOR

BALTIMORE COUNTY

Civil Action No. 03-C-09-006257

---

### PLAINTIFF/COUNTER-DEFENDANT FELDMAN'S MEDICAL CENTER PHARMACY, INC.'S RESPONSE TO MOTION FOR ORDER DIRECTING CLERK TO ACCEPT INTERPLEADER AMOUNT AND MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING

        Plaintiff/Counter-Defendant Feldman's Medical Center Pharmacy, Inc. ("Feldman's") respectfully files this (i) Response to Defendant/Counter-Claimant/Third-Party Plaintiff CareFirst, Inc.'s ("CareFirst") Motion for Order Directing Clerk to Accept Interpleader Amount, (ii) Motion for Summary Judgment, and (iii) Request for Hearing. Feldman's moves for summary judgment pursuant to Maryland Rule 2-501, on the ground that there is no genuine dispute as to any material fact and that Feldman's is entitled to judgment as a matter of law. In support thereof, Feldman's states as follows:

1.     Pursuant to Maryland Rule 2-221, "[a]n action for interpleader or in the nature of interpleader may be brought against two or more adverse claimants who claim or may claim to be entitled to property." MD Rules, Rule 2-221

2.     Each of John DOE 1 and John DOE 2 has previously assigned and transferred to Factor Health Management, Inc. ("FHM") – the parent company of Feldman's – and FCS Pharmacy, Inc. ("FCS") – an affiliate of Feldman's – all rights to "reimbursement payable to me for services provided by FHM, FCS and its associated contract providers. I agree to immediately turn over to FHM, either by endorsing any check that I receive, or by sending the amount of the payment that I receive, for services rendered by FHM, FCS or its associated contract providers.   Under no circumstances shall I retain any such payment." See Service Agreement/Assignment of Benefits, attached as Exhibits A and B to the Affidavit of Jarrett Bostwick, Esq., which is attached hereto as Exhibit 1 (the "Bostwick Aff.").

3.     As described in the affidavits of John DOE 1 and John DOE 2 attached hereto as Exhibits 2 and 3, respectively, each of John DOE 1 and John DOE 2 has disclaimed any entitlement to payment for the claims submitted to CareFirst relating to factor products John DOE 1 and John DOE 2 received from Feldman's.

4.     Feldman's, on the one hand, and John DOES 1 and 2, on the other hand, are therefore not adverse claimants vis-a-vis any reimbursement or other payments in respect of the claims submitted to CareFirst for factor products John DOE 1 and John DOE 2 received from Feldman's.

## Conclusion

For the reasons stated above and in the accompanying memorandum of law, Feldman's respectfully requests the Court grant the motion for summary judgment, deny CareFirst's motion to direct the clerk to accept the interpleader amount, and order CareFirst to make any payment in respect of the claims for John DOE 1 and John DOE 2 directly to Feldman's.

Dated:  December 31, 2009

Respectfully submitted,

By: _____

Thomas O'Toole
Baroody & O'Toole
201 N. Charles Street, Suite 2102
Baltimore, MD 21201
(410) 539-8413 (telephone)
(410) 539-8411 facsimile)
totoolelaw@aol.com

Of Counsel:
PADUANO & WEINTRAUB LLP
Anthony Paduano
Jordan D. Becker
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)
ap@pwlawyers.com
jdb@pwlawyers.com

Attorneys for Feldman's Medical Center
Pharmacy, Inc.

3

REQUEST FOR HEARING

Plaintiff, through its undersigned counsel, requests a hearing.

Thomas O'Toole

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of December 2009, a copy of the foregoing document was mailed, first class postage prepaid, to:

> Patrick de Gravelles
> CareFirst Blue Cross Blue Shield
> Office of Corporate Counsel
> 840 1st Street, N.E., DC12-08
> Washington, DC 20065

Thomas O'Toole

4

EXHIBIT 1

FELDMAN'S MEDICAL CENTER PHARMACY, INC.,

                Plaintiff and
                Counter-Defendant,

v.

CAREFIRST, INC.

                Defendant,
                Counter-Claimant and
                Third-Party Plaintiff,

John DOE 1
[Address withheld]

                Third-Party Defendant,

John DOE 2
[Address withheld]

                Third-Party Defendant.

|  |
|---|
| IN THE |
| CIRCUIT COURT FOR |
| BALTIMORE COUNTY |
| Civil Action No. 03-C-09-006257 |

---

## AFFIDAVIT OF JARRETT BOSTWICK, ESQ. IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STATE OF *Florida*   )
               )   ss.:
COUNTY OF *Palm Beach* )

      JARRETT BOSTWICK, under penalty of perjury, deposes and says:

      1.    I am the Chief Executive Officer and General Counsel of Factor Health Management, Inc., the parent company of Plaintiff Feldman's Medical Center Pharmacy, Inc. I submit this Affidavit in support of Feldman's Motion for Summary Judgment.

2.      Feldman's, a pharmacy in Columbia, Maryland, provides a very expensive blood clotting factor treatment ("factor") to patients throughout the United States who are suffering from hemophilia or other blood clotting disorders. Hemophilia and other blood clotting disorders are life threatening diseases which often require this very costly factor treatment. Feldman's has provided specialty pharmacy and health management care coordination services to patients since 1986.

3.      Pursuant to the rules of Blue Cross Blue Shield Association (the "BCBSA") and the BlueCard system, Feldman's is permitted to service any patient who is insured by a BCBSA licensee. The BCBSA licensee that is local to the service provider -- the "host plan," in this case CareFirst -- is then responsible for administering the claims on behalf of the BCBSA licensee with whom the patient has its insurance. The two patients whose claims are at issue in the Third Party Complaint, however, are directly insured by CareFirst, so CareFirst is solely responsible for the administration and payment of the claims.

4.      Despite Feldman's' rendering of Covered Services pursuant to the Professional Provider Agreement between Feldman's and CareFirst (the "PPP Agreement"), and the timely submission of claims for payment, in breach of the PPP Agreement CareFirst has failed and refused to correctly and timely pay $1,588,127.77 in legitimate claims submitted by Feldman's as of April 14, 2009, the date the Complaint was filed.

2

5.     CareFirst now proposes to pay certain post-December 11, 2008 claims in respect of factor products provided by Feldman's to two patients who are insured by CareFirst.

6.     CareFirst asserts that "Feldman's has a claim of entitlement [to the payments to be made CareFirst] that is adverse to the claims of John DOES 1 and 2 for the amounts due under the post-December 11, 2008 claims for factor products supplied to those two individuals." (Third Party Compl. ¶ 38) But CareFirst's assertion is clearly and demonstrably false.

7.     Each of the patients whose claims CareFirst proposes to pay has (a) signed a Service Agreement/Assignment of benefits in which it assigned and transferred all right to reimbursement for such claims to Factor Health Management, Inc. ("FHM") – the parent company of Feldman's – and FCS Pharmacy, Inc. ("FCS") – an affiliate of Feldman's, and (b) submitted an affidavit to the Court further clarifying that he disclaims any right to payment in respect of the factor products provided to him by Feldman's.

8.     Attached as <u>Exhibit A</u> is a true and correct copy of the Service Agreement/Assignment of Benefits signed by John DOE 1.

9.     Attached as <u>Exhibit B</u> is a true and correct copy of the Service Agreement/Assignment of Benefits signed by John DOE 2.

10.     Attached as <u>Exhibit C</u> is a spreadsheet prepared by Feldman's showing the total amount due for the factor products supplied by Feldman's to John DOES 1 and 2 after December 11, 2008.

3

11.    Following the service of the Third Party Complaint by CareFirst, Feldman's offered to indemnify CareFirst in the event that any patient, in respect of whose claims payment is made to Feldman's, files any legal action against, or makes any demand or claim to, CareFirst for payment of such claims.  Such offer was refused by CareFirst.

This affiant, Jarrett Bostwick, Esq., herein being duly sworn upon oath, deposes and states that the facts stated in the foregoing affidavit are true and correct according to his best knowledge, information and belief.

Dated: 12/28/09

_Jarrett Bostwick_

Subscribed and sworn to before me this 28th day of December, 2009.

Notary Public

My commission expires 12/12/13

EXHIBIT A

 **FactorHealth**

Material Redacted

 *Expert Care* **FCSPharmacy™**

## SERVICE AGREEMENT/ASSIGNMENT OF BENEFITS

Patient Name: _____

Patient ID Number: _____     Date: 10/11/08

### Consent for Treatment

I consent to treatment and services provided by FactorHealth Management, LLC™ (FactorHealth™), FCS Pharmacy, LLC™ (FCS™), and/or associated contract providers consistent with a plan of care authorized by my physician, FactorHealth™ care team, and myself. All pharmacy services will be authorized by my insurance company. I understand that enrollment is my choice and that I can disenroll at any time.

### Consent for Record Retention/Acknowledgement of Receipt of Notice of Privacy Practices/ Patient's Rights and Responsibilities.

I understand that FactorHealth™, FCS™, and its associated contract providers will keep a record of my care. I acknowledge that I have received a copy of: (i) FactorHealth™ and FCS™ HIPAA Notice of Privacy Practices for Personal Health Information; which describes how FactorHealth™, FCS™, and/or associated contract providers may use and disclose the information contained in my record and explains my rights with respect to such information; (ii) FactorHealth's™ Confidentiality Policy; (iii) a written description of Patient's Rights and Responsibilities; and (iv) FactorHealth's™ Grievance Procedure.

### Assignment of Benefits/Authorization for Payment/ Financial Responsibility

In consideration of services provided by FactorHealth™, FCS™, and its associated contract providers, I hereby assign and transfer to FactorHealth™ and FCS™ all rights, title, and interest to reimbursement payable to me for services provided by FactorHealth™, FCS™, and its associated contract providers. I agree to immediately turn over to FactorHealth™ any payment I receive, either by endorsing any check I receive or by sending the amount of the payment I receive, for services rendered by FactorHealth™, FCS™, or its associated contract providers. Under no circumstance shall I retain any such payment.

I request that FactorHealth™ act on my behalf to submit charges for services rendered by FCS™ or its associated contract providers, and I hereby authorize payment directly to FactorHealth™, FCS™, or its associated contract providers of any benefits otherwise payable for items/services at a rate not to exceed FactorHealth's™ regular charges for such items/services. I hereby authorize FactorHealth™, FCS™, or its associated contract pharmacies to bill for services and receive payment directly from my private health insurance, Medicare, and/or Medicaid.

I understand that I am responsible for and will pay in full the portion of my bill not covered by insurance companies, government agencies, or third party payors, including, but not limited to, any applicable co-payments, share of cost payments, deductibles, denials, and charges for services not covered by my insurance company, a governmental agency, or third party payor, such as charges for services that are determined by such entity not to be medically necessary or not covered under the terms of my health plan. In consideration of services to be provided, I agree to pay FactorHealth™ and FCS™ in accordance with the regular rates and terms of each applicable provider. Should the account be referred to an attorney or collection agency for collection, I agree to pay reasonable attorneys' fees and collection expenses.

### Relationship between Physician and FactorHealth Management, LLC™

1

 **FACTORHEALTH** ALLIANCE™

7700 Congress Avenue, Suite #3109, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (561) 981-8804

**FactorHealth**

Expert Care
FCSPharmacy™
*Because your well-being*

FactorHealth™ will work with my physician and incorporate my physician's treatment plan within the FactorHealth™ care plan. I understand that my physician is not an employee, an agent, or associated in any way with FactorHealth™ or FCS™. FactorHealth™, FCS™, and its associated contract pharmacies shall not be liable for any act or omission of my physician or for following my physician's orders.

## Signature of Agreement/Witness

_____
Legal Name of Patient

_____     _____
Signature of Patient, Parent, or Legal Guardian     Date   10/11/08

_____     _____
Witness     Date

_____     _____
Signature of FactorHealth™/FCS™ Representative/Title     Date   10/14/08

Material
Redacted

FACTOR HEALTH
ALLIANCE®
7700 Congress Avenue, Suite #3109, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (551) 981-8804

2

EXHIBIT B

Material
Redacted

# SERVICE AGREEMENT/ASSIGNMENT OF BENEFITS

Patient Name: _____

Patient ID Number: _____    Date: **11/07/06**

### Consent for Treatment

I consent to treatment and services provided by Factor Health Management, LLC (FHM), FCS Pharmacy LLC (FCS) and/or associated contract providers consistent with a plan of care authorized by my physician, FHM care team and myself. All pharmacy services will be authorized by my insurance company. I understand that enrollment is my choice and that I can disenroll at any time.

### Consent for Record Retention/Acknowledgement of Receipt of Notice of Privacy Practices/ Patient's Rights and Responsibilities.

I understand that FHM, FCS and its associated contract providers will keep a record of my care. I acknowledge that I have received a copy of: (i) FHM and FCS' HIPAA Notice of Privacy Practices for Personal Health Information, which describes how FHM, FCS and/or associated contract providers may use and disclose the information contained in my record and explains my rights with respect to such information; (ii) FHM's Confidentiality Policy; (iii) a written description of Patient's Rights and Responsibilities; and (iv) FHM's Grievance Procedure.

### Assignment of Benefits/Authorization for Payment/ Financial Responsibility

In consideration of services provided by FHM, FCS and its associated contract providers, I hereby assign and transfer to FHM and FCS all rights, title and interest to reimbursement payable to me for services provided by FHM FCS and its associated contract providers. I agree to immediately turn over to FHM, either by endorsing any check that I receive, or by sending the amount of the payment that I receive, for services rendered by FHM, FCS or its associated contract providers. Under no circumstance shall I retain any such payment.

I request that FHM act on my behalf to submit charges for services rendered by FCS or its associated contract providers and I hereby authorize payment directly to FHM, FCS or its associated contract providers of any benefits otherwise payable for items/services, at a rate not to exceed FHM's regular charges for such items/services. I hereby authorize FHM, FCS or its associated contract pharmacies to bill for services and receive payment directly from my private health insurance, Medicare and/or Medicaid.

I understand that I am responsible for and will pay in full the portion of my bill not covered by insurance companies, governmental agencies or third party payors, including, but not limited to, any applicable co-payments, share of cost payments, deductibles, denials and charges for services not covered by my insurance company, a governmental agency or third party payor, such as charges for services that are determined by such entity not to be medically necessary or not covered under the terms of my health plan. In consideration of services to be provided, I agree to pay FHM and FCS in accordance with the regular rates and terms of each applicable provider. Should the account be referred to an attorney or collection agency for collection, I agree to pay reasonable attorney's fees and collection expenses.

### Relationship between Physician and Factor Health Management

FHM will work with my physician and incorporate my physician's treatment plan within the FHM care plan. I understand that my physician is not an employee or agent or associated in any way with FHM or FCS. FHM, FCS and its associated contract pharmacies shall not be liable for any act or omission of my physician or for following my physician's orders.

1



**Factor Health Management, LLC**
*Value, Quality, Community Respect*

7700 Congress Avenue, Suite #3105, Boca Raton, FL 33487
T#: (866) 322-3461 F#: (561) 981-8804

Signature of Agreement/ Witness

_____            11/07/07
Legal Name of Patient                   Date

_____            _____
Signature of Patient, Parent or Legal Guardian    Date

_____            _____
Witness                                 Date

_____            _____
Signature of FHM/FCS Representative/ Title    Date

# Material
# Redacted

2



EXHIBIT C

Factor Health Management
for Feldmans Medical Center
Account Receivable Summary

| Inv # | Patient Name | Date of Birth | Payor | Policy | Date of Servic | Date Billed | HCPC | NDC # | Units Billed | Age | Amt. Charged | Expected | Total Payments | CPR Outstanding |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17633 | John DOE 1 | 12/02/69 | BC BS Carefirst | XIP900854677 | 03/19/09 | 03/30/09 | J7193 | 68515-3690-02 | | 273 | $ 47.00 | | | $ - |
| 17514 | John DOE 1 | 12/02/69 | BC BS Carefirst | XIP900854677 | 03/11/09 | 03/19/09 | J7193 | 68515-3690-02 | | 284 | $ | | | $ 75,469.80 |
| 16843 | John DOE 1 | 12/02/69 | BC BS Carefirst | XIP900854677 | 01/17/09 | 01/23/09 | J7193 | 68515-3690-02 | 73,950 | 339 | $ 109,636.33 | 75,469.80 | | $ 75,123.00 |
| 16568 | John DOE 1 | 12/02/69 | BC BS Carefirst | XIP900854677 | 12/13/08 | 12/16/08 | J7193 | 68515-3690-02 | 73,650 | 377 | $ 109,036.55 | 75,123.00 | | $ 75,123.00 |
| 17790 | John DOE 2 | 10/30/77 | BC BS Carefirst | XIP904223478 | 04/09/09 | 04/09/09 | J7192 | 00026-3793-30 | 73,650 | 263 | $ 109,002.00 | 75,123.00 | | $ 37,507.68 |
| 17313 | John DOE 2 | 10/30/77 | BC BS Carefirst | XIP904223478 | 02/26/09 | 02/27/09 | J7192 | 00026-3793-30 | 30,744 | 304 | $ 53,802.00 | 37,507.68 | | $ 37,156.32 |
| 16702 | John DOE 2 | 10/30/77 | BC BS Carefirst | XIP904223478 | 01/10/09 | 01/13/09 | J7192 | 00026-3793-30 | 30,456 | 349 | $ 53,298.00 | 37,156.32 | | $ 38,547.12 |
| 16348 | John DOE 2 | 10/30/77 | BC BS Carefirst | XIP904223478 | 12/12/08 | 12/12/08 | J7192 | 00026-3793-30 | 31,596 | 381 | $ 55,393.00 | 38,547.12 | | $ 37,741.92 |
| | | | | | | | | | 30,936 | | $ 54,138.00 | 37,741.92 | | |

Total Accounts Receivable as of 12/28/2009

$ 544,252.88    376,668.84    $ 376,668.84

EXHIBIT 2

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,
     Plaintiff,

v.

CAREFIRST, INC.
     Defendant.

| IN THE |
| CIRCUIT COURT |
| FOR |
| BALTIMORE COUNTY |
| Case No. 03-C-09-6257 |

MATERIAL
REDACTED

STATE OF MARYLAND     )
                     )   ss.:
COUNTY OF [CECIL]     )

### AFFIDAVIT OF

. under penalty of perjury, deposes and says:

1.     I am 40 years old and reside at


2.     I have been insured by CareFirst, Inc. ("CareFirst").

3.     I have been a customer of Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and was a customer of Feldman's on the dates of service for all claims regarding me that are at issue in this lawsuit.

4.     I have not paid for any of the Factor I received from Feldman's and therefore disclaim any entitlement to any money paid by CareFirst in satisfaction of the claims submitted to CareFirst for Factor that was provided to me by Feldman's.

5.     I consent to the reliance on this Affidavit by both Feldman's and CareFirst for any purpose related to the above-captioned matter.

This affiant, _____ herein, being duly sworn upon oath, deposes and states that the facts stated in the foregoing affidavit are true and correct according to his best knowledge, information and belief.

Dated: _12/30/2009_

Subscribed and sworn to before me this _30th_ day of December, 2009.

_Betty Lee Howard_
Notary Public

My commission expires
_March 20, 2013_

**MATERIAL REDACTED**

EXHIBIT 3

MATERIAL
REDACTED

| | |
|---|---|
| FELDMAN'S MEDIC AL CENTER PHARMACY, INC., | IN THE |
| Plaintiff, | CIRCUIT COURT |
| v. | FOR |
| CAREFIRST, INC. | BALTIMORE COUNTY |
| Defendant. | Case No. 03-C-09-6257 |

---

WASHINGTON )
                      )   ss.:

DISTRICT OF COLUMBIA )

### AFFIDAVIT OF

under penalty of perjury, deposes and says:

1. I am 32 years old and reside at

2. I have been insured by CareFirst, Inc. ("C areFirst").

3. I have been a customer of Feldman's Medical Center Pharmacy, Inc. ("F eldman's") and was a customer of Feldman's on the dates of service for all claims regarding me that are at issue in this lawsuit.

4. I have not paid for any of the Factor I received from Feldman's and therefore disclaim any entitlement to any money paid by CareFirst in satisfaction of the claims submitted to CareFirst for Factor that was provided to me by Feldman's.

5. I consent to the reliance on this Affidavit by both Feldman's and CareFirst for any purpose related to the above-captioned matter.

This affiant,                          herein being duly sworn upon oath, deposes and states that the facts stated in the foregoing affidavit are true and correct according to his best knowledge, information and belief.

Dated: _12/28/2009_                          _____          __

Subscribed and sworn to before me this 28th day of December, 2009.

_____
Notary Public

My commission expires _____

Clifford Hubbard Jr
Notary Public, District of Columbia
My Commission Expires 5/31/2013

MATERIAL
REDACTED

2

# Exhibit F

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.

        Plaintiff and
        Counter-Defendant,

v.

CAREFIRST, INC.

        Defendant,
        Counter-Claimant
        And Third-Party
        Plaintiff,

v.

John DOES 1 and 2

        Third-Party
        Defendants

IN THE

CIRCUIT COURT

FOR

BALTIMORE COUNTY

Case No. 03-C-09-006257

## OPPOSITION OF DEFENDANT, COUNTER-CLAIMAINT AND THIRD-PARTY PLAINTIFF CAREFIRST, INC. TO PLAINTIFF AND COUNTER-DEFENDANT FELDMAN'S MEDICAL CENTER PHARMACY, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO INTERPLEADER ACTION

Defendant CareFirst, Inc. ("CareFirst"), through the undersigned counsel, respectfully submits this opposition to Plaintiff and Counter-Defendant Feldman's Medical Center Pharmacy, Inc.'s Motion for Summary Judgment as to Interpleader Action (hereafter "Feldman's Summary Judgment Motion"). In support thereof, CareFirst states as follows:

### RELEVANT FACTS

As summed up in the Interpleader Complaint filed by CareFirst, a dispute exists between the parties as to whether the contract cited in Feldman's original Complaint covers factor products, which are used to treat hemophilia. CareFirst contends that the contract does not cover factor products, and therefore to the extent that certain claims for factor provided by Feldman's have been processed, those claims should be paid to John DOES 1 and 2. Feldman's, on the

other hand, contends that it is entitled to payment of those claims directly because the contract

covers factor products, and thus Feldman's is a "participating provider" for purposes of those

products.

In response to the Interpleader Complaint, Feldman's has filed the instant Motion for

Summary Judgment. Its argument as to why it is entitled to summary judgment can easily be

summed up as follows: John DOES 1 and 2 have assigned their rights to Feldman's, and

therefore Feldman's is entitled to payment in any event – therefore, summary judgment is

appropriate. *See* Mem. of Law in Supp. of Feldman's Mot. for S.J. at 3-4. What Feldman's fails

to inform the Court, however, is that the very assignments on which Feldman's bases its Motion

are invalid *ab initio*, and cannot be relied on for anything.

## ARGUMENT

### I.   STANDARD FOR SUMMARY JUDGMENT

CareFirst does not take issue with the standard for summary judgment set forth by

Feldman's. However, Feldman's cannot come close to meeting that standard.

### II.  A TRIABLE ISSUE OF FACT EXISTS BECAUSE THE ASSIGNMENTS ON WHICH FELDMAN'S RELIES ARE INVALID

John DOES 1 and 2 received their health insurance through group plans offered by their

respective employers. *See* Attachments A and B to Ex. 1 (Decl. of Jordana Bradley). This

means that they are governed by and subject to the Employee Retirement Income Security Act of

1974 ("ERISA"), as amended.

