## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FELDMAN'S MEDICAL CENTER PHARMACY, INC., and PHARMACY MANAGEMENT ASSOCIATES, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. WDQ-12-613 |
| v. | ) ) | <u>**ORAL ARGUMENT REQUESTED**</u> |
| CAREFIRST, INC., INDEPENDENCE BLUE CROSS, QCC INSURANCE COMPANY, THE BLUE CROSS AND BLUE SHIELD ASSOCIATION, and JOHN DOES 1 – 10, | ) ) ) ) ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Thomas O'Toole
Neal C. Baroody
BAROODY & O'TOOLE
201 N. Charles Street, Suite 2102
Baltimore, Maryland 21201
(410) 539-8412 (telephone)
(410) 539-8411 (telecopier)

Anthony Paduano
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (telecopier)

Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

Preliminary Statement .................................................................................. 1

FACTUAL BACKGROUND ............................................................................. 2

    The FMCP ERISA Case ........................................................................... 6

    The Templin Case ................................................................................... 8

ARGUMENT .................................................................................................. 9

POINT I. THE CLAIMS ARE NOT PREEMPTED BY ERISA ...................................... 9

    A. Plaintiffs' Claims Are Not Completely Preempted by ERISA ...................... 9

    B. Plaintiffs' Claims are Not Expressly Preempted .......................................... 9

POINT II. THE CLAIMS ARE NOT PRECLUDED BY *RES JUDICATA* ...................... 13

    A. The Prior Decisions Relied Upon by Defendants Were Not On the Merits ... 14

    B. There Is No Identity of Claims ............................................................. 17

POINT III. PLAINTIFFS' CLAIMS SATISFY MARYLAND LAW .............................. 22

    A. The FAC Properly Pleads An Antitrust Claim.......................................... 23

        i. Plaintiffs Allegations of a "Group Boycott" Are Sufficient Under the Statue..................................................................................... 23

        ii. The FAC Adequately Alleges Defendants' Concerted Activity ............ 25

        iii. Plaintiffs Have Alleged Damage to Competition................................ 27

    B. The "Business of Insurance" Exemption Does Not Apply ......................... 29

    C. Plaintiffs Have Stated a Claim for Tortious Interference........................... 32

    D. The Unfair Competition Claim Is Properly Pleaded .................................. 33

    E. The Civil Conspiracy Claim Is Proper.................................................... 35

POINT IV. PLAINTIFFS' TORT CLAIMS ARE NOT BARRED BY THE APPLICABLE STATUTES OF LIMITATION ............................................................. 36

    A. Counts I, III and IV are Not Time-Barred.................................................. 36

    B. Plaintiffs' Claim for Defamation is Not Time-Barred................................... 37

CONCLUSION ............................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,
849 F.2d 1336 (11th Cir. 1987) ................................................................... 24

Andrulonis v. Andrulonis,
998 A.2d 898 (Md. App. 2010) ................................................................... 14

Angelico v. Lehigh Valley Hospital, Inc.,
184 F.3d 268 n.3 (3d Cir. 1999)................................................................. 24

Ashcroft v. Iqbal,
556 U.S. 662, 129 S. Ct. 1937 (2009).......................................................... 22

Awah v. Board of Education,
2009 WL 5030729 (D. Md. Dec. 15, 2009) ................................................... 19

Bailey v. Fairfax County,
2011 WL 4578452 (E.D. Va. Sept. 29, 2011) ................................................ 19

Baker, Watts & Co. v. Miles & Stockbridge,
620 A.2d 356 (Md. App.1993) .................................................................... 37

Baltimore Scrap Corp. v. David J. Joseph Co.,
81 F. Supp. 2d 602 (D. Md. 2000),
aff'd 237 F.3d 394 (4th Cir.),
cert. denied 533 U.S. 916, 121 S. Ct. 2521 (2001) ....................................... 31

Baron Financial Corp. v. Natanzon,
471 F. Supp. 2d 535 n.12 (D. Md. 2006).............................................34n, 35n

Bell Atlantic v. Twombly,
550 U.S. 544, 127 S. Ct. 1955 (2007).......................................................... 22

Berlyn v. The Gazette Newspapers, Inc.,
157 F. Supp. 2d 609. (D. Md. 2001) ........................................................... 34

Berry & Gould, P.A. v. Berry,
757 A.2d 108 (Md. 2000) .......................................................................... 32

Church v. Maryland,
180 F. Supp. 2d. 708 (D. Md. 2002)
aff'd 53 Fed. Appx. 673 (4th Cir. 2002) ........................................................ 16

Clark v. Humane Soc. of Carroll County, Inc.,
2012 WL 665986 (4th Cir. Mar. 1, 2012) ...................................................... 22

Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Association, Inc.,
730 F. Supp. 2d. 451 (D. Md. 2010) ............................................................. 34

Consolidated Beef Indus. v. New York Life Ins. Co.,
949 F.2d 960 (8th Cir. 1991),
cert. denied 503 U.S. 985, 112 S. Ct. 1670 (1992) ....................................... 13n

Cooper v. Berkshire Life Ins. Co.,
810 A.2d 1045 (Md. App. 2002) .................................................................. 36

Coyne & Delaney Co. v. Selman
98 F.3d 1457 (4th Cir. 1996) .....................................................10, 11, 12, 13n

D.J. Diamond Imports v. Silverman Consultants,
2012 WL 163231 (D. Md. Jan. 18, 2012)...................................................... 32

Darcangelo v. Verizon Communications, Inc.,
292 F.3d 181 (4th Cir. 2002) ................................................................. 11, 12

David P. Coldesina, D.D.S. v. Estate of Simper,
407 F.3d 1126 (10th Cir. 2005) ............................................................. 12, 13

Durham v. Jones,
2011 WL 1557841 (D. Md. April 21, 2011) ................................................... 20

Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship,
213 F.3d 175 (4th Cir. 2000) ...................................................................... 22

Eastside Vend Distributors, Inc. v. Coca-Cola Enterprises, Inc.
2006 WL 1516012 (Md. Cir. Ct. May 8, 2006)............................................... 23

Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc.,
2011 WL 5433754 (D. Md. Nov. 9, 2011) .................................................. 8, 15

Fischer v. Viacom Intern., Inc.,
115 F. Supp. 2d 535 (D. Md. 2000) ....................................................... 36, 38

Full Draw Productions v. Easton Sports, Inc.,
182 F. 3d 745 (10th Cir. 1999) ............................................................ 23, 27

Gilchrist v. State Farm Mut. Auto. Ins. Co.,
390 F.3d 1327 (11th Cir. 2004) .................................................................. 31

Goldstein v. Potomac Elec. Power Co.,
404 A.2d 1064 (Md. 1979) ......................................................................... 37

Group Life & Health Inc. Co. v. Royal Drug Co.,
440 U.S. 205, 99 S. Ct. 1067 (1979)..................................................... 30, 31

Guardian Life Ins. Co. v. Reinaman,
2011 WL 2133703 (D. Md. May 26, 2011)............................................. 10, 12

Haley Paint Co. v. E.I DuPont de Nemours & Co.,
804 F. Supp. 2d 419 (D. Md. 2011) ............................................................ 27

Hall v. St. Mary's Seminary & Univ.,
608 F. Supp. 2d 679 (D. Md.)
aff'd 378 Fed. Appx. 326 (4th Cir. 2009)..................................................... 16

Harris v. JAT Trucking,
2009 WL 2222740 (C.D. Ill. July 24, 2009) ................................................ 13

Hebrew Home of Greater Washington, Inc. v. CoreSource,
2011 WL 5513229 (D. Md. Nov. 3, 2011) .................................................... 12

Herrmann v. Cencom Cable Assocs., Inc.,
999 F.2d 223 (7th Cir. 1993) ................................................................ 18, 19

In re Microsoft Corp. Antitrust Litigation,
355 F.3d 322 (4th Cir. 2004) ..................................................................... 21

Kent County Board of Education v. Bilbrough,
525 A.2d 232 (Md. 1987) ..................................................................... 13, 14

Kim v. Nyce,
807 F. Supp. 2d. 442 (D. Md. 2011) ........................................................... 20

Laurel Sand & Gravel, Inc. v. Wilson,
519 F.3d 156 (4th Cir. 2008) ..................................................................... 13

Lloyd v. General Motors Corp.,
916 A.2d 257 (Md. 2007). ............................................................................. 35

Luy v. Baltimore Police Dep't.,
326 F. Supp. 2d 682 (D. Md. 2004) .......................................................... 37n

Mahmud v. Kaufmann,
607 F. Supp. 2d 551 (S.D.N.Y.)
aff'd 358 Fed. Appx. 229 (2d Cir. 2009) ...................................................... 28

Martello v. Blue Cross and Blue Shield of Maryland, Inc.,
795 A. 2d 185 (Md. Ct. Spec. App.),
cert. denied 802 A.2d 439 (Md. 2002) ......................................................... 24

Massachusetts Mutual Life. Ins. Co. v. Marinari,
2009 WL 5171862 (D.N.J. Dec. 29, 2009) ................................................... 13

Mercatus Group, LLC v. Lake Forest Hospital,
641 F.3d 834 (7th Cir. 2011) ..................................................................... 25n

Morstein v. National Ins. Services, Inc.,
93 F.3d 715 (11th Cir. 1996),
cert. denied 519 U.S. 1092, 117 S. Ct. 769 (1997) ....................................... 11

New York State Conference of Blue Cross & Blue Shield Plans v. Travelers
Insurance Co.,
514 U.S. 645, 115 S. Ct. 1671 (1995) .......................................................... 10

Novell v. Microsoft Corp.,
505 F.3d 302(4th Cir. 2007),
cert. denied 552 U.S. 1276, 128 S. Ct. 1659 (2008) ...................................... 29

NYNEX Corp. v. Discon, Inc.,
525 U.S. 128 119 S. Ct. 493, 498 (1998) .................................................... 28

Petry v. Wells Fargo Bank,
597 F. Supp. 2d 558 (D. Md. 2009) ............................................................. 35

Pilot Life Ins. Co. v. Dedeaux,
481 U.S. 41, 107 S. Ct. 1549 (1987) ............................................................ 10

Pittston Co. v. U.S.,
199 F.3d 694 (4th Cir. 1999) ........................................................ 17, 18, 19

Pizlo v. Bethlehem Steel Corp.,
884 F.2d 116 (4th Cir. 1989) ........................................................................ 21

Poffenberger v. Risser,
431 A.2d 677, 80 (Md. 1981) ...................................................................... 36

Poku v F.D.I.C.,
2011 WL 334680 (D. Md. Jan. 31, 2011).................................................. 16, 17

Pueschel v. United States,
369 F.3d 345 (4th Cir. 2004) ................................................................. 13, 14

Ranney v. Nelson,
176 Fed. Appx. 405 (4th Cir. 2006) ............................................................. 19

Ratino v. Medical Service of the District of Columbia (Blue Shield),
718 F.2d 1260 (4th Cir. 1983) ...................................................................... 31

Reicher v. Berkshire Life Ins. Co.,
2002 WL 31426758 (D. Mass. Oct. 29, 2002)............................................. 16

S. Austin Coal. Cmty. Council v. SBC Communications Inc.,
274 F.3d 1168 (7th Cir. 2001),
cert. denied 537 U.S. 814, 123 S. Ct. 81 (2002)........................................... 24

Santana Products, Inc. v. Bobrick Washroom Equipment,
401 F.3d 123 (3rd Cir.),
cert. denied 546 U.S. 1031, 126 S. Ct. 734 (2005) ...................................... 25n

Schafer v. State Farm Fire and Cas. Co.,
507 F. Supp. 2d 587 (E.D. La. 2007)............................................................. 31

Schelhaus v. Sears Holding Corporation,
2009 WL 4728989 (D. Md. Dec. 3, 2009) .................................................... 38

Sears, Roebuck and Co. v. Ulman,
287 Md. 397 A. 2d 1240 (1980) ................................................................... 37

Sedlack v. Braswell Services Group, Inc.,
134 F.3d 219 (4th Cir. 1998) ....................................................................... 21

Sun Dun, Inc. v. Coca-Cola Co.,
740 F. Supp. 381 (D. Md.1990)................................................................... 34

Templin v. Independence Blue Cross,
2011 WL 18780182 (E.D. Pa. May 13, 2011) .......................................... 14, 15

Translucent Communications, LLC v. Americas Premiere Corp.,
2010 WL 723937 (D. Md. Feb. 24, 2010) ...................................................... 34

Trustees of the AFTRA Health Fund v. Biondi,
303 F.3d 765 (7th Cir. 2002) ........................................................ 10, 12, 13

Union Labor Life Ins. Co. v. Pireno,
458 U.S. 119, 102 S. Ct. 3002 (1982) .......................................................... 30

Webb v. Green Tree Servicing, LLC,
2011 WL 6141464 (D. Md. Dec. 9, 2011) ................................................ 32, 33

Williams v. Wicomico Co. Board of Education,
2011 WL 3022300 (D. Md. July 21, 2011) ...................................................... 33

Wisznia v. City of Albuquerque,
135 Fed. Appx. 181 (10th Cir. 2005) ................................................... 16, 16n

Witthohn v. Federal Ins. Co.,
164 Fed. Appx. 395 (4th Cir. 2006) .............................................................. 6n

**Statutes**

11 U.S.C. § 1013 (b) ................................................................................ 30

15 U.S.C. § 1 ........................................................................................... 23

15 U.S.C. § 1012 ...................................................................................... 29

29 U.S.C. §1132(a) ..................................................................................... 9

29 U.S.C. §1144(a) ..................................................................................... 9

Maryland Antitrust Act § 11-204(a)(1) ......................................................... 23

**Other Authorities**

Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*
   (2d ed. 2002) ....................................................................................... 15

Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and Pharmacy Management Associates, LLC ("PMA", collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to the Motions to Dismiss filed by defendants Independence Blue Cross ("IBC") and QCC Insurance Company ("QCC", along with "IBC", the "IBC Defendants"), CareFirst, Inc. ("CareFirst") and the Blue Cross Blue Shield Association ("BCBSA").

<u>Preliminary Statement</u>

Had CareFirst and the IBC Defendants acted properly, Feldman's would still be a flourishing independent pharmacy, serving patients with hemophilia and providing them with excellent service.  Instead, in order to benefit themselves, CareFirst and the IBC Defendants, along with the BCBSA, engaged in a massive and ultimately successful conspiracy designed to destroy Feldman's and to limit the treatment choices for hemophilia patients.

Faced with what appeared, at the time, to be meritless bases for a refusal to pay millions of dollars in outstanding claims, Feldman's was forced to engage in expensive litigation, only to have CareFirst and the IBC Defendants wave the white flag and finally pay the claims, after years of delay and after PMA was forced to sell Feldman's assets at distress sale prices.

During the course of discovery in the FMCP ERISA Case litigation, however, Feldman's became aware that CareFirst and the IBC Defendants had, along with the BCBSA, engaged in the conspiracy detailed in the First Amended

Complaint ("FAC") here.  Accordingly, this case was brought to seek redress from Defendants for their misconduct far beyond failing to pay the specific claims at issue in and <u>Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc</u>., Civil Action No. SKG–10–254 (the "FMCP ERISA Case") and <u>Templin v. Independence Blue Cross</u>, Civil Action No. JHS-09–4092 (the "Templin Case").

Finally called to task for the ultimate success of their plan to destroy Feldman's, Defendants now seek to have this suit dismissed for a laundry-list of factually and legally unsupportable reasons.  Defendants' motions to dismiss should be denied in their entirety.

## <u>FACTUAL BACKGROUND</u>

The facts of the case are contained in the First Amended Complaint (the "FAC") and will not be repeated herein except as relevant to the instant motion.  In addition to the facts in the FAC, the background of the Templin Case and the FMCP ERISA Case are relevant here.

The FAC seeks damages as a result of Defendants' concerted and intentional efforts to destroy Plaintiffs' business by, among other things, driving Feldman's customers away, impugning Feldman's reputation within the hemophilia community and with regulators and law enforcement, and wrongfully withholding millions of dollars from Feldman's for medicine it purchased and dispensed. Specifically, the FAC alleges:

- Defendants put profits and executive compensation above their responsibility to their insureds and vendors and participated in a scheme to: (a) drive Feldman's out of business, (b) direct the hemophilia patients Feldman's served away from insurance plans offered by BCBSA licensees, (c) purge

hemophiliacs from the rosters of their insureds and push Feldman's hemophilia patients to government programs such as Medicare and Medicaid, and/or (d) steer Feldman's hemophilia patients to large pharmacies and pharmacy benefit managers from whom Defendants receive a financial benefit or in whom Defendants have a financial interest. (FAC ¶¶ 2, 126, 340-42)

- Federal, state, and local law enforcement agencies investigated Feldman's based on allegations made by Defendants, yet on information and belief, all investigations regarding Feldman's were closed without any finding of material wrongdoing on the part of Feldman's.  On information and belief, such agencies were intentionally misled by Defendants with regard to the information supplied to them by Defendants. (FAC ¶ 125)

- CareFirst balked at paying the high cost of the Factor medicine and, along with its co-conspirators including the IBC Defendants and the BCBSA engaged in a witch hunt to find reasons to deny payment to Feldman's, in an effort to drive Feldman's out of business and hemophilia patients to other insurance companies, to Medicaid or to federal-government funded Hemophilia Treatment Centers. (FAC ¶ 129)

- The BCBSA's participation in the conspiracy was led by Calvin Sneed, who spearheaded and coordinated the conspiratorial "investigation." (FAC ¶ 132)

- As part of their "investigation" of Feldman's, CareFirst, IBC, and the BCBSA came up with an ever-shifting set of completely bogus reasons for not paying Feldman's. (FAC ¶ 136)

- IBC dispatched its own investigators, who although quickly establishing that Feldman's engaged in no wrongdoing of any type, worked hard to intimidate Feldman's patients in an effort to cause them to question Feldman's bona fides so that they would discontinue their patronage of Feldman's.  (FAC ¶ 141)

- On information and belief, the massive and entirely bogus "investigation" of Feldman's and other independent pharmacies was triggered by a spike in claims for Factor drugs that resulted from Feldman's success at building relationships with patients in the hemophilia community.  (FAC ¶ 165)

- Under the scheme, even if CareFirst was ultimately required to pay the claims for Factor medicine, CareFirst would nevertheless be able to inflict severe financial damage on Feldman's and the other independent providers of the medicine.  (FAC ¶167)

3

- Shortly after the audit, at which again no wrongdoing was discovered by CareFirst, on information and belief CareFirst put a "hold" on all claims submitted by Feldman's.   The "hold" meant that no payments were permitted on such claims, even if the "home plan" – i.e., the BCBSA licensee that insured the patient – wished to make such payments.  (FAC ¶ 170)

- On information and belief IBC, as the home plan for certain insureds, simply followed CareFirst's lead and put a "hold" on all Feldman's claims, or, in IBC's parlance, "flagged" the claims without conducting any independent review of the claims on behalf of its own insureds. (FAC ¶ 171)

- On October 29, 2008, representatives of CareFirst and IBC, as well as Calvin Sneed of the BCBSA, attended a meeting of a "Factor VIII Strike Force" at the offices of Highmark Blue Cross in Camp Hill, Pennsylvania. On information and belief, Feldman's was one of the main topics of discussion. (FAC ¶¶ 150, 182-83)

- At the Camp Hill meeting, on information and belief, CareFirst, IBC, and the BCBSA developed the "theories" that would be used to deny, or place "holds" on, claims submitted by Feldman's. (FAC ¶ 183)

- CareFirst regularly told fellow BCBSA licensees and law enforcement that Feldman's was involved in "fraud" and was diverting the Factor medicine to a "grey market", each of which are serious felonies, if they were true.  (FAC ¶¶ 186, 291)

- At the request of the BCBSA and its licensees, the FDA investigated FCS on allegations of diversion of Factor medicine to the "grey market."    Based upon information provided by CareFirst, the FDA conducted a similar investigation of Feldman's.  (FAC ¶¶ 190, 191, 291)

- CareFirst knew, however, that the allegations of grey market diversion were baseless.  On October 21, 2008 a consultant employed by Catalyst Rx, working for CareFirst, who had experience with hemophiliacs and the anti-hemophilic Factor medicine responded to a question about such a "grey market" by informing his contacts at CareFirst that he had never heard of any instance of diversion of Factor medicine. (FAC ¶ 199)

- On at least one occasion, Jamie Hanson, an investigator for CareFirst, also trafficked in rumors about Feldman's and passed a rumor about Feldman's supposed bankruptcy to an investigator working for the BCBSA's Louisiana licensee.   (FAC ¶ 187)

4

- Even though CareFirst had previously been processing claims for Factor medicine dispensed by Feldman's without question, CareFirst claimed to have suddenly realized that Feldman's did not have the "correct" contract to dispense Factor drugs as a CareFirst participating provider.  (FAC ¶ 205)

- In addition to the defamation of Feldman's at patient interviews, CareFirst, IBC, the BCBSA and the PBMs attempted to steer Feldman's customers to use the specialty pharmacy services of the PBMs, from whom CareFirst received better "pricing" in the form of "discounts," or as they are more commonly known, kickbacks. (FAC ¶ 262)

- As a result of CareFirst's, IBC's, and the BCBSA's actions, on information and belief, numerous Feldman's patients switched to another pharmacy after hearing the defamation of Feldman's by CareFirst, IBC, and the BCBSA. (FAC ¶ 264)

- On information and belief, CareFirst and the BCBSA conducted interviews of numerous Feldman's patients, and other hemophilia patients that were not Feldman's patients, at which CareFirst implied or even outright stated Feldman's involvement in a massive fraud.   (FAC ¶ 295)

- CareFirst also told IBC on numerous occasions that Feldman's did not have the necessary licensees to dispense Factor drugs, even though CareFirst knew – or certainly should have known, because Feldman's told them so – that Feldman's never needed an RSA license, or any other special license, to dispense Factor drugs.   (FAC ¶ 297)

- On February 12, 2009, Jamie Hanson, an investigator for CareFirst, wrote an email to Michael Ebner, Senior Financial Investigator for IBC, and Christopher Deery, an Investigator for IBC, falsely informing them that Feldman's did not have the proper license to dispense Factor drugs.  (FAC ¶ 298)

- Patients, unnerved by rumors of Feldman's bankruptcy and by "suggestions" from BCBSA licensees that the patients seek their medicine from a different pharmacy, abandoned Feldman's in droves.  (FAC ¶ 309)

- Feldman's was also unable to acquire any new patients, as rumors of its purported criminal activity and financial distress spread like wildfire through the hemophilia community.  (FAC ¶ 310)

- In fact, during the time period in which CareFirst insisted (without merit) that Feldman's obtain an RSA, CareFirst represented that Feldman's should continue to dispense Factor medicine to its patients because all aspects of

the claims reimbursement issue would be addressed retroactively to the first claim in question. (FAC ¶ 317)

- CareFirst's defamation of Feldman's resulted in the loss of Feldman's business relationships with IBC and other BCBSA licensees, other non-BCBSA insurance companies, and with potential patients who were concerned about doing business with a company even accused of such unsavory tactics as diverting medicine from chronically ill patients. (FAC ¶ 202)

- Ultimately, PMA was forced to sell Feldman's operating assets for considerably less than fair market value, in part because of the false, malicious, and defamatory rumors spread by the BCBSA and CareFirst that Feldman's diverted Factor medicine to the non-existent "grey market" and in part because of the uncertainty of whether Feldman's would be paid by CareFirst and/or IBC for Factor drugs dispensed to their insureds. (FAC ¶¶ 203, 265)

### The FMCP ERISA Case

In June 2009, Feldman's filed a lawsuit against Defendant CareFirst in the Circuit Court for Baltimore County, captioned <u>Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc</u>, Case No. 03-C-09-6257, seeking payment of nearly $2 million in claims for life-saving Factor drugs dispensed to hemophiliac patients insured by CareFirst or insured by other licensees of BCBSA and for whom CareFirst acted as the payment "gatekeeper" under the rules of the BlueCard system in which the BCBSA's licensees participated (Paduano Dec. ¶ 8, Ex. B).[1]

---

[1] Plaintiffs have filed the Declaration of Anthony Paduano, dated April 23, 2012, in connection with the Motion for Remand (the "Paduano Decl."). It is appropriate for the Court to consider the documents attached to the Paduano Declaration in connection with Plaintiffs' Opposition to Defendants' Motions to Dismiss without converting the motion to one for summary judgment where, as here, the only documents relied upon in the Opposition are publicly available pleadings filed with Courts of Record. <u>See</u>   <u>Witthohn v. Federal Ins. Co.</u>, 164 Fed. Appx. 395, 396, (4th Cir. 2006).

Those claims had been unpaid for significant lengths of time, some for well over one year at the time the lawsuit was filed (Paduano Dec. ¶ 8, Ex. B).  Feldman's 2009 lawsuit against CareFirst was initially filed in the Circuit Court for Baltimore County, but on February 1, 2010 CareFirst removed the FMCP ERISA Case to this Court (Paduano Dec. ¶ 9, Ex. C).

On March 3, 2010, Feldman's moved the Court to remand the case to the Circuit Court for Baltimore County (Paduano Dec. ¶ 10, Ex. D).  CareFirst opposed Feldman's motion, arguing that although Feldman's asserted state law claims in its Complaint, ERISA preempted the state law claims because Feldman's also asserted an alternate theory of recovery based on general assignments of benefits Feldman's had received from its patients.   The legal effect of the assignments was to put Feldman's in the patients' shoes for purposes of recovery of the unpaid claims (Paduano Dec. ¶ 11, Ex. E).  The Court agreed with CareFirst, finding that the only reason the lawsuit for unpaid claims was removable to federal court was because Feldman's asserted a theory of recovery based on the patient assignments.   The Court therefore denied Feldman's Motion for Remand and retained jurisdiction over the case (Paduano Dec. ¶ 12, Ex. F).

CareFirst ultimately agreed to pay the claims in the FMCP ERISA Case in September 2010 and actually paid the claims some time thereafter (Paduano Dec. ¶ 13, Ex. G).  The Court then granted in part and denied in part Feldman's motion for summary judgment and denied in part CareFirst's motion for summary judgment, granting prejudgment interest to Feldman's, in a proceeding that was

exclusively limited to the prejudgment interest issue.  See Feldman's Medical Center Pharmacy, Inc. v. CareFirst, Inc., 2011 WL 5433754, *1 (D. Md. Nov. 9, 2011) (Gauvey, J.).  The case remains *sub judice* on the issue of Feldman's application for attorneys' fees (Paduano Dec. ¶ 14).

### The Templin Case

On September 8, 2009, Feldman's, along with FCS Pharmacy LLC ("FCS") and two individuals who were participants in an ERISA plan – Christopher Templin and Viola Hendricks – filed the Templin Case against IBC, QCC, and CareFirst in the United States District Court for the Eastern District of Pennsylvania (Paduano Dec. ¶ 15).  In that Complaint, Feldman's and its co-plaintiffs asserted federal question jurisdiction based on the participation in the lawsuit of the two ERISA plan participants – one who was a patient of Feldman's and/or FCS and other who was the guardian and caregiver of a patient of Feldman's and/or FCS – as well as based on the assignments of benefits Feldman's and FCS had received from the patients whose claims were at issue in that case (Paduano Dec. ¶ 16).

CareFirst, IBC and QCC asserted that Feldman's and FCS did not have standing to bring an ERISA claim because the assignments from the patients were invalid under anti-assignment clauses in the insurance contracts (Paduano Dec. ¶ 17, Ex. H).  After CareFirst, IBC, and QCC dragged the case out for many months, in December 2010, CareFirst, IBC and QCC agreed to pay all the outstanding claims (Paduano Dec. ¶ 18).  Upon renewed motions to dismiss by IBC and QCC, the court dismissed the Complaint as moot because all the claims had been paid.

8

The Court also dismissed the claims against CareFirst <u>sua</u> <u>sponte</u> despite the fact that CareFirst had answered the Second Amended Complaint and had not served a motion to dismiss (Paduano Dec. ¶ 19, Ex. I).  Subsequent to the dismissal, both Plaintiffs and Defendants IBC and QCC filed cross-motions for awards of attorneys' fees.  The Court denied those motions (Paduano Dec. ¶ 20).  Cross-appeals of these various orders are currently pending before the Third Circuit (Paduano Dec. ¶ 20).

**ARGUMENT**

**POINT I**

**THE CLAIMS ARE NOT PREEMPTED BY ERISA**

Defendants argue that the claims asserted in the FAC are preempted by ERISA, based on "complete preemption" under ERISA Section 502(a), 29 U.S.C. §1132(a) and "express preemption" under ERISA Section 514(a), 29 U.S.C. §1144(a).

### A. <u>Plaintiffs' Claims Are Not Completely Preempted by ERISA</u>

The reasons why the claims pleaded in the FAC are not preempted by the "complete preemption" doctrine are set forth in detail in Plaintiffs' Memorandum of law in Support of the Motion for Remand ("Remand Mem.") which was filed simultaneously with this brief.  These arguments are incorporated by reference and will not be repeated herein.

### B. <u>Plaintiffs' Claims are Not Expressly Preempted</u>

Plaintiffs' claims are also not preempted by the "express preemption"

9

doctrine. Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan". However, as is described above and in the FAC, the state law claims here do not directly "relate to any employee benefit plan." Defendants' reliance on Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S. Ct. 1549 (1987), for the proposition that the exemption is "expansive" is misleading, based on subsequent interpretations of Section 514 by the Supreme Court and lower federal courts. As the Seventh Circuit recognized in Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d 765, 773 (7th Cir. 2002):

> The Supreme Court's early ERISA preemption cases glossed over the "relate to" text of § 1144(a) by portraying the phrase as deliberately expansive. *See e.g. Pilot Life Ins. Co. v. Dedeaux . . . .* in recent years, the Court has taken a more restrictive view of § 1144(a). The tide began to turn in this direction with the seminal decision of *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*

See Coyne & Delaney Co. v. Selman 98 F.3d 1457, 1467 (4th Cir. 1996) (recognizing that Travelers narrowed the scope of ERISA preemption).

In New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 115 S. Ct. 1671 (1995), the Supreme Court noted that the "basic thrust of the pre-emption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." Id. at 658, 115 S. Ct. at 1678. The Court described three areas where express preemption would apply, which were succinctly summarized by this Court in Guardian Life Ins. Co. v. Reinaman, 2011 WL 2133703 at *7 (D. Md. May 26, 2011) (Quarles, J.) as follows:

10

> (1) laws that mandate [ ] employee benefit structures or their administration; (2) laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice; and (3) laws providing alternate enforcement mechanisms for employees to obtain ERISA plan benefits. (internal quotation marks and citations omitted).

Accord Coyne & Delaney, 98 F.3d at 1468-69; Darcangelo v. Verizon Communications, Inc., 292 F.3d 181, 190 (4th Cir. 2002).

In Coyne & Delaney, the Fourth Circuit stated:

> as we recently made clear, Congress did not intend to preempt "traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities," including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries.

98 F.3d at 1469 (emphasis added) (quoting Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir.1996)).   Because Plaintiffs here are not "traditional ERISA plan entities" and because the claims do not implicate any of the Travelers categories, the claims are not subject to express preemption.   See Morstein v. National Ins. Services, Inc., 93 F.3d 715, 722 (11th Cir. 1996) (en banc) ("when a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA"), cert. denied 519 U.S. 1092, 117 S. Ct. 769 (1997).

Defendants' repetition of the fact that the initial dispute between Feldman's, CareFirst and the IBC Defendants related to an ERISA plan does not demonstrate that preemption is appropriate.   Nor does their selective reference to limited allegations of the FAC establish that this case relates to the administration

11

of an ERISA plan.  Not only do Plaintiffs lack standing to bring ERISA claims (Remand Mem. at p. 11), but the FAC makes it clear that the claims at issue are based on Defendants' conspiracy to destroy Plaintiffs' business through various means, not limited to their improper refusal to make payments to Feldman's.

In any event, even if an ERISA plan is involved in the claims, preemption is not required unless it is "a critical factor in establishing liability," Coyne & Delaney, 98 F.3d at 1472 (quoting Ingersoll–Rand Co. v. McClendon, 498 U.S. 133, 140, 111 S. Ct. 478, 483 (1990)).  Accord Reinaman, 2011 WL 2133703 at *6 (permitting negligence claim to proceed).  As the Seventh Circuit noted, preemption is not appropriate when a claim "does not require us to interpret or apply any of the Plan's provisions." Biondi, 303 F.3d at 781.  Here, the Court will not be required to interpret an ERISA plan to determine whether Defendants are liable to Plaintiffs.

Indeed, in Coyne & Delaney, supra, the Court permitted state law malpractice claims to proceed, despite the fact that the negligence related to the procuring of an ERISA plan.  Similarly, in Darcangelo, the Fourth Circuit held that state law claims for negligence, invasion of privacy, breach of medical record confidentiality and deceptive trade practices were not preempted because they did not satisfy the Travelers test.  In fact, two of the cases relied upon by Defendants refused to apply the preemption doctrine to a state law claim that failed to satisfy the Travelers test, Hebrew Home of Greater Washington, Inc. v. CoreSource, 2011 WL 5513229 (D. Md. Nov. 3, 2011) (Williams, J.), and David P. Coldesina, D.D.S.

v. Estate of Simper, 407 F.3d 1126 (10th Cir. 2005). See also Biondi, 303 F.3d at 775-82 (preemption doctrine not applicable to fraud claim); Massachusetts Mutual Life. Ins. Co. v. Marinari, 2009 WL 5171862 at *8-9 (claim under the New Jersey Fraud Act not preempted) (D.N.J. Dec. 29, 2009); Harris v. JAT Trucking, 2009 WL 2222740 at *6-8 (C.D. Ill. July 24, 2009) (denying motion to dismiss fraud and breach of contract claim in reliance on express preemption doctrine).

Defendants' other cases do not require a contrary finding. All of them concern claims brought by and against "traditional ERISA plan entities," unlike the claims here, which are brought by a provider against insurers and a trade association, and many of them were decided before Travelers, therefore applying an outdated standard to the application of the doctrine.[2]

## POINT II

### THE CLAIMS ARE NOT PRECLUDED BY *RES JUDICATA*

*Res judicata*, or claim preclusion, only bars a party from relitigating a claim that was decided or could have been decided in a prior suit. See Pueschel v. United States, 369 F.3d 345, 355 (4th Cir. 2004); Laurel Sand & Gravel, Inc. v. Wilson, 519 F.3d 156, 161 (4th Cir. 2008). Although "a mere change in the legal theory, applied to the same set of facts previously litigated, will not in and of itself avoid claim preclusion," Kent County Board of Education v. Bilbrough, 525 A.2d 232, 237 (Md. 1987), "the scope of a cause of action for claim preclusion

---

[2]     Consolidated Beef Indus. v. New York Life Ins. Co., 949 F.2d 960 (8th Cir. 1991), cert. denied 503 U.S. 985, 112 S. Ct. 1670 (1992), cited by the BCBSA, was specifically rejected as a precedent by the Fourth Circuit in Coyne & Delaney because it was decided before Travelers. 98 F.3d at 1469 n.14.

purposes is *not* as broad as the scope of permissible joinder under modern pleading codes." Id. at 236 (emphasis in original).  See Andrulonis v. Andrulonis, 998 A.2d 898, 908 (Md. App. 2010).

To demonstrate that *res judicata* should be applied to bar a claim, Defendants must demonstrate the existence of three elements:  (i) a final judgment on the merits, (ii) identity of the cause of action in both cases; and (iii) identity of parties or their privities in the two suits.  Pueschel, 369 F.3d at 354-55.  Although as to CareFirst and the IBC Defendants, there is an identity of parties, Defendants' cannot satisfy their burden as to the other two factors.[3]

## A.    The Prior Decisions Relied Upon by Defendants Were Not On the Merits

In neither the FMCP ERISA Case nor the Templin Case was there a final decision on the merits of the claims for relief asserted by the plaintiffs in those cases.  In both cases the claims at issue were paid in full prior to the Court's decision. Therefore, none of the substantive claims asserted in either the Templin Case or the FMCP ERISA Case were ever resolved on the merits.

In the Templin Case, the Court granted the IBC Defendants' motion to dismiss "because the approval and payment of all disputed claims has rendered this case moot."  Templin v. Independence Blue Cross, 2011 WL 1870182, *6 (E.D. Pa. May 13, 2011).  The Court specifically stated:

> In the Motion, IBC Defendants argue that the Court no
> longer has jurisdiction over this case because approval

---

[3]    BCBSA was not a party to any prior lawsuit with Plaintiffs, and therefore does not join with the IBC Defendants and CareFirst in asserting *res judicata* as a ground for dismissal.

and payment of the disputed insurance claims has been accomplished. The approval and payment renders the case moot and removes the element of a case or controversy. Therefore, the Court no longer has jurisdiction. A lack of jurisdiction based on mootness may be raised by a court *sua sponte* at any time. Accordingly, this Court will decide whether the claims against Defendant CareFirst asserted in Counts One, Two, and Four should be dismissed as moot. *See Abulkhair v. Bush,* No. 08–5410, 2008 WL 5416401, at *2 (D.N.J. Dec. 22, 2008) (citing *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S. Ct. 1326, 89 L.Ed.2d 501 (1986)) (mootness is a jurisdictional issue that must be resolved by a court and may be raised by a court *sua sponte* at any time).

Id. at *1 n.2.

Similarly, although the FMCP ERISA Case was not dismissed for mootness, the Court explicitly acknowledged that:

> CareFirst paid $1,547,054.87 in satisfaction of [Feldman's] claims for reimbursement as well as $23,017.00 in prejudgment interest. The parties agree that the only issue presently pending before the Court is [Feldman's] claim for prejudgment interest.

2011 WL 5433754 at *1 (footnotes omitted, emphasis added).

Therefore, the Court never ruled on any of the substantive issues pleaded in the complaint in that action. In fact, the FMCP ERISA Case Court specifically noted that it "need not reach [Feldman's] argument that it is entitled to summary judgment on its motion for summary judgment." Id. at *20 n.19.

"A dismissal based on mootness is not a judgment on the merits and, therefore does not lay a foundation for the application of the doctrine of *res judicata*. See 18A Charles Wright, Arthur R. Miller & Edward H. Cooper, *Federal*

*Practice and Procedure* § 4436 at 166-68 (2d ed. 2002)." Poku v F.D.I.C., 2011 WL 334680 at *4 (D. Md. Jan. 31, 2011) (Bennett, J.)  The Poku Court further noted, "'[T]he holding of mootness is not a judgment on the merits and, as a nonmerits judgment, it does not bar further action on any matters not actually adjudged.'" Id. (quoting De Volld v. Bailar, 568 F.2d 1162, 1165-66 (5th Cir. 1978)).  See Wisznia v. City of Albuquerque, 135 Fed. Appx. 181, 186-87 (10th Cir. 2005) ("a dismissal on the grounds of mootness effectively indicates that the ruling court lacked jurisdiction over the matter, and thus the dismissal does not operate as a ruling on the merits of the action"); Reicher v. Berkshire Life Ins. Co., 2002 WL 31426758 at *1 (D. Mass. Oct. 29, 2002) ("An action that was dismissed as moot does not have a res judicata effect."), aff'd 360 F.3d 1 (1st Cir. 2004).  In fact, the Wisznia Court noted that this rule is "well-established in other jurisdictions." 135 Fed. Appx. at 187.[4]

Defendants' cases do not demonstrate otherwise.  In neither Hall v. St. Mary's Seminary & Univ., 608 F. Supp. 2d 679 (D. Md.) (Legg, J.), aff'd 378 Fed. Appx. 326 (4th Cir. 2009), nor Church v. Maryland, 180 F. Supp. 2d. 708 (D. Md.) (Davis, J.), aff'd 53 Fed. Appx. 673 (4th Cir. 2002), was the first case dismissed, as here, for mootness or when the critical substantive issues were not reached by the Court.

---

[4]     The fact that the Templin judgment states that it is "with prejudice" does not mean that it is "on the merits" for the purpose of *res judicata*.  See Wisznia, 135 Fed. Appx. at 188.

**B.**   **There Is No Identity of Claims**

Defendants cannot establish that there is an identity of claims.  The Templin Case and the FMCP ERISA Case related to causes of action under ERISA for the collection of unpaid insurance claims for pharmacy services provided to patients.  Here, the claims arise from the conspiracy by Defendants to destroy Plaintiffs' business and pressure their patients to change providers.

The standard for determining whether there is an identity of claims is whether the claims arise out of the same transaction or series of transactions as the claim resolved by the prior judgment. Poku, 2011 WL 334680 at *5.  The Fourth Circuit has relied upon the formulation of the Restatement (Second) of Judgments §24 to define what constitutes a "transaction" or "series of transactions". See Pittston Co. v. U.S., 199 F.3d 694, 704 (4th Cir. 1999); Poku, 2011 WL 334680 at *5-6.  That section sets forth the rule:

> What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. Restatement (Second) of Judgments §24(2).

In the comments to this section, the Restatement explains,

> The expression "transaction, or series of connected transactions," is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant

> and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim. Restatement (Second) of Judgments §24 comment b.

However, there is no standard for determining what constitutes the "same transaction." Notwithstanding the Restatement's attempt at guidance, as the Fourth Circuit noted in Pittston Co., 199 F.3d at 704:

> No simple test exists to determine whether causes of action are identical for claim preclusion purposes, and each case must be determined separately within the conceptual framework of the doctrine. (Citation omitted)

See also Herrmann v. Cencom Cable Assocs., Inc., 999 F.2d 223, 226 (7th Cir. 1993) ("It is not much use being told, as by the restaters, that the question what claims constitute a single transaction is to be decided 'pragmatically').

For that reason, the Defendants' insistence that this case, on one hand, and the Templin Case and the FMCP ERISA Case on the other, relate to the same facts or transaction does not pass muster. Simply repeating, as Defendants do, that the claims at issue all relate to the IBC Defendants and CareFirst refusal to pay the claims until they were forced to do so by litigation does not demonstrate that the claims arise from the same transaction.

For example, in Pittston Co., supra, the Fourth Circuit rejected the argument that a prior judgment on claims relating to calculation of the premiums that coal companies were required to pay for retiree health benefits under the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act") barred a subsequent suit challenging the constitutionality of the Coal Act because they were not part of the

18

same transaction.  The Court found that the determination of the premium amount:

> is clearly distinct in time, space, and origin from the assessments Pittston is now challenging . . . . Further, there is no particular reason why the constitutional claims would have combined with the calculation claim to form a convenient trial unit, nor do we see any policy consideration that would justify denying Pittston an opportunity to argue the merits of its constitutional challenges.  199 F.3d at 705.

In <u>Bailey v. Fairfax County</u>, 2011 WL 4578452 (E.D. Va. Sept. 29, 2011), the Court found that the plaintiff's Title VII case was not precluded by the prior dismissal of her §1983 claims, even though they both arose out of her employment.  <u>See</u> <u>Ranney v. Nelson</u>, 176 Fed. Appx. 405, 410 (4th Cir. 2006) (no *res judicata* effect where the "conspiracy claim alleged in Ranney's federal complaint appears to encompass conduct distinct from and occurring prior to the conspiracy claim alleged in state court"); <u>Awah v. Board of Education</u>, 2009 WL 5030729 at *3-4 (D. Md. Dec. 15, 2009) (Nickerson, J.) (rejecting application of *res judicata* when the prior action related to failure to make payments to plaintiff and subsequent action was a Title VII claim relating to discrimination, despite the fact that the claims "all arose because Plaintiff resigned").  <u>See</u> <u>also</u> <u>Herrmann</u>, 999 F.2d at 225-26 (no *res judicata* bar on Title VII claim based on prior claim for COBRA benefits, despite the fact that both arose out of plaintiff's discharge).

The situation is similar here.  In the Templin Case and the FMCP ERISA Case, Feldman's asserted theories of relief under ERISA based on assignments of benefits from its patients.  In this case, however, there are no assignments of benefits, no patients, no outstanding claims, and thus no

connection to ERISA.[5]  In the prior cases, the complaints sought payment for benefits that were not paid to the patients; here, the claims are based on a conspiracy to cause the destruction of Feldman's.  There would be no logical reason to combine these into a "convenient trial unit."  Moreover, Feldman's could not have been aware of the breadth of the conspiracy and wrongful conduct by Defendants until it engaged in discovery.  These claims for antitrust violations and tortious conduct are wholly separate from the simple claims for nonpayment asserted in the Templin Case and the FMCP ERISA Case and cannot fairly be considered as part of the "same transaction."

Moreover, as is discussed above, because none of the substantive issues relating to any of the claims in the Templin Case and the FMCP ERISA Case were ruled upon by the courts, either because the claims were dismissed for mootness, or because the summary judgment motion was limited only to the issue of prejudgment interest, it would be inappropriate to bar Feldman's from litigating the claims in the FAC here.  See Kim v. Nyce, 807 F. Supp. 2d. 442, 450-51 (D. Md. 2011) (Williams, J.) (no *res judicata* effect to prior judgment where court did not consider the claims asserted in the second action).  See also Durham v. Jones, 2011 WL 1557841 at *4-5 (D. Md. April 21, 2011) (Nickerson, J.) (*res judicata* not applicable to findings in administrative hearing where "Plaintiff had no

---

[5]     As is set forth in the Remand Mem. at p. 12, the patients whose claims were at issue in the Templin Case and the FMCP ERISA Case have no standing to bring the claims asserted herein.

opportunity in the previous proceedings to develop or bring the claims he now brings").

Finally CareFirst's position that "specific findings" by the Court in the FMCP ERISA Case preclude Plaintiffs from satisfying the elements of Counts I, III and IV (tortious interference, fraud and misrepresentation, and unfair competition) is without merit.  The statements that CareFirst (CareFirst Mem. at 8-9) relies upon are dicta that lack any preclusive effect.  Although CareFirst asserts that this dicta is "*res judicata*," in reality, CareFirst appears to be arguing for "issue preclusion" or collateral estoppel.   In order to apply collateral estoppel, CareFirst must demonstrate, *inter alia*, that the issue was actually determined in the prior proceeding and that determination of the issue was a critical and necessary part of the decision in the prior proceeding. See  Sedlack v. Braswell Services Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998).   Accord In re Microsoft Corp. Antitrust Litigation, 355 F.3d 322, 326 (4th Cir. 2004).

As is described above, the only issue before the Court in the FMCP ERISA Case opinion was Feldman's entitlement to prejudgment interest; the issue of CareFirst's intent was therefore not before the Court, rendering the statements relied upon by CareFirst as dicta. See Sedlack, 134 F.3d at 224 (although the prior decision made factual findings, the issue was not before the court in the prior litigation and collateral estoppel did not apply); Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 119 (4th Cir. 1989) (recognizing that dicta cannot be the basis for collateral estoppel).  See also In re Microsoft, 355 F.2d at 327-28 (recognizing that

collateral estoppel can only apply to findings that are "critical and necessary" to the decision).

Therefore, Defendants have failed to satisfy their burden of demonstrating that the prerequisites for applying *res judicata* or collateral estoppel to this case exist.

## POINT III

### PLAINTIFFS' CLAIMS SATISFY MARYLAND LAW

When the legal sufficiency of a complaint is challenged under a Rule 12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000) (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229 (1984)).  After Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S .Ct. 1937 (2009), "[t]o survive a motion to dismiss, a complaint must state 'a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" Clark v. Humane Soc. of Carroll County, Inc., 2012 WL 665986 at *1 (4th Cir. Mar. 1, 2012) (quoting Iqbal).

Plaintiffs have more than met that standard, and, as is described in detail below, Defendants' motions must fail.

A.      The FAC Properly Pleads An Antitrust Claim

Contrary to the Defendants' allegations, Plaintiffs' antitrust allegations state a claim under the Maryland Antitrust Act.  There "are few cases, and even fewer applicable, interpreting the Maryland Antitrust Act."  Eastside Vend Distributors, Inc. v. Coca-Cola Enterprises, Inc.  2006 WL 1516012, *2 (Md. Cir. Ct. May 8, 2006).  However, because the Maryland Antitrust Act and the federal Sherman Antitrust Act are analogous, courts look to guidance from federal courts' interpretation of the Sherman Act to analyze the Maryland Antitrust Act.  See Id. at *17.

Under the Maryland Antitrust Act § 11-204(a)(1),

A person may not: (1) By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce

Accord, Sherman Act, 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal").

i.   Plaintiffs Allegations of a "Group Boycott" Are Sufficient Under the Statute

Defendants argue that because Plaintiffs are not their "competitors," there can be no violation of the antitrust laws.  However, the Courts have recognized that a plaintiff states an antitrust claim when it alleges a "group boycott" See Full Draw Productions v. Easton Sports, Inc., 182 F. 3d 745, 750-51 (10th Cir. 1999) (denying a motion to dismiss antitrust claims relating to a group boycott brought by a trade show organizer against manufacturers, distributors and

a trade association).   Such behavior can be found to constitute antitrust violations under either the "per se" approach, or the "rule of reason" analysis.  See Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 275 n.3 (3d Cir. 1999).   Here, Plaintiffs have adequately alleged a group boycott -- a "concerted refusal [] to deal" -- because Defendants have initially refused to pay Feldman's for the claims that were properly submitted, and, at the same time sought to drive Feldman's patients to other pharmacies with which they have closer economic interests.

Defendants also misconstrue the holdings of Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 849 F.2d 1336 (11th Cir. 1987) and S. Austin Coal. Cmty. Council v. SBC Communications Inc., 274 F.3d 1168 (7th Cir. 2001), cert. denied 537 U.S. 814, 123 S. Ct. 81 (2002).   These cases do not stand for the proposition that a plaintiff must be a competitor of the defendants to assert an antitrust claim.   The group boycott cases cited above make it clear that is not necessary.   Ad-Vantage Tel. simply noted that in resale price maintenance cases—which this is not—claims could not be asserted when the seller was an agent of the distributor.  S. Austin Coal related to the common carrier exception under Section 7 of the Clayton Act, which has no relationship to this case.   Similarly, Martello v. Blue Cross and Blue Shield of Maryland, Inc., 795 A. 2d 185 (Md. Ct. Spec. App.), cert. denied 802 A.2d 439 (Md. 2002), cited by Defendants, is inapplicable.   First, it is a decision on a motion for summary judgment, not a motion to dismiss, and therefore requires that the plaintiff satisfy a higher burden than in defending against a motion to dismiss.   Second, the Court's

dicta concerning the actions of Blue Cross relate solely to that case and is not, as Defendants would have this Court find, a blanket statement that Blue Cross entities are not liable for antitrust violations.  Rather, it was a determination made by the Court on the facts of that case.

**ii.  The FAC Adequately Alleges Defendants' Concerted Activity**

Defendants also assert that the only allegations relating to the conspiracy were effectuated by "allegedly false or misleading statements made to Feldman's customers" (IBC Defendants Mem. at 21).[6] Of course, the FAC alleges substantially more.  The FAC asserts that CareFirst and the IBC Defendants "tried to push Feldman's patients to abandon Feldman's and get their Factor medicine from PBMs [pharmacy benefit managers] and chain pharmacies" (FAC ¶50). Further, the FAC alleges that CareFirst eliminated Feldman's from the specialty pharmacy business in CareFirst's geographic area, with the assistance of IBC (FAC ¶¶106-107).[7]

_____

[6]     Thus, <u>Mercatus Group, LLC v. Lake Forest Hospital</u>, 641 F.3d 834 (7th Cir. 2011), and <u>Santana Products, Inc. v. Bobrick Washroom Equipment</u>, 401 F.3d 123 (3rd Cir.), <u>cert</u>. <u>denied</u> 546 U.S. 1031, 126 S. Ct. 734 (2005), which relate to claims based solely on allegedly wrongful statements, are irrelevant to the analysis here, where Plaintiffs have alleged a substantial and wide-ranging conspiracy by Defendants.  Further, both of these cases were decided on summary judgment and thus are inapplicable to the Court's analysis on Defendants' motions to dismiss.

[7]     The IBC Defendants' argument that plaintiffs made no allegations against IBC relating to the attempt to steer Feldman's customers to PBMs (IBC Mem. at 23) is belied by one of the paragraphs of the FAC *quoted by the IBC Defendants*: "CareFirst, IBC, the BCBSA and the PBMs attempted to steer Feldman's customers to use the specialty pharmacy services of the PBMs" (FAC ¶262).

The conspiracies against Feldman's are further detailed in paragraphs 126 - 265 of the FAC.  Plaintiffs allege three separate, but related conspiracies against Feldman's – a conspiracy to drive Feldman's out of business, a conspiracy to purge hemophiliacs from the rosters of their insureds and push Feldman's patients to government-run Hemophilia Treatment Centers and programs such as Medicare and Medicaid, and a conspiracy to steer Feldman's patients to pharmacies that provided financial benefits to CareFirst and/or the IBC Defendants. (FAC ¶126)

The conspiracy to drive Feldman's out of business was put into place once Feldman's began to submit claims for large numbers of hemophilia patients. (FAC ¶¶165) The goal was to come up with reasons not to pay Feldman's, thus driving them out of business and forcing the patients to either move to other insurers, Medicaid or government funded Hemophilia Treatment Centers. (FAC ¶¶ 340-41) As is described in the FAC, CareFirst's Special Investigative Unit and pharmacy director sought to identify any possible reason, whether valid or not, to deny paying the claims submitted by Feldman's. (FAC ¶131) The FAC further describes how the BCBSA "spearheaded and coordinated" the investigation, (FAC ¶¶132, 147, 150, 154-55, 157-58) and the involvement of the IBC Defendants. (FAC ¶¶133-34, 140-42)  As a result of this coordinated action, the Defendants conjured up a series of ever-shifting set of meritless reasons for not paying the claims, including diversion to the "gray market," lack of medical necessity, that the contract Feldman's had was improper, paperwork issues, and, finally, that Feldman's lacked a Residential Service Agency ("RSA") license. (FAC ¶¶136-39)

IBC accepted CareFirst's false representations, and although its investigators determined that Feldman's engaged in no wrongdoing of any type, worked hard to intimidate Feldman's patients in an effort to cause them to question Feldman's bona fides so that they would discontinue their patronage of Feldman's. (FAC ¶¶ 140-41) By the time that IBC and CareFirst paid the claims at issue in the Templin Case and the FMCP ERISA Case, the damage to Feldman's was done, and PMA sold Feldman's assets at fire sale prices. (FAC ¶¶ 144-45)[8]

Accordingly, Plaintiffs have more than adequately alleged parallel conduct of Defendants to support a claim for anti-trust violation. See Haley Paint Co. v. E.I DuPont de Nemours & Co., 804 F. Supp. 2d 419 (D. Md. 2011) (Bennett, J.) (Court denied a motion to dismiss an antitrust complaint because, as here, the Plaintiffs had "pleaded more than conclusory allegations of parallel conduct among Defendants"); accord Full Draw Productions, 182 F.3d at 757 (pre-Twombly case denying motion to dismiss antitrust claim because the complaint pleaded sufficient facts alleging that "defendants conspired and combined in various ways").

### iii. Plaintiffs Have Alleged Damage to Competition

Finally, Defendants argue that the FAC fails to allege any antitrust injury because it fails to allege damage to competition. First, the two cases cited

---

[8] The FAC details meetings, emails and other specific conduct in furtherance of these conspiracies sufficient to demonstrate plausible claims sufficient to satisfy the Twombly standards (FAC ¶¶ 131-34, 139-40, 146-151, 154, 157, 160, 169-71, 178-87, 190-99, 204-53, 259-63).

by Defendants, <u>NYNEX Corp. v. Discon, Inc.</u>, 525 U.S. 128, 135, 119 S. Ct. 493, 498 (1998) ("the plaintiff here must *allege and prove* harm, not just to a single competitor, but to the competitive process, *i.e.,* to competition itself) (emphasis added) and <u>Mahmud v. Kaufmann</u>, 607 F. Supp. 2d 551, 554 (S.D.N.Y.) (court ruled on summary judgment motion, stating, to "*prove* an antitrust injury, the plaintiff must show that the defendants' actions caused an injury to competition") (emphasis added), <u>aff'd</u> 358 Fed. Appx. 229 (2d Cir. 2009), again focus on the proof needed to prevail on an antitrust claim, which is premature on a motion to dismiss.  In any event, the FAC specifically alleges that:

> Defendants' conspiracy had a pernicious effect on competition in the market to provide hemophilia drugs in the State of Maryland, preventing CareFirst's insureds from doing business with their preferred pharmacy and preventing Feldman's from conducting (and growing) its lawfully-operated business (FAC ¶123)

> In Paragraph 352, the FAC asserts:

> As a direct result of the conspiracy among Defendants, Feldman's was forced out of the business of dispensing Factor medicine to chronically-ill hemophilia patients. With Feldman's no longer in the business of dispensing the Factor medicine to patients suffering from hemophilia, competition is clearly and obviously lessened.

The FAC also asserts that "Defendants' conspiracy has a chilling effect on other specialty pharmacies and other independent pharmacies" (FAC ¶353) and "the net effect of this will be to reduce the number of independent pharmacies in the specialty drug business, leaving only the large chain pharmacies and the mail-order arms of the PBMs" (FAC ¶354).  Such allegations are sufficient to plead antitrust

injury. See Novell v. Microsoft Corp., 505 F.3d 302, 317 (4th Cir. 2007) (affirming the denial of a motion to dismiss, and stating, "the injury that Novell alleges here is plainly an injury to *competition* that the anti-trust laws were intended to forestall. Microsoft's activities, Novell claims, were intended to and did restrain competition in the PC operating-system market by keeping the barriers to entry into that market high."), cert. denied 552 U.S. 1276, 128 S. Ct. 1659 (2008).

**B.    The "Business of Insurance" Exemption Does Not Apply**

Defendants' assertion that they are exempt from antitrust liability is remarkably disingenuous and cynical.  They do not cite a single Maryland case supporting such immunity, instead relying upon cases that purport to provide immunity from *federal* antitrust claims for matters relating to the "business of insurance."  This argument fails for many reasons.

First, the exception was codified in the McCarran-Ferguson Act, 15 U.S.C. § 1012, which exempted from the scope of the Sherman Act, claims that relate to the "business of insurance", to the extent that such business is not regulated by state law.  Thus, even if the claims are exempt from scrutiny under the Sherman Act, this exception has no applicability to the claims at issue here, which arise under the Maryland Antitrust Act.

In any event, the claims asserted do not qualify for the exemption. As an initial matter, the McCarran-Ferguson Act states that the exemption is "inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott,

coercion, or intimidation." 11 U.S.C. § 1013 (b) (emphasis added).  Therefore, it is not applicable on the facts here.   Even if this section does apply, the Supreme Court, first in Group Life & Health Inc. Co. v. Royal Drug Co., 440 U.S. 205, 99 S. Ct. 1067 (1979), and then in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S. Ct. 3002 (1982), established criteria for the application of the "business of insurance" exemption.   As the Court in Royal Drug made clear, the "exemption is for the 'business of insurance,' not the 'business of insurers'" 440 U.S. at 211, 99 S. Ct. at 1073.   Thus, not every activity of an insurance company is given immunity from federal antitrust scrutiny.

The Court, in Pireno set forth the analysis, as follows:

> *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

458 U.S. at 129, 102 S. Ct. at 3009.   Defendants cannot satisfy any of these criteria.   First, the behavior complained of in the FAC, a concerted effort by Defendants to drive Plaintiffs out of business and force patients to use pharmacies or PBMs that have business relationships with Defendants, in no way relate to spreading a policy holder's risk.   Second, this case relates to the Defendants' relationship with a provider — Feldman's — and not the insureds.   Such agreements were specifically found by the Supreme Court not to be part of the "business of insurance."   Royal Drug, 440 U.S. at 232-33, 99 S. Ct. at 1084. Finally, the Court in Royal Drug also found that such agreements "involve parties

30

wholly outside the insurance industry." Id., 440 U.S. at 232, 99 S. Ct. at 1083.

Notably, the Fourth Circuit, in Ratino v. Medical Service of the District of Columbia (Blue Shield), 718 F.2d 1260, 1267 (4th Cir. 1983), addressed claims brought against a predecessor of CareFirst relating in part to provider agreements. The defendant asserted the "business of insurance" exception, but the Fourth Circuit, applying Pireno and Royal Drug, found that that it did not apply.

Finally, the cases cited by Defendants do not support their positions. Baltimore Scrap Corp. v. David J. Joseph Co., 81 F. Supp. 2d 602 (D. Md. 2000), aff'd 237 F.3d 394 (4th Cir.), cert. denied 533 U.S. 916, 121 S. Ct. 2521 (2001), relates not to the "business of insurance" exemption under the McCarron-Ferguson act, but to immunity under the Noerr-Pennington doctrine, which has nothing to do with this issue. Both Gilchrist v. State Farm Mut. Auto. Ins. Co., 390 F.3d 1327, 1333 (11th Cir. 2004) and Schafer v. State Farm Fire and Cas. Co., 507 F. Supp. 2d 587, 589 (E.D. La. 2007), related to the relationship between the insurer and the insured, which is not the case here.

Moreover, the Schafer case specifically noted that because it found that the "business of insurance" exception applied, "Plaintiffs must rely on state antitrust law."   507 F. Supp. 2d. at 393 n.20.   Similarly here, even if the exemption applied, the claims would still be proper under the Maryland Antitrust Act.

31

C.     **Plaintiffs Have Stated a Claim for Tortious Interference**

Plaintiffs have properly pleaded their claim for Intentional Interference

with Economic Relations, also known as tortious interference with business or

economic relations.  The elements of the tort are:

> (1) intentional and wilful acts; (2) calculated to cause
> damage to the plaintiffs in their lawful business; (3) done
> with the unlawful purpose to cause such damage and
> loss, without right or justifiable cause on the part of the
> defendants (which constitutes malice); and (4) actual
> damage and loss resulting.

Berry & Gould, P.A. v. Berry, 757 A.2d 108, 113 (Md. 2000) (quoting Natural

Design, Inc. v. Rouse Co., 485 A.2d 663, 675 (Md. 1984)).  The Court in Berry set

forth a list of the types of wrongful acts that would support the claim, including

"violence or intimidation, injurious falsehood or other fraud, violation of criminal

law, and the institution or threat of groundless civil suits or criminal prosecutions in

bad faith."  757 A.2d at 113 (quoting W. Prosser, *Law of Torts* § 130, at 952-53

(4th ed. 1971).  Accord Webb v. Green Tree Servicing, LLC, 2011 WL 6141464 at

*5 (D. Md. Dec. 9, 2011) (Hollander, J.)  Plaintiffs have properly pleaded each

element.

Again, the FAC sets forth, in detail, the wrongful and intentional acts

of all Defendants, that they were done to damage Plaintiffs, unlawfully, and that

Plaintiffs suffered damages.  Such allegations are sufficient to survive a motion to

dismiss.  See D.J. Diamond Imports v. Silverman Consultants, 2012 WL 163231 at

*6-7 (D. Md. Jan. 18, 2012) (Nickerson, J.) (facts alleged and allegations of

wrongdoing sufficient to survive a motion to dismiss); Webb, 2011 WL 6141464

at *6 (facts alleged were sufficient to plead a claim of tortious interference); Williams v. Wicomico Co. Board of Education, 2011 WL 3022300 at *9 (D. Md. July 21, 2011) (Nickerson, J.) (allegations of wrongdoing, including defamatory statements, sufficient to plead tortious interference claim).

**D.    The Unfair Competition Claim Is Properly Pleaded**

Defendants arguably assert two grounds for dismissal of Plaintiffs' unfair competition claim, neither of which have merit. The first ground is simply an argument that this claim should be dismissed because the other claims, upon which this claim is premised, require dismissal.  As is described above, however, because all of Plaintiffs' claims are properly pleaded, this argument is without merit.

Defendants' second argument is predicated on the assertion that Plaintiffs have failed to plead any recognizable theory of unfair competition. Defendants argue that "unfair competition" is limited to claims relating to "passing off, deceptive advertising, and the infringement of trademarks, trade secrets and publicity rights," in reliance on a single case quoting the Restatement (Third) of Unfair Competition.

The cases relied upon by Defendants all focus on this aspect of unfair competition.  Defendants conveniently have left out the rest of the Restatement section, which states:

> One who causes harm to the commercial relations of
> another by engaging in a business or trade is not subject
> to liability to the other for such harm unless: . . . (b) the
> acts or practices of the actor are actionable by the other
> under federal or state statutes, international agreements,
> or general principles of common law apart from those

33

considered in this Restatement.

Restatement (Third) of Unfair Competition §1(b) (emphasis added).

The cause of action under Maryland law is not limited in the way that Defendants claim.   A "claim for unfair competition can encompass 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort . . .   What constitutes unfair competition in a given case is governed by its own particular facts and circumstances.'" Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Association, Inc., 730 F. Supp. 2d. 451, 467 (D. Md. 2010) (Bennett, J.) (quoting Sun Dun, Inc. v. Coca-Cola Co., 740 F. Supp. 381, 397 (D. Md. 1990) (Smalkin, J.) (quoting Baltimore Bedding Corp. v. Moses, 34 A.2d 338 (Md. 1943))).   Accord Translucent Communications, LLC v. Americas Premiere Corp., 2010 WL 723937 at * 22 (D. Md. Feb. 24, 2010) (Connelly, M.J.) (although unfair competition was originally applicable only to trade mark cases, "the doctrine is no longer limited to a particular kind of business activity.")

In fact, violations of antitrust law have been found sufficient to support a state law claim for unfair competition.  See Cloverleaf Enterprises, 730 F. Supp. 2d at 467; Berlyn v. The Gazette Newspapers, Inc., 157 F. Supp. 2d 609. (D. Md. 2001) (Smalkin, J.); Sun Dun, 740 F. Supp. at 397.

Thus, Defendants' misconduct, as detailed in the FAC, is sufficient to plead an unfair competition claim.[9]

_____

[9]    Defendants' reliance on dicta in a footnote in Baron Financial Corp. v. Natanzon, 471 F. Supp. 2d 535, 548 n.12 (D. Md. 2006), should be ignored by the Court.  In any event, Baron recognized that "Maryland defines unfair

**E.**   **The Civil Conspiracy Claim Is Proper**

Defendants assert that the conspiracy claims brought against them must be dismissed because Maryland law requires that the conspiracy relate to other tortious injury.   However, as is described above, because Plaintiffs have asserted numerous valid claims, the conspiracy claim can survive.   Under Maryland law,

> A claim for civil conspiracy requires proof of the following elements:
>
> 1) A confederation of two or more persons by agreement or understanding;
>
> 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and
>
> 3) Actual legal damage resulting to the plaintiff.

Lloyd v. General Motors Corp., 916 A.2d 257, 284 (Md. 2007).   See Petry v. Wells Fargo Bank, 597 F. Supp. 2d 558 (D. Md. 2009) (Nickerson, J.).

Here, as in Lloyd, Plaintiffs have pleaded "pointed facts alleging specific acts of conspiracy" by Defendants.   916 A.2d at 285.   Therefore, the motion to dismiss this claim must be denied.

---

competition as 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods.'   Id. at 547 (quoting Maryland Metals v. Metzner, 382 A.2d 564 (1978)).

POINT IV

**PLAINTIFFS' TORT CLAIMS ARE NOT BARRED
BY THE APPLICABLE STATUTES OF LIMITATION**

### A. <u>Counts I, III and IV are Not Time-Barred</u>

CareFirst and BCBSA make the remarkable assertion that Plaintiffs' claims for intentional interference with economic relations, fraud and negligent misrepresentation and unfair competition should be dismissed because they accrued in 2008, more than three years before the filing of this action. These Defendants argue that Plaintiffs were on notice of the potential misconduct at issue simply because Feldman's receivables increased dramatically due to the failure of CareFirst and the IBC Defendants to make the payments to Feldman's that they were obligated to make.

Section 5-105 of the Maryland Courts and Judicial Proceedings Article of the Maryland Code sets a three year statute of limitation that encompasses these claims. However, Maryland applies a discovery rule, <u>Poffenberger v. Risser</u>, 431 A.2d 677, 80 (Md. 1981). Under this rule a cause of action accrues when:

> (1) the plaintiff had knowledge of circumstances that would have led a reasonable person in the same circumstances to undertake an investigation; and (2) the investigation, if pursued with reasonable diligence, would have led to knowledge of the alleged wrong.

<u>Fischer v. Viacom Intern., Inc.</u>, 115 F. Supp. 2d 535, 539 (D. Md. 2000) (Motz, J.)

<u>Accord</u> <u>Cooper v. Berkshire Life Ins. Co.</u>, 810 A.2d 1045, 1071 (Md. App. 2002).

Clearly, the existence of the conspiracy could not reasonably have been known to Plaintiffs until they received documents from CareFirst in discovery

36

in the FMCP ERISA Case.  CareFirst served its response to Feldman's First Request for Production of Documents on August 10, 2009, and began its initial production of approximately 11,000 documents at that time with discovery continuing in the case through December 2010.  Even assuming that Feldman's could be put on notice immediately after that production was complete, it would be less than three years before the case was filed, making the claims timely.  Further, a cause of action cannot accrue until all the elements are present, including damages.  See Goldstein v. Potomac Elec. Power Co., 404 A.2d 1064 (Md. 1979). Baker, Watts & Co. v. Miles & Stockbridge, 620 A.2d 356, 377 (Md. App.1993).  Because the damage to Plaintiffs were not present until PMA sold Feldman's assets at a loss in 2009 (FAC ¶ 253), the cause of action could not accrue before that time.

### B.  Plaintiffs' Claim for Defamation is Not Time-Barred

Pursuant to Section 5-105 of the Maryland Courts and Judicial Proceedings Article of the Maryland Code, a claim for defamation must be brought within one year of accrual.  Under Maryland law, a cause of action for defamation accrues when a plaintiff in fact knows, or reasonably should know, of the wrong. Sears, Roebuck and Co. v. Ulman, 287 Md. 397, 412 A. 2d 1240 (1980).[10]

In Ulman, the Maryland Court of Appeals concluded that a defamation cause of action did not accrue when the defendant first made wrongful statements to a credit reporting agency, but instead accrued when the plaintiff was denied a

---

[10]     BCBSA's reliance upon Luy v. Baltimore Police Dep't., 326 F.Supp. 2d 682 (D. Md. 2004) (Blake, J.) is in error.  The Luy Court was not asked to, nor did it engage in, an analysis of when the alleged defamation was discovered or could have reasonably been discovered.

credit account on the basis of those statements. According to the Court, prior to the denial of a credit account, the plaintiff did not know and reasonably should not have known that the defendant had made the statements. Accord, Schelhaus v. Sears Holding Corporation, 2009 WL 4728989 at * 2 (D. Md. Dec. 3, 2009) (Motz, J.).

BCBSA and CareFirst cannot point to a single allegation in the FAC which establishes that Plaintiffs knew, or should have known, about their defamatory conduct, on or before December 29, 2010.  Rather, they urge this Court to dismiss Plaintiffs' defamation claims based upon nothing more than speculation and conjecture.  As BCBSA states in its Memorandum (pp. 6-7):

> Thus, as is true with respect to the purported defamatory statements allegedly made by Carefirst, it begs credulity that at no time prior to December 29, 2010 (one year prior to the filing of this lawsuit) did Plaintiffs have knowledge of facts that "would have led a reasonable person in the same circumstances to undertaken an investigation…" that "would have led (and in fact in this case probably did lead) "to knowledge of the alleged" defamatory statements purportedly made by BCBSA and Sneed. (citations omitted).

In such a case, where the question of when the Plaintiff was properly on notice for the purpose of determining when the statute of limitations begins to run is contested, a motion to dismiss should be denied.  Fischer, 115 F. Supp. at 539.

## CONCLUSION

For the reasons set forth herein, Defendants' motions to dismiss should be denied in their entirety.  Plaintiffs request oral argument on this motion pursuant to Local Rule 105.6.

Dated:  Baltimore, Maryland
        April 23, 2012

Respectfully submitted,

PADUANO & WEINTRAUB LLP

By: /s/ Anthony Paduano
    Anthony Paduano
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (telephone)
(212) 785-9099 (facsimile)

BAROODY & O'TOOLE

Thomas O'Toole
201 N. Charles Street, Suite 2102
Baltimore, Maryland 21201
(410) 539-8412 (telephone)
(410) 539-8411 (facsimile)

Attorneys for Plaintiffs