IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FELDMAN'S MEDICAL CENTER
PHARMACY, INC., *et al.*,

    Plaintiffs,

        v.

CAREFIRST, INC., *et al.*,

    Defendants.

\*      

CIVIL NO.: WDQ-12-0613

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

MEMORANDUM OPINION

Feldman's Medical Center Pharmacy, Inc. ("Feldman's") and

Pharmacy Management Associates, LLC ("PMA") sued CareFirst, Inc.

("CareFirst") and others[1] in the Circuit Court for Baltimore

City, alleging intentional interference with economic relations

and other claims.  Independence and QCC removed the lawsuit to

this Court.  For the following reasons, the Plaintiffs' motion

to remand will be granted and the action, and all other pending

motions, will be remanded to the Circuit Court for Baltimore

City.[2]

---

[1] The other named Defendants are Independence Blue Cross
("Independence"), QCC Insurance Company ("QCC"), and the Blue
Cross Blue Shield Association (the "Association").  The
Plaintiffs also sued John Does 1-10.

[2] The Defendants' joint motion to file a surreply in further
opposition to the motion to remand, ECF No. 58, will be denied.
Unless otherwise ordered by the Court, a party generally may not
file a surreply.  Local Rule 105.2(a) (D. Md. 2011).  Leave to

I. Background[3]

The Defendants are health insurers.  *See* Am. Compl. ¶¶ 3-6, 76.  The Association is a national federation that licenses 39 locally operated Blue Cross and Blue Shield companies, including CareFirst, a Maryland corporation, and Independence, a Pennsylvania corporation.[4]  QCC, a Pennsylvania corporation, is a wholly-owned subsidiary of Independence.  Am. Compl. ¶ 6.

Feldman's is a Maryland corporation.  Am. Compl. ¶ 1.  In the 1970s, it began operating a retail pharmacy that dispensed specialty drugs.[5]  Feldman's regularly submitted reimbursement

---

file a surreply may be granted when the movant otherwise would be unable to contest matters presented for the first time in the opposing party's reply.  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).  The Defendants argue that a surreply is necessary because the Plaintiffs' reply "continue[s] to . . . misapply and misconstrue inapposite ERISA . . . precedent, and . . . mischaracterize or ignore the allegations they made" in their amended complaint. ECF No. 58 at 2.  But these alleged misrepresentations are not "matters presented for the first time."  *Khoury*, 268 F. Supp. 2d at 606.

[3] For the Plaintiffs' motion to remand, the Court will accept as true the well-pled allegations in the amended complaint.  *See Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005) (removal on the basis of federal question jurisdiction is appropriate only if the plaintiff's "well-pleaded complaint" raises issues of federal law).

[4] Am. Compl. ¶¶ 4-5.  The Association's 39 licensees provide health insurance to more than 100 million Americans.  Am. Compl. ¶ 117.

[5] Am. Compl. ¶¶ 1, 35, 69.  "Specialty drugs are prescription medications for complex conditions that require special handling, administration, or monitoring."  Am. Compl. ¶ 32

claims to CareFirst for the drugs that it dispensed to patients insured by CareFirst and Independence.[6]

In October 2007, PMA, a Maryland limited liability company, purchased Feldman's.  Am. Compl. ¶¶ 2, 60, 69.  The pharmacy became "increasingly focused" on dispensing specialty drugs to treat hemophilia,[7] such as synthetic factors that aid in blood clotting.  *See* Am. Compl. ¶¶ 14, 36, 52.  Synthetic factors, which are injected into the bloodstream, cost "tens of thousands of dollars a month" because of the "time it takes to manufacture the drugs, the small number of hemophilia patients in the United States, and the frequency of the required injection treatments."[8]

Before dispensing factor drugs to CareFirst patients, Feldman's "checked the patients' benefits" and "received [an oral] precertification for the prescription from CareFirst."

---

(internal quotation marks omitted).

[6] Am. Compl. ¶ 69.  The Association's licensees, including CareFirst and Independence, participated in a national program that allowed patients insured by one licensee to obtain healthcare services while traveling or living in another state served by a different licensee.  Am. Compl. ¶¶ 72, 103.  Thus, CareFirst administered claims for Independence members who had received healthcare services in CareFirst's coverage area.  *See* Am. Compl. ¶¶ 104-05.

[7] Hemophilia is a genetic disorder that impairs the body's ability to control blood clotting due to a deficiency of clotting proteins called "factors."  Am. Compl. ¶¶ 10, 12.

[8] Am. Compl. ¶ 14.  Most pharmacies do not stock synthetic factors because of their expense and "limited shelf life," and "the relative rarity of hemophilia."  Am. Compl. ¶ 27.

Am. Compl. ¶ 315.  Feldman's began "submitting [reimbursement] claims for relatively large numbers of hemophilia patients" as its "business grew substantially in a short . . . time."  Am. Compl. ¶¶ 71, 128.

Sometime after PMA acquired Feldman's, CareFirst stopped paying the pharmacy's reimbursement claims.[9]  On October 26, 2007, Calvin Sneed, an antifraud consultant for the Association, asked the Association's antifraud managers to contact the Association's licensee in Louisiana with any information about "exposure to" FCS Pharmacy ("FCS"), which is affiliated with PMA.  Am. Compl. ¶¶ 147, 148.  After Sneed's October 2007 request, the Association and the special investigation units of its licensees formed a "strike force" to coordinate their investigations of FCS and other pharmacies dispensing synthetic factors.  Am. Compl. ¶ 150.  On December 5, 2007, CareFirst investigator Jaime Hanson emailed another investigator about CareFirst's "serious exposure" to FCS that "warrant[ed] investigation."  Am. Compl. ¶ 151.

On February 6, 2008, Sneed coordinated a conference call for medical directors of the Association's licensees.  Am. Compl. ¶ 154.  Before the conference call, Sneed distributed a

---

[9] The Plaintiffs assert that CareFirst "continued . . . to deny payment" after February 20, 2008, and "put a 'hold'" on claims "[s]hortly after" June 26, 2008.  *See, e.g.*, Am. Compl. ¶¶ 170, 177, 197, 240.

memorandum about "whether it was possible to establish coverage and/or payment restrictions on [f]actor drugs due to the high cost of such drugs." *Id.*  On February 12, 2008, Sneed asked all Association licensees for "data relating to the amount of payments made to pharmacies dispensing [synthetic factor]." Am. Compl. ¶ 157.  The request "specifically excluded patients who received factor[s] from large, national, or institutional providers." *Id.*

CareFirst "regularly" told other Association licensees and law enforcement officials that Feldman's was committing fraud. Am. Compl. ¶ 186.  The Food and Drug Administration (the "FDA") investigated allegations by the Association and its licensees that Feldman's was "dispensing more [f]actor medicine than a patient needed" and diverting it to a gray market[10] where Feldman's sold the medicine for cash.  Am. Compl. ¶¶ 190-94.

On February 20, 2008, the FDA closed its investigation after finding "no evidence of the suspected diversion." Am. Compl. ¶ 196.  CareFirst continued to assert that Feldman's was diverting synthetic factors to the gray market, and denied payments to Feldman's. Am. Compl. ¶ 197.

On March 13, 2008, CareFirst's pharmacy director, Winston

---

[10] A gray market is "[a] market in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell goods . . . at prices lower than those envisioned by the manufacturer." *Black's Law Dictionary* (9th ed. 2009).

Wong, told CareFirst's antifraud investigators that the company "had not found any real problems with Feldman's." Am. Compl. ¶ 160.

In April 2008, the National Health Care Antifraud Association hosted its annual pharmacy conference, where an agent with the Federal Bureau of Investigation ("FBI") asked anyone "dealing with hemophiliacs to contact him." Am. Compl. ¶ 162. Hanson, CareFirst's investigator, attended the conference and contacted the FBI agent. *Id.* "[T]he FBI was not impressed with [Hanson's] information," and "never pursued a formal investigation of Feldman's." Am. Compl. ¶ 163.

On June 2, 2008, Independence asked Feldman's for "information and documents," and thereafter stopped paying Feldman's claims. Am. Compl. ¶ 108.

On June 19, 2008, CareFirst "officially" opened an investigation of Feldman's. Am. Compl. ¶ 164. CareFirst, Independence, and the Association interviewed "numerous" Feldman's employees and patients, and advised patients to "consider a switch" to pharmacy services operated by CareFirst's pharmacy benefit managers.[11] Many patients left Feldman's. Am.

---

[11] Am. Compl. ¶¶ 261, 263. Health insurance companies contract with pharmacy benefit managers ("PBMs") to administer and process prescription drug claims, negotiate prices with drug manufacturers, and contract with pharmacies for dispensing drugs. Am. Compl. ¶¶ 41, 44. Many PBMs compete with independent pharmacies by operating their own retail and mail

Compl. ¶ 264.

On June 26, 2008, CareFirst investigators conducted an on-site audit of Feldman's.  Am. Compl. ¶ 169.  Although the audit revealed no wrongdoing, CareFirst put a "hold" on all claims for reimbursement.  Am. Compl. ¶¶ 170.  CareFirst did not inform Feldman's of the hold, but advised other Association licensees not to pay Feldman's.  Am. Compl. ¶¶ 177, 319.  On "numerous occasions," CareFirst told Independence that it was denying claims because Feldman's had "improper licensure."  Am. Compl. ¶ 178.

On August 21, 2008, CareFirst refused to renew its contract with Feldman's because it lacked a Residential Service Agency license (an "RSA license").  Am. Compl. ¶ 233.  An RSA license is required under Maryland law to provide health care services in a patient's home.  Am. Compl. ¶ 219.  On August 22, 2008, a PMA employee emailed CareFirst to explain that Feldman's did not provide services in patients' homes and, thus, did not require an RSA license.  Am. Compl. ¶ 234.  CareFirst continued to give Feldman's precertification for factor medicine claims, but denied reimbursement claims.  See Am. Compl. ¶¶ 240, 317-18.

On October 6, 2008, Hanson sent an email to CareFirst colleagues about Sneed "talking to FDA and FBI agents in Texas

_____

order pharmacies, which offer lower prices than independent specialty pharmacies.  Am. Compl. ¶¶ 30, 45.

[about] a possible diversion case." Am. Compl. ¶ 198.  On October 29, 2008, representatives of Sneed, CareFirst, and Independence attended a strike force meeting in Pennsylvania.[12]

On December 11, 2008, Feldman's obtained an RSA license because of "CareFirst's insistence," but CareFirst continued to deny reimbursement claims. Am. Compl. ¶¶ 236-37, 240.

On February 12, 2009, Hanson told Independence investigators that Feldman's lacked the proper license for dispensing factor drugs. Am. Compl. ¶ 298.  On February 13, 2009, Independence told Feldman's that it had been rejecting claims because of CareFirst's determination that Feldman's "did not have the appropriate licensing." *Id*.  Independence told other Association licensees that Feldman's lacked necessary licenses. Am. Compl. ¶ 227.

On March 25, 2009, Hanson wrote a memo to Stacy Bredenstein, CareFirst's associate director of network management, requesting that CareFirst investigators "be included in the decision whether to extend a new contract to Feldman's." Am. Compl. ¶ 214.  Hanson cited "'possible diversion' as the reason for the scrutiny." *Id*.

On April 30, 2009, Hanson told Sneed in an email that

---

[12] Am. Compl. ¶ 182.  The Plaintiffs assert, "on information and belief," that Feldman's "was one of the main topics of discussion," and the Defendants "developed the 'theories' that would be used to deny" reimbursement claims submitted by Feldman's. Am. Compl. ¶¶ 183-84.

"CareFirst had decided not to offer Feldman's a new contract and
. . . was just looking for the strongest *ex post* justification
for its denial." Am. Compl. ¶ 215.

A. Prior Litigation

1. The Maryland Action

On June 1, 2009, Feldman's sued CareFirst in the Circuit
Court for Baltimore County for breach of contract, unjust
enrichment, and bad faith. *Feldman's Med. Ctr. Pharmacy, Inc.
v. CareFirst, Inc.*, 723 F. Supp. 2d 814, 816 (D. Md. 2010).
Feldman's alleged that CareFirst had violated a 1997 provider
agreement[13] because Feldman's was a participating provider, the
factors it dispensed to CareFirst members were "Covered
Services," and CareFirst had refused to "correctly and timely
pay" more than $1.5 million in "legitimate claims" for
reimbursement. *Id.* Feldman's alleged alternatively that it was
entitled to reimbursement because CareFirst members had assigned
their benefits to Feldman's.[14]

---

[13] Under the agreement, Feldman's became a participating provider
in CareFirst's network, and CareFirst agreed to reimburse
Feldman's for "Covered Services rendered to [CareFirst]
Members." *See id.* A "Covered Service" was a "medically
necessary service or supply provided to a Member for which the
Member [was] entitled to receive a benefit under the [CareFirst]
Program in which he/she [was] enrolled." *Id.* A "Member" was
"any eligible person covered under a [CareFirst] Program." *Id.*

[14] *Id.* The assignments provided that "[u]nder no circumstances"
was an insured to retain any payment from his insurer for
Feldman's products, and allowed Feldman's "to bill for services

On February 1, 2010, CareFirst removed the lawsuit to this
Court.  *Id.* at 817.  CareFirst argued that, to the extent that
Feldman's had sued as the assignee of CareFirst members, its
claims were completely preempted by the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et
seq.*, thus "providing federal question jurisdiction."  *Id.*

On June 29, 2010, the Court found that any "assignment-
based claims [were] completely preempted by ERISA," and denied
Feldman's motion to remand.  *Id.* at 815, 821.  The Court found
that "a healthcare provider may acquire derivative standing
under ERISA by obtaining a written assignment from a participant
or beneficiary of his right to payment of medical benefits."
*Id.* at 819.  The Court further found that the "only theory of
recovery under the assignments"--the wrongful denial of
benefits--"directly implicate[d] ERISA," and would require the
Court to interpret ERISA plans.  *Id.* at 820-21.

On August 20, 2010, CareFirst agreed "to pay the claims at
issue."  *See Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst,
Inc.*, 823 F. Supp. 2d 307, 313 (D. Md. 2011).

2. The Pennsylvania Action

On September 9, 2009, Feldman's and others sued
Independence, QCC, and CareFirst in the Eastern District of

---

and receive payment directly from [a patient's] private health
Insurance."  *Id.* at 817.

Pennsylvania for wrongful denial of "at least" $1.48 million in benefits, in violation of ERISA.[15]   As in the Maryland Action, Feldman's alleged that it had provided factor drugs to participants or beneficiaries of ERISA plans administered or underwritten by the Defendants; the participants or beneficiaries had assigned Feldman's their rights to benefits under those plans; and the Defendants had failed to reimburse Feldman's.   *Templin*, 2011 WL 3664427, at *1.

By May 13, 2011, Independence and QCC had "approved the payment of the . . . claims" and CareFirst had "disbursed the actual payments."   *Id.* at *2.

B. Feldman's Goes Out of Business

After PMA acquired Feldman's, accounts receivable "ballooned" from $430,000 to more than $3 million.  Am. Compl. ¶ 252.   In March 2009, Feldman's "began to wind down its business."  Am. Compl. ¶ 72.   On April 16, 2009, Hanson told other Association licensees during a conference call that Feldman's was "a problem company."  Am. Compl. ¶¶ 304-05.

By July 2009, accounts receivable at Feldman's had grown to $3.95 million, and Feldman's defaulted on its bank loans.  Am. Compl. ¶ 252.   On August 7, 2009, Hanson told an investigator

---

[15] *See Templin v. Independence Blue Cross*, No. 09-4092, 2011 WL 3664427, at *1-2 (E.D. Pa. Aug. 19, 2011); Am. Compl. 18, No. 09-4092, ECF No. 48.  The amended complaint also alleged violations of Pennsylvania and Maryland law.  Am. Compl. 16-18, No. 09-4092.

with the Association's Louisiana licensee that Feldman's had filed for bankruptcy. Am. Compl. ¶¶ 187, 188, 302.  It had not. Am. Compl. ¶ 302.

On December 17, 2009, PMA sold all of Feldman's assets "at fire sale prices." Am. Compl. ¶¶ 55, 145, 253.

C. The Pending Lawsuit

On December 22, 2011, the Plaintiffs filed this action in the Circuit Court for Baltimore City. ECF No. 44 at 2.  On January 18, 2012, the Plaintiffs filed an amended complaint alleging that the Defendants had "participated in a scheme" to

> (a) drive Feldman's out of business, (b) direct
> [Feldman's] hemophilia patients . . . away from
> insurance plans offered by [the Association's]
> licensees, (c) purge hemophiliacs from the rosters of
> their insureds and push Feldman's hemophilia patients
> to government programs such as Medicare and Medicaid,
> and/or (d) steer Feldman's hemophilia patients to
> large pharmacies and pharmacy benefit managers for
> whom [the] Defendants receive a financial benefit or
> in whom [the] Defendants have a financial interest.

Am. Compl. 2.[16]  The Plaintiffs sought $8 million in damages,

---

[16] The Plaintiffs alleged six causes of action:
  (1) intentional interference with economic relations, for
      "provid[ing] false information to [the] Plaintiffs'
      patients" and "investigat[ing], harass[ing], delay[ing]
      payment to, boycott[ing], and destroy[ing] [the]
      Plaintiffs' business," Am. Compl. ¶¶ 275-88;
  (2) defamation--against CareFirst and the Association only, *see*
      Am. Compl. 61--for telling government agents and patients
      that Feldman's was involved in fraud, telling Independence
      that Feldman's lacked a necessary license, and telling the
      Association's other licensees that Feldman's was bankrupt
      and a "problem company," Am. Compl. ¶¶ 289-13;
  (3) fraud and fraudulent misrepresentation--against CareFirst

plus interest and costs.[17]

On February 24, 2012, Independence and QCC removed the lawsuit to this Court, arguing that "all or part of the purported state law claims" are preempted by ERISA.[18]

---

only, *see* Am. Compl. 65--for CareFirst's precertification of claims it "had no intention of ever paying," Am. Compl. ¶¶ 314-28;
(4) unfair competition--against CareFirst and Independence only, *see* Am. Compl. 67--for "refus[ing] to pay Feldman's the millions of dollars they owed . . . even after CareFirst encouraged Feldman's to continue to dispense . . . medicine," "insist[ing] that Feldman's was missing a crucial RSA license . . . even though . . . CareFirst knew that Feldman's did not need the RSA license" and "Independence made no attempt to independently verify" licensing requirements, "encourag[ing] . . . Feldman's patients to abandon Feldman's," and making "baseless and defamatory statements" about Feldman's, Am. Compl. ¶¶ 329-38;
(5) conspiracy, for "act[ing] with unity of purpose" to "harass Feldman's and drive it out of the pharmacy business" by "denying and delaying payment to Feldman's," encouraging patients to switch to other pharmacies, and "perpetuating continual baseless investigations of Feldman's," Am. Compl. ¶¶ 339-46; and
(6) violation of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-204(a)(1), for "conspir[ing] to harass, intimidate, and drive Feldman's out of business by . . . putting a hold on Feldman's claims," "'investigating' Feldman's without any basis for suspecting wrongdoing," "spreading defamatory and malicious rumors of Feldman's purported criminal behavior," and "'recommending' that Feldman's customers take their business to pharmacy benefits managers and chain pharmacies in which . . . CareFirst and/or Independence had a financial interest," Am. Compl. ¶¶ 347-54.

[17] *See, e.g.*, Am. Compl. 60.  In Count VI (violation of the Maryland Antitrust Act), the Plaintiffs also sought treble damages and attorney fees.  *See* Am. Compl. 73.

[18] *See* Notice of Removal, ECF No. 1.  Independence and QCC had

On March 2, 2012, Independence and QCC moved to dismiss the complaint. ECF No. 8. On March 5, 2012, CareFirst moved to dismiss. ECF No. 9. On March 19, 2012, the Association moved to dismiss. ECF No. 36.

On April 23, 2012, the Plaintiffs moved to remand, and opposed the motions to dismiss. ECF Nos. 44, 45. On May 21, 2012, the Defendants filed a joint opposition to the motion to remand. ECF No. 49. On May 25, 2012, the Defendants filed a joint reply in further support of their motions to dismiss. ECF No. 51. On June 19, 2012, the Plaintiffs filed a reply in further support of the motion to remand.[19]

II. Analysis

A. Motion to Remand

The Plaintiffs argue that the Court lacks subject matter jurisdiction--and must remand the case--because the Plaintiffs "are not participants, beneficiaries or fiduciaries of an ERISA plan," and they have pled only state law claims that do not "fall within the scope of ERISA or require interpretation of an ERISA plan." ECF No. 44 at 3.

The Defendants counter that the Court has jurisdiction

---

been served with the amended complaint on January 26, 2012. *See id.* at 2.

[19] ECF No. 57. All motions and related briefs were timely filed. *See* ECF No. 38 (approving joint proposed scheduling order) and ECF Nos. 41, 50 (approving amendments to the scheduling order).

because the Plaintiffs' claims "are based on allegations that [the] [D]efendants improperly processed reimbursement requests for ERISA benefit claims." ECF No. 49 at 1. They argue that removal was proper under the complete preemption doctrine because the Plaintiffs' claims are "subsumed by" ERISA § 502(a) and cannot be resolved without reviewing ERISA plan documents. *Id.* at 3.

    1. Removal

A party may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). The removing party bears the burden of showing that the district court has jurisdiction, *see Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008), and the Court "must strictly construe removal jurisdiction" because it "raises significant federalism concerns." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994).

The district courts have federal question jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Generally, removal on the basis of federal question jurisdiction is appropriate only if the plaintiff's "well-pleaded complaint" raises issues of federal law. *Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005). Thus, "state law complaints usually must stay

in state court when they assert what appear to be state law claims." *Id.* at 441.

The complete preemption doctrine is a "narrow exception" to this rule. *See Lontz*, 413 F.3d at 439-40. Under this doctrine, "if the subject matter of a putative state law claim has been totally subsumed by federal law . . . then removal is appropriate."[20]  "The presumption," however, "is against finding complete preemption." *Id.* at 440.

2. ERISA and Complete Preemption

"ERISA's civil enforcement provision, § 502(a), completely preempts state law claims that come within its scope and converts these state claims into federal claims under § 502."[21] A state claim is preempted by § 502 if: (1) the plaintiff has standing under § 502(a); (2) the claim is within the scope of § 502(a); and (3) the claim is not capable of resolution without

---

[20] *Id.*  "[W]hen complete preemption exists, there is no such thing as the state action since the federal claim is treated as if it appears on the face of the complaint because it effectively displaces the state cause of action.  Complete preemption thus transforms the plaintiff's state-law claims into federal claims." *Id.* at 441 (internal citation and quotation marks omitted).

[21] *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 187 (4th Cir. 2002) (internal citations and quotation marks omitted); *see also Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.").

interpretation of the ERISA plan.[22]

   a. Whether the Plaintiffs Have Standing Under § 502(a)

Under § 502, "[a] civil action may be brought . . . by a participant[23] or beneficiary[24] . . . to recover benefits due to him," or to enforce or clarify "his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). A participant or beneficiary may also sue "[a]ny person who is a fiduciary with respect to a plan who breaches any of [his] responsibilities, obligations, or duties." *Id.* § 1132(a)(2); *id.* § 1109(a).

---

[22] *See Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 372 (4th Cir. 2003). Some courts of appeal have read the Supreme Court's ruling in *Davila* as establishing a two-part test for preemption under § 502. *See, e.g., Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 946 (9th Cir. 2009) ("Under *Davila*, a state law cause of action is completely preempted if (1) an individual, at some point in time, could have brought [the] claim under ERISA § 502(a)(1)(B) and (2) . . . there is no other independent legal duty that is implicated by a defendant's actions."). Since *Davila*, the Fourth Circuit and judges in this district have continued to apply the three-part test of *Sonoco Products. See, e.g., Deem v. BB&T Corp.*, 279 F. App'x 283, 284 (4th Cir. 2008) (per curiam); *Kuthy v. Mansheim*, 124 F. App'x 756, 757 (4th Cir. 2004); *Hewett v. Tri-State Radiology, P.C.*, No. WMN-09-2017, 2009 WL 3048675, at *3 (D. Md. Sept. 17, 2009); *Ankney v. Metro. Life Ins. Co.*, 438 F. Supp. 2d 566, 572-73 (D. Md. 2006).

[23] A "participant" is "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7).

[24] A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

17

Healthcare provider claims are "usually not subject to complete preemption" because healthcare providers "generally are not considered 'beneficiaries' or 'participants' under ERISA."[25] However, as this Court noted in the Maryland Action, "a healthcare provider may acquire derivative standing under ERISA by obtaining a written assignment from a participant or beneficiary of his right to payment of medical benefits." *Feldman's*, 723 F. Supp. 2d at 819.  Derivative standing comports with "the underlying purpose of ERISA--to protect the interests of participants in employee benefit plans and their beneficiaries"--by "giv[ing] a person otherwise unable to file a claim under ERISA an opportunity to receive benefits that properly belong to a plan participant or beneficiary."[26]

The Defendants argue that the Plaintiffs have ERISA standing for the same reasons that Feldman's had standing in the Maryland Action:

> (1) Feldman's obtained assignments from its patients,
> (2) those patients were members of ERISA plans, [and]
> (3) those plans were administered by [Independence, QCC] or CareFirst[.]

ECF No. 49 at 5 (internal footnote omitted).  The Defendants

---

[25] *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1346 (11th Cir. 2009) (internal quotation marks omitted), *cited in Feldman's*, 723 F. Supp. 2d at 819.

[26] *Yarde v. Pan Am. Life Ins. Co.*, 67 F.3d 298 (table), 1995 WL 539736, at *2, *4 (4th Cir. Sept. 12, 1995) (internal quotation marks omitted).

18

argue that the Maryland and Pennsylvania Actions challenged the Defendants' "processing of ERISA benefit claims under [the] purported assignments," and "[t]he only distinction in this case is that [the] [P]laintiffs now seek the consequential damages Feldman's allegedly suffered as a result of how those same benefit claims were processed." *Id.*

Although they concede that Feldman's obtained assignments,[27] the Plaintiffs argue that--unlike the earlier litigation--they have not sued here as assignees; rather, they "are suing for harm caused directly to them." ECF No. 44-1 at 20. The Plaintiffs further argue that they lack derivative standing because the patients could not have brought the asserted destruction-of-business claims. *Id.* at 16.

An assignee "stands in the shoes of [its] assignor," and only "has standing to assert whatever rights the assignor possessed."[28] ERISA plan participants and beneficiaries can sue

---

[27] The Plaintiffs argue that "PMA is not an assignee of patients and [the] Defendants do not contend otherwise." ECF No. 44-1 at 6.

[28] *Yarde*, 1995 WL 539736, at *13-14; *see also Conn. State Dental Ass'n*, 591 F.3d at 1347 ("the existence of the assignment is irrelevant to complete preemption if the provider asserts no claim under the assignment"); *Drs. Reichmister, Becker, Smulyan & Keehn, P.A. v. United Healthcare of the Mid-Atlantic, Inc.*, 93 F. Supp. 2d 618, 620 (D. Md. 2000) ("While it is true that state law claims brought in a plaintiff's capacity as an assignee are preempted . . . this exclusive remedy is limited to situations in which the plaintiff sues in its capacity as assignee.").

for breach of fiduciary duty, to recover benefits, or to enforce or clarify their rights under their plans. *See* 29 U.S.C. §§ 1109, 1132(a). Thus, the Court's standing inquiry merges with the next step in the preemption analysis: determining whether the Plaintiffs have stated a § 502(a) claim.[29]

   b. Whether Any Claim Is Within the Scope of § 502(a)

   The Defendants argue that the Plaintiffs allege "two primary categories of wrongdoing" that fall within the scope of

---

[29] *See Reichmister*, 93 F. Supp. 2d at 621 ("[The] Plaintiff[s']
status as assignee[s] does not automatically bring [their
claims] within ERISA's enforcement scheme. Rather preemption
hinges on whether the state law claim[s] relate[] to the terms
of the ERISA plan.").
   The Court rejects the Defendants' apparent contention that,
because Feldman's had assignee standing in the Maryland Action,
the Plaintiffs necessarily have such standing in this lawsuit.
*See* ECF No. 49 at 6 ("the 'question is whether the Appellants,
*at any time*, asserted claims on behalf of ERISA beneficiaries'")
(*quoting Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d
1296, 1303 (11th Cir. 2010) (emphasis added)). The *Borrero*
passage cited by the Defendants merely paraphrases the Supreme
Court's statement that standing depends on whether "an
individual, at some point in time, could have brought his
claim"--i.e., the claim in the pending lawsuit--"under ERISA."
*See Borrero*, 610 F.3d at 1301 (*quoting Davila*, 542 U.S. at 210).
The *Borrero* Court did not consider whether the claims asserted
in separate litigation would have been within the scope of
ERISA. Indeed, the *Borrero* Court made clear that standing was a
case-specific inquiry, because "plaintiffs may choose to
exclusively pursue their state law claims in state court, even
against the backdrop of another set of potentially preempted
claims." *Id.* at 1303; *see also Franciscan Skemp Healthcare,
Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538
F.3d 594, 598 (7th Cir. 2008) ("Simply because at one point in
time [the plaintiff] acknowledged an assignment from [a
participant] does not mean that it simultaneously and implicitly
gave up any claim(s) it had against [the defendant] apart from
that assignment.").

§ 502(a): the Defendants' (1) "untimely processing and reimbursement of Feldman's factor-related ERISA benefit claims," and (2) "alleged breach of fiduciary duty, by failing to administer ERISA plans solely in the interests of their participants."  ECF No. 49 at 11.  The Defendants contend that Feldman's "allegedly suffered harm in its status as an assignee" because of how the Defendants "processed the assigned ERISA benefit claims [that] Feldman's submitted for reimbursement." *Id.* at 12 n.7.

The Plaintiffs argue that the Defendants "gross[ly] misread[]" the amended complaint, which has "nothing to do with an ERISA plan, a particular claim, or a particular patient." ECF No. 44-1 at 20-21, 5.  They contend that all their claims "relate to the interference by [the] Defendants in [their] business relationships[,] leading to the ultimate destruction of those business relationships and [the] Plaintiffs' business." *Id.* at 25.

"[H]ow a plaintiff denominates [its] claim does not determine whether [the claim] is within the scope of § 502(a)."[30] The Court must consider the facts alleged.  If a claim "could be brought as an enforcement action under § 502," it is "actually

---

[30] *Warren v. Blue Cross & Blue Shield of S.C.*, 129 F.3d 118 (table), No. 97-1374, 1997 WL 701413, at *2 (4th Cir. 1997) (*citing Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987)).

[an] ERISA claim[]." *Darcangelo*, 292 F.3d at 190-91.  Thus, a cause of action that seeks to recover benefits due under an ERISA plan is within the scope of § 502(a),[31] but preemption does not apply when a claim merely challenges withholding of compensation under an employment agreement to fund an ERISA plan.[32]  Similarly, ERISA may preempt a claim that seeks as damages "the actual value of the . . . benefits" due under a plan,[33] but does not subsume a claim that merely references benefits denied under an ERISA plan.[34]  Even when purported state law claims "affect and involve ERISA plans," they are not preempted if they assert misconduct that does not "have anything

---

[31] *See Singh v. Prudential Health Care Plan, Inc.*, 335 F.3d 278, 283 (4th Cir. 2003).

[32] *See Hewett v. Tri-State Radiology, P.C.*, No. WMN-09-2017, 2009 WL 3048675, at *3 (D. Md. Sept. 17, 2009).

[33] *See Warren*, 1997 WL 701413, at *3 n* ("the language of the prayer for relief . . . is relevant" because preemption applies when "the relief sought is the recovery, enforcement, or clarification of rights to benefits").

[34] *Franciscan Skemp Healthcare*, 538 F.3d at 598 (references to "wrongfully denied benefits" did not trigger preemption when "[t]hese references . . . [were] solely for the purpose of identifying a damages amount" and the plaintiff sought "damages, not wrongfully denied benefits"); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 247 (5th Cir. 1990) (no preemption when the "benefits issue ar[ose] only to set a benchmark on payment [the plaintiff] could have . . . relied upon, and to prevent a court from speculating on the proper amount of damages").

to do with [the defendant's] duties with respect to the plan."[35]

The Plaintiffs allege that the Defendants destroyed the Plaintiffs' business by withholding payments on reimbursement claims, instigating frivolous investigations, spreading false rumors, and encouraging the Plaintiffs' customers to fill their prescriptions elsewhere.  This differs from "[t]he core allegation underlying a § 502(a) claim"--that "a plan participant or beneficiary was denied a benefit . . . or that the manner of administering the benefits caused *the participants or beneficiaries* some injury."[36]  The Plaintiffs do not seek to recover for harm to beneficiaries or participants.  They do not seek benefits under their patients' ERISA plans, or damages equal to the amount of reimbursement claims they submitted under the terms of an ERISA plan.  *See Warren*, 1997 WL 701413, at *3. Instead, the Plaintiffs seek $8 million in damages--presumably, the Plaintiffs' valuation of Feldman's before it went out of business.  *See, e.g.*, Am. Compl. 60.

---

[35] *See Darcangelo*, 292 F.3d at 192 (a defendant's "solicitation of [the plaintiff's] private medical information for the sole purpose of helping [another defendant] determine whether [the plaintiff] posed enough of a threat to her coworkers to warrant her discharge [did] not . . . have anything to do with [the defendant's] duties with respect to the plan"); *see also Sonoco Prods. Co.*, 338 F.3d at 374 n.12 (claim was not preempted when plaintiff's role as an ERISA fiduciary had only a "tangential relationship" to the litigation).

[36] *Lippard v. Unumprovident Corp.*, 261 F. Supp. 2d 368, 376 (M.D.N.C. 2003) (emphasis added).

Although several claims refer to the Defendants' handling of reimbursement claims,[37] those details merely "provide a background factual explanation" of the parties' relationship. *See Franciscan Skemp Healthcare*, 538 F.3d at 599.  The Plaintiffs allege a harm "independent from any harm suffered by [ERISA] [p]lan [b]eneficiaries" or participants, *see Sonoco Prods. Co.*, 338 F.3d at 374, and, thus, do not "stand[] in the shoes" of their assignors, *see Yarde*, 1995 WL 539736, at *13-14.

Because the Plaintiffs are not suing as the assignees of beneficiaries or participants, nor seeking to enforce a remedy under § 502, complete preemption does not apply.[38]  Thus, the Court must remand the lawsuit.[39]

III. Conclusion

For the reasons stated above, the Plaintiffs' motion to remand will be granted and the action, and all other pending

---

[37] *See, e.g.*, Am. Compl. ¶¶ 275-88, 329-38, 339-46, 347-54.

[38] Having found no standing or claim within the scope of § 502(a), the Court need not determine whether the Plaintiffs' claims could be resolved without interpretation of an ERISA plan.  *See Sonoco Prods. Co.*, 338 F.3d at 372.

[39] Because this Court lacks subject matter jurisdiction, it will not address the Defendants' argument that the Plaintiffs' claims are barred by res judicata.  *See Nutter v. Monongahela Co.*, 4 F.3d 319, 321 (4th Cir. 1993) (explaining that when "complete preemption [i]s the basis for [a] district court's jurisdiction, the court's findings regarding preemption and jurisdiction are indistinguishable"); *cf. King v. Hoover Grp.*, 958 F.2d 219, 221-23 (8th Cir. 1992) (analyzing res judicata only after determining that the court had subject matter jurisdiction under the doctrine of complete preemption).

motions, will be remanded to the Circuit Court for Baltimore City.

_____10/5/12_____
Date

William D. Quarles, Jr.
United States District Judge