Both of the insurance policies at issue contain express anti-assignment clauses. *Id.*,

Attachment A at p. COC-23, § 7.1; Attachment B at p. COC-23, § 7.1. Federal Circuit Courts

around the country have held that these very types of anti-assignment provisions are valid and

enforceable under ERISA. *See, e.g., Physicians Multispeciality Group v. Health Care Plan of*

- 2 -

*Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir. 2004) (joining "the majority of federal courts that have concluded that an assignment is ineffectual if the plan contains an unambiguous anti-assignment provision"); *Le-Tourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 352 (5th Cir. 2002) (noting the absence of any prohibition on the inclusion of an anti-assignment provision in an employee benefit plan and concluding that "the plain wording of the instant anti-assignment clause leads inexorably to the conclusion that any purported assignment of benefits from [the beneficiary] to [the provider] would be void"); *City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 229 (1st Cir. 1998) ("Consistent with the other circuits which have addressed this issue, we hold that ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to the negotiations of the contracting parties"); *St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Kan., Inc.*, 49 F.3d 1460, 1464-65 (10th Cir. 1995) ("We interpret ERISA as leaving the assignability of benefits to the free negotiations and agreement of the contracting parties"); *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F.2d 1476, 1478 (9th Cir. 1991) ("As a general rule of law, where the parties' intent is clear, courts will enforce non-assignment provisions.")

Because the assignment clauses are the very foundation on which Feldman's Motion for Summary Judgment rests, and because those assignments are invalid *ab initio*, Feldman's Motion simply collapses. Even if Feldman's has some as of yet undisclosed theory as to why the anti-assignment provisions are invalid, there is at minimum a triable issue of fact as to that issue. Therefore, Feldman's is certainly not entitled to judgment as a matter of law.

## III. OTHER ISSUES PRECLUDE SUMMARY JUDGMENT

The question about the validity of the assignment clauses is not the only triable issue preventing summary judgment. For example, the assignments themselves contain this phrase:

"All pharmacy services will be authorized by my insurance company." Yet, Feldman's has not shown that such authorization was indisputably obtained. Indeed, we would not have a controversy if that were the case. Feldman's also does not in any way address the fact that even if the assignments were valid, DOES 1 and 2 could be responsible for payments to Feldman's above and beyond what Feldman's would receive from any insurance company. This potential for being "balance billed" creates a tension between Feldman's and John DOES 1 and 2. It is highly unlikely that those individuals have an interest in this Motion being granted, but they seem to have little say in as much as they are apparently represented by Feldman's counsel. At a minimum, the Court may want to ask DOES' counsel what the DOES' position is, and whether they have received advice indpedently.

## Conclusion

For the foregoing reasons, CareFirst respectfully requests that the Court deny Feldman's request for Summary Judgment as to the Interpleader Complaint.

Dated: January 27, 2010

Patrick P. de Gravelles
A. Dean Stocksdale
CareFirst BlueCross BlueShield
Litigation General Counsel
1501 S. Clinton Street
Baltimore, Maryland 21224
202-680-7457 (voice) (Mr. de Gravelles)
202-680-7620 (fax) (Mr. de Gravelles)
410-528-7923 (voice) (Mr. Stocksdale)
410-720-5847 (fax) (Mr. Stocksdale)

*Attorneys for Defendant CareFirst, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of January 2010, a copy of Opposition of Defendant, Counter-Claimant and Third-Party Plaintiff to Plaintiff and Counter-Defendant Feldman's Medical Center Pharmacy, Inc.'s Motion for Summary Judgment as to Interpleader Action was mailed, first-class, postage prepaid to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201 and Anthony Paduano, Esq., Paduano & Weintraub, 1251 Avenue of the Americas, Ninth Floor, New York, New York 10020, attorneys for Plaintiff Feldman's Medical Center Pharmacy, Inc.

Patrick de Gravelles

# Exhibit  G

**CAREFIRST BLUECROSS BLUESHIELD**

*OFFICE OF CORPORATE COUNSEL*
1501 S. Clinton Street, 10th floor
Baltimore, Maryland 21224

**A. Dean Stocksdale**
Litigation General Counsel
Telephone: 410-528-7923
Fax: 410-720-5847
Dean.Stocksdale@CareFirst.com

**HAND DELIVERED**
February 1, 2010

United States District Court
  for the District of Maryland
Garmatz Federal Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

  Re: Notice of Removal
  *Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc.*
  Baltimore County Circuit Court Civil Action No. 03-C-09-006257 CN

Dear Sir/Madam:

  In connection with the above-captioned case, enclosed please find for filing a Notice of Removal from the Circuit Court for Baltimore County along with a complete set of pleadings, a Civil Cover Sheet for the U.S. District Court for the District of Maryland, and a check for $350 payable to the "Clerk, United States District Court." I have also enclosed for filing the Rule 7.1 Disclosure Statement for CareFirst, Inc.

  Thank you for your attention to this matter. If you have any questions, please contact me.

  Sincerely,

  A. Dean Stocksdale

cc: Neal C. Baroody, Esquire

Enclosures

CareFirst BlueCross BlueShield is an independent licensee of the Blue Cross and Blue Shield Association.
® Registered trademark of the Blue Cross and Blue Shield Association.
®' Registered trademark of CareFirst of Maryland, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FELDMAN'S MEDICAL CENTER<br>PHARMACY, INC.<br>11055 Little Patuxent Parkway<br>Columbia, MD 21044<br>Howard County, MD | *<br>*<br>*<br>*<br>*<br>* |
| Plaintiff and Counter-Defendant | * Civil Action No.:<br>* |
| v. | *<br>* |
| CAREFIRST, INC.<br>1501 South Clinton St.,<br>Baltimore, MD 21224<br>Baltimore City | *<br>*<br>*<br>*<br>*<br>* |
| Defendant, Counter-Plaintiff and<br>Third-Party Plaintiff | *<br>*<br>* |
| v. | *<br>* |
| John DOE 1<br>36 Craig Court<br>Conowingo, MD 21918<br>Cecil County | *<br>*<br>*<br>*<br>* |
| and | *<br>* |
| John DOE 2<br>1272 Oates St., N.E.<br>Washington, DC 21918 | *<br>*<br>* |
| Third-Party Defendants | *<br>* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*  \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441 and 1446, Defendant, Counter-Plaintiff and

Third-Party Defendant CareFirst, Inc. ("CareFirst"), through undersigned counsel, hereby

files this Notice of Removal of the above-captioned action currently pending before The Circuit Court for Baltimore County, Case No.: 03-C-09-006257. In support thereof, CareFirst states as follows.

1.     Feldman's Medical Center Pharmacy, Inc. ("Feldman's") initiated this civil action by filing a Complaint on June 1, 2009 in The Circuit Court for Baltimore County, Maryland. A true copy of the Complaint, along with all process, pleadings and orders served upon CareFirst thus far are attached as Exhibit A.

2.     As originally pled, the case purports to be a contract action founded upon an agreement between Feldman's and BlueCross BlueShield of Maryland, Inc. ("BCBSM"). BCBSM is the former name of CareFirst of Maryland, Inc. ("CFMIA"), which is an affiliate of CareFirst.

3.     The dispute focuses on claims for payment of factor products that Feldman's purportedly sent to individuals insured by CareFirst (although in reality, those individuals are insured by CFMI or CareFirst's other affiliate, Group Hospitalization and Medical Services, Inc. ("GHMSI").)

4.     Factor products are used to treat hemophiliacs. CareFirst has maintained throughout this litigation that the contract on which Feldman's sued covers only durable medical equipment, which is also known as "DME". There is no real dispute that factor products do not fall within the definition of DME. Feldman's maintains that the contract is not so limited and therefore it has a contract under which it is entitled to payment for the factor products.

5.     The individuals who received the factor products from Feldman's obtained their health insurance from CFMI or GHMSI through private employers. Those various

2

health insurance plans are governed by and subject to the Employee Retirement Income Security Act of 1977, 29 U.S.C. § 1001, *et seq.* ("ERISA").

6.      Although for several months Feldman's maintained that it was seeking relief under the contract with CFMI, that posture changed on December 31, 2009.

7.      Shortly before then, CareFirst filed an Interpleader action in which it sought to pay into the registry of The Circuit Court for Baltimore County certain funds to pay for some of the claims that had been processed.

8.      The gist of the Interpleader action was that although CareFirst continues to maintain that it owes no money for factor products shipped prior to December 11, 2008 because prior to that date Feldman's lacked the necessary Maryland license to dispense those products, CareFirst had processed claims for factor products provided after that date.

9.      However, in CareFirst's view, CareFirst, and more accurately CFMI, was obligated to pay only the insureds, rather than Feldman's because, as noted above, CareFirst does not believe the contract covers factor products.

10.     As explained in the Interpleader, CareFirst wanted a judicial determination whether it should pay the post-December 11, 2008 claims to John DOES 1 and 2 or to Feldman's (although payment to Feldman's is potentially subject to a counterclaim and offset to be filed once a stipulated order allowing CFMI to intervene is signed).

11.     As was required under Maryland law, CareFirst named and served John DOES 1 and 2.[1] (Because they are third-party defendants, their consent to removal is not required. *Hydro-Action, Inc. v. James*, 233 F.Supp.2d 836, 840-41 (E.D. Tex. 2002).)

---

[1] These individuals were named as DOES in the public version of the Interpleader because that document necessarily reveals protected health information. CareFirst has

12.     In response to the Interpleader Action, for the first time in this litigation Feldman's asserted that it had assignments from the insureds and it was basing its claims at least in part on those assignments.

13.     Notwithstanding what appears on the face Feldman's Complaint, in reality Feldman's is at least in part seeking to enforce rights that arise under ERISA. Although a plaintiff is typically the master of the pleadings, the U.S. Supreme Court on numerous occasions has recognized that a claim to enforce ERISA rights is an exception to the well-pleaded complaint rule, giving rise to complete preemption and thus removal jurisdiction. *See* 29 U.S.C. § 1441: *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208-209 (2004); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987). In short, because Feldman's attempts to assert its supposed rights as an assignee of ERISA claims, the case centers on the enforcement of benefits due under an employee welfare benefits plan. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-53 (1987). Thus, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

14.     As Feldman's has asserted a cause of action arising under the laws of the United States, this Court has original jurisdiction to hear Plaintiff's claims. *See* 28 U.S.C. §§ 1331 and 1441.

15.     Because CareFirst only became aware of Feldman's assertion of its rights as an assignee of claims for ERISA benefits when it received papers that were mailed on December 31, 2009, this case is being removed in a timely fashion under 28 U.S.C. § 1446(b). *Lovern v. Gen. Motors Corp.*, 126 F.3d 160, 162-63 (4th Cir. 1997); *Quality*

---

filed a motion to file the Interpleader with the individuals' names under seal. In any event, DOES summonses have been issued for those individuals and counsel for Feldman's, who also represents the DOES, accepted service of those summonses.

*Dialysis One LP v. Aetna Life Ins. Co.*, CA No. H-08-1121, 2009 WL 3247370 at *3

(S.D. Tex., Sept. 29, 2009)

  16. A Notice of Filing for Removal to Federal Court is being filed

contemporaneously with The Circuit Court for Baltimore County.

  17. Written notice of this pleading has been given to Feldman's.

  18. Removal to this Court is appropriate because Feldman's action is pending

in this District and Division. *See* 28 U.S.C. § 1441(a).


  WHEREFORE, Defendant CareFirst, respectfully notices the removal of this

action to this Court from the Circuit Court for Baltimore County.


          Respectfully submitted,


          A. Dean Stocksdale
          Bar No. 28416
          Associate General Counsel
          Group Hospitalization and Medical
          Services, Inc.
          10455 Mill Run Circle
          Owings Mills, Maryland 21117
          (410) 998-5487
          Attorney for CareFirst

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February 2010, a copy of the foregoing Notice of Removal was mailed, first-class, postage prepaid to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201 attorney for Plaintiff Feldman's Medical Center Pharmacy, Inc. and Third-Party Defendants.


A. Dean Stocksdale

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.           *
                              *
                              *
Plaintiff and Counter-Defendant    *
                              *
        v.                   *
                              *    Civil Action No.:
                              *
CAREFIRST, INC.             *
                              *
Defendant, Counter-Plaintiff and  *
  Third-Party Plaintiff            *
                              *
        v.                   *
                              *
John DOES 1 and 2,           *
                              *
Third-Party Defendants       *
                              *

\* \* \* \* \* \* \* \* \* \* \* \* \* \*    \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## RULE 7.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, CareFirst, Inc. ("CareFirst"), through undersigned

counsel, hereby states that it issues no stock and so there is no parent corporation or

publicly held corporation that owns 10% or more of CareFirst's stock.

Respectfully submitted,

A. Dean Stocksdale
Bar No. 28416
Associate General Counsel
Group Hospitalization and Medical
Services, Inc.
10455 Mill Run Circle
Owings Mills, Maryland 21117
(410) 998-5487
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February 2010, a copy of the foregoing Rule 7.1 Disclosure Statement was mailed, first-class, postage prepaid to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201, attorney for Plaintiff Feldman's Medical Center Pharmacy, Inc. and Third-Party Defendants.

A. Dean Stocksdale

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Feldman's Medical Center Pharmacy, Inc.

### DEFENDANTS
CareFirst, Inc.

(b) County of Residence of First Listed Plaintiff ___Howard County___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___Baltimore City___
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Neal C. Baroody, Esq.          Anthony Paduano, Esq.
201 N. Charles Street, Ste 2102    1251 Avenue of the Americas, Ninth Fl
Baltimore, Md 21201 (410) 539-8412   New York, NY 100020 (212) 786-9100

Attorneys (If Known)
A. Dean Stocksdale, Esq.
1501 S. Clinton Street, 10th Fl
Baltimore, MD 21224  (410) 528-7923

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. § 1001, et seq. ("ERISA")

Brief description of cause:
Claim for recovery of ERISA benefits per assignment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE 2/1/2010

SIGNATURE OF ATTORNEY OF RECORD
_Alan Dw_

### FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,

        Plaintiff,

v.

CAREFIRST, INC.

        Defendant,

v.

John DOES 1 and 2

        Third-Party-

        Defendants.

Civil Action No. WDQ-10-254

_____

## [PROPOSED] ORDER

Upon consideration of Plaintiff's Motion for Remand, it is this ____ day of March, 2010, hereby

ORDERED that this case is REMANDED to the Circuit Court for Baltimore County, Maryland for further proceedings.

_____
William D. Quarles, Jr.
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.                          *
                                        *
Plaintiff and Counter-Defendant         *
                                        *
        v.                              *
                                        *
                                        *     Civil Action No.:  1:10-cv-00254-WDQ
                                        *
                                        *
                                        *
CAREFIRST, INC.                         *
                                        *
Defendant, Counter-Plaintiff and        *
  Third-Party Plaintiff                 *
                                        *
                                        *
* * * * * * * * * * * * * *  *   * * * * * * * * * * * * * * * *

## OPPOSITION TO MOTION FOR REMAND

*[I]n the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.*

   –   Plaintiff's Complaint, Doc. 46-4 ¶¶ 29, 35[1]

                    *[I]t bears emphasizing that Plaintiff is only asserting its right to payment as 'in network provider' in the present case.*

                       –   Plaintiff's Motion for Remand, Doc. 46-1 at 7-8, n.3

---

[1] Citations to the documents already in the record of this case appear as "Doc. [no.]" Whenever possible, CareFirst will use the documents attached as Exhibits to the Motion for Remand, *i.e.* Doc. 46 through Doc. 46-10.  When citing to specific pages in those documents, CareFirst uses the page number applied by this Court, rather than the documents' internal page numbers.

Plaintiff's Motion for Remand ("Motion") is a highly emotional (and equally transparent) invective against insurance companies in general that seeks to parlay the current political climate against the industry into a reason to remand the case. On a substantive level, the Motion ignores or misapplies governing precedent, is internally inconsistent in that it alleges CareFirst removed the case both too early and too late, and, as demonstrated by the quoted passages above, is highly dubious given the position that Plaintiff has taken up until now. In the final analysis, the Motion fails to provide any reason to remand the case.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Only a few procedural events bear on Plaintiff's remand motion. First, on June 1, 2009, Plaintiff filed a Complaint in the Circuit Court for Baltimore County. Doc. 46-4. In Count I, Plaintiff asserts that it "properly provided Covered Services to patients pursuant to the PPP [Participating Professional Provider] Agreement and is entitled to be paid thereunder; *in the alternative, Plaintiff is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds.*" *Id.* ¶¶ 29, 35 (emphasis added). In addition to bringing a cause of action for breach of contract, Plaintiff also seeks recovery under the extra-contractual theories of unjust enrichment and bad faith. *Id.* ¶¶ 34-43.

On September 11, 2009, Plaintiff served the following response to CareFirst's Interrogatory No. 18, which asked about all agreements, contracts and understandings between the parties: "Feldman's is entitled to provide Factor VIII therapies to Factor VIII patients *as an out-of-network provider* to the extent any such patient's health benefits provide for such coverage." Ex. 1 at 19 (emphasis added). (Exhibit 1 is a true and

correct copy of Plaintiff Feldman's Medical Center Pharmacy, Inc.'s Responses and Objections to First Set of Interrogatories.)

On December 4, 2009, CareFirst's counsel deposed Plaintiff's chief executive officer, Jarrett Bostwick. A true and correct copy of relevant portions of Mr. Bostwick's deposition testimony is attached as Exhibit 2. From that deposition, it appeared for the first time in the context of this litigation that Feldman's is apparently using the term "out-of-network provider" to mean "non-participating provider." Ex. 2 at 147, ln. 10 through 149, ln. 7. While those terms are not synonymous, they are sometimes confused by persons not intimately familiar with insurance terminology. *See* Declaration of Michelle Powell (Ex. 3) ¶¶ 5-9.

At Mr. Bostwick's deposition, the following exchange took place:

> Q. If – assume for a moment that CareFirst is correct and there is no contract that covers the provision of Factor VIII services provided by Feldman's … and [CareFirst's] only contract is with [its] members. In that scenario, how does [CareFirst's] obligation get from the members to Feldman's?
>
> …
>
> A. Taking the assumption that you, that you posed, my understanding is that if the members' benefits, whatever all of those things are in their insurance plan with CareFirst, if the members' benefits provide that, that they seek services from an out-of-network provider, if their benefits indicate that they are allowed to do that and those services will be paid for, then that's where the obligation arises, and that's assuming that the member is compliant with their agreement with CareFirst, an out-of-network provider would be entitled to payment.

Ex. 2 at 241, ln. 21 through 243, ln. 7.

Up to that point in the litigation – December 4, 2009 – Plaintiff had made it clear that it was relying in the alternative on a theory that it was entitled to payment as a non-

3

participating provider (what it called an "out-of-network provider"). Plaintiff had not, however, explained the source of its right to collect as a non-participating provider, and it had not revealed that it had received assignments of benefits from its members.

On November 25, 2009, CareFirst filed a Third Party Complaint for Interpleader. Doc. 17. In response, on January 4, 2010, Plaintiff filed among other things a motion for summary judgment and memorandum in support of the motion. Doc. 46-7. Included was an affidavit from Mr. Bostwick that disclosed for the first time that Plaintiff had received from each of its customers a "Service Agreement/Assignment of Benefit" ("Assignment"). *Id.* at 30-34. Mr. Bostwick never mentioned those Assignments in his deposition. In the memorandum in support of the motion, Plaintiff made many statements related to the assignments, including the following:

> Whether or not Feldman's is a "Participating Provider" or a "Non-Participating Provider" – one of the critical issues in the underlying suit – makes no difference in determining whether there are any adverse claims at issue in the case of the Third Party Complaint. [¶] If Feldman's is a participating provider, then even CareFirst acknowledges that "CareFirst would be obligated to pay Feldman's directly for factor product provided by Feldman's to John DOES 1 and 2 after December 11, 20008." (Third Party Compl. ¶ 37). *If Feldman's is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that Feldman's is the party entitled to receive payment from CareFirst* for factor product provided by Feldman's to John DOES 1 and 2.

Doc. 46-7 at 7-8 (emphasis added).

Prior to receiving Plaintiff's response to the Third Party Complaint, CareFirst served a second set of interrogatories in an attempt to clarify the as-of-then unresolved question of why Plaintiff believed it was entitled to payment as a non-participating provide. A true and complete copy of Plaintiff Feldman's Medical Center Pharmacy,

4

Inc.'s Responses and Objections to Second Set of Interrogatories is attached hereto as Exhibit 4. Plaintiff responded to Interrogatory No. 21 by stating in part that "even if the Court ultimately agrees with CareFirst's reading of the PPP Agreement, Feldman's is, at a minimum, entitled to payment as a non-participating provider." Ex. 4 at 1. When asked the basis for any contention that it is entitled to receive payments as a non-participating provider, Feldman's responded to Interrogatory No. 22 in relevant part as follows:

> The bases for such entitlement are the relevant statutes and member and other contracts, as well as the Assignment of Benefits executed by each of those CareFirst members who received factor products from Feldman's. Such Assignments grant Feldman's "all rights, title and interest to reimbursement payable" to such CareFirst member, in respect of products and services provided to such member by Feldman's.

*Id.* at 2. Plaintiff identified no Maryland statute that entitles non-participating providers to payments from health insurance companies (and indeed no such statute exists). Nor did Plaintiff explain how the "member and other contracts" entitle Plaintiff to payment as a non-participating provider, leaving only the Assignments as the real basis.

On February 1, 2010, CareFirst removed the matter to this Court. On March 3, Plaintiff filed its Motion for Remand, stating, among other things, that:

- "it bears emphasizing that Plaintiff *is only asserting its right to payment as 'in network provider'* in the present case." Doc. 46-1 at 7-8, n.3 (emphasis added);
- "the Assignments are not relevant to this litigation, because Plaintiff sued Defendant for breach of contract. The Assignments grant Feldman's Pharmacy an alternative ground for payment it reserves but nonetheless has <u>not</u> exercised in the current lawsuit." *Id.* at 10 (emphasis in original);
- "[t]he Assignments that form the basis for the Removal Petition do not implicate ERISA because *Plaintiff has not asserted a right to payment under the Assignments* in this case." *Id.* at 11 (emphasis added);
- "the Assignments are actually immaterial to the instant suit…." *Id.* at 14;

- "[r]edress of Plaintiff's claims *does not implicate the Assignments whatsoever*" *id.* (emphasis added); and
- "Plaintiff has *never claimed any right of action or remedy* in this proceeding *via the Assignments*." *Id.* at 20 (emphasis added).

It is also helpful to understand something about the difference between how claims are paid based on whether an insured receives treatment from a participating or non-participating provider. An insured is free to go to a non-participating provider, but the fact that the provider has no contract with CareFirst has certain implications. Ex. 3 ¶¶ 13, 14. Assuming the insured's policy covers services rendered by non-participating providers, the insured or the provider submits a claim. Except in rare circumstances not at issue in this case, the insurance company then pays the insured – not the provider – the amount allowed by the policy for that service. *Id.* ¶ 13. If the provider happens to charge more for the service than the amount allowed under the policy, then the provider can look to the insured to cover the difference. *Id.* ¶ 14. This is known as "balance billing." *Id.* ¶ 12. Nothing obligates the insurance company to the provider in that situation.

The foregoing scenario is in stark contrast to the situation with participating providers. Insurers like CareFirst offer providers the opportunity to participate. To do that, the provider signs a contract that, among other things, obligates the provider to accept predetermined amounts for services. *Id.* ¶¶ 11-12. The contract also prohibits the provider from collecting any money from an insured other than copayments and co-insurance. In return, the provider gets certain benefits. For example, a participating provider gets paid directly from the insurance company. *Id.* In addition, because members understand that they cannot be balanced billed by participating providers, they generally tend to favor those providers. *Id.* ¶ 15. A provider may decide to participate

6

with an insurance company if the ability to collect directly from the company and the

increase in patients more than offset the chance to charge higher fees and balance bill.

**ARGUMENT**

I.      PLAINTIFF RELIES ON THE ASSIGNMENTS AS A
        <u>BASIS FOR RECOVERY IN THIS ACTION</u>

The primary thrust of Plaintiff's Motion is a simple one:  Plaintiff does not rely on

the Assignments.  If, given the record above, the Court finds that Plaintiff is correct,

CareFirst concedes that the Court should remand the case.  CareFirst would only ask that

the Court make it clear that Plaintiff is estopped from relying on the Assignments.

It is CareFirst's position, though, that Plaintiff is, in kind words, being somewhat

disingenuous in now asserting that it is only seeking reimbursement as an "in-network"

or participating provider.  After all, in the Complaint and several other documents signed

under oath or filed with the Court, Plaintiff asserts it is entitled to relief as an "out-of-

network" or non-participating provider.  Plaintiff is equally disingenuous in now

asserting that it does not rely on the Assignments when Plaintiff so clearly cited those

very documents in opposing the Third Party Complaint and responding to discovery.[2]

Beyond the question of whether Plaintiff is relying on Assignments, the answer to

the question at hand is relatively easy:  the Court has jurisdiction under the complete

preemption doctrine of the Employee Retirement Income Security Act of 1977, 29 U.S.C.

---

[2] CareFirst recognizes that because the undersigned is a full-time employee, there is little point in seeking sanctions because CareFirst cannot point to any legal fees it incurred in opposing the Motion for Remand.  However, CareFirst respectfully suggests that if the Court reads the foregoing procedural history the same way CareFirst does, the Court may want to *sua sponte* address the issue of whether Plaintiff's Motion violates the obligation to assert only good faith arguments.

§ 1001, *et seq.* ("ERISA") over Plaintiff's claim for payment as a non-participating

provider because the claim is based on the assignment of ERISA rights.[3]

## II. CLAIMS FOR ASSIGNED ERISA BENEFITS ARE COMPLETELY PREEMPTED AND GIVE RISE TO REMOVAL JURISDICTION

### A. The Relevant Case Law Supports Removal Jurisdiction

It is now well-established law that any claim for relief that falls within the ambit

of ERISA's carefully crafted enforcement scheme is completely preempted and gives rise

to federal jurisdiction. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).[4]  That

scheme is contained § 502(a) of ERISA, which is codified at 29 U.S.C. § 1132(a).  *Id.* at

204.  Under a firmly established exception to the "well-pleaded complaint rule," ERISA

completely preempts a case that falls under § 502(a) even if the plaintiff pleads only state

law claims.  *Id.* at 207-08.

The lesson of the *Davila* opinion is quite simple:  if a suit could have been

brought as an ERISA claim under 29 U.S.C. § 1132(a), then it is completely preempted

and creates federal question jurisdiction.  *Id.* at 210.  Applying that lesson to this case

means that the Court only needs to answer the following question:  could Plaintiff have

brought those claims based on the Assignments as an ERISA claim under 29 U.S.C. §

1132(a)?  The answer is a resounding "yes."

Multiple opinions from federal courts have held as much.  *See*, *e.g.*, *Quality*

*Infusion Care, Inc. v. Humana Health Plan of Tex. Inc.*, 290 Fed.Appx. 671 (5th Cir.,

---

[3] CareFirst does not assert that the Court has removal jurisdiction over Plaintiff's claims based on the PPP.  Rather, the Court has pendant jurisdiction over those claims under 28 U.S.C. § 1441(c).

[4] Plaintiff does not claim (nor could it) that none of the underlying insurance contracts are part of an ERISA welfare benefit plan.  Therefore, what the insureds assigned were ERISA rights.

2008); *Montefiore Med. Center v. Teamsters Local 272*, CA No. 3096(HB), 2009 WL

3787209 (S.D.N.Y. Nov. 12, 2009; *In re Managed Care Litig.*, Master File No. 00-1334-

MD, 2009 WL 855967 (S.D. Fla. March 30, 2009).

Additionally, those opinions point out that if the question concerned is one of a

*right* to a payment as opposed to an *amount* of payment, the issue is likely one so

intertwined with interpretation of an ERISA plan that complete preemption is

appropriate. *Quality Infusion Med. Center*, 290 Fed.Appx. at 680; *Montefiore Med.*

*Center*, 2009 WL 3787209 at *6. There is little question that what is at issue here is

Plaintiff's right to be paid by CareFirst, as opposed to what amount CareFirst owes.

The cases that Plaintiff cites regarding situations in which health care providers

potentially have both ERISA claims and state law claims are inapposite. Doc. 19-20.

CareFirst does not dispute that Plaintiff is also asserting state law claims. What CareFirst

contends is that when multiple claims are asserted and one is completely preempted, the

case can be removed to federal court. Indeed, if that were not the case, the pendant

jurisdiction provisions of 28 U.S.C. § 1441(c) would make little sense.

Furthermore, the cases cited by Plaintiff supports CareFirst's position. The key

factor in those cases is that, unlike here, the plaintiffs asserted *only* state law claims. As

explained in one of those opinions: "[t]hus, so long as the provider's state law claim does

not fall within § 502(a), the existence of the assignment is irrelevant to complete

preemption *if the provider asserts no claim under the assignment*." *Connecticut State*

*Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1347 (11th Cir. 2009)

(emphasis added). CareFirst removed this case because Plaintiff is pleading that it is

entitled to payment as a non-participating provider, and only recently acknowledged that it does so based on the Assignments of ERISA rights.

### B. In a Related Case, Plaintiff Acknowledges a Claim Based on the Assignments is an ERISA § 502 Claim

Aside from suing CareFirst in the instant action, Plaintiff also sued CareFirst in a case styled *Templin v. Independence Blue Cross*, Civil Action No. 09-4092 (JHS), which is pending in the United States District Court for the Eastern District of Pennsylvania. A true and correct copy of the First Amended Complaint in that case (without exhibits) is attached hereto as Exhibit 5. In that case, Plaintiff, a related entity, and two insureds sued CareFirst and two other insurance companies for failing to cover the cost of Factor VIII provided by Plaintiff to the individuals. In other words, *Templin* very closely mirrors the instant case except that in *Templin* Plaintiff brought in other plaintiffs.

In its jurisdictional allegation in *Templin*, Plaintiff states that the U.S. District "Court has jurisdiction over this action because it involves a federal question under the Employee Retirement and Security Income [sic] Act of 1974 ("ERISA") …." Ex. 5 ¶ 8. And why does Plaintiff – a medical provider – assert that it has standing to bring the ERISA claim under federal jurisdiction? Because the "[i]ndividual Plaintiffs assigned their right to payment" to the pharmacies, including Plaintiff. *Id.* ¶ 17. In opposition to a motion to dismiss the *Templin* case, Plaintiff asserted that the assignments from its customers entitle Plaintiff to bring an ERISA § 502(a) action. Ex. 6 at (internal pages) 7-8. (Exhibit 6 is a true and correct copy of the Memorandum in Opposition to Defendant CareFirst, Inc.'s Motion to Dismiss the First Amended Complaint, filed in *Templin*).

So on the one hand, Plaintiff asserts in *Templin* that it can bring an action in federal court under ERISA § 502(a) because it was assigned ERISA rights from its

customers. On the other hand, and in direct contradiction to its assertions in *Templin*, Plaintiff tells this Court that it there is no federal jurisdiction under ERISA § 502(a) even though Plaintiff clearly relies on the Assignments as one of its bases for recovery.

In its reply memorandum Plaintiff will no doubt point out that in *Templin* CareFirst argues that Plaintiff does not have standing under ERISA. That is true but the reason is that the insurance contracts in *Templin* have anti-assignment clauses. *See* Ex. 6 at (internal pages) 8-10. The question of whether anti-assignment clauses will come into play in this case is not germane to the instant Motion. As Plaintiff pointed out in *Templin*, "'a person does not lack standing to claim benefits under ERISA simply because it may turn out that he or she is not entitled to prevail and ultimately collect the benefits.'" *Id.* at (internal page) 10 (quoting *Chiropractic Nutritional Assocs. v. Empire Blue Cross and Blue Shield*, 669 A.2d 975, 981 (Pa. Super. 1995)).

In other words, the fact that Plaintiff may not be able to recover under the Assignments (because of anti-assignment clauses) does not mean that Plaintiff's claim does not fall under ERISA § 502(a), and therefore subject to complete preemption and removal. At most, if CareFirst proves enforceable anti-assignment clauses exist, the Court could dismiss Plaintiff's claim as a non-participating provider and remand the surviving contract claims back to state court. But those are all issues for another day.

### C.  Plaintiff Misrepresents the Terms of the Underlying Insurance Contracts

A central question in this case is whether Plaintiff needed a Residential Service Agency license, or "RSA", to distribute Factor VIII. *See* Doc. 46-5 at 4 ¶ 6. Plaintiff asserts that "[a] patient-insured's right to payment does not depend upon the presence or absence of a 'Residential Services Agency license.'" Doc. 46-1 at 22. Therefore,

Plaintiff argues, the dispute here could not possibly be one that invokes ERISA. Plaintiff has failed to read or chooses to ignore the policies that are part of the record in this case.

The policy covering John DOE 1 specifically provides that "[s]ervices are covered only if the provider" is "licensed in the jurisdiction in which services are provided…" and "to be covered, the services must be within the lawful scope of the services for which that provider is licensed."[5] Doc. 29-2 at 31 ¶ 1.6. Contrary to Plaintiff's position, the sources of the ERISA benefits (the insurance policies) explicitly limit coverage to services covered by a provider's license. It is disputed whether Plaintiff needed an RSA to dispense Factor VIII. Thus, the case clearly involves adjudication of ERISA rights.

## III. CAREFIRST TIMELY REMOVED THIS CASE

On the one hand, Plaintiff argues that CareFirst prematurely removed this case because it is only "[a]t some future unspecified date" that "Plaintiff may or may not choose to pursue" recovery based on the Assignments. Doc. 46-1 at 21. On the other hand, Plaintiff also argues that CareFirst is too late in removing the case. *Id.* at 24-27. As shown above, CareFirst clearly did not remove the case prematurely. It also did not remove the case too late. CareFirst removed the case within thirty days of receiving notice that Plaintiff intended to rely on the Assignments. That comports with the time period set forth in 28 U.S.C. § 1446(b). Indeed, it is rather odd that Plaintiff cites *Lovern v. General Motors Corp.*, 121 F.3d 160 (4th Cir. 1997) for this issue. The *Lovern* decision clearly holds that a court cannot look at the "subjective knowledge of the defendant" to determine when the 30-day removal clock starts to run. *Lovern*, 121 F.3d at 162. The clock starts when the grounds for removal appear in the record. *Id.* It is

simply ridiculous for Plaintiff to assert that the 30-day removal clock started "once

Defendant's Interpleader Complaint laid the first brick of ERISA's alleged foundation."

Doc. 46-1 at 27.[6]

**CONCLUSION**

For the foregoing reasons, Defendant CareFirst, Inc. respectfully requests that the

Court deny Plaintiff's Motion for Remand.


March 17, 2010                                                Respectfully submitted,


                                                             _____/s/_____
                                                             A. Dean Stocksdale
                                                             Bar No. 28416
                                                             Associate General Counsel
                                                             Group Hospitalization and Medical
                                                             Services, Inc.
                                                             1501 S. Clinton Street
                                                             Baltimore, MD 21224
                                                             (410) 605-7923
                                                             Attorney for CareFirst

---

[5] Identical language appears in the policy covering John DOE 2, but for some reason that policy (which should have been 29-3) does not appear in the Court's online records, even though it was submitted along with Docs. 29, 29-1 and 29-2.
[6] CareFirst sees little chance that the Court will reward Plaintiff with attorney's fees as requested. *See* Doc. 46-1 at 27-29. Therefore, CareFirst will not address that issue. Likewise, CareFirst will also avoid the temptation to point out why so many of Plaintiff's assertions of fact are incorrect. Those misrepresentations, while obviously meant to be inflammatory, are not relevant to the Motion for Remand. CareFirst is prepared to address whatever questions the Court has either through a supplemental submission or at a hearing on this Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of March 2010, a copy of the foregoing Opposition to Motion for Remand, with attachments, was served electronically via the CM/ECF system on Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201, attorney for Plaintiff Feldman's Medical Center Pharmacy, Inc. and Third-Party Defendants. In addition, because the memorandum plus attachments exceeds fifteen pages, it was also mailed to the Clerk of Court and copies of the cover letter to the Clerk, the memorandum, with attachments and the Notice of Electronic Filing were mailed, first-class, postage prepaid to Neal C. Baroody, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201.

<div style="text-align:center">

 

/s/

A. Dean Stocksdale

</div>

## 1. **APPENDIX OF EXHIBITS**

Ex. 1 – Plaintiff Feldman's Medical Center Pharmacy, Inc.'s Responses and Objections to First Set of Interrogatories

Ex. 2 – Relevant Portions of the Transcript of the Deposition of Jarrett T. Bostwick

Ex. 3 – Declaration of Michelle Powell

Ex. 4 – Plaintiff Feldman's Medical Center Pharmacy, Inc.'s Responses and Objections to Second Set of Interrogatories

Ex. 5 – First Amended Complaint (without exhibits) filed in *Templin v. Independence Blue Cross*, Civil Action No. 09-4092 (JHS), pending in the U.S. District Court for the Eastern District of Pennsylvania

Ex. 6 – Memorandum in Opposition to Defendant CareFirst, Inc.'s Motion to Dismiss the First Amended Complaint filed in *Templin v. Independence Blue Cross*, Civil Action No. 09-4092 (JHS), pending in the U.S. District Court for the Eastern District of Pennsylvania

# EXHIBIT F

```
         IN THE UNITED STATES DISTRICT COURT FOR
         THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                              *
FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,               *

      Plaintiff,              *

                              *

         v.                           CIVIL NO.: WDQ-10-0254
                              *

CAREFIRST, INC.,              *

      Defendant.              *

                              *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

Feldman's Medical Center Pharmacy, Inc. ("FMCP") sued

CareFirst, Inc. for breach of contract, unjust enrichment and

bad faith in the Circuit Court for Baltimore County.  CareFirst

removed to this Court on the ground that one of FMCP's claims

was completely preempted by § 502(a) of the Employee Retirement

Income Security Act of 1974 ("ERISA"), thus providing federal

question jurisdiction.  For the following reasons, FMCP's motion

to remand will be denied.

1

I. Background

FMCP is a Maryland specialty pharmacy that dispenses drugs used to treat hemophilia, von Willebrand's disease,[1] hepatitis, and HIV. Compl. ¶ 1. CareFirst is a Maryland health insurer, an independent licensee of the Blue Cross Blue Shield Association. *Id*. ¶ 2. Under an August 1997 subscriber agreement (the "Participating Professional Provider Agreement" or "PPP"), FMCP became a participating provider in CareFirst's network. *Id.*; Ex. A [hereinafter the "PPP"]. CareFirst agreed to reimburse FMCP for "Covered Services rendered to [CareFirst] Members." PPP ¶ 20. A "Covered Service" is a "medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the [CareFirst] Program in which he/she is enrolled." Compl. ¶ 3. A "Member" is "any eligible person covered under a [CareFirst] Program." *Id*. ¶ 4.

On June 1, 2009, FMCP sued CareFirst in the Circuit Court for Baltimore County for breach of contract, unjust enrichment, and bad faith. The Complaint alleged that CareFirst had failed "to correctly and timely pay $1,588,127.77 in legitimate claims submitted by [FMCP]." *Id*. ¶ 9. The "services" for which FMCP

---

[1] Von Willebrand's disease is "[a] hereditary predisposition to hemorrhaging characterized by bleeding from mucous membranes and various abnormalities in the blood components responsible for clotting." *Compact American Medical Dictionary* 489 (1998).

2

claims reimbursement appear to involve FMCP's provision of "factor," a blood-clotting substance used in the treatment of hemophilia. *See* Compl. ¶ 6; Mot. to Remand 3.

In Counts I and II (breach of contract and unjust enrichment), FMCP pled alternative theories of recovery. *See* Compl. ¶¶ 29, 35. The Complaint alleges that CareFirst is in breach of contract and was unjustly enriched because "[FMCP] properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder"; "alternative[ly], [FMCP] is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds." *Id.*

The Complaint focused on the PPP, under which FMCP became an "in-network" or "participating" provider for covered services provided to CareFirst Members. *See* ¶¶ 8-9, 13-16. The Complaint does not state the basis of FMCP's alterative claim that it is entitled to reimbursement as an "out-of-network provider." *Id.* ¶¶ 29, 35.[2] On September 11, 2009, FMCP

---

[2] CareFirst notes that the terms "in-network" and "out-of-network" are not interchangeable with "participating" and "non-participating." *See* Opp., Ex. 3 (Michelle Powell Decl. ¶¶ 6-8, Mar. 16, 2010). The parties appear to agree that the providers FMCP refers to as "in-network" providers have a right to reimbursement from CareFirst under a PPP for services rendered to CareFirst members, while "out-of-network" providers must usually seek reimbursement from CareFirst's members for covered

3

responded to an interrogatory about agreements with CareFirst that FMCP relied on in asserting its claims. Opp., Ex. 1. The response stated that "[FMCP] is entitled to provide factor to . . . patients as an out-of-network provider to the extent any such patient's health benefits provide for such coverage." *Id*.

CareFirst then filed a Third-Party Complaint and Counter-Complaint for Interpleader, naming FMCP patients "John Does 1 and 2" ("the Does") as third-party defendants. Paper No. 17 [hereinafter "Third-Party Compl."]. The Interpleader Complaint alleged that FMCP was a "non-participating provider" of factor because the PPP did not cover that treatment. *See* Third-Party Compl. ¶¶ 8-11. Because FMCP was a "non-participating provider," any CareFirst member who obtained factor at FMCP was required to submit a claim to CareFirst, which would reimburse the member--not FMCP. *Id*. ¶ 14. FMCP could then seek payment from the member. *Id*.

CareFirst alleged that the Does were members who had obtained factor from FMCP, and asserted that the interpleader was necessary because FMCP and the Does had potentially adverse claims. CareFirst maintained that if the court found that FMCP was a participating provider of factor, CareFirst would have to

---

services. This Memorandum Opinion uses the terms interchange-ably.

reimburse FMCP; if FMCP was a non-participating provider, CareFirst would have to reimburse the Does. *Id.* ¶¶ 36-37.

On January 4, 2010 FMCP moved for summary judgment on the FMCP's Third-Party Complaint and opposed the interpleader.[3] Paper No. 46-7. FMCP argued that the interpleader was inappropriate because FMCP's claims were not adverse to the Does' claims. As FMCP explained:

> Whether or not [FMCP] is a "Participating Provider" or a "Non-Participating Provider"—one of the critical issues in the underlying suit—makes no difference in determining whether there are any adverse claims. If [FMCP] is a participating provider, then even CareFirst acknowledges that [it] would be obligated to pay [FMCP] for factor . . . . If [FMCP] is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that FMCP is the party entitled to receive payment from CareFirst.

*Id.* 7-8 (internal citation and quotation marks omitted). FMCP attached to its motion the Service Agreements/Assignments of Benefits (the "Assignments") from the Does. *Id.*, Exs. A, B. These Assignments stated that "[u]nder no circumstances" was the insured to retain any payment from his insurer for FMCP products and authorized FMCP "to bill for services and receive payment directly from [the patient's] private health Insurance." *Id.*

On January 25, 2010, FMCP served answers to a second set of interrogatories. *See* Opp., Ex. 4. Interrogatory No. 22 asked:

---

[3] FMCP notes that CareFirst was served with this paper on December 31, 2009. *See* Paper No. 46-7.

"If you contend that you are entitled to payment of the claims
identified in the Complaint as a non-participating provider,
specify the basis or bases on which you allege such
entitlement." *Id.* FMCP responded:

> The bases for such entitlement are the relevant
> statutes and member and other contracts, as well as
> the Assignment of Benefits executed by each of those
> CareFirst members who received factor products from
> [FMCP]. Such assignments grant [FMCP] "all rights,
> title and interest to reimbursement payable to such
> CareFirst member, in respect of products and services
> provided to such member by [FMCP].

*Id.* On February 1, 2010, CareFirst removed to this Court.
Paper No. 2. On March 3, 2010, FMCP moved to remand. Paper No.
46.

II. Analysis

FMCP argues that remand is required because the Court lacks
subject matter jurisdiction, and CareFirst's removal was
untimely. CareFirst responds that to the extent FMCP is suing
as the assignee of John Does 1 and 2, its breach of contract and
unjust enrichment claims are preempted by ERISA's civil enforce-
ment provision, thus providing federal question jurisdiction.
CareFirst contends that the February 1, 2010 removal was timely
because FMCP's December 31, 2010 opposition to the interpleader
revealed for the first time that some of FMCP's claims were
preempted.

6

A.  Removal Under 28 U.S.C. § 1441

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing where such action is pending."  To remove a case, the defendant must file a notice of removal in the district court within 30 days after receiving the initial pleading.  *Id.* § 1446(a)-(b) (2006).

If the case stated by the initial pleading is not removable, the defendant may remove within 30 days of receiving "an amended pleading, motion or other paper from which it may first be ascertained that the case is one which is or has become removable."  *Id*. § 1446(b).  The removing party has the burden of proving subject matter jurisdiction.  *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 260 (4th Cir. 2005).  Because removal raises "significant federalism concerns," the removal statutes must be strictly construed, and all doubts must be resolved in favor of remanding the case to state court.  *Id*.

B.  Subject Matter Jurisdiction and Complete Preemption

CareFirst's Notice of Removal alleged federal question jurisdiction on the ground that at least some of FMCP's state law claims are "completely preempted" by § 502 of ERISA.  Gener-

7

ally, removal on the basis of federal question jurisdiction is appropriate only if the plaintiff's "well-pleaded complaint" raises issues of federal law. *Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005). Thus, "state law complaints usually must stay in state court when they assert what appear to be state law claims." *Id.* at 440. The complete preemption doctrine is a "narrow exception" to this rule. *See id.* at 439-40. Under this doctrine, "if the subject matter of a putative state law claim has been totally subsumed by federal law . . . then removal is appropriate." *Id.*[4]

"ERISA's civil enforcement provision, § 502(a), completely preempts state law claims that come within its scope and converts these state claims into federal claims under § 502." *Darcangelo v. Verizon Commc'ns., Inc.*, 292 F.3d 181, 187 (4th Cir. 2002) (internal citations and quotation marks omitted).[5] A state claim is preempted by § 502 if: (1) the plaintiff has

---

[4] "[W]hen complete preemption exists, there is no such thing as the state action since the federal claim is treated as if it appears on the face of the complaint because it effectively displaces the state cause of action. Complete preemption thus transforms the plaintiff's state-law claims into federal claims." *Id.* at 441.

[5] *See also Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.").

standing under § 502(a); (2) the claim is within the scope of

§ 502(a); and (3) the claim is not capable of resolution without

interpretation of the ERISA plan. *See Sonoco Prods. Co. v.*

*Physicians Health Plan, Inc.*, 338 F.3d 366, 372 (4th Cir. 2003).[6]

---

[6] *See also, e.g.*, *Deem v. BB&T Corp.*, 279 Fed. Appx. 283, 284
(4th Cir. 2008); *Kuthy v. Mansheim*, 124 Fed. Appx. 756, 757 (4th
Cir. 2004); *Hewett v. Tri-State Radiology, P.C.*, 2009 U.S. Dist.
LEXIS 85054, at *6 (D. Md. Sept. 17, 2009); *Akney v. Metro Life
Ins. Co.*, 438 F. Supp. 2d 566, 572-73 (D. Md. 2006).

The parties note that some courts of appeals have read the
Supreme Court's *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004)
as establishing a two-part test for preemption under § 502.
*See, e.g.*, *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*,
581 F.3d 941, 946-47 (9th Cir. 2009) ("Under *Davila*, a state law
cause of action is completely preempted if (1) an individual, at
some point in time, could have brought [the] claim under ERISA §
502(a)(1)(B) and (2) where there is no other independent legal
duty that is implicated by a defendant's actions."). Since
*Davila*, the Fourth Circuit and courts in this district have
continued to apply the three-part test of *Sonoco Products*. *See,
e.g.*, *Deem*, 279 Fed. Appx. at 284; *Hewett*, 2009 U.S. Dist. LEXIS
95054, at *6.

Although this Court follows the *Sonoco Products* test,
FMCP's assignment-based claims are also preempted under the two-
part test that has been used in other circuits. FMCP
acknowledges that it *could* sue CareFirst under ERISA by virtue
of the Does' assignments. *See* Mot. to Remand 19. Further,
although FMCP has identified a number of legal duties implicated
by CareFirst's actions vis-à-vis FMCP (e.g., breach of the PPP,
breach of implied contract, etc.), FMCP has identified no other
independent legal duty that is implicated by CareFirst's denial
of benefits to the Does. To the extent FMCP's claims arise
under the assignments, those claims are exclusively within the
scope of ERISA § 502(a)(1)(B).

9

1.  Whether FMCP has Standing Under § 502(a)

Under § 502(a)(1)(B), "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).  It is undisputed that the Does obtained their health insurance from CareFirst through an employer-sponsored plan that is governed by ERISA.  *See* Not. of Removal ¶ 5.  Thus, they were beneficiaries under § 502(a) and would have standing to sue CareFirst for an improper denial of benefits.  *See Davila*, 542 U.S. at 211.

CareFirst argues that FMCP has derivative standing as the assignee of the Does' rights.  Although the Fourth Circuit has "never addressed the question of derivative standing for ERISA benefits," *Brown v. Sikora & Assocs.*, 311 Fed. Appx. 568, 570 (4th Cir. 2008), other circuits "have consistently recognized such standing when based on the valid assignment of ERISA . . . benefits by participants and beneficiaries," *id*.[7]  "These [out-of-circuit decisions] represent a careful balance of competing

---

[7] *See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1347 (11th Cir. 2009); *Franciscan Skemp Healthcare, Inc.*, v. *Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 597-98 (7th Cir. 2008); *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 893 (5th Cir. 2003); *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 115 n.4 (2d Cir. 2002); *Blue Cross of Calif. v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F.3d 1045, 1047-51 (9th Cir. 1999); *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1277 (6th Cir. 1991).

10

concerns, in part grounded on the recognition that extending
derivative standing to health care providers serves to further
the explicit purpose of ERISA in a number of distinct ways."
*Id.* This Court will follow these decisions and hold that a
healthcare provider may acquire derivative standing under ERISA
by obtaining a written assignment from a participant or
beneficiary of his right to payment of medical benefits. *Conn.
State Dental Ass'n*, 591 F.3d at 1347. Accordingly, FMCP has
standing.

> 2. Whether any Claim is Within the Scope of § 502(a)

That a provider has derivative standing from an assignment
is not sufficient for complete preemption; the provider must
actually assert a claim under that assignment. *See id.* ("[T]he
existence of the assignment is irrelevant to complete preemption
if the provider asserts no claim under the assignment.");
*Anesthesia Care Assocs.*, 187 F.2d at 1052. The parties appear
to correctly agree that to the extent that FMCP is suing as the
Does' assignee, its claims are preempted. *See Anesthesia Care
Assocs.*, 187 F.3d at 1051 ("ERISA preempts the state law claims
of a provider suing as an assignee of a beneficiary's rights to
benefits under an ERISA plan."). If FMCP's reimbursement for
factor is based on the Does' CareFirst insurance policies, it is

11

suing for benefits under an ERISA plan, and its claims are within § 502(a).

The parties dispute whether FMCP's claims rely on the assignments. CareFirst cites FMCP's: (1) complaint, which alleged that FMCP was entitled to payment under the PPP Agreement and "*in the alternative, . . . as an out-of-network provider for the Covered Services it provided to CareFirst's insureds,* " Compl. ¶¶ 29, 35; (2) opposition to the inter-pleader, in which FMCP stated that "If [FMCP] is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that FMCP is the party entitled to receive payment from CareFirst," Paper No. 46-7; and (3) answer to Interrogatory No. 22, which reiterated that "[t]he bases for . . . its entitlement [as a non-participating provider] are the relevant statutes and member and other contracts, *as well as the Assignment of Benefits executed by each of those CareFirst members who received factor products from [FMCP],*" Opp., Ex. 4 (emphasis added).

FMCP contends that, notwithstanding these statements, it is not pursuing relief under the assignments. *See* Reply 8. FMCP maintains that although "at some future date, [it] may exercise the right the Assignments yield it and sue [CareFirst] under

12

ERISA § 502(a)(1)(B) . . . it has not proceeded as such in the instant case." Mot. to Remand 19.[8]  The record at the time of removal--which is what the Court looks to on a motion to remand[9]--says otherwise.  FMCP's opposition and response to Interrogatory No. 22 clearly indicated the assignments as an alternative basis for recovery on its breach of contract and unjust enrichment claims.

FMCP also notes that it may seek recovery as an out-of-network provider on bases other than the assignments, such as constructive or implied contract.  Thus, its alternative claim is not necessarily predicated on an ERISA right.[10]  FMCP's only theory of recovery under the assignments--the wrongful denial of benefits to the Does--directly implicates ERISA.  Liability under a constructive or implied contract is based on FMCP's relationship with CareFirst.[11]  That FMCP relies on other

---

[8] FMCP also argues that it will rely on the assignments only if the Court finds that it is an "out-of-network" or "non-participating" provider; thus, its claims are "speculative and . . . latent."  FMCP cites no authority that a claim pled in the alternative is not subject to complete preemption under § 502.

[9] *See* Charles Alan Wright *et al.*, *Federal Practice & Procedure* §§ 3721, 3723 (4th ed. 2010) (collecting cases).

[10] *See Davila*, 542 U.S. at 210 (suit based on legal duty independent of ERISA not subject to complete preemption).

[11] The case on which FMCP relies for its implied and constructive contract theories, *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1290-94 (S.D. Fla. 2003) recognized that such claims may

13

theories in support of its claims does not remove its
assignment-based claims from ERISA.[12]  Because FMCP's assignment-
based claims allege the improper denial of benefits to the Does,
they are ERISA claims.  *See Conn. State Dental Ass'n*, 591 F.3d
at 1351 (portions of claims arising solely under ERISA were
completely pre-empted).

> 3.  Whether the Claim may be Resolved
>     Without Interpretation of the ERISA Plan

To the extent that FMCP's claims are based on the Does'
assignments of benefits, those claims will require interpre-
tation of the Does' ERISA plans.  The parties dispute whether an
insured's right to payment for services depends on the
provider's licensure in the jurisdiction where the services are
provided.  *See* Mot. to Remand 22; Opp. 11-12.  This dispute
about the coverage of the Does' plans will require their inter-
pretation.

---

be available to a non-participating provider suing as a third-
party rather than an assignee, *see id*. at 1292-93.  *See also In
re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1268 (S.D. Fla.
2001).

[12] The converse is also true: that FMCP's assignment-based claims
are within ERISA does not affect its claims that are not based
on the assignments.  "[A] provider that has received an
assignment of benefits and has a state law claim independent of
the claim arising under the assignment holds two separate
claims.  In such a case, the provider may assert a claim for
benefits under ERISA, the state law claim, *or both*."  *Conn.
State Dental Ass'n*, 591 F.3d at 1347 (emphasis added).

CareFirst has shown that (1) FMCP has standing under § 502, (2) some of its claims are within § 502, and (3) resolving those claims will require interpretation of ERISA plans.  Accordingly, FMCP's assignment-based claims are completely preempted by ERISA.  Because those claims are preempted, the Court has jurisdiction over all FMCP's claims.  "[W]he[n] removal jurisdiction exists over a completely preempted claim, the district court has jurisdiction over any claims joined with the preempted claim." *Conn. State Dental Ass'n*, 591 F.3d at 1353; *see also* 28 U.S.C. § 1441(c).[13]

C.  Timeliness of the Removal

FMCP argues that even if some of its claims are preempted by ERISA, the removal was untimely because CareFirst was aware that FMCP intended to sue on the assignments more than 30 days before filing the notice of removal.  CareFirst responds that the February 1, 2010 removal was timely because FMCP's January 4, 2010 opposition to the interpleader revealed for the first time that some of FMCP's claims were preempted--*i.e.*, that (1) FMCP had assignments from the Does and (2) planned to rely on

---

[13] Section 1441(c) states that "[w]henever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates."

15

those assignments in pursuing its claims for breach of contract and unjust enrichment.

The 30-day period for removal under 28 U.S.C. § 1446(b) runs from the "receipt by the defendant, through service or otherwise, of [the paper] from which it may first be ascertained that the case is or has become removable." CareFirst contends that the removal period began on December 31, 2009 when it was served with the opposition to the interpleader; thus, the February 1, 2010 removal was timely.[14]

FMCP argues that CareFirst had notice of its intention to sue on the assignments (1) on June 1, 2009, when FMCP filed its complaint on June 1, 2009, (2) on November 25, 2009, when CareFirst filed its Third-Party Complaint and Counter-Complaint for Interpleader, and (3) on December 4, 2009, when CareFirst deposed FMCP's CEO, Jarrett Bostwick, and asked questions that implied it was aware that FMCP had assignments from CareFirst members. If the removal period began on any of these dates, the notice of removal is untimely.

In deciding when the 30-day removal period begins, courts do not "inquire into the subjective knowledge of the defendant," but rather must determine when the grounds for removal appeared

---

[14] Under Fed. R. Civ. P. 6(a), the period began to run on January 1, 2010 and expired on January 30, 2010. Because January 30 was a Saturday, however, the period was extended to the following Monday, February 1, 2010. *See* Fed. R. Civ. P. 6(a)(1)(C).

"within the four corners of . . . [a] paper." *See Lovern v. GMC*, 121 F.3d 160, 162 (4th Cir. 1997). Thus, the question is when the record revealed that FMCP had assignments from the Does and planned to rely on them in this suit. As FMCP notes, the Complaint did not mention the assignments or indicate an intent to sue on them. Nor did CareFirst's Third-Party Complaint. Although FMCP argues that CareFirst knew that FMCP would invoke the assignments in response to its Third-Party Complaint, this argument impermissibly relies on speculations about CareFirst's subjective knowledge. Although CareFirst's questioning of Bostwick may demonstrate that it believed FMCP would invoke the assignments of CareFirst members as a theory of recovery and was therefore considering removal, nothing in Bostwick's testimony indicates that FMCP had the assignments and planned to sue on them.

The grounds for removal only appeared when FMCP filed its opposition to the interpleader, attached the Does' assignments, and asserted an entitlement to recovery under them. Because CareFirst removed within 30 days of receiving this paper, the removal was timely.

17

III.  Conclusion

        For the reasons stated above, FMCP's motion to remand will

be denied.


June 29, 2010                    _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge

18

# EXHIBIT G

2011 WL 5433754
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

FELDMAN'S MEDICAL CENTER
PHARMACY, INC., Plaintiff
v.
CAREFIRST, INC., Defendant.

Civil No. SKG–10–254. | Nov. 9, 2011.

**Synopsis**

**Background:** Specialty pharmacy brought action in state court against insurer, alleging breach of contract, unjust enrichment, and bad faith arising out of insurer's denial of reimbursement for drugs pharmacy provided to patients. Insurer removed action to federal court. Pharmacy moved for summary judgment, and insurer filed cross-motion for partial summary judgment.

**Holdings:** In an amended opinion, the District Court, Susan K. Gauvey, United States Magistrate Judge, held that:

[1] pharmacy was not entitled to mandatory award of prejudgment interest under Maryland Prompt Pay Statute;

[2] pharmacy had standing as valid assignee to seek prejudgment interest from insurer under Employee Retirement Income Security Act (ERISA);

[3] pharmacy was entitled to prejudgment interest as part of claim against insurer for unpaid benefits under ERISA; and

[4] pharmacy was entitled to prejudgment interest at federal postjudgment interest rate.

Motions granted in part and denied in part.

West Headnotes (14)

**[1]** **Interest**
👉 Insurance matters

**Interest**
👉 Labor relations and employment

Specialty pharmacy was not "participating provider" with respect to factor drugs under subscriber agreement, and thus was not entitled to mandatory award of prejudgment interest from

insurer under Maryland Prompt Pay Statute.
West's Ann.Md.Code, Insurance, § 15–1005(f).

**[2]** **Contracts**
👉 Intention of Parties

In determining the intentions of contracting parties under the objective theory of contracts, courts look at what a reasonable person in the same position would have understood as the meaning of the agreement regardless of the intent of the parties at the time of contract formation.

**[3]** **Contracts**
👉 Existence of ambiguity

An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.

**[4]** **Labor and Employment**
👉 Parties in general; standing

Specialty pharmacy had standing as valid assignee to seek prejudgment interest from insurer under Employee Retirement Income Security Act (ERISA); patients to whom pharmacy dispensed factor drugs obtained their health insurance from insurer through employer-sponsored plans that were governed by ERISA. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[5]** **Labor and Employment**
👉 Preemption

**States**
👉 Pensions and benefits

Employee Retirement Income Security Act's (ERISA'S) civil enforcement provision preempts state law claims that come within its scope and converts those claims into federal claims under ERISA. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[6]**  **Interest**

🔑 Labor relations and employment

**Labor and Employment**

🔑 Preemption

**States**

🔑 Particular cases, preemption or supersession

Specialty pharmacy's claims for prejudgment interest under Maryland Prompt Pay Statute were preempted by Employee Retirement Income Security Act (ERISA) civil enforcement provision; pharmacy's claims for reimbursement for factor drugs, and consequently claims for prejudgment interest, were dependent upon and derived from pharmacy's right to recover benefits under ERISA plans. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132; West's Ann.Md.Code, Insurance, § 15–1005(f).

**[7]**  **Interest**

🔑 Labor relations and employment

Specialty pharmacy was entitled to prejudgment interest as part of claim against insurer for unpaid benefits under Employee Retirement Income Security Act (ERISA); insurer owed payment for claims for factor drugs, and pharmacy lost opportunity to use funds to which it was entitled because insurer erroneously denied payment on basis that pharmacy needed license under Maryland law. 28 U.S.C.A. § 1961; Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[8]**  **Federal Courts**

🔑 Damages, interest, costs and fees

Federal law controls the issuance of prejudgment interest awarded on federal claims.

**[9]**  **Labor and Employment**

🔑 Interest

A participant whose Employee Retirement Income Security Act (ERISA) benefits are delayed but ultimately paid prior to judgment may seek to recover interest on the delayed

payment as a form of other equitable relief under ERISA, even though there has been no underlying judgment awarding such benefits. Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[10]**  **Interest**

🔑 Prejudgment Interest in General

**Interest**

🔑 Discretion in general

In exercising its discretion to award prejudgment interest, the court may take into consideration (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

**[11]**  **Interest**

🔑 Computation of rate in general

Generally, the interest rate prescribed for post-judgment interest under federal law is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of a particular case require a different rate. 28 U.S.C.A. § 1961.

**[12]**  **Interest**

🔑 Computation of rate in general

Specialty pharmacy was entitled to prejudgment interest at federal postjudgment interest rate as part of claim against insurer for unpaid benefits under Employee Retirement Income Security Act (ERISA); federal postjudgment interest rate adequately compensated pharmacy for loss of use of its funds and did not amount to a penalty against insurer. 28 U.S.C.A. § 1961; Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**[13]**  **Interest**

🔑 Labor relations and employment

For purposes of determining prejudgment interest owed to specialty pharmacy by insurer, interest accrued on pharmacy's claims to insurer for payment for factor drugs from the 31st day after each claim was submitted, irrespective of insurer's beliefs about pharmacy's licensure requirements. 28 U.S.C.A. § 1961.

[14]   **Federal Civil Procedure**
  👉  Insurance cases

Genuine issue of material fact existed regarding whether interest was tolled between date on which insurer issued provider voucher and when medical records requested in provider voucher were received by insurer, precluding summary judgment on specialty pharmacy's claim against insurer for prejudgment interest. 28 U.S.C.A. § 1961; Employee Retirement Income Security Act of 1974, § 502, 29 U.S.C.A. § 1132.

**Attorneys and Law Firms**

Neal Cormac Baroody, Baroody and O. Toole, Thomas O. Toole, Baroody and O. Toole, Baltimore, MD, Anthony Paduano, Jordan D. Becker, Paduano and Wientraub LLP, New York, NY, for Plaintiff.

Alan Dean Stocksdale, CareFirst BlueCross BlueShield, Baltimore, MD, Patrick P. de Gravelles, CareFirst BlueCross BlueShield, Washington, DC, for Defendant.

**Opinion**

*AMENDED MEMORANDUM OPINION AND ORDER*

SUSAN K. GAUVEY, United States Magistrate Judge.

**\*1**  On June 1, 2009, Plaintiff Feldman's Medical Center and Pharmacy, Inc. ("FMCP" or "Plaintiff") sued Defendant CareFirst, Inc. ("CareFirst" or "Defendant") in the Circuit Court for Baltimore County for $1,588,127.77 plus interest for breach of contract, unjust enrichment, and bad faith arising out of CareFirst's denial of reimbursement to FMCP for factor drugs it provided to CareFirst's insureds. (ECF No. 2). CareFirst removed to this Court pursuant to 28 U.S.C. § 1441. (ECF No. 1). The case was referred to the undersigned

magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF No. 94).

On March 4, 2011, FMCP moved for summary judgment, seeking as relief: (i) judgment on Counts I through III for non-payment of invoices in the amount of $109,989.32; (ii) interest on the unpaid contributions in the amount of $886,483.93; (iii) attorneys' fees and costs; and (iv) such other and further relief as the Court deems just and proper. (ECF No. 100, 1–2). FMCP asserted alternative theories of recovery: Maryland contract law; § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; and unjust enrichment. (ECF No. 100–1). FMCP asserted entitlement to prejudgment interest under Md.Code Ann., Insur. § 15–1005 (the "Maryland Prompt Pay Statute") or, alternatively, under ERISA § 502. (*Id.*). CareFirst opposed FMCP's motion for summary judgment and moved for partial summary judgment with respect to FMCP's claims for reimbursement and prejudgment interest under the Maryland Prompt Pay Statute. (ECF No. 109). CareFirst did not, however, assert entitlement to summary judgment under § 502 of ERISA. *See id.* The Court held motions hearings on June 9, 2011 and August 11, 2011 pursuant to Local Rule 105.6. (ECF No. 128).

During the pendency of the litigation, CareFirst paid $1,547,054.87 in satisfaction of FMCP's claims for reimbursement [1], as well as $23,017.00 in prejudgment interest.

The parties agree that the only issue presently pending before the Court is FMCP's claim for prejudgment interest. (ECF No. 121, 2). [2] For the reasons set forth herein, the Court GRANTS IN PART FMCP's motion for summary judgment with respect to its claim for prejudgment interest under ERISA § 502 but DENIES IN PART FMCP's motion for summary judgment with respect to its claim for prejudgment interest under the Maryland Prompt Pay Statute. The Court DENIES IN PART CareFirst's motion for summary judgment with respect to FMCP's claim for additional interest.

For the reasons set forth below, the Court orders prejudgment interest under ERISA § 502 at the federal postjudgment rate set forth in 28 U.S.C. 1961. Interest shall be determined on a claim-by-claim basis using the 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which interest begins to accrue for each individual claim. For all claims for factor drugs dispensed prior to December 11, 2008, prejudgment interest shall accrue from

the 31st day after each individual claim was received by CareFirst until paid. For all claims for factor drugs dispensed after December 11, 2008, with the exception of two claims (invoice numbers 17790 and 17629 for services rendered on April 9, 2009 and March 27, 2009 respectively), prejudgment interest shall accrue from the 31st day after the claim was received by CareFirst until paid. With respect to these two remaining claims, there exists a genuine dispute of material fact regarding whether certain conditions to payment were met and, if so, when they were met. Accordingly, the Court does not award prejudgment interest on these claims at this time. To be clear, prejudgment interest shall cease to run on all claims for which interest is due, whether for factor drugs dispensed before or after December 11, 2008, on the date that each individual claim was paid. [3] In addition, CareFirst shall be credited $23,017 for interest already paid to FMCP.

**\*2** The parties should submit within two weeks of the date of this Memorandum Opinion and Order ("Order") an accounting of their prejudgment interest calculations for each of the 38 individual claims for which interest is due under this Order, and the total sum due. If either party intends to move for summary judgment with respect to prejudgment interest on the remaining two claims, it should do so within two weeks of this Order. If the moving party believes that resolution requires a hearing, it should make this known to the Court within two weeks as well. Of course, the Court strongly suggests that the parties try to resolve these two remaining claims, without further litigation.

### I. HISTORY OF DISPUTE

### A. FACTUAL BACKGROUND

FMCP is a Maryland specialty pharmacy that dispenses drugs used to treat hemophilia, von Willebrand disease, hepatitis, and HIV. (ECF No. 2, ¶ 1). CareFirst is a Maryland health insurer and independent licensee of the Blue Cross Blue Shield Association. (*Id.*, ¶ 2). In support of their respective motions for summary judgment, FMCP and CareFirst provided declaration testimony, deposition excerpts, documentary evidence, and correspondence. The essential facts of the case, either undisputed or, where disputed, recited in the light most favorable to the nonmovant, are as follows.

FMCP submitted claims to, and was reimbursed by, CareFirst and its predecessors, starting from FMCP's inception in the mid–1980s. (SUMF, ECF No. 100–2, ¶ 52; Bostwick

Decl., ECF No. 104, ¶ 33). Beginning in the 1990s, FMCP submitted certain prescription drug claims through CareFirst's "EPIC" contract. (White Decl., ECF No. 120–5, ¶ 4) (EPIC was a consortium of pharmacies to which FMCP was a party that joined together to obtain certain efficiencies). Under a subscriber agreement dated August 12, 1997 (the "Participating Professional Provider Agreement" or "PPP Agreement"), FMCP became a "participating" or "par" provider in CareFirst's network and secured its entitlement to direct payment for insurance claims submitted for "covered services." (ECF No. 2, Ex. A); *see also* (Becker Decl., ECF No. 46–2, ¶ 5). FMCP asserts that it submitted claims to CareFirst directly for services that were not covered by the EPIC contract and that CareFirst paid FMCP directly for these claims pursuant to the PPP Agreement, or if there was no applicable contract, FMCP was paid as a non-participating provider at reimbursement rates set by CareFirst. (White Decl, ECF No. 120–5, ¶ 4). CareFirst does not dispute this.

Factor Health Management ("FHM"), a Florida company, purchased FMCP from its founder in October 2007. (Bostwick Decl., ECF No. 104, ¶ 20). [4] Prior to acquisition by FHM, FMCP dispensed prescription drugs and durable medical equipment ("DME"), such as wheelchairs, canes, and catheters. (White Decl., ECF No. 120–5, ¶ 2). In addition to common prescription drugs, FMCP dispensed more expensive medicines, including insulin, drugs used to treat cancer and hepatitis, and vaccinations. (*Id.* at ¶ 2). FMCP maintains that patients either visited the retail location or FMCP would deliver to their homes, but FMCP did not provide home health care services to the patients. (*Id.*). After FMCP was purchased by FHM, it continued to dispense prescription drugs and DME, but also began to distribute "factor drugs" to patients with hemophilia. (*Id.* at ¶ 5).

**\*3** Hemophilia is a hereditary genetic disorder that impairs the body's natural ability to control blood clotting. (ECF No. 100–2, ¶ 1; Bostwick Decl., ECF No. 104, ¶ 6; Levi Report (annexed to the Bostwick Decl.) at (V)(b)(i)). Because hemophiliacs' bodies do not produce sufficient clotting factor to stop bleeding quickly, they must inject or infuse blood clotting factor ("factor" or "factor drugs") in order to prevent a potentially fatal bleed out. (ECF No. 100–2, ¶¶ 3–5). FMCP reports that the medication dispensed to patients in connection with the claims at issue in this case consisted of self-injectible synthetic recombinant clotting factor replacement medication, of which Advate is an example. (ECF No. 100–2, ¶ 140; Bostwick Decl., ECF No. 104, ¶ 87).

CareFirst informed FMCP on August 22, 2008 that it could not reimburse claims for factor drugs because—according to CareFirst—FMCP did not have the correct type of contract with CareFirst. (ECF No. 100–2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55 and Exhibit 27). CareFirst informed FMCP that it needed a Home Infusion Therapy ("HIT") contract in order to dispense factor drugs as a CareFirst participating provider and that FMCP only had a Durable Medical Equipment ("DME") contract. (ECF No. 100–2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55). CareFirst advised FMCP that it needed to obtain a Resident Services Agency ("RSA") license. (ECF No. 100–2, ¶ 124; Gardner Decl., ECF No. 12–3, ¶¶ 8 & 9; ECF No. 17, ¶ 6). There is no dispute that CareFirst had paid claims for factor drugs to FMCP (ECF No. 104, ¶ 56) but CareFirst states that payment was inadvertent as a result of automated processing. *See* (Hanson Decl., ECF No. 116, ¶¶ 27–31).

On August 20, 2010, CareFirst submitted a letter to the Court reporting that it had received an "opinion" from the Maryland Board of Pharmacy regarding the RSA licensing issue. (ECF No. 74). CareFirst stated that, on the basis of the Pharmacy Board's opinion, it was "now ready to pay the claims at issue." (*Id.*). As stated supra, these claims were paid to FMCP between September 17, 2010 and December 24, 2010 (ECF No. 145). CareFirst maintains that it was prepared to deposit at least some of the disputed claim amount into a court registry at any earlier date. [5] *See infra.*

### B. PROCEDURAL BACKGROUND

This dispute began in state court. In its complaint filed in state court, FMCP alleged that CareFirst had failed to correctly and timely pay $1,588,127.77 in legitimate claims for reimbursement submitted by FMCP for provision of factor to CareFirst's insureds. (ECF No. 2, ¶ 9). In Counts I and II (breach of contract and unjust enrichment), FMCP pled alternative theories of recovery. *See* (ECF No. 2, ¶¶ 29, 35). The complaint alleges that CareFirst is in breach of contract and was unjustly enriched because "[FMCP] properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder"; "alternative[ly], [FMCP] is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds." (*Id.*). The complaint focused on the PPP, under which FMCP became an "in-network" or "participating" provider for covered services provided to CareFirst Members, see (*Id.*, ¶¶ 8–9, 13–16), but did not state

the basis of FMCP's alternative claim that it is entitled to reimbursement as an "out-of-network provider." (*Id.*, ¶¶ 29, 35).

**\*4** On September 11, 2009, in the state litigation, FMCP responded to an interrogatory about agreements with CareFirst that FMCP relied on in asserting its claims. (ECF No. 53–4). The response stated that "[FMCP] is entitled to provide factor to ... patients as an out-of-network provider to the extent any such patient's health benefits provide for such coverage." (*Id.*). On November 25, 2009, CareFirst then filed a Third–Party Complaint and Counter–Complaint for Interpleader, naming FMCP patients "John Does 1 and 2" ("the Does") as third-party defendants. (ECF No. 17). The Interpleader Complaint alleged that FMCP was a "non-participating provider" of factor because the PPP did not cover that treatment. *See* (ECF No. 17, ¶¶ 8–11). Because FMCP was a "non-participating provider," any CareFirst member who obtained factor at FMCP was required to submit a claim to CareFirst, which would reimburse the member—not FMCP. (*Id.*, ¶ 14). FMCP could then seek payment from the member. (*Id.*). CareFirst alleged that the Does were members who had obtained factor from FMCP, and asserted that the interpleader was necessary because FMCP and the Does had potentially adverse claims. CareFirst maintained that if the court found that FMCP was a participating provider of factor, CareFirst would have to reimburse FMCP; if FMCP was a nonparticipating provider, CareFirst would have to reimburse the Does. (*Id.*, ¶¶ 36–37).

On January 4, 2010 FMCP moved for summary judgment on the FMCP's Third–Party Complaint and opposed the interpleader. (ECF No. 46–7). FMCP argued that the interpleader was inappropriate because FMCP's claims were not adverse to the Does' claims. As FMCP explained: "Whether or not [FMCP] is a 'Participating Provider' or a 'Non–Participating Provider'—one of the critical issues in the underlying suit—makes no difference in determining whether there are any adverse claims. If [FMCP] is a participating provider, then even CareFirst acknowledges that [it] would be obligated to pay [FMCP] for factor.... If [FMCP] is a non-participating provider, then the Service Agreement/ Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that FMCP is the party entitled to receive payment from CareFirst." (*Id.*, 7–8) (internal citation and quotation marks omitted). FMCP attached to its motion the Service Agreements/Assignments of Benefits (the "Assignments") from the Does. (*Id.*, Ex. A). These Assignments stated that "[u]nder no circumstances" was the insured to retain any payment from his insurer for FMCP

products and authorized FMCP "to bill for services and receive payment directly from [the patient's] private health Insurance." (*Id.*). FMCP opposed the interpleader action and thus the deposit of some of disputed claim monies in the court's registry.

On February 1, 2010, CareFirst removed to this Court. (ECF No. 1). CareFirst's Notice of Removal alleged that at least some of FMCP's state law claims are "completely preempted" by § 502 of ERISA. (*Id.* at ¶ 13). On March 3, 2010, FMCP moved to remand. (ECF No. 46). On June 29, 2010, *723 F.Supp.2d 814 (D.Md.2010),* this Court in an opinion by Judge Quarles denied FMCP's motion for remand on the ground that "one of FMCP's claims was completely preempted by § 502(a) of ERISA, thus providing federal question jurisdiction." (ECF No. 53, 1).

**\*5** Beginning on or about September 24, 2010, CareFirst began paying the outstanding claims at issue in this case (ECF No. 100–2, ¶ 170), ultimately paying $1,547,054.87 to FMCP (Hanson Decl., ECF No. 116, ¶ 75). [6] In addition, CareFirst has paid $23,017.00 in interest on the claims based upon its own decision on when interest began to accrue under the Maryland Prompt Pay Statute. *See* (Hanson Decl., ECF No. 116, ¶¶ 80–83). [7] Accordingly, the issue before the Court is the interest due on the claims which now have been paid.

## II. LEGAL STANDARD

The purpose of the summary judgment inquiry is to examine "the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993). Under *Federal Rule of Civil Procedure 56,* the moving party is entitled to summary judgment if it shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a).* Materiality is determined by the substantive law pertaining to a particular claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stricker v. Eastern Off Road Equip., Inc.,* 935 F.Supp. 650, 653 (D.Md.1996).

Once the moving party has met this requirement, the burden shifts to the nonmoving party to prove there is a genuine issue for trial and that evidence exists to prove the elements of the party's substantive law claims. *Celotex,* 477 U.S. at 321, 106 S.Ct. 2548; *Matsushita Electric Industrial Co., Ltd.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sylvia Development Corp. v. Calvert County,* 48 F.3d 810, 817 (4th Cir.1995); *Fed.R.Civ.P. 56(e).* To survive summary judgment, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings." *Fed.R.Civ.P. 56(e); Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party "must do more than present a 'scintilla' of evidence in its favor." *Sylvia Development Corp.,* 48 F.3d at 818 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). If the nonmoving party fails to prove an essential element of its case, all other facts become immaterial and the moving party should be granted judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

The role of the Court at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, inferences which may be "drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Only inferences which are "reasonable" may be considered by the court. *Sylvia Development Corp.,* 48 F.3d at 817–18.

**\*6** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Fed.R.Civ.P. 56(c).* Evidence submitted both in support of and in opposition to a motion for summary judgment must be admissible and based on personal knowledge. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991).

## III. ANALYSIS

The sole issue presently before the Court is FMCP's entitlement to prejudgment interest on its claims for reimbursement for factor drugs. In order to recover prejudgment interest, FMCP must establish that there is no genuine dispute as to material fact and that it is entitled as a matter of law to an award under either the Maryland Prompt Pay Statute or § 502 of ERISA. (ECF No. 126, 9). The distinction between these two mutually-exclusive theories of relief is significant. An award of interest at the prescribed statutory rate is mandatory under the Maryland Prompt Pay Statute, Md.Code Ann., Insur., 15–1005(f)(2), whereas both the right to an award of prejudgment interest and the rate are discretionary under ERISA, *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1030–31 (4th Cir.1993) (*en banc* ).

To the extent that the PPP Agreement makes FMCP a "par provider" with respect to factor drugs, its right to reimbursement arises in contract and the Maryland Prompt Pay Statute governs prejudgment interest on the previously unpaid claims. On the other hand, if FMCP is not a par provider of factor drugs under the PPP Agreement, then its entitlement to reimbursement arises from the insurance contracts between CareFirst and the insureds to whom FMCP dispensed factor drugs. The parties agree that these employer-sponsored insurance plans fall within the scope of ERISA's civil enforcement provision, which provides that a plan participant or beneficiary may bring a civil action to recover benefits due or to enforce rights under the plan. 29 U.S.C. § 1132. Under this scenario, FMCP has derivative standing to sue CareFirst only to the extent that it has valid assignments of benefits from CareFirst's insureds, enabling it to "stand in the shoes" of the plan beneficiaries to whom it dispensed factor to enforce their rights under ERISA. In the event that FMCP is entitled to direct payment only as an assignee of CareFirst's insureds, ERISA completely preempts state law with respect to its claim for reimbursement and prejudgment interest. Under ERISA, the Court has broad discretion to determine FMCP's right to prejudgment interest and the applicable rate of interest. *See* (ECF No. 53); *see also Quesinberry,* 987 F.2d at 1030–31. Thus, whether FMCP is a par provider of factor drugs under the PPP Agreement is determinative of which theory of interest recovery applies. [8]

 **\*7**  The Court finds for the reasons set forth herein that there is no dispute of material fact as to the scope of the PPP Agreement and that, as a matter of law, FMCP was not a participating provider with respect to factor drugs, during the relevant time period. In addition, the Court finds there is no dispute of material fact as to FMCP's standing as an assignee to sue CareFirst under ERISA § 502, 29 U.S.C. § 1132, for nonpayment of claims and prejudgment interest. CareFirst has waived any objection to the validity of FMCP's assignments and has conceded liability for payment of the principal balance of the claims at issue and indeed has paid FMCP directly for the claims. Although ERISA § 502 does not explicitly address prejudgment interest, courts have found that both the right to an award and the interest rate are discretionary in ERISA actions. For the reasons articulated below, the Court finds that an award of prejudgment interest at the federal postjudgment rate in 28 U.S.C. § 1961 is necessary and appropriate in this case to compensate FMCP for loss of use of its funds. Accordingly, FMCP's motion for summary judgment is GRANTED IN PART and DENIED IN PART and CareFirst's motion for partial summary judgment is DENIED, but FMCP's claim for prejudgment interest under the Maryland Prompt Pay Statute is rejected.

### A. FMCP's Entitlement to Prejudgment Interest under the PPP Agreement and the Maryland Prompt Pay Statute

 **[1]**   FMCP asserts in its motion for summary judgment that it is a participating provider under the PPP Agreement with respect to factor drugs, that CareFirst breached the PPP Agreement by failing to reimburse FMCP for factor drugs dispensed to CareFirst's insureds, and that FMCP is therefore entitled to a mandatory award of prejudgment interest under the Maryland Prompt Pay Statute, Md.Code Ann., Insur. § 15–1005(f), in the amount of $866,483.93. (ECF No. 100–1). FMCP argues that factor is covered under the PPP Agreement because the contract by its own terms is not limited to any particular service. (ECF Nos. 100–2, 22; 17, ¶ 8). CareFirst argues that the PPP Agreement is limited to Durable Medical Equipment ("DME") and does not cover provision of factor. CareFirst had maintained that in order to be reimbursed directly for factor, providers in CareFirst's network must have a Home Infusion Therapy ("HIT") contract. Thus, the Court must establish whether there exists a dispute of material fact relevant to whether FMCP is a par provider with respect to factor drugs under the PPP Agreement and, if there is not, must interpret the contract in order to conclude whether either FMCP or CareFirst are entitled to judgment as a matter of law. *See United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 78, 899 A.2d 819 (2006) (contract interpretation is a question of law that may be properly determined on summary judgment).

**[2]** Summary judgment is appropriate in breach of contract cases if the parties' intentions are clear based on the plain and unambiguous language of the contract. *Geo Plastics v. Beacon Dev. Co.,* 434 Fed.Appx. 256 (4th Cir.2011); *see also Pac. AG Group v. H. Ghesquiere Farms, Inc.,* 420 Fed.Appx. 278 (4th Cir.2011). By its own terms, the PPP Agreement is governed by Maryland law (ECF No. 2, Ex. A, ¶ 42), which follows the principle of the objective interpretation of contracts. *Ledo Pizza Sys. v. Ledo Rest., Inc.,* 407 Fed.Appx. 729 (4th Cir.2011). In determining the intentions of contracting parties under the objective theory of contracts, courts look at what a reasonable person in the same position would have understood as the meaning of the agreement regardless of the intent of the parties at the time of contract formation. (*Id.*); *see also Stratakos v. Parcells,* 172 Md.App. 464, 915 A.2d 1022 (2007).

**\*8 [3]** An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations. *Pac. AG Group,* 420 Fed.Appx. at 280–81 (internal citations omitted). Determining whether language in a contract is susceptible to more than one meaning requires an examination of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution. *Riley,* 393 Md. at 80, 899 A.2d 819 (quoting *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486 (1985)). Where a contract is ambiguous, summary judgment is nevertheless appropriate if the ambiguity can be definitively resolved by reference to extrinsic evidence. *Ledo Pizza,* 407 Fed.Appx. 729; the *see also Red Roof Inns, Inc. v. Scottsdale Ins. Co.,* 419 Fed.Appx. 325 (4th Cir.2011).

In accordance with the principles of contract interpretation set forth above, the Court turns first to the relevant language of the PPP Agreement. By way of the PPP Agreement dated August 12, 1997, FMCP became a "Participating Provider" in the Blue Cross Blue Shield of Maryland ("BCBSM") network and elected to become part of BCBSM's Preferred Provider Network ("PPN").[9] (ECF No. 2, Ex. A). Per the PPP Agreement, "Participating Provider means any provider who contracts with BCBSM to be paid directly for rendering Covered Services." (*Id.* at ¶ 5). "Covered Service" is defined in the PPP Agreement as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled." (*Id.* at ¶ 3). The PPP Agreement further provides that "You agree to provide Covered Services to Members in accordance with the terms and conditions of this Agreement; within the scope of your professional license or certification; and in accordance with, and subject to the provisions of the subscription agreements for the BCBSM programs." (*Id.* at ¶ 9).

The PPP Agreement requires CareFirst to reimburse FMCP for any "Covered Services" it provides to CareFirst's insureds, stating that,

> [w]e agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claims or any portion thereof in accordance with Maryland law.

(*Id.* at ¶ 20). In addition, the PPP Agreement provides that "BCBSM agrees that you may bill and collect directly from Members charges for services that have been determined not to be Covered Services." (*Id.* at ¶ 23). This is because, "[i]n the case of services rendered by a non-participating provider, CareFirst typically pays claims to members who are in turn responsible for paying the provider. On the other hand, CareFirst pays a participating provider directly when the provider renders services to a CareFirst insured." (Hanson Decl., ECF No. 116, ¶ 53). The PPP Agreement also sets forth a procedure for appeal, which establishes that BCBSM will provide FMCP with a procedure to appeal any decisions made in connection with the contract, FMCP will file any appeal within 90 days of the date it receives notice of CareFirst's determination that is the subject of the appeal, and both parties will be bound by the decision of an appeals committee. (ECF No. 2, Ex. A, ¶ 36). Next to a space labeled "Field of Practice or Specialty" on page 7 of the PPP Agreement, there is a handwritten notation stating "DME—(Pharmacy)." *See id.* There is no other mention of "DME" in the body of the 8–page contract. *See id.*

**\*9** CareFirst asserts that the handwritten notation indicates that the PPP Agreement is limited to Durable Medical Equipment ("DME"). *See* (Anuszewski Decl., ECF No. 117, ¶ 19) ("In 1997, CareFirst (then known as BlueCross BlueShield of Maryland) entered into a contract under which Feldman's became a par DME provider."); *see also* (ECF No. 17, ¶¶ 9–10) ("The contracts issued by CareFirst that

cover providers who send factor products to insureds' homes are referred to as Home Infusion Therapy contracts, or "HIT" contracts. The PPP Agreement referred to in the Complaint did not cover factor products. Instead, it covered only [DME].") DME "is medical equipment such as canes, wheelchairs, catheters and the like." (Gardner Decl., ECF No. 120–3, ¶ 7). "The definition of DME in the industry excludes item such as factor products which are used up. DME by definition is reusable ..." (ECF No. 17, ¶ 10).

FMCP argues that, "[c]ontrary to the allegations made by CareFirst, the [PPP] agreement ... does not contain any limitations on the type of services that may be provided to CareFirst's insureds." (Gardner Decl., ECF No. 120–3, ¶ 4). *Accord Id.* at ¶ 10 ("[t]he PPP Agreement speaks for itself and does not restrict coverage to durable medical equipment or any other specific products"); *see also* (Bostwick Decl., ECF No. 104, ¶ 35).[10] Given that there is only one handwritten notation mentioning "DME" in the contract, and this notation does not on its face limit the products or services covered, and that the remainder of the agreement does not refer definitively to "field of practice or specialty," the contract language does not plainly and unambiguously establish that the PPP Agreement renders FMCP a participating provider only with respect to DME. Thus, extrinsic evidence relevant to the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution must be considered.

The standard contracting practices of CareFirst provide relevant context for interpretation of the PPP Agreement. In her declaration testimony, Lisa Anuszewski, a Contract Manager for CareFirst, explains that,

> Because there are so many different types of medical services, CareFirst maintains many different provider networks. For example, CareFirst maintains a network of participating durable medical equipment ("DME") providers, a network of retail pharmacies, a network of hospitals, networks of many different physician specialties (such as cardiologists, orthopedists, pediatricians, etc.) The contract which a provider enters is meant to be specific to a particular network. Therefore, a provider can be par for one type of service, but non-par for another.

(ECF No. 117, ¶¶ 12–14). The Anuszewski Declaration further states that "[i]t is CareFirst's standard contracting policy the providers of Factor VIII who are based in Maryland and who want to be par with CareFirst join CareFirst's HIT network." (ECF No. 117, ¶ 29). CareFirst maintains that "because FMCP had a DME contract, but not a HIT contract, it was a participating provider for purposes of DME, but a non-participating provider for factor products." (ECF No. 17, ¶ 11). CareFirst's statement that "[t]he contract which a provider enters is meant to be specific to a particular network" suggests that FMCP's characterization of the contract as unrestricted to any particular products or services is wrong.

**\*10** FMCP did not provide any evidence controverting Ms. Anuszewski's characterization of CareFirst's contracting practices. While Ms. Gardner, formerly of FMCP, gave her own interpretation of the PPP Agreement as not limiting the services FMCP could provide under that Agreement (*see* Gardner Decl., ECF No. 120–3, ¶ 4), she did not present any evidence controverting Ms. Anuszewski's testimony on contracting practices. Additionally, Ms. Gardner would have no personal knowledge of the formation of the subject PPA agreement as she joined FMCP in 2003, years after the 1997 agreement was executed. (*Id.* at ¶ 2). While there was a dispute as to whether an RSA or HIT was ever required for FMCP to become a par provider for factor, there is no dispute on the contracting practices of CareFirst, that is, that the PPP agreement for "DME" was not viewed as authorizing FMCP as a par provider for factor. As Ms. Anuszewski stated: "[t]he contract which a provider enters is meant to be specific to a particular network. Therefore, a provider can be par for one type of service, but non-par for another." (ECF No. 117, ¶¶ 13–14). Indeed, Ms. Gardner of FMCP states that "the distinction [between a provider as participating or non participating] is within CareFirst's control." *See* (Gardner Decl., ECF No. 120–3, ¶ 5).

The circumstances of the parties at the time of execution of the PPP Agreement further support CareFirst's characterization of the contract. FMCP did not begin to dispense factor until FHM acquired the company approximately ten years after the parties entered the PPP Agreement. In addition, Anuszewski explains in her declaration testimony that,

> [FMCP] also maintains a par contract with CareFirst through the EPIC network of pharmacies ... The scope of the EPIC contract is basically standard prescription medication that is routinely filled by a

neighborhood pharmacy. If [FMCP's] 1997 contract covered all services that it could provide as a licensed pharmacy, then joining and staying in the EPIC network would have been completely superfluous.

(ECF No. 117, ¶¶ 24, 26, 27). Under the objective theory of contracts, the parties would not reasonably have understood that FMCP desired to become a participating provider with respect to factor and that the PPP agreement covered factor.

The Anuszewski Declaration further states that, "[t]he background documents related to the [PPP Agreement] show that Feldman's inquired about becoming a par DME provider. No other type of medical service was ever mentioned in those documents." (*Id.* at ¶ 20). Correspondence from BCBSM to FMCP attached to the PPP Agreement and collectively submitted as Exhibit A to FMCP's Complaint provides further extrinsic evidence that FMCP sought to become a par DME provider and that BCBSM considered the application as so limited. (ECF No. 2, Ex. A). The letter states,

Dear Provider,

In response to your inquiry regarding your request for a Durable Medical Equipment provider account number with Blue Cross Blue Shield of Maryland, Inc. (BCBSM), please provide us with the following information ...

**\*11** (*Id.* at 14). On the form following the introductory statement reproduced above, BCBSM requested a "detailed description of the services being rendered and/or equipment/supplies used," and FMCP responded "rental of wheelchairs, purchase or rental of walkers, glucometers [and] supplies, ostomy supplies, misc. small DME." (*Id.*). The PPP Agreement provides that "[a]pplications or other documents required by BCBSM for participation under this Agreement shall be incorporated in and made part hereof." (ECF No. 2, Ex. A, ¶ 46). It is not disputed that the form included in the correspondence from BCBSM referenced *supra* is required by BCBSM for participation in the PPP Agreement and therefore part of the contract. FMCP submitted it as an attachment to the PPP Agreement. FMCP provides no evidence controverting this or other CareFirst extrinsic evidence on the meaning of FMCP's PPP Agreement.

Having reviewed the record before it, this Court concludes that there is no genuine dispute of material fact regarding whether FMCP's PPP Agreement covers provision of factor, and that this issue turns upon interpretation of the contract and extrinsic evidence. Considered in the aggregate, the notation

in the PPP Agreement indicating that FMCP's specialty is "DME—(Pharmacy)," and associated correspondence and documents, CareFirst's standard practice of contracting with providers to become par with respect to specific networks, and FMCP's participation in the EPIC network, demonstrate that FMCP is not, as a matter of law, a participating provider with respect to factor under the PPP Agreement. [11]

## B. FMCP's Entitlement to Prejudgment Interest under ERISA § 502 of as an Assignee of CareFirst's Insureds

FMCP argues that even if it is a non-par provider with respect to factor drugs, it is entitled to reimbursement and prejudgment interest under ERISA § 502. (ECF No. 120, 11). FMCP may only recover under ERISA § 502 if there exists no dispute of material fact as to whether: (1) it has valid assignments from CareFirsts's insureds and (2) it has standing on the basis of the assignments to recover benefits due under the employer-provided insurance plans. 29 U.S.C. § 1132. The Court finds that FMCP has satisfied its burden and is entitled as a matter of law to assert its right under ERISA § 502 to direct reimbursement for factor drugs. Given that CareFirst has acknowledged that payment is due for the factor, waived any argument regarding "the invalidity of the assignments" and paid the principal balance, only the question of FMCP's entitlement to prejudgment interest, including the rate of such interest and the time periods for which interest is due, remains.

Both FMCP's right to interest and the rate of interest lie within the Court's discretion in this case given that ERISA § 502 preempts the Maryland Prompt Pay Statute. The Court finds that award of prejudgment interest is necessary to compensate FMCP and that the federal statutory post-judgment interest rate under 28 U.S.C. § 1961 is appropriate. The Court finds that there is no genuine dispute as to material fact regarding when interest began to run on the claims for services rendered prior to December 11, 2008. With respect to this group of claims, the Court finds that, as a matter of law, interest began to accrue on the 31st day after the date each claim was submitted. The Court also finds that interest began to accrue on the 31st day after the date the claims were submitted for the claims for services rendered after December 11, 2008, except for two particular claims. As set forth below, the Court finds that there exists a genuine dispute of material fact as to whether and when CareFirst requested certain documentation necessary for the processing and payment of these two claims. Thus, the Court does not award interest on these two claims. The Court further finds that interest ceased to run for each individual claim on the date CareFirst paid the claim.

## 1. FMCP's Standing as an Assignee of CareFirst's Insureds

**\*12** **[4]** FMCP asserts that it has valid assignments of benefits from the CareFirst insureds to which it dispensed factor and contends that, based on these assignments, it is entitled to seek direct payment from CareFirst, regardless of its status as a par or non-par provider under the PPP Agreement. (ECF No. 120, 11). Notwithstanding certain statements in its motion papers, as made absolutely clear in the hearings, CareFirst does not challenge the validity of the assignments that FMCP has from CareFirst's insureds. *See also* (ECF No. 127, 5)("[FMCP's] only cognizable rights are those it has by virtue of being an ERISA assignee."). Based on the record before it, the Court finds that FMCP has standing as a valid assignee to seek prejudgment interest under ERISA § 502.

It is undisputed that the patients to whom FMCP dispensed factor drugs obtained their health insurance from CareFirst through employer-sponsored plans that are governed by ERISA. (ECF No. 53, 10)(internal citation omitted). ERISA § 502(a) empowers certain classes of people to bring civil actions to recover benefits due under such plans. 29 U.S.C. § 1132(a)(1)(B) ("[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan."). A majority of courts have recognized that health care providers may acquire derivative standing to bring an action against a health benefit plan payor to recover the benefits payable under the plan for services rendered by the provider to the participants in or beneficiaries of the plan. Although the Fourth Circuit has not addressed this issue, the Court previously held in this case that FMCP has standing because "a health care provider has derivative standing under ERISA by obtaining a written assignment from a participant or beneficiary of his right to payment of medical benefits." (ECF No. 53, 10–11) (collecting authority)(stating that "other circuits have consistently recognized such standing when based on the valid assignment of ERISA ... benefits by participants and beneficiaries."); *see also* 133 A.L.R. Fed. 109 ("Health care providers often rely on assignments of benefits from their patients in order to receive payment directly under the health insurance policies or other health benefit plans covering the patients.").

Thus, in order to demonstrate entitlement as a matter of law to prejudgment interest under § 502 of ERISA, FMCP must initially demonstrate that it has valid assignments from

each of the CareFirst insureds to which it dispensed factor in conjunction with the claims for reimbursement at issue in this case. In support of its motion for summary judgment, FMCP submitted declaration testimony indicating that it has written assignments of benefits from each of the eight CareFirst insureds to whom it dispensed factor in conjunction with the claims at issue in this case. (Bostwick Decl., ECF No. 104, ¶¶ 39–40)("Each of the patients to whom [FMCP] dispensed Factor signed an Assignment of Benefits pursuant to which they assigned and transferred 'to FHM and FCS all rights, title and interest to reimbursement payable to me for services provided by FHM, FCS and its associated contract provider' ... Each patient also requested 'that FHM act on my behalf to submit charges for services rendered by FCS or its associated contract providers and I hereby authorize payment directly to FHM, FCS or its associated contract providers of any benefits otherwise payable for items/services, at a rate not to exceed FHM's regular charges for such items/services.' "). In addition, FMCP submitted copies of each of these assignments for the Court's review in advance of the August 11, 2011 hearing. (ECF No. 137).

**\*13** CareFirst stated in its motion for partial summary judgment that "[a]s is typically the case, the insurance contracts at issue in this matter do not allow the members to assign their rights to payment to a non-par provider to any other person." (ECF No. 110, 7); *see also* (Hanson Decl., ECF No. 116, 76–77)(stating that the insurance contracts for at least six of the eight insureds implicated in this case prohibit the member from assigning his or her benefits). Nevertheless, CareFirst does not move for summary judgment on FMCP's assignment-based claims under ERISA and conceded unequivocally on the record during the August 11, 2011 hearing that it has waived any objection to the validity of the assignments.

Accordingly, the Court finds that FMCP is a valid assignee with standing to assert the rights of CareFirst's insureds under their employer-sponsored health benefit plans for the factor as a covered service.

## 2. ERISA Preemption of FMCP's Claim for Prejudgment Interest under the Maryland Prompt Pay Statute

**[5]** ERISA's civil enforcement provision, § 502(a), preempts state law claims that come within its scope and converts those claims into federal claims under § 502. *Metropolitan Life Insur. Co. v. Taylor,* 481 U.S. 58, 64–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Darcangelo v. Verizon Commc'ns,*

*Inc.,* 292 F.3d 181, 187 (4th Cir.2002)(internal citations and quotation marks omitted). As this Court previously explained in this case, "[a] state claim is preempted by § 502 if: (1) the plaintiff has standing under § 502(a); (2) the claim is within the scope of § 502(a); and (3) the claim is not capable of resolution without interpretation of the ERISA plan." (*Id.* at 9)(citing *Sonoco Prods. Co. v. Physicians Health Plan, Inc.,* 338 F.3d 366, 372 (4th Cir.2003)). Each of these requirements is met here.

[6] FMCP's claims for reimbursement for factor drugs, which have now been paid, and consequently its claim for prejudgment interest, are dependent upon and derive from FMCP's right to recover benefits under ERISA plans. *See Hermann Hospital v. MEBA Medical & Benefits Plan,* 845 F.2d 1286, 1290 (5th Cir.1988) (holding that a third-party provider's state law claims were preempted by ERISA where those claims were "dependent on, and derived from, the rights of the plan beneficiaries to recover benefits under the terms of the plan.").

### 3. Award of Prejudgment Interest under ERISA § 502

[7] Congress' purpose in enacting ERISA in 1974 was "to promote the interests of employees and their beneficiaries in employee benefit plans, ... and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)(internal citations and quotations omitted). However, the original legislation did not address several substantive remedies. As a result of this omission, the Supreme Court has determined that extra-contractual damages, compensatory damages, and punitive damages are not available under ERISA. Despite this strict interpretation of ERISA's language, however, the Court has permitted a participant or beneficiary to recover prejudgment interest as part of a claim for unpaid benefits. Similarly, all circuits have adopted prejudgment interest as a remedy under ERISA to prevent the unjust enrichment.

**\*14** [8] [9] Federal law controls the issuance of prejudgment interest awarded on federal claims. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 194, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). "ERISA does not specifically provide for prejudgment interest, and absent a statutory mandate the award of prejudgment interest is discretionary with the trial court." *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1030–31 (4th Cir.1993)(en banc). The presumption in favor of prejudgment interest, especially in ERISA cases, is widely recognized, however. *Ehrman v. The Henkel Corp. Long–Term Disability Plan*

*and Prudential Life Insur. Co.,* 194 F.Supp.2d 813, 821 (2002)(citing *Rivera v. Benefit Trust Life Insur. Co.,* 921 F.2d 692, 696–97 (7th Cir.1991)). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee,* 515 U.S. at 195, 115 S.Ct. 2091. Prejudgment interest is viewed as a form of compensatory damage designed to place the plaintiff in the same position as if no violation had occurred. *Id.* A participant whose ERISA benefits are delayed but ultimately paid prior to judgment, as in this case, may seek to recover interest on the delayed payment as a form of "other equitable relief" under ERISA, even though there has been no underlying judgment awarding such benefits. *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193 (3d Cir.2004).

[10] In exercising its discretion to award prejudgment interest, the Court may take into consideration "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.' " *Jones v. UNUM Life Insur. Co. of Am.,* 223 F.3d 130, 139 (2d Cir.2000)(quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir.1996)).

There is no issue in this case of whether CareFirst owed payment as a matter of law—whether to its insureds or FMCP —for the claims for factor drugs at issue in this case. Although CareFirst previously argued that it could not pay FMCP because it did not have the necessary license to dispense factor drugs in accordance with Maryland law, it has since abandoned this position and paid the balance due on the claims. FMCP suffered a loss of opportunity to use the funds to which it was entitled because CareFirst erroneously denied payment on the basis that FMCP needed an RSA license. FMCP contends that loss of these funds necessitated the December 19, 2009 sale of its assets. (Bostwick Decl., ECF No. 104, at ¶ 21). FMCP does not, however, state that the sale was financially disadvantageous, nor does FMCP attempt to quantify any loss from the sale. Nor would it seem that such a loss, if proven, would be recoverable. *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (Money damages cannot be awarded under ERISA).

**\*15** In any event, FMCP's failure to present a more full picture of this alleged consequence prevents any consideration of it in selecting the appropriate interest rate. However, in the Court's judgment, interest is necessarily awarded in this case both to fully compensate the FMCP for

loss of use of funds wrongly withheld and to prevent CareFirst from unfairly benefitting by its delay in payment.

Having found that an award of prejudgment interest is necessary, the Court must determine the appropriate rate, which "for cases involving federal questions is a matter left to the discretion of the district court." *Quesinberry,* 987 F.2d at 1031 (relying on *United States v. Dollar Rent A Car Systems, Inc.,* 712 F.2d 938, 940 (4th Cir.1983)). Both parties recognize that the applicable interest rate in an ERISA action lies within the Court's discretion (ECF No. 126, 10; ECF No. 127, 6–8). FMCP urges the Court to apply the escalating Maryland Prompt Pay rate (id. at 11), and asserts that "FMCP can be compensated only if it is granted a *substantial* award of interest" (*id.* at 9)(emphasis in the original). [12] FMCP also notes that "[t]he Maryland pre-judgment statutory interest rate is 6% per annum." (*Id.*) (citing Md. Const. Art. III, § 57).

Thus, while FMCP argues for the Maryland Prompt Pay interest formula, and mentions the state statutory interest rate of 6%-all higher than the Section 1961 rate-FMCP does not demonstrate, or indeed even argue, that the federal rate does not "place it in the position [it] would have occupied but for the defendants wrongdoing." *Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 619 (3rd Cir.1998). FMCP merely conclusorily declares that it "can be compensated only if it is granted a *substantial* award of interest." (ECF No. 127, 9) (emphasis in the original).

CareFirst contends that the Maryland Prompt Pay Statute should be excluded from consideration because interest under its terms amounts to a penalty (ECF No. 127, 6), and submits that two alternative rates are justifiable in this case: (1) the federal post-judgment interest rate in 28 U.S.C. § 1961(a) (the "Section 1961 rate") and (2) the prime rate. (ECF No. 127, 6–7).

[11] Generally, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of a particular case require a different rate." *Blankenship v. Liberty Life Assurance Company of Boston,* 486 F.3d 620, 628 (7th Cir.2007)(citing *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1164 (9th Cir.2001)). A number of courts have approved the Section 1961 rate to compute pre-judgment interest on ERISA damage awards. *See e.g., Cottrill v. Sparrow, Johnson, & Ursillo, Inc.,* 100 F.3d 220, 224–25(1st Cir.1996); *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1331 (8th Cir.1995); *Sweet v. Consolidated Aluminum Corp.,* 913 F.2d 268, 270 (6th Cir.1990); *Blanton v. Anzalone,* 760 F.2d 989, 992 (9th Cir.1985). While the Fourth Circuit has let an award of a Virginia state interest rate of 6% stand in *Quesinberry* without discussion, 987 F.2d at 1031, it has not declared a position on the appropriate rate nor provided any definitive guidance. While FMCP argues that the Fourth Circuit in *Quesinberry* "specifically endorsed the use of a state statutory rate" *see* (ECF No. 126, 4), the Court disagrees. [13] "The essential rationale for awarding prejudgment interest is to insure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Division, National Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995).

*16 [12] The Court finds that the Section 1961 rate adequately compensates FMCP for loss of the use of its funds and does not amount to a penalty against CareFirst. *See Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 618 (6th Cir.1998) ("Although prejudgment interest is typically not punitive, an excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one in contravention of ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing."). In addition, "use of the federal rate promotes uniformity in ERISA cases and provides an objective measure of the value of money over time." *Edmonds,* 1998 WL 782016, at *2 (citing *Cottrill,* 100 F.3d at 225).

The Court does not believe that there is "substantial evidence that the equities in [this] particular case require a different—[higher] rate." *Blankenship, supra.* Notably in Blankenship, the plaintiff presented a factual record that Liberty Life's wrongful nonpayment of ERISA benefits required him to sell his investment, a mutual fund which had a 10.01% rate of return during the relevant period. The Ninth Circuit found on this record that "the district court did not abuse its discretion in awarding prejudgment interest at a rate that exceeded the standard Treasury bill rate." *Id.* at 628. Similarly, in *Fox v. Fox,* 167 F.3d 880, 884 (4th Cir.1999), there was a factual basis for the 12% prejudgment interest rate awarded—the S & P performance during the relevant time period. *Accord Meyer v. Berkshire Life Ins. Co.,* 250 F.Supp.2d 544, 573–74 (D.Md.2003) (8% prejudgment interest rate awarded based on evidence of market performance during relevant time period).

FMCP did not prevent any evidence justifying a higher interest rate to fully comensate the company for the loss of the

use of monies during the relevant time period. Without such evidence, the Court declines to grant any interest rate higher than allowed under § 1961.

Finally, FMCP seems to suggest that a higher interest rate should be imposed because "CareFirst wrongly refused to pay in excess of $1.8 million in properly submitted invoices for well more than 32 months." *See* (ECF No. 126, 4). However, an award under ERISA cannot be punitive, only compensatory. CareFirst asserts that its belief that FMCP was improperly licensed was based upon FMCP's own representations about its services and practices. *See* (ECF No. 110, 25 and exhibits cited therein). FMCP counters that "on information and belief, CareFirst knew that [it was not true that FMCP required a RSA license]." *See* (ECF No. 104, ¶ 57). *See also* (*Id.*, ¶¶ 59–60). There is a dispute as to fact as to whether FMCP ever told CareFirst that it was not required to have a RSA. *Compare* (Anuszewski Dec., ECF No. 117, ¶¶ 36, 41) *with* (Gardner Decl., ECF No. 120–3, ¶ 6). The evidence paints a picture of legitimate confusion, on both sides and indeed on the part of the involved agencies. There is arguably a picture of bureaucratic miscommunication, but not of venality. The parties have submitted correspondence from various FMCP and CareFirst representatives relevant to the RSA issue to both the Board of Pharmacy and the Office of Health Care Quality. It appears for some period of time FMCP thought it might need an RSA license for the medical equipment and supplies it provided and sometimes delivered. *See, e.g.,* (ECF No. 121, Ex. B—May 12, 2008 letter from FMCP to office of Health Care Quality); (ECF No. 121, Ex. B—May 23, 2008 letter to FMCP from DHMH requesting RSA license). While ultimately wrong on FMCP's need for an RSA license for provision of factor, and FMCP must be compensated for its loss of use of the delayed payment for factor, there is no clear basis in fact that CareFirst's position was frivolous or ill-motivated, and even if so shown, no basis in the law to impose a high interest rate to punish CareFirst for its conduct.

 **\*17**  Having decided to adopt the Section 1961 rate in this case for the reasons set forth above, the Court must define the other variables necessary to calculate prejudgment interest in this case. As stated above, prejudgment interest serves principally to compensate a plaintiff for the loss of use of money over time. To ascertain the effect of the loss of the use of money, "it is necessary to determine when the wrongful deprivation occurred and the duration of the deprivation." *Edmonds,* 1998 WL 782016, at \*3. In this case, the applicable rate is the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal

Reserve System, for the calendar week preceding the date on which interest begins to accrue for each of the individual claims at issue.

The parties dispute the date on which interest should begin to accrue. At issue are 40 distinct claims for factor drugs dispensed to eight individual patients between February 6, 2008 and the filing of this action on June 1, 2009. [14] CareFirst argues that the claims should be divided into two categories for the purpose of calculating interest: claims for service predating and post-dating December 11, 2008, the date on which FMCP obtained its RSA license. [15] For clarity and ease of reference, the Court will refer to these two categories as "pre-RSA" and "post-RSA" claims. FMCP maintains that interest began to run on the 31st day after FMCP submitted each of its individual claims and was at no point tolled. (ECF No. 120, 26).

With respect to the pre-RSA claims, CareFirst asserts that, prior to December 11, 2008, a reasonable dispute existed as to whether FMCP was properly licensed to dispense factor drugs. (ECF No. 110, 20–21). CareFirst further contends that payment did not become due, and interest therefore should not run, until after the licensure dispute was resolved to its satisfaction by the Pharmacy Board's August 18, 2010 advisory opinion, which stated that a pharmacy does not require an RSA to drop ship factor drugs to patients' homes in accordance with Maryland law. [16] (ECF No. 110, 17). Under the Maryland Prompt Pay Statute, an insurer must pay a properly submitted or "clean" claim within 30 days. Md.Code Ann., Insur. § 15–1005(c). Based upon this standard, CareFirst contends that—even though it has voluntarily paid the claims on the basis that FMCP in fact never needed an RSA—interest should accrue from September 17, 2010, the 31st day after it received the Pharmacy Board's opinion. (ECF No. 110, 17).

 **[13]**   The Court finds that, with respect to the pre-RSA claims, interest accrues from the 31st day after each claim was submitted irrespective of CareFirst's beliefs about FMCP's licensure requirements. The Court notes that the Maryland Prompt Pay Statute, which governs timeliness of payment of claims for health care services under Maryland law, makes no provision for withholding payment based upon a "reasonable belief" that the claim is somehow improper. Indeed, the Maryland General Assembly amended the statute in 2000 to omit the provision that "this section does not apply when there is a good faith dispute about the legitimacy of a claim or the appropriate amount of reimbursement." Md.Code Ann.,

Insur. § 15–1005. In this case the Court does not have to decide whether CareFirst was obligated to pay the claims under the Prompt Pay statute notwithstanding its question regarding RSA licensure. However, by refusing payment on the grounds that FMCP was not properly licensed, CareFirst accepted the risk that its position was inaccurate. CareFirst was wrong about FMCP's need for a RSA license. CareFirst should not benefit from its error. CareFirst could have deposited the amount billed for factor drugs in an interest bearing escrow account until the issue was resolved. Instead, however, CareFirst withheld the funds and benefited from their use until it ultimately paid the claims during the pendency of the litigation. As FMCP points out in its briefing, the claims at issue did not become "clean" when the Pharmacy Board rendered its advisory opinion; rather, the Pharmacy Board merely confirmed that the claims were "clean" from the moment they were submitted. (ECF No. 120, 19). Thus, the date that the wrongful deprivation occurred, and on which interest begins to run in this case, is the 31st day after each pre-RSA claim was submitted. Thus, the interest to be applied during the entire period, that is, until the claim was paid, is the Section 1961 interest rate for the calendar week preceding the date on which interest begins to accrue for each of the claims at issue. While the Court understands that the federal rate decreased over the period of interest entitlement (ECF No. 127, Ex. 1), the Court is awarding FMCP the (higher) interest in effect *as of* interest entitlement began throughout the period and is not requiring computation on a weekly basis, as the interest rate changes. Obviously, if CareFirst had paid FMCP when it was entitled to the money, FMCP could have made other decisions about use of the money which might have brought a more favorable return. *See Edmonds v. Hughes Aircraft Co.,* 1998 WL 782016 (E.D.Va. Nov. 6, 1998). Finally, the interest should be compounded monthly to more closely put FMCP in the position it otherwise would have been in. *See Ehrman v. The Henkel Corp.,* 194 F.Supp.2d 813, 821–22 (C.D.Ill.2002) and cases cited therein. The Court does not penalize CareFirst by reaching this conclusion, but rather ensures that the party bearing the risk for the underlying error is not unjustly enriched.

**\*18** With respect to the post-RSA claims, CareFirst contends that interest began to accrue on August 18, 2010, the date of the Pharmacy Board's advisory opinion. (ECF No. 116, ¶¶ 80–83). CareFirst argues that it requested additional documentation from FMCP with respect to the post-RSA claims, thereby effectively stopping the interest "clock." (ECF No. 121, 5). CareFirst again invokes the Maryland Prompt Pay Statute rubric (ECF No. 121, 5), citing

the notice provision in Md.Code Ann., Insur. § 15–1005(c), which provides that:

Within 30 days after receipt of a claim for reimbursement from a person entitled to reimbursement ... an insurer, nonprofit health service plan, or [HMO] shall:

(1) mail or otherwise transmit payment for the claim in accordance with this section; or

(2) send a notice of receipt and status of the claim that states:

(i) that the insurer, nonprofit health service plan, or [HMO] refuses to reimburse all or part of the claim and the reason for the refusal;

(ii) that, in accordance with § 15–1003(d)(1)(ii) of this subtitle, the legitimacy of the claim or the inappropriateness of the amount of reimbursement is in dispute and additional information is necessary to determine if all or part of the claim will be reimbursed and what specific information is necessary; or

(iii) that the claim is not clean and the specific information necessary for the claim to be considered a clean claim.

The Hanson Declaration explains that "it is perfectly normal for CareFirst to sometimes require a provider to submit medical records to support a claim. When this happens, the claim is not considered clean until the documentation is received. CareFirst then has 30 days from receipt of the medical records to process the claim." (ECF No. 116, ¶ 32–33). The Hanson Declaration further states that "[i]n some instances, CareFirst has reason to more carefully scrutinize claims from a given provider. One way to do so is to "pend" claims from that provider in CareFirst's systems, meaning that claims from the provider will not be allowed to go through the automated claims processing systems." (*Id.* at ¶ 34). The Special Investigations Unit at CareFirst pended the post-RSA claims to investigate numerous "red flags" it had identified related to FMCP's billing for factor drugs. (ECF No. 116, ¶¶ 11–22). Exhibit A to the Hanson Declaration is a letter dated July 22, 2009 from Ms. Hanson to FMCP requesting additional information for each of the post-RSA claims. The letter states as follows:

CareFirst Special Investigations has received several claims for services billed by [FMCP] as detailed in the enclosed chart.

In order for CareFirst Special Investigations to complete the processing of these claims, we need additional information for each claim as indicated. The claims will be placed in our closed files, but will be reviewed when the necessary information is received.

(ECF No. 116, Ex. A). Exhibit E to the Declaration of Patrick deGravelles ("deGravelle Declaration") submitted in support of CareFirst's motion for summary judgment is email correspondence from Mr. deGravelles dated September 25, 2009 again requesting additional records in support of the post-RSA claims. (ECF No. 115, Ex. E). The Hanson Declaration states that Ms. Hanson "finally received the records for the post-December 11, 2008 claims on October 2, 2009." (ECF No. 116, ¶ 47); *see also* (ECF No. 110, 10)("in the case of services provided after FMCP received its RSA (December 11, 2008), the necessary records were received by CareFirst on October 2, 2009."). Upon receiving the records, Ms. Hanson states that she "immediately sent them to ICORE, which is a an entity CareFirst uses to review certain types of claims." (Hanson Decl., ECF No. 116, ¶ 48). Once ICORE approved the claims, CareFirst "stood ready to pay." (*Id.* at ¶ 49). CareFirst asserts that, because it did not consider FMCP to be a par provider with respect to factor drugs, it filed an interpleader action within 30 days of receiving the records, and requested that the Circuit Court for Baltimore County (where the case was then pending) direct the clerk to accept the amount until such time as it was determined whether the members or [FMCP] should be paid. (ECF No. 110, 11) (citing Hanson Decl., ECF No. 116, ¶ 51). FMCP opposed the interpleader action. (ECF No. 47–2). CareFirst asserts that its interpleader action also stops the interest "clock" with respect to the post-RSA claims because it represents a good faith attempt to make payment. (ECF No. 121, 5).

**\*19** The Court first addresses CareFirst's argument that its request for additional documentation tolls the accrual of interest on the post-RSA claims. CareFirst points to its request on July 22, 2009 for additional medical information for some 21 individual post-RSA "dates of service" (or claims) as the justification for its delay in payment of the post-RSA claims and its argument that interest should not run on these claims until FMCP provided the requested information. (ECF No. 116, Ex. A). At the August 11, 2011 hearing in this matter, CareFirst argued that these requests satisfy the notice requirement in Md.Code Ann., Insur. § 15–1005(c). This is a largely untenable argument, however, in light of the Prompt Pay Statute requirements for timely processing of claims. Ms.

Hanson's records request is dated July 22, 2009, more than 30 days after the date of service for each of the 21 claims identified in an attached chart ("Patient List"). (ECF No. 116, Ex. A). Thus, the request was untimely when considered for payment purposes and does not toll the accrual of interest on the post-RSA claims. *See* Md.Code Ann., Insur. § 15–1005(c) (stating that any additional information required to process a claim must be requested within 30 days).

Also at the August 11, 2011 hearing, CareFirst raised the argument that "provider vouchers" issued to FMCP satisfy the notice requirement of Md.Code Ann., Insur. § 15–1005(c) with respect to the post-RSA claims. Following the hearing, CareFirst submitted these vouchers, which had previously been produced in discovery, for the Court's review. (ECF No. 138). Given that CareFirst did not raise the issue of its requests for documentation with respect to the pre-RSA claims in its submissions and did not raise the provider voucher argument until the August 11, 2011 hearing, the Court shall restrict its consideration of the provider vouchers to the post-RSA claims, for which CareFirst argued that outstanding documentation requests tolled the accrual of interest.

The provider vouchers indicate, even to a lay person without expertise in medical claims coding and processing, that CareFirst withheld payment on certain claims for a variety of discrete reasons, including incomplete documentation, or that the service is not a covered benefit when performed by this provider type. *See* (ECF No. 138). Of the 21 claims included on Ms. Hanson's July 22, 2009 Patient List (ECF No. 116, Ex. A), only two corresponding provider vouchers identify the need for more information as the reason payment was withheld, *see* (ECF No. 138)(stating "A–This claim cannot be processed because the medical documentation that the provider of service supplied to us is incomplete. The information still needed is the medical records for this service"). [17] As to the rest of the claims on the Patient List, either no denial code was listed, or CareFirst did not provide documentation or another reason, besides insufficient medical information, was listed. In other words, only two of the provider vouchers appear to request the same type of medical records information for post-RSA claims as the July 22, 2009 records request did. These two claims are invoice numbers 17790 and 17629 for services rendered on April 9, 2009 and March 27, 2009 respectively. As stated above, the provider vouchers must issue to FMCP within 30 days of the date the claim was received by CareFirst in order to satisfy the 30–day notice requirement in the Maryland Prompt Pay Statute, Md.Code Ann., Insur. § 15–1005(c). Two

critical pieces of information necessary to determine whether interest is due and the start date of interest entitlement are unclear from the provider vouchers: (1) the date on which each of the two claims was received by CareFirst and (2) the date CareFirst issued provider vouchers corresponding to the these two claims. [18] If these two dates are more than 30 days apart, then CareFirst's request for medical records in the provider vouchers was untimely under the Maryland Prompt Pay Statute and do not toll the accrual of interest with respect to the claims with invoice numbers 17790 and 17629. It is also not clear from the record before the Court when the medical records requested by way of the provider vouchers were ultimately submitted to CareFirst (whether as part of the records submitted on October 2, 2009 or otherwise). Without that date—the date that the claim was "clean," it is not possible to compute the start date of interest entitlement.

**\*20** **[14]** In sum, with respect to the claims with invoice numbers 17790 and 17629, there exists a genuine dispute of material fact as to whether interest was tolled between the date on which CareFirst issued the provider voucher (if the voucher was issued within 30 days of the date of service) and when the medical records requested in the provider voucher were received by CareFirst (the date of which is not clear from the record). As to all the other post RSA claims, payment was due and interest accrues from the 31st day after the claim was submitted, as with the pre-RSA claims, computation of interest throughout the period of interest entitlement shall be at the applicable federal rate on the onset date of interest entitlement.

Finally, with respect to CareFirst's argument that the interest clock again was tolled when it attempted by interpleader action to pay the amount due for the post-RSA claims into the Circuit Court for Baltimore County, the Court finds that the interest continued to accrue. As stated above, the prejudgment interest award in this case is intended to compensate FMCP and to prevent CareFirst from being unjustly enriched, as it had use of the principal during this period. [19]

### IV. CONCLUSION

For the reasons set forth above, the Court finds that FMCP is not entitled to prejudgment interest under the Maryland Prompt Pay Statute as it is not a par provider with respect to factor drugs under the PPP Agreement. Based on its assignments of benefits from CareFirst's insureds, however, FMCP is entitled to direct reimbursement under ERISA § 502. Given that FMCP's right to payment arises from ERISA's

civil enforcement provision, which completely preempts the Maryland Prompt Pay Statute, ERISA also governs FMCP's claim for prejudgment interest. Considering that the award of prejudgment interest is intended to compensate the plaintiff for the loss of use of its money and thereby to make it whole, and considering that FMCP's right to payment arose under federal law and the use of the federal rate will promote both uniformity and predictability under ERISA and in the absence of any strong equitees in FMCP's favor, the Court concludes that the appropriate rate is the federal postjudgment interest rate under 28 U.S.C. § 1961.

Thus, the Court GRANTS IN PART and DENIES IN PART FMCP's motion for summary judgment and finds FMCP entitled to prejudgment interest under ERISA § 502, not under the Maryland Prompt Pay Statute. The Court DENIES IN PART CareFirst's motion for summary judgment with respect to FMCP's claim for interest under the Maryland Prompt Pay Statute.

For all claims for services rendered prior to December 11, 2008, prejudgment interest shall accrue from the date of the wrongful deprivation of benefits—in this case, the 31st day after each claim for factor drugs was received—until the date of payment for each individual claim. Prejudgment interest shall accrue from the 31st day after the claim was submitted to CareFirst for each claims for factor drugs dispensed after December 11, 2008, with the exception of two claims (invoice numbers 17790 and 17629 for services rendered on April 9, 2009 and March 27, 2009 respectively). With respect to these two claims, there exists a genuine dispute of material fact regarding whether certain prerequisites to payment were outstanding and, if so, when they were satisfied. Prejudgment interest shall cease to run on all claims for which interest is due, whether for factor drugs dispensed before or after December 11, 2008, on the date that each individual claim was paid. In addition, CareFirst shall be credited $23,017 for interest already paid to FMCP.

**\*21** The parties should submit within two weeks of the date of this Memorandum Opinion and Order an accounting of their prejudgment interest calculations for each of the 38 individual claims for which interest is due under this Order, and the total sum due. If either party intends to move for summary judgment with respect to prejudgment interest on the two remaining claims, it should do so within two weeks of this Memorandum Opinion and Order. If the moving party believes that resolution requires a hearing, it should make this known to the Court within two weeks as well.

## Footnotes

1 The Court notes several discrepancies in the record regarding the amount due and the amount paid to FMCP in satisfaction of the principal balance of the claims at issue. The Complaint states that FMCP sought payment in the amount of $1,588,127.77. (ECF No. 2). The Hanson Declaration states that CareFirst paid $1,704,295.27 (ECF No. 116, ¶ 75) and CareFirst's combined opposition and motion for partial summary judgment states that "[FMCP] has received about $1.7 million in payments already, which is actually more than it sought in the Complaint." (ECF No. 110, 5). For the purposes of this decision, the Court accepts as correct the figure paid on the universe of claims that parties agreed upon in correspondence submitted to the Court on August 18 and 19, 2011, and as stated in the Supplemental Declaration of Jaime Hanson ("Hanson Supplemental Declaration") submitted as an attachment thereto. (ECF Nos. 144, 145). As cited above, this figure is $1,547,054.87. A chart attached to the Hanson Supplemental Declaration and submitted by CareFirst indicates that CareFirst paid the claims between September 17, 2010 and December 24, 2010. (ECF No. 145).

2 CareFirst in its combined opposition and motion for partial summary judgment disputed FMCP's claim for non-payment of invoices totaling $109,989.32, which it referred to as claims pertaining to patients "A, B, and C," on the basis that these three claims are for services rendered after the filing of the Complaint on June 1, 2009. (ECF No. 109, 1). The parties subsequently stipulated that "Plaintiff is not seeking any relief in this matter with respect to the claims identified in Defendant's Motion for Partial Summary Judgment relating to patients 'A, B, and C.' " (ECF No. 120–2). Thus, the Court shall not address the claims pertaining to patients A, B, and C totaling $109,989.32 or the issue of whether payment is due on the claims included in the Complaint. Similarly, the Court shall not address FMCP's entitlement to attorneys' fees and costs under ERISA, as FMCP has clarified that it "only mentioned the attorneys' fees issue in its Motion to put the Court on notice that it intends to seek attorneys' fees if it is successful in this case," but does not seek such relief at this time. (ECF No. 120, 5 n.2). After judgment is entered, the Court shall consider and award attorneys' fees under ERISA, as appropriate.

3 In response to the Court's letter order dated August 18, 2011 requesting additional information (ECF No. 135), CareFirst submitted along with the Hanson Supplemental Declaration a chart indicating the date of service, date of claim, and date of payment for each claim at issue. (ECF No. 145). The Court does find as a matter of fact that the payment dates submitted by CareFirst are accurate as FMCP does not dispute them.

4 FMCP was a wholly-owned subsidiary of FHM during the time period relevant to the underlying suit. On December 19, 2009, FMCP's assets were sold to Rajendra Appalaneni. (Bostwick Decl., ECF No. 104, at ¶ 21). The sale of FMCP's assets specifically excluded receivables, including any money received from CareFirst in connection with the claims at issue in this case. (Id.).

5 See (ECF No. 17, $236,864.52 for John Does 1 and 2).

6 See footnote 2 supra.

7 CareFirst explains by way of the Hanson Declaration that, in reaching its figure of $23,017, "interest was calculated differently for the claims pre-dating [FMCP's] receipt of its RSA (which happened on December 11, 2008) and for the claims for services after that date." (Hanson Decl., ECF No. 116, ¶¶ 80–83). The Court addresses FMCP's interest calculations in greater detail below.

8 FMCP raised an additional argument for the first time at the June 9, 2011 hearing, that is, that FMCP had an implied contract with CareFirst based upon a course of dealing since FMCP's founding entitling it to direct payment for factor products as a par provider. FMCP argues that the PPP Agreement is irrelevant under this theory of the case. This claim was not raised in the Complaint or in motions papers. On the contrary, FMCP attached the PPP Agreement to its Complaint and argued that it is the controlling contract. In addition, the deposition testimony of Julia White, a staff pharmacist for FMCP, indicates that FMCP began to distribute factor drugs to patients *after* FMCP was purchased by FHM in 2007. (ECF No. 120–5, ¶ 5). Counsel for the plaintiff confirmed this during the August 11, 2011 motions hearing. Thus, there could be no implied contract arising out of a course of dealing stretching back to FMCP's founding with respect to FMCP's provision of factor drugs and CareFirst's reimbursement for the same. Finally, of course, CareFirst is not now challenging FMCP's entitlement to reimbursement for the cost of the factor or indeed interest—just the amount and manner of interest.

9 BCBSM subsequently became CareFirst.

10 The PPP Agreement most certainly by explicit terms limits providers to provision of services and supplies "within the scope of your professional license or certification." (ECF No. 2, Ex. A, ¶ 9). Accordingly, if FMCP needed an RSA or HIT certification for provision of factor, this contract, independent of the DME notation, would not allow that.

11 This analysis resolves the issue of whether FMCP is entitled as a matter of law to direct reimbursement for factor drugs as a "par provider." However, the Court notes that previously in this case there was a separate dispute as to whether FMCP was entitled to reimbursement for provision of factor even as a "non-participating provider" because CareFirst believed that FMCP did not have the required licensure. CareFirst maintained that FMCP was required by Maryland law to have a Resident Services Agency ("RSA") license in order to dispense factor. FMCP maintains that it never needed a RSA license and that, although it eventually did obtain a RSA license on December 8, 2008, it did so only to placate CareFirst in an effort to secure reimbursement. (Gardner Decl., ECF No.

120–3, ¶ 11) ("Although we continued to believe that Feldman's did not need an RSA under the law, we still relied on CareFirst's representations and demands that CareFirst required that Feldman's obtain one in order to be paid for the claims that had been submitted. Therefore, we completed the necessary applications."). CareFirst asserts, pointing to FMCP correspondence with the Office of Health Care Quality about whether it needed an RSA, that FMCP sought the RSA license for reasons other than CareFirst's insistence, (ECF No. 121, 3–5). Indeed, there seems to be some support for that view. However, this dispute is not material, to whether FMCP had a PPP Agreement governing provision of factor, as a matter of law. Relying in large part on an advisory opinion from the Maryland Board of Pharmacy regarding this issue, CareFirst effectively, if not expressly, has conceded that FMCP was not required to have an RSA license in order to drop ship factor to patients' homes. Believing it to be relevant to FMCP's claim for prejudgment interest under the Maryland Prompt Pay Statute, the parties discuss at great length in their briefing the issue of whether FMCP needed a RSA license to dispense factor, and whether CareFirst's belief that FMCP needed such a license was reasonable. The Court shall not address this inquiry here, however, as it has already determined that FMCP cannot recover under the Maryland Prompt Pay Statute as a matter of law. While the circumstances of CareFirst's delay in payment might be relevant in choice of interest rate, it is not relevant here to determine the scope of the PPP Agreement.

**12**  The Maryland Prompt Pay Statute provides that:

> (1) If an insurer, nonprofit health service plan, or health maintenance organization fails to pay a clean claim for reimbursement or otherwise violates any provision of this section, the insurer, nonprofit health service plan, or health maintenance organization shall pay interest on the amount of the claim that remains unpaid 30 days after receipt of the initial clean claim for reimbursement at the monthly rate of:

> > (i) 1.5% from the 31st day through the 60th day;
> > (ii) 2% from the 61st day through the 120th day; and
> > (iii) 2.5% after the 120th day.

> Md.Code Ann., Insur. § 15–1005(f). The structure of this interest scheme, which increases over time, suggests that it is intended as a penalty that will incentivize prompt payment of claims, rather than an approximation of the payee's loss as a result of being deprived of the funds.

**13**  FMCP is correct that some courts have imposed the state rate of interest, *see, e.g., Gruber v. Unum Life Ins. Co. of America,* 195 F.Supp.2d 711, 719 (D.Md.2002). The determinant is whether the rate is compensatory as a matter of fact. The § 1961 rate in 2002 is unknown. What is clear is that there is no automatic adoption of the state statutory rate in ERISA cases.

**14**  The record reflects numerous discrepancies with respect to the universe of claims at issue in this case. Exhibit B to the Complaint is a table of 36 claims (ECF No. 2, Ex. B); in correspondence submitted to the Court on August 18, 2011, FMCP stated that it seeks interest with respect to 42 claims (ECF No. 143); and a chart submitted on the same day by CareFirst showed 45 claims (ECF No. 145). The Court sought clarification from the parties and the parties have now agreed that there are 40 distinct claims at issue, and that this represents the entire universe of claims that CareFirst paid in satisfaction of the principal balance owed to FMCP in this matter. *See* (ECF No. 146)("Upon consultation with CareFirst's counsel and further review, we have determined that two invoices were inadvertently included in the list provided to the Court. Accordingly, Plaintiff is submitting a revised list of 40 invoices for which it seeks interest."). Thus, the universe of claims at issue on the underlying motions is restricted to the following invoice numbers: 14900, 15259, 12555, 13617, 13967, 14319, 14727, 14917, 15291, 15787, 16500, 16849, 17360, 17675, 17981, 14685, 14904, 15321, 16035, 16348, 16702, 17313, 17790, 13636, 13912, 15811, 17538, 18590, 13202, 13205, 16502, 17629, 18258, 13463, 13887, 14914, 16089, 16368, 16843, and 17514. *See* (ECF No. 145)(chart indicating that each of these claims, and only these claims, are at issue).

**15**  CareFirst reportedly used this approach to calculate the interest it has already paid to FMCP in the amount of $23,017. The Hanson Declaration explains that,

> CareFirst has already paid $23,017.00 in interest to [FMCP] for the claims at issue in this case. This interest was calculated differently for the claims for services predating [FMCP's] receipt of its RSA (which happened December 11, 2008) and for the claims for services after that date.

> For claims for services prior to December 11, 2008, interest was calculated starting on September 17, 2010. That date was used because it is the 31st day after the date on which CareFirst received the oral decision from the Board of Pharmacy that [FMCP] could drop ship Factor VIII without an RSA—August 18, 2010.

> For the claims for services after December 11, 2008, interest was calculated starting on August 18, 2010. The reason that CareFirst used that day to start the interest was because it assumed that CareFirst had used its 30–day period [15] to pay those claims in the time between which I received the records for certain members ... and the day on which CareFirst filed its interpleader action.

> (ECF No. 116, ¶¶ 80–83).

**16**  CareFirst also argues in its motion for summary judgment that, even if the Court finds that FMCP was at all relevant times operating within the scope of its license, payment never became due on the underlying claims because FMCP failed to submit them on the proper

form (the Universal Prescription Drug Claim Form). (ECF No. 110, 25)(citing COMAR 31.10.11.06, which states that "[t]hird-party payors shall accept the Universal Prescription Drug Claim form as the sole instrument for filing claims with third-party payors for prescription drugs."). CareFirst asserts that the HCFA 1500, on which FMCP submitted the claims at issue, is not to be used for "[p]harmacies or pharmacists which are filing claims for prescription drugs." (*Id.*)(citing COMAR 31.10.11.02.B.4). In response, FMCP submitted declaration testimony indicating that FMCP has always submitted claims on the HCFA 1500 form, as it did for each of the claims at issue in this case, and that CareFirst has never before objected or indicated in any way that the form was deficient. *See* (Puente Decl., ECF No. 120–4, ¶¶ 2–7); (White Decl., ECF No. 120–5, ¶ 7). CareFirst did not submit any evidence contradicting FMCP's declaration testimony. Indeed, CareFirst itself states that it "does not raise this issue to claw back any payments or assert that it owed absolutely no interest." (ECF No. 11, 22). Also, it appears that CareFirst has waived its argument that FMCP's claims were not "clean" because they were not submitted on the proper forms by not asserting it within 30 days or a reasonable time following submission of claims for reimbursement, and is estopped from raising it now as a way to avoid payment of claims long overdue, or as a basis to delay onset of interest accrual.

17    The Patient List identified claims by patient's name, patient's date of birth, and date of service. (ECF No. 116, Ex. A). The Court crossreferenced the date of service of each claim with the dates of service on the provider vouchers submitted by CareFirst in order to determine the invoice number. (ECF No. 138).

18    Because CareFirst paid these claims, entitlement to some interest is due *unless* paid by the 31st day after a "clean" claim was submitted. As to the claims, there might be a further dispute as to whether the claims were "clean" when submitted, making interest due by the 31st day after initial submission.

19    Also for this reason, the Court need not reach FMCP's argument that it is entitled to summary judgment on its motion for unjust enrichment. The prejudgment interest award serves to ensure that CareFirst is not unjustly enriched by its delay in paying the underlying claims for factor drugs and any potential relief on the unjust enrichment claim would be duplicative.

**End of Document**                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER TEMPLIN, VIOLA
HENDRICKS, FELDMAN'S MEDICAL
CENTER PHARMACY, INC., and FCS
PHARMACY, LLC,

                    Plaintiffs,                              Case No.: 09-4092 (JHS)

          vs.

INDEPENDENCE BLUE CROSS, QCC
INSURANCE COMPANY, and
CAREFIRST, INC.

                    Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANT CAREFIRST, INC.'S
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
(856) 795-2121

On the Brief:
Mark J. Oberstaedt, Esquire

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

FACTS AND PROCEDURAL HISTORY ...............................................................................2

LEGAL ARGUMENT ..............................................................................................................5

       POINT I ......................................................................................................................6

       The Pharmacy Plaintiffs Lack Standing Because the Plan Expressly Forbids an
       Assignment of Benefits ..............................................................................................6

       POINT II.....................................................................................................................7

       The ERISA Claims Against CareFirst Must Be Dismissed as a Matter of Law Because
       CareFirst is not a Proper Party Defendant. ...............................................................7

       POINT III .................................................................................................................12

       The Individual Plaintiffs Claims Against CareFirst Should be Dismissed for Failure to
       Exhaust Administrative Remedies.............................................................................12

CONCLUSION ........................................................................................................................15

## TABLE OF AUTHORITIES

### FEDERAL CASES

Berger v. Edgewater Steel Co., 911 F.2d 911 (3d Cir. 1990)............................................13

Curcio v. John Hancock Mutual Life. Insurance Co., 33 F.3d 226 (3d Cir. 1994) .......9, 12

D'Amico v. CBS Corp., 297 F.3d 287 (3d Cir. 2002) ......................................................13

Harrow v. Prudential Insurance Co. of America, 279 F.3d 244 (3d Cir. 2002) ...............14

Mulder v. PCS Health Systems, Inc., 432 F. Supp. 2d 450 (D.N.J. 2006)........................12

### STATE CASES

Blahuta-Glover v. Cyanamid Ltd. Plan, Case No. 95-7068, Civ. Action No. 95-
    7069, 1996 WL 220997 (E.D.Pa. April 30, 1996).......................................................11

Capozzi v. Northampton County, Civ. Action No. 08-1480, 2009 WL 2854859
    (E.D.Pa. Sept. 3, 2009) .................................................................................................6

Fitzgerald Gerald v. Bank of American Corp., 2009 WL 3806759 (E.D. Pa. Nov.
    10, 2009).........................................................................................................................9

Fowler v. UPMC Shadyside, No. 07-4285, 2009 WL 2501662 (3d Cir. Aug. 18,
    2009)................................................................................................................................6

Menendez v. United Food & Committee Workers Local, 450T, AFL-CIO, Civ.
    Act. No. 2005 WL 1925787 (D.N.J. Aug. 11, 2005) ..................................................13

North Jersey Center for Surgery, P.A. v Horizon Blue Cross Blue Shield of NJ,
    Civ. Act No. 07-4812, 2008 WL. 4371754 at 4 (D.N.J. 2008) ....................................7

North Jersey Center for Surgery, 2008 WL. 4371745........................................................8

Reinert v. Giorgio Foods, Inc., Civil Action No. 06-cv-1101, 2006 WL 3250864
    (E.D. Pa. June 25, 1997)..............................................................................................11

Shepard v. Aetna Life Insurance Co., Civ. Action No. 09-1436, 2009 WL
    2448548 (E.D. Pa. Aug. 7, 2009) ................................................................................13

Smith v. Prudential Health Care Plan, Civil Action No. 97-891, 1997 WL 587340
    (E.D. Pa. Sept. 9, 1997)...............................................................................................11

Sparks v. Duckrey Enterprises, Inc., 2007 WL 320260 (E.D. Pa. 2007) .......................... 12

Temple University Hospital, Inc. v. Group Health Inc., Civil Action No. 05-102,
    2006 WL 1997424 (E.D. Pa. July 17, 2006) .................................................................. 8

Utility Workers Union, 2009 WL 331321 .................................................................. 13, 14

Utility Workers Union of America, Local 601 v. PSE&G, Civil Action No. 07-
    2378, 2009 WL 331421 (D.N.J. Feb. 10, 2009) ........................................................... 13

### FEDERAL STATUTES

29 U.S.C. §1002(21) .................................................................................................... 12

29 U.S.C. §1132(a)(3)(B) and §1109 ......................................................................... 6, 9

### FEDERAL RULES

Fed.R.Civ.P. 12(b)(6) ..................................................................................................... 2

Defendant CareFirst, Inc. ("CareFirst") submits the following brief in support of its motion to dismiss plaintiffs' First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## **INTRODUCTION**

The Amended Complaint in this ERISA denial of benefits matter fails to state a claim for three reasons:  it has the wrong plaintiffs, it has the wrong defendants, and it was brought in the wrong forum.

First, the Amended Complaint asserts claims on behalf of two sets of plaintiffs.  The first set of plaintiffs are two employees who allegedly were denied pharmaceutical benefits for themselves or their dependants under the terms of their employer's ERISA-governed health benefits plan.  While the employees are proper plaintiffs in an ERISA denial of benefits case, the second set of plaintiffs are the pharmacies that allegedly provided the products or services to the participants at issue.  The pharmacies claim that they have a right to bring suit for payment under ERISA because they hold benefit assignments from the participants.  As explained below, however, the health plan at issue expressly forbids any such assignment and that provision is enforceable under ERISA.  As such, the pharmacy plaintiffs do not have standing to sue under ERISA and their claims should be dismissed as a matter of law.

Second, the Amended Complaint wrongfully targets CareFirst as a defendant.  As explained below, CareFirst is not a proper party defendant to this action because claims for denial of benefits under ERISA may only be brought against the ERISA plan itself.  Even if this Court finds that ERISA denial of benefits claims can also be brought against plan fiduciaries, plaintiffs do not contend that CareFirst served the Plan in a fiduciary capacity and, therefore, CareFirst is not a proper party defendant.  Therefore, the claims against CareFirst should be dismissed as a matter of law.

1

Third, the proper forum for the employee plaintiffs to have brought their claims for benefits was the Plan's mandatory administrative appeals process. While plaintiffs plead that such actions would be futile and that they should be absolved of their obligation to exhaust that process, they fall far short of the strict requirements set forth by the Third Circuit for proving futility. As such, the Amended Complaint must be dismissed against CareFirst because plaintiffs failed to exhaust their mandatory administrative remedies.

For these and the other reasons set forth below, the Amended Complaint fails to state a claim upon which relief may be granted and should be dismissed. Moreover, because plaintiffs have already tried and failed on two occasions to assert legally cognizable claims against CareFirst, and because the problems with their claims are not capable of being cured with further pleading amendments, any request for leave to try yet again should be denied.

## FACTS AND PROCEDURAL HISTORY

The following facts are set forth in plaintiffs' First Amended Complaint and the exhibits thereto and are accepted as true for purposes of this motion only.

Plaintiffs Christopher Templin and Viola Hendricks (collectively, the "Individual Plaintiffs") contend that they are employees of Factor Health Services II, LLC ("Factor II"), and that they are participants in an ERISA-governed health insurance plan sponsored by Factor II. According to the Amended Complaint, the Individual Plaintiffs are hemophiliacs or provide support for their hemophiliac dependents or family members. (Amended Complaint ¶¶ 1,2,8,10).

Plaintiffs allege that Factor II entered into a group health insurance policy with defendant QCC Insurance Company on or about October 1, 2007 and that the policy was renewed on October 1, 2008 and October 1, 2009. (Amended Complaint at ¶¶ 15, 20). The document

2

outlining the terms of the "Personal Choice Health Benefits Plan" is attached as Exhibit "B" to

the Amended Complaint (the "Plan").  Among other things, the Plan sets forth an administrative

process for resolving denial of benefits claims.  Specifically, the Plan contains a section entitled

"Resolving Problems" which explains the various types of appeals, the composition and role of

the appeals committee, and the time limits that are applicable to each type of appeal.  (Plan at pp.

3.2-70 to 75).

In addition, the Plan makes clear that participants, such as the Individual Plaintiffs, must

follow the appeal process before they can file a claim in court under ERISA:

> **Right to Pursue Civil Action**.  If the Member is enrolled in a
> group health plan that is subject to the requirements of Employee
> Retirement Income Security Act of 1974 (ERISA), he has the right
> to bring a civil action under Section 502(a) of the Act after
> completing the Member Appeal processes described here.

(Plan at pp. 3.2-71).

The Plan expressly forbids participants from assigning their rights to receive benefit

payments under the Plan to anyone, including any providers:

> The right of a Covered Person to receive benefit payments under
> this Plan is personal to the covered person and is not assignable in
> whole or in part to any person, Hospital, or other entity nor may
> benefits of this coverage be transferred, either before or after
> covered services are rendered."

(Plan at pp. 3.2-22).

Plaintiffs Feldman's Medical Center Pharmacy, Inc. and FCS Pharmacy LLC

(collectively, the "Pharmacy Plaintiffs") contend that they are providers that dispensed

"specialized medications, products, and services, including factor" directly to the Individual

Plaintiffs or their dependents.  (Amended Complaint at ¶ 15).  The Pharmacy Plaintiffs further

contend that they allegedly obtained an assignment of the benefit payments due under the Plan

from the Individual Plaintiffs, although no assignment documents are attached to the Amended

Complaint.  (Amended Complaint at ¶11).

     The Pharmacy Plaintiffs further contend that, pursuant to these alleged assignments, they

submitted insurance claims to the defendants, including CareFirst, that have not been paid under

the Plan.  (Amended Complaint at ¶21).  The Amended Complaint does not distinguish between

claims that were allegedly sent for payment to CareFirst as opposed to claims that were allegedly

sent to the other defendants.

     At no point in their Amended Complaint do plaintiffs allege that they pursued the

required administrative appeal through CareFirst or, for that matter, any of the other defendants.

Rather, plaintiffs argue that such an appeal would be futile because the Pharmacy Plaintiffs

allegedly made efforts to resolve the claims with defendant Independence Blue Cross ("IBC").

(Amended Complaint at ¶¶ 22-27).  The Amended Complaint makes no allegations that any of

the plaintiffs made any effort - - formal or informal - - to resolve the claims with CareFirst.

     The Individual and Pharmacy Plaintiffs jointly filed their original complaint against these

same three defendants on or about September 9, 2009.  [Docket Entry No. 1].  The original

complaint alleged causes of action for alleged violations of Pennsylvania Statute 991.2166 and

breach of fiduciary duty under ERISA.  IBC filed a motion to dismiss the original complaint

under Fed.R.Civ.P. 12(b)(6).  [Docket Entry No. 3].   Following receipt of that motion, the

parties entered into a stipulation allowing plaintiffs an opportunity to amend their complaint.

[Docket Entry No. 11].

     Plaintiffs' Amended Complaint, which was filed on or about December 2, 2009,

abandons all three prior causes of action and now seeks relief against all three defendants solely

under a theory of denial of benefits under §502(a)(1)(B) of ERISA [29 U.S.C. §1132(a)(1)(B)].

[Docket Entry No. 16].

CareFirst now moves to dismiss the Amended Complaint under Fed.R.Civ.P. 12(b)(6).

## LEGAL ARGUMENT

As this Court recently explained in Capozzi v. Northampton County, Civ. Action No. 08-1480, 2009 WL 2854859 at * 2 (E.D.Pa. Sept. 3, 2009), the Rule 12(b)(6) motion to dismiss standard "has undergone recent transformation, culminating with the Supreme Court's Opinion in Ashcroft v. Iqbal, U.S. 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009)." After Iqbal, "it is clear that 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice' in defeating a motion to dismiss." Id. Applying this principle of Iqbal, the Third Circuit has articulated a two part analysis for evaluating whether allegations in a complaint survive a motion to dismiss. Fowler v. UPMC Shadyside, No. 07-4285, 2009 WL 2501662 (3d Cir. Aug. 18, 2009).

First, "the factual and legal elements of a claim should be separated, meaning 'a District Court must accept all of the complaints well-pleaded facts as true, but may disregard any legal conclusions.'" Capozzi, 2009 WL 2854859 at * 2 (quoting Fowler, 2009 WL 2501662 at *17). Second, "the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a 'plausible claim for relief.'" Id. "In other words, a complaint must do more than allege a plaintiff's entitlement to relief; it must 'show' such an entitlement with its facts." Id. The new "plausibility" determination under step two of the analysis "is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id.

5

"In conducting this two step analysis, the Court, in addition to reviewing the Complaint, may also review documents attached to the Complaint and matters of public record." Id. (citing Lum v. Bank of America, 361 F.3d 217, 221 n. 3 (3d Cir.2004)).

Applying this new standard to the Amended Complaint in this case leaves no doubt that plaintiffs' ERISA claims must be dismissed as against defendant CareFirst.

### POINT I

#### The Pharmacy Plaintiffs Lack Standing Because the Plan Expressly Forbids an Assignment of Benefits

The claims of the Pharmacy Plaintiffs must be dismissed because these assignees do not have standing. "Under [§502(a) of ERISA], the civil enforcement provision of ERISA, only participants and beneficiaries may sue to recover benefits or to enforce rights due under a plan." Lehigh Valley Hosp. v. UAW Local 259 Social Security Dep't., Civil Act. No. 98-4116, 1999 WL 600539 at *3 (E.D. Pa. Aug. 10, 1999). Here, the Pharmacy Plaintiffs are neither participants nor beneficiaries and, therefore, do not have a legal right of their own to pursue payment on these claims.

Indeed, the Pharmacy Plaintiffs do not contend that they have standing in their own right to pursue claims under ERISA. Instead, they contend that their standing derives from an assignment of benefits that they allegedly obtained from the Individual Plaintiffs.

This argument fails for two key reasons. First, the Complaint does not attach any of the assignment of benefits forms that the Individual Plaintiffs or their dependants allegedly executed and, therefore, a key element of proof is absent. See, e.g., North Jersey Center for Surgery, P.A. v Horizon Blue Cross Blue Shield of NJ, Civ. Act. No. 07-4812, 2008 WL 4371754 at *4 (D.N.J. 2008) (where alleged right to assert a claim for denial of benefits rests on assignment, failure to

produce proof of actual assignment documents and the language therein "leaves the Court with grave doubt that Plaintiff would have standing to sue under ERISA"). Mere allegations in a pleading do not suffice. See id. at *3 (district court opinion) and *8 (report and recommendation).

Second, and more importantly, even if the Pharmacy Plaintiffs could proffer evidence of the alleged assignments, derivative standing is not available because the Plan explicitly prohibits such assignments. Specifically, the Plan states that the right to receive benefit payments "is personal to the Covered Person and is not assignable in whole or in part to any person, Hospital, or other entity nor may benefits of this coverage be transferred, either before or after Covered Services are rendered." (Plan at pp. 3.2-22). The law is settled that anti-assignment provisions such as the one at issue here are enforceable under ERISA. See, e.g., Lehigh Valley Hosp., 1999 WL at 600539 at *3; Temple Univ. Hosp., Inc. v. Group Health Inc., Civil Action No. 05-102, 2006 WL 1997424 at *10 (E.D. Pa. July 17, 2006); North Jersey Center for Surgery, 2008 WL 4371745 at *8 n.1.

Because the Plan expressly prohibits an assignment of benefits, and because the Pharmacy Plaintiffs' alleged standing is based solely upon the purported assignments, the Pharmacy Plaintiffs' claims against CareFirst must be dismissed as a matter of law.


## POINT II

### The ERISA Claims Against CareFirst Must Be Dismissed as a Matter of Law Because CareFirst is not a Proper Party Defendant.

Both counts of the Amended Complaint assert claims under ERISA §502(a)(1)(B) against all three defendants. Plaintiffs contend that they have been wrongfully denied benefits under the terms of the Plan.

Plaintiffs' claims however, are asserted against the wrong defendant.  As recently recognized by Judge Joyner in Fitzgerald Gerald v. Bank of American Corp., 2009 WL 3806759 (E.D. Pa. Nov. 10, 2009), the district courts within the Third Circuit are split as to who may be a proper defendant under ERISA §502(a)(1)(B).  Id. at *3 and n.1 (citing and discussing cases on both sides of the split).

The holdings in these cases break down as follows:  On the one side, courts that have focused upon the statutory language of ERISA have held that the language of ERISA §§ 502(a)(1)(B) and 502(d) "clearly and unambiguously provide[] that the plan is the only entity against whom claims for benefits under the plan may be brought."  See, e.g., Guiles v. Metropolitan Life Ins. Co., Civil Act No. 00-5029, 2002 WL 229696 (E.D. Pa. Feb. 13, 2002 at *1).  The other line of cases holds that persons who serve in a fiduciary capacity to an ERISA plan may be held liable for recovery of benefits in addition to the Plan itself.  The courts that have taken this second approach have done so relying primarily upon the Third Circuit's decision in Curcio v. John Hancock Mut. Life. Ins. Co., 33 F.3d 226 (3d. Cir. 1994), which was decided under ERISA §502(a)(3)(B) and §509 [29 U.S.C. §1132(a)(3)(B) and §1109].

In Guiles, Judge Robreno performed a detailed analysis of the statutory language and its purpose and concluded that it was clear that the ERISA plan itself is the only proper defendant in an ERISA denial of benefits case under §502(a)(1)(B).  In Guiles, the plaintiff was a participant in an ERISA-qualified long-term disability plan administered by Metropolitan Life Insurance Company ("Met Life").  The plaintiff sought disability benefits under the plan, which Met Life denied.  The plaintiff thereafter brought an action against Met Life seeking payment of the benefit allegedly owed under the plan and Met Life moved for dismissal on the grounds that it was not a proper party defendant.

Noting that cases within the Third Circuit had reached different results, Judge Robreno

began by examining ERISA's statutory language and he found that the statute authorized civil

actions against plans:

> a Civil Action may be brought (1) by a participant or beneficiary .
> . . (B) to recover benefits due to him under the terms of his plan,
> to enforce his rights under the terms of the plan, or to clarify his
> rights to future benefits under the terms of the plan.

Guiles, 2002 WL 229696 at *1 (quoting 29 U.S.C. §1132(a)(1)(B)).

Judge Robreno then analyzed ERISA §502(d)(2), which provides as follows:

> Any money judgment under this title against an employee benefit
> plan shall be enforceable only against the plan as an entity and
> shall not be enforceable against any other person unless liability
> against such person is established as individual capacity under this
> title.

Id. (quoting 29 U.S.C. §1132(d)(2)).  Thus, Judge Robreno found that ERISA's statutory

language when "read together clearly and unambiguously provides that the plan is the only entity

against whom claims for benefits under the plan may be brought."  Id. (citing Gelardi v. Pertec

Computer Corp., 761 F.2d 1323, 1324-25 (9th Cir. 1985)).

Judge Robreno then examined the reasoning behind those cases which have held that

fiduciaries may also be liable under ERISA §502(a)(1)(B) and he specifically looked at whether

the Third Circuit's decision in Curcio could be read to hold that a fiduciary was a proper party

defendant under that section.  His analysis concluded that Curcio was distinguishable for several

important reasons.  First, he concluded that Curcio "involved a claim against the plan

administrator for equitable relief pursuant to theories of equitable estoppel [ERISA

§502(a)(3)(B)] and for breach of fiduciary duty under [ERISA §509]."  Id. at *2.  Noting that

denial of benefits claim arose under a different section of ERISA, the court concluded that the

reasoning in Curcio was not applicable.

Second, Judge Robreno distinguished <u>Curcio</u> by finding that it "involved allegations that the plan administrator was a fiduciary and had breached its duty," whereas a claim for denial of benefits under ERISA §502(a)(1)(B) "does not allege any breaches of duty on the part of the plan administrator." <u>Id.</u> at *2. Holding that the "statutory mandate is clear, and <u>Curcio</u> does not apply," the court granted judgment as a matter of law in favor of the plan administrator on the grounds that it was not a proper party defendant. <u>See also</u> <u>Smith v. Prudential Health Care Plan</u>, Civil Action No. 97-891, 1997 WL 587340 (E.D. Pa. Sept. 9, 1997) ("Prudential correctly argues that the Plan is the only proper defendant in a claim for money damages under this section [ERISA § 502 (a)(1)(B)]"); <u>Reinert v. Giorgio Foods, Inc.</u>, Civil Action No. 06-cv-1101, 2006 WL 3250864 at *8-9 (E.D. Pa. June 25, 1997) ("Plaintiff's claims under [ERISA §502 (a)(1)(B)] are dismissed because the Plan is the only appropriate defendant to these claims"); <u>Blahuta-Glover v. Cyanamid Ltd. Plan</u>, Case No. 95-7068, Civ. Action No. 95-7069, 1996 WL 220997 (E.D.Pa. April 30, 1996) ("ERISA permits suits to recover benefits under [ERISA §502 (a)(1)(B)] only against a plan").

Here, CareFirst respectfully submits that Judge Robreno's analysis reached the correct conclusion: an ERISA plan is the only proper party defendant in a ERISA denial of benefits case under §502(a)(1)(B). CareFirst respectfully submits that this Court should apply the same reasoning here and dismiss the Amended Complaint against CareFirst because it is not the Plan and, therefore, is not a proper party defendant.

Even if this Court were to conclude that a plan fiduciary may also be a proper party defendant under ERISA §502(a)(1)(B), the claims still must be dismissed as against CareFirst because the facts set forth in the Amended Complaint do not establish that CareFirst served the Plan in a fiduciary capacity. ERISA defines "fiduciary" as a person who exercises discretionary

10

authority or control over the plan's management, administration or assets. 29 U.S.C. §1002(21)(A). Under Third Circuit law, "the linchpin of fiduciary status is discretion." Sparks v. Duckrey Enterprises, Inc., 2007 WL 320260 at *7 (E.D. Pa. 2007) (citing Curcio, 33 F.3d. at 233). By contrast, those persons "who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles." Id; see also Mulder v. PCS Health Systems, Inc., 432 F. Supp. 2d 450 (D.N.J. 2006) (defendant hired to process claims was not a plan fiduciary because the defendant simply followed the plan specifications in performing its duties, even though the defendant had designed, implemented and administered the claims processing system).

Here, the Amended Complaint contains virtually no operative allegations against CareFirst at all, let alone allegations that CareFirst served as a fiduciary to the Plan. Indeed, the only allegations made against CareFirst in the Amended Complaint are as follows:

- CareFirst has a location in Maryland and operates under a license from the Blue Cross/Blue Shield Association (¶ 7);

- CareFirst is considered a "host plan" in the terminology of the Blue Cross/Blue Shield Association with respect to one of the two Pharmacy Plaintiffs and that a host plan administers claims and coordinates payment (¶12);

- Defendants have not paid claims submitted to them by the Pharmacy Plaintiffs (¶¶14, 17, 21, 24).

Nothing in the four corners of the Amended Complaint alleges that CareFirst had any discretionary role in the Plan or that it acted as a fiduciary to the Plan in any way. Therefore, even if this Court were to follow the line of cases which holds that fiduciaries may be liable for a denial of benefits under ERISA §502(a)(1)(B), CareFirst is still not a proper party defendant because the Amended Complaint does not establish that CareFirst served the plan in a fiduciary capacity. See Sparks, 2007 WL 320260 at *7 (concluding that the court did not need to decide between the differing view points on who is a proper party defendant because the plaintiff had

11

not established fiduciary status).  Accordingly, the Amended Complaint should be dismissed

against CareFirst.

### POINT III

**The Individual Plaintiffs Claims Against CareFirst Should be Dismissed
for Failure to Exhaust Administrative Remedies**

Assuming *arguendo* that the Court were to hold that CareFirst is a proper party

defendant, plaintiffs' claims must still be dismissed for failure to exhaust their administrative

remedies.

"The Third Circuit has long held that 'except in limited circumstances' . . . a federal court

will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under

the plan." Utility Workers Union of America, Local 601 v. PSE&G, Civil Action No. 07-2378,

2009 WL 331421 at *3 (D.N.J. Feb. 10, 2009).  In ERISA denial of benefits cases, "courts have

found that a failure to exhaust administrative remedies may constitute grounds for dismissal

under Rule 12(b)(6)."  Shepard v. Aetna Life Ins. Co., Civ. Action No. 09-1436, 2009 WL

2448548 at *3 (E.D. Pa. Aug. 7, 2009) (citing Menendez v. United Food & Comm. Workers

Local, 450T, AFL-CIO, Civ. Act. No. 05-1165, 2005 WL 1925787 at *1-2 (D.N.J. Aug. 11,

2005)); see also D'Amico v. CBS Corp., 297 F.3d 287, 290-93 (3d Cir. 2002); Berger v.

Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990).  The exhaustion requirement is strictly

enforced in the Third Circuit.  Utility Workers Union, 2009 WL 331321 at *3.

Here, the Plan provides a mandatory administrative appeals procedure and makes clear

that participants who wish to file a lawsuit under ERISA must first exhaust their administrative

remedies before doing so.  (Plan at pp. 3.2-70 to 75).  There is nothing in the Amended

Complaint which alleges that any of the plaintiffs sought to resolve these disputed claims with
CareFirst through the mandated administrative process.

Apparently aware that they failed to exhaust their administrative remedies, plaintiffs
allege in their Amended Complaint that it would be futile for them to proceed through the
administrative process.  While futility is one of the limited exceptions to the exhaustion
requirement, the Third Circuit has held that a party seeking to avoid his obligation to utilize the
administrative process must make a "clear and positive showing of futility."  Harrow v.
Prudential Ins. Co. of America, 279 F.3d 244, 249 (3d Cir. 2002).  In Harrow, the Third Circuit
identified five factors that the Court must weigh in determining whether to excuse exhaustion on
futility grounds:

1.   Whether the plaintiff diligently pursued administrative relief;

2.   Whether the plaintiff acted reasonably in seeking immediate judicial review
under the circumstances;

3.   Existence of a fixed policy denying benefits;

4.   Failure of the insurance company to comply with its own internal
administrative procedures; and

5.   Testimony of plan administrators that any administrative appeal was futile.

Id at 250; see also Utility Workers Union, 2009 WL 331421 at *4.

Here, while plaintiffs attempt to describe efforts they allegedly made to reach a resolution
with IBC outside of the Plan's administrative process, they do not make similar allegations with
respect to CareFirst.  Indeed, there is nothing in the Amended Complaint which indicates that
plaintiffs made any efforts at all to resolve their disputed claims with CareFirst or any indication
that it would be futile for them to follow the administrative process with CareFirst.

Application of the five factors set forth in Harrow shows that plaintiffs have not
presented this Court with any facts that would support a finding of futility.  First, plaintiffs never

13

pursued administrative relief from CareFirst and, therefore, cannot show that they did so "diligently." Second, the exhibits to the Amended Complaint show that many of the allegedly disputed claims are one to two years old. (See Exhibit A to the Amended Complaint). Given that passage of time, it cannot be said that plaintiffs acted to seek "immediate judicial review." Third, there is nothing in the Amended Complaint to indicate that CareFirst has a "fixed policy denying benefits." Fourth, there is nothing in the Amended Complaint to indicate that CareFirst failed "to comply with its own internal administrative procedures." Finally, there is no allegation - - much less any testimony of any plan administrators -- that an administrative appeal would be futile as to CareFirst. As a result, plaintiffs cannot satisfy any of the Harrow factors against CareFirst. Therefore, the Amended Complaint sets forth no basis for the Court to excuse plaintiff's failure to exhaust the administrative process on futility grounds.

Accordingly, the Complaint must be dismissed as against CareFirst, because plaintiffs did not exhaust their administrative remedies and they have not made a clear and positive showing of futility sufficient to excuse their failure.

## CONCLUSION

For the foregoing reasons, Defendant CareFirst, Inc., respectfully requests that the Court

dismiss the Complaint against it under Fed.R.Civ.P. 12(b)(6).

ARCHER & GREINER
A Professional Corporation
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
(856) 795-2121
Attorneys for CareFirst, Inc.


By: ___/s/ Mark J. Oberstaedt____
        Mark J. Oberstaedt, Esquire
        I.D. No. 67026

Dated: December 18, 2009.

5150520v1

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER TEMPLIN, et al.,          :
                                      :
          Plaintiffs,                 :     CIVIL ACTION
                                      :
          v.                          :     NO. 09-4092
                                      :
INDEPENDENCE BLUE CROSS, et al.,      :
                                      :
          Defendants.                 :

## ORDER

**AND NOW**, this 13th day of May 2011, upon consideration of Defendants'

Independence Blue Cross and QCC Insurance Company's ("IBC Defendants") Motion to

Dismiss the Second Amended Complaint (Doc. No. 54), Plaintiffs' Brief in Opposition to the

Motion to Dismiss (Doc. No. 57), IBC Defendants' Reply Brief in Further Support of the Motion

to Dismiss (Doc. No. 58), the Second Amended Complaint (Doc. No. 48), Defendant Carefirst,

Inc.'s Answer (Doc. No. 52), and the Status Reports of February 12 and 15, 2011 (Doc. Nos. 65,

67), and after a hearing held on January 21, 2011 and for the reasons stated in the Court's

Opinion filed this day, it is **ORDERED** as follows:

1.    IBC Defendants' Motion to Dismiss the Second Amended Complaint

      (Doc. No. 54) is **GRANTED**.

2.    The Second Amended Complaint (Doc. No. 48) is **DISMISSED WITH**

      **PREJUDICE** against all Defendants.

3.    All pending Motions are **DENIED AS MOOT**.

4.     The Clerk of Court shall **CLOSE** this case.

                              BY THE COURT:


                               /s/ Joel H. Slomsky, J.
                              JOEL H. SLOMSKY, J